## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
## CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

**1. SEE NOTICE ON REVERSE.**  **2. PLEASE TYPE OR PRINT.**  **3. STAPLE ALL ADDITIONAL PAGES**

| Case Caption:  FRANK W. DEARSTYNE  Petitioner,  - against -  WILLIAM MAZZUCA, Superintendent Fishkill Correctional Facility,  Respondent. | District Court or Agency:  Northern District of New York | Judge:  Frederick J. Scullin, Jr. |
|---|---|---|
| | Date the Order or Judgment Appealed from was Entered on the Docket:  August 21, 2015 | District Court Docket No.:  9:04-cv-741 |
| | Date the Notice of Appeal was Filed:  September 17, 2015 | Is this a Cross Appeal?  Yes ✔ No |

| Attorney(s) for Appellant(s):  ✔ Plaintiff  Defendant | Counsel's Name:  Address:  Telephone No.:  Fax No.:  E-mail:  James O'Gara; Keiley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178; (o) (212) 808-7800; (f) (212) 808-7897; (e) jogara@keileydrye.com  Lisa Peebles; Federal Public Defender, 4 Clinton Street, Syracuse, NY 13202; (o) (315) 701-0080; (e) lisa.peebles@fd.org |
|---|---|
| Attorney(s) for Appellee(s):  Plaintiff  ✔ Defendant | Counsel's Name:  Address:  Telephone No.:  Fax No.:  E-mail:  Paul B. Lyons, AAG, Alyson J, Gill, AAG; Office of the New York State Attorney General, 120 Broadway, New York, NY 10271; (o) (212) 416-8229; (e) paul.lyons@ag.ny.gov |

| Has Transcript Been Prepared?  N/A | Approx. Number of Transcript Pages: | Number of Exhibits Appended to Transcript: | Has this matter been before this Circuit previously?  Yes ✔ No  If Yes, provide the following:  Case Name:  2d Cir. Docket No.:  Reporter Citation: (i.e., F.3d or Fed. App.) |
|---|---|---|---|

**ADDENDUM "A"**: COUNSEL MUST ATTACH TO THIS FORM: (1) A BRIEF, BUT NOT PERFUNCTORY, DESCRIPTION OF THE NATURE OF THE ACTION; (2) THE RESULT BELOW; (3) A COPY OF THE NOTICE OF APPEAL AND A CURRENT COPY OF THE LOWER COURT DOCKET SHEET; AND (4) A COPY OF ALL RELEVANT OPINIONS/ORDERS FORMING THE BASIS FOR THIS APPEAL, INCLUDING TRANSCRIPTS OF ORDERS ISSUED FROM THE BENCH OR IN CHAMBERS.

**ADDENDUM "B"**: COUNSEL MUST ATTACH TO THIS FORM A LIST OF THE ISSUES PROPOSED TO BE RAISED ON APPEAL, AS WELL AS THE APPLICABLE APPELLATE STANDARD OF REVIEW FOR EACH PROPOSED ISSUE.

### PART A: JURISDICTION

| 1. Federal Jurisdiction | 2. Appellate Jurisdiction |
|---|---|
| U.S. a party  Diversity  ✔ Federal question (U.S. not a party)  ✔ Other (specify): Habeas petition | ✔ Final Decision  Order Certified by District Judge (i.e., Fed. R. Civ. P. 54(b))  Interlocutory Decision Appealable As of Right  Other (specify): _____ |

## IMPORTANT. COMPLETE AND SIGN REVERSE SIDE OF THIS FORM.

## PART B: DISTRICT COURT DISPOSITION (Check as many as apply)

**1. Stage of Proceedings**
- ✔ Pre-trial
- During trial
- After trial

**2. Type of Judgment/Order Appealed**
- Default judgment
- Dismissal/FRCP 12(b)(1) lack of subj. matter juris.
- ✔ Dismissal/merit
- Dismissal/other jurisdiction
- Judgment / Decision of the Court
- Dismissal/FRCP 12(b)(6) failure to state a claim
- Summary judgment
- Declaratory judgment
- Dismissal/28 U.S.C. § 1915(e)(2) frivolous complaint
- Jury verdict
- Judgment NOV
- Dismissal/28 U.S.C. § 1915(e)(2) other dismissal
- Directed verdict
- Other (specify):

**3. Relief**

Damages:
- Sought: $ _____
- Granted: $ _____
- Denied: $ _____

Injunctions:
- Preliminary
- Permanent
- Denied

✔ Writ of Habeus Corpus

## PART C: NATURE OF SUIT (Check as many as apply)

**1. Federal Statutes**
- Antitrust
- Bankruptcy
- Banks/Banking
- Civil Rights
- Commerce,
- Energy
- Commodities
- Communications
- Consumer Protection
- Copyright ☐ Patent
- Trademark
- Election
- Soc. Security
- Environmental
- Freedom of Information Act
- Immigration
- Labor
- OSHA
- Securities
- Tax
- ✔ Other (specify): 28 U.S.C. § 2254

**2. Torts**
- Admiralty/Maritime
- Assault / Defamation
- FELA
- Products Liability
- Other (Specify):

**3. Contracts**
- Admiralty/Maritime
- Arbitration
- Commercial
- Employment
- Insurance
- Negotiable Instruments
- Other Specify

**4. Prisoner Petitions**
- Civil Rights
- ✔ Habeas Corpus
- Mandamus
- Parole
- Vacate Sentence
- Other

**5. Other**
- Forfeiture/Penalty
- Real Property
- Treaty (specify): _____
- Other (specify): _____

**6. General**
- Arbitration
- Attorney Disqualification
- Class Action
- Counsel Fees
- Shareholder Derivative
- Transfer

**7.** Will appeal raise constitutional issue(s)?
- ✔ Yes  No

Will appeal raise a matter of first impression?
- Yes  ✔ No

1. Is any matter relative to this appeal still pending below? Yes, specify: _____ ✔ No

2. To your knowledge, is there any case presently pending or about to be brought before this Court or another court or administrative agency which:
   (A) Arises from substantially the same case or controversy as this appeal? Yes ✔ No
   (B) Involves an issue that is substantially similar or related to an issue in this appeal? Yes ✔ No

If yes, state whether "A," or "B," or both are applicable, and provide in the spaces below the following information on the *other* action(s):

| Case Name: | Docket No.: | Citation: | Court or Agency: |
|---|---|---|---|

Name of Appellant:

Date: October 1, 2015    Signature of Counsel of Record:

## NOTICE TO COUNSEL

Once you have filed your Notice of Appeal with the District Court or the Tax Court, you have only 14 days in which to complete the following important steps:

1. Complete this Civil Appeal Pre-Argument Statement (Form C); serve it upon all parties, and file it with the Clerk of the Second Circuit in accordance with LR 25.1.
2. File the Court of Appeals Transcript Information/Civil Appeal Form (Form D) with the Clerk of the Second Circuit in accordance with LR 25.1.
3. Pay the $505 docketing fee to the United States District Court or the $500 docketing fee to the United States Tax Court unless you are authorized to prosecute the appeal without payment.

**PLEASE NOTE: IF YOU DO NOT COMPLY WITH THESE REQUIREMENTS WITHIN 14 DAYS, YOUR APPEAL WILL BE DISMISSED.** *SEE* LOCAL RULE 12.1.

## PRE-ARGUMENT STATEMENT

## ADDENDUM "A"

### NATURE OF ACTION AND RESULTS BELOW

Petitioner was convicted of Attempted Rape in the First Degree, in violation of P.L. §110 and §130.35, and of Endangering the Welfare of a Child, in violation of PL § 260.20, with respect to the alleged victim identified as "T.O." and convicted of Aggravated Sexual Abuse in the First Degree, in violation of PL § 130.70, and Endangering the Welfare of a Child, in violation of PL § 260.20, with respect to the alleged victim identified as "C.C." Petitioner maintains his innocence and filed a petition for a writ of habeas corpus to vacate his conviction. (Petition, Dkt. 1).

On March 3, 2011, Magistrate Judge Victor E. Bianchini filed a 218-page Report and Recommendation, which recommended that *habeas* relief be granted on three of sixteen grounds set forth in the Petition. (Report, Dkt. 90)[1]. (The Report is attached as Exhibit B.) The three grounds identified by Mag. Judge Bianchini as requiring habeas relief were: (1) the "voluntariness" of Petitioner's statement to the police; (2) trial counsel's failure to consult or call a medical expert to counter the state's "highly equivocal medical evidence"; and (3) trial counsel's failure to consult or call a child behavioral or psychological expert to rebut trial testimony regarding the victim's behavioral changes purportedly suggestive of sexual abuse. (Report, Dkt. 90). While Mag. Judge Bianchini disagreed with Petitioner's contention that the prosecutor's summation improperly shifted the burden of proof to the defense and improperly

---

[1]     References to documents in the District Court Docket appear as (Dkt. __) herein. A copy of the District Court Docket is attached as Exhibit A.

commented upon evidence not previously disclosed to the defense, the Report recommends that a COA issue on this matter as well.

On August 20, 2015, the District Court issued a decision denying Dearstyne's *habeas* Petition in its entirety, rejecting significant portions of what the District Court Judge acknowledged was "an extensive, and very thorough, Report and Recommendation." (August 20th Order, Dkt. 127 at 2). (The August 20th Order is attached as Exhibit C.) The August 20th Order denies the Petition in its entirety.

On September 17, 2015 Petitioner filed a Notice of Appeal, a copy of which is attached as Exhibit D. (Dkt. 128).

Petitioner seeks a Certificate of Appeal ("COA") on certain issues raised in his *habeas* Petition. The fact that the August 20th Order summarily reaches the opposite conclusion of the Report demonstrates that a COA should be issued here. Should this Court decide to hear Petitioner's appeal, Petitioner intends to demonstrate that his conviction was contrary to, or involved an unreasonable application of, clearly established Federal law and that it was based on an unreasonable determination of the facts in light of the evidence present in the state court proceeding.

2

# PRE-ARGUMENT STATEMENT

## ADDENDUM "B"

### Issues To Be Raised On Appeal

Petitioner requests a COA so that he might appeal each of the following issues:

(1) Was Petitioner deprived of his Due Process and Fifth Amendment rights when his involuntarily obtained statement was used as evidence against him at trial;

(2) Was Petitioner denied his Sixth Amendment right to effective assistance of counsel and his right to a fair trial when his trial counsel failed to consult or call a:

    (a) medical expert to counter the state's "highly equivocal medical evidence"; and

    (b) child behavioral or psychological expert to rebut trial testimony regarding the victims' behavioral changes purportedly suggestive of sexual abuse.

(3) Did the Prosecution's failure to disclose to Petitioner that the specimen obtained by Dr. Close upon his examination of T.O. had been destroyed, violate *Brady* and constitute prosecutorial misconduct;

(4) Was Petitioner denied his Sixth Amendment right to effective assistance of counsel and his right to a fair trial when trial counsel failed to visually inspect and examine the specimen taken from T.O. by Dr. Close;

(5) Was Petitioner denied his right to a fair trial due to the Prosecutor's improper and prejudicial summation comments; and

(6) Was Petitioner denied his right to a fair trial and Due Process when the Prosecution failed to corroborate the unsworn testimony of child victim C.C., rendering the evidence insufficient to support a conviction.

NY01\OGarJ\4222416.1

# EXHIBIT A

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**ROBERT A. KATZMANN**
CHIEF JUDGE

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

Date: September 18, 2015
Docket #: 15-2950pr
Short Title: Dearstyne v. Mazzuca

DC Docket #: 04-cv-741
DC Court: NDNY (SYRACUSE)
DC Judge: Bianchini
DC Judge: Scullin

**NOTICE OF RECORD ON APPEAL FILED**

In the above referenced case the document indicated below has been filed in the Court.

_____ Record on Appeal - Certified List

_____ Record on Appeal - CD ROM

_____ Record on Appeal - Paper Documents

__X__ Record on Appeal - Electronic Index

_____ Record on Appeal - Paper Index

Inquiries regarding this case may be directed to 212-857-8524.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

## ELECTRONIC NOTICE OF CIVIL OR PRISONER APPEAL & CLERK'S CERTIFICATION

Dear Clerk of the Court,

Please take notice that on September 17, 2015 the court received a notice of appeal. This notice serves to inform you of the pending appeal and provides you with the information needed to process the appeal.

I, LAWRENCE K. BAERMAN, CLERK, U.S. District Court for the Northern District of New York, DO, HEREBY CERTIFY that the foregoing docket entries, with the exception of the documents listed below, are maintained electronically on the court's CM/ECF system and constitute the Record on Appeal in the below listed action.

The following documents *are not* available electronically. Please notify the Syracuse Clerk's Office if you need any of the following documents:

Docket No.(s):  __all documents are electronic__

IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Seal of said Court to be hereto affixed at the City of Syracuse, New York, this 17th day of September, 2015.

Lawrence K. Baerman, Clerk
U.S. District Court

By:     Nancy A. Steves
        Deputy Clerk

### Case Information

| | |
|---|---|
| Case Name & Case No. | __Frank Dearstyne v. Mazzuca    9:04-cv-741__ |
| Docket No. of Appeal: | __129__ |
| Document Appealed: | __127, 128__ |

Fee Status:    Paid _X_          Due ___          Waived (IFP/CJA)___
               IFP revoked ___          Application Attached ___          IFP pending before USDJ ___

Counsel:       Retained _X_    Pro Se ___

Time Status:  Timely _X_          Untimely___

Motion for Extension of Time:     Granted ___  Denied ___

Certificate of Appealability:  Granted ___  Denied _X_    N/A ___

APPEAL,CLOSED,HABEAS

## U.S. District Court
## Northern District of New York – Main Office (Syracuse) [LIVE – Version 6.1] (Prisoner)
## CIVIL DOCKET FOR CASE #: 9:04-cv-00741-FJS-VEB

Dearstyne v. Mazzuca
Assigned to: Senior Judge Frederick J. Scullin, Jr
Referred to: Magistrate Judge Victor E. Bianchini
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 06/25/2004
Date Terminated: 08/21/2015
Jury Demand: None
Nature of Suit: 530 Habeas Corpus (General)
Jurisdiction: Federal Question

**Petitioner**

**Frank W. Dearstyne**

represented by **James V. O'Gara**
Kelley, Drye & Warren LLP
101 Park Avenue
New York, NY 10178
212-808-7711
Fax: Fax 212-808-7898
Email: jogara@kelleydrye.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lisa A. Peebles**
Office of the Federal Public Defender –
Syracuse Office
Districts of Northern New York &
Vermont
The Clinton Exchange, 3rd Floor
4 Clinton Square
Syracuse, NY 13202
315-701-0080
Fax: 315-701-0081
Email: lisa.peebles@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Bunin**
Office of the Federal Public Defender –
Albany Office
39 North Pearl Street, 5th Floor
Albany, NY 12207
518-436-1850
Fax: 518-436-1780
Email: alex_bunin@fd.org
*TERMINATED: 03/08/2011*

V.

**Respondent**

**William Mazzuca**
*Supterintendent, Fishkill Correctional
Facility*

represented by **Luke Martland**
New York State Division of Criminal
Justice Services
80 South Swan Street
Albany, NY 12210
518-485-1897
Email: Luke.Martland@dcjs.state.ny.us
*TERMINATED: 10/28/2007*
*LEAD ATTORNEY*

**Paul B. Lyons**

New York State Attorney General – New York Office
120 Broadway
New York, NY 10271
212–416–8229
Fax: 212–416–8010
Email: paul.lyons@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alyson J. Gill**
Office of Attorney General – NY Office
120 Broadway
New York, NY 10271
212–416–6037
Fax: 212–416–8010
Email: Alyson.gill@oag.state.ny.us
*ATTORNEY TO BE NOTICED*

**Danielle L. Attias**
Ganfer, Shore Law Firm
360 Lexington Avenue
14th Floor
New York, NY 10017
212–922–9250
*TERMINATED: 09/08/2005*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/25/2004 | 1 | PETITION for Writ of Habeas Corpus (Filing fee $ 5.) RECEIPT NO.: 76175, filed by Frank W. Dearstyne. (Attachments: # 1 Exhibit to the petition)(nas) (Entered: 06/29/2004) |
| 06/25/2004 | 2 | IFP APPLICATION by Frank W. Dearstyne. (nas) (Entered: 06/29/2004) |
| 06/25/2004 | 3 | MOTION to Appoint Counsel by Frank W. Dearstyne. (Attachments: # 1 Exhibit)(nas) (Entered: 06/29/2004) |
| 06/25/2004 | 4 | MOTION for transcripts and other related materials by Frank W. Dearstyne.(nas) (Entered: 06/29/2004) |
| 07/01/2004 | 5 | DOCUMENT REJECTION ORDER as to returning Mr. Dearstyne's exhibits "A" thru "U" since they are state court records and per Rule 5 of the Rules Governing Section 2254 cases provides for submission of state court records by the respondent. An attempt to expand the record must be made by motion in accordance with Rule 5. Signed by Judge George H. Lowe on 7/1/04. (nas) (Entered: 07/01/2004) |
| 08/02/2004 | 6 | ORDER DIRECTING COMPLIANCE as to Frank W. Dearstyne. Petitioner is directed to file within 30 days of the filing date of this Order, an amended petition or the Clerk shall enter judgment dismissing this action without further Order of this Court. ORDERED that petitioner's request to proceed with this action in forma pauperis is granted. ORDERED that 3 MOTION to Appoint Counsel by Frank W. Dearstyne IS DENIED WITHOUT PREJUDICE; ORDERED 4 MOTION for transcripts and other related materials filed by Frank W. Dearstyne IS DENIED WITHOUT PREJUDICE. Motions terminated: 3 MOTION to Appoint Counsel filed by Frank W. Dearstyne, 4 MOTION for transcripts and other related materials filed by Frank W. Dearstyne. ORDERED that the Clerk serve a copy of this order on petitioner by certified mail and on the Attorney General of the State of New York by regular mail. Date Served 8/2/2004 Notice of Compliance Deadline 9/1/2004 Clerk Action Deadline 10/1/2004. Signed by Judge Frederick J. Scullin Jr. on 7/31/04. (nas) (Entered: 08/02/2004) |
| 08/04/2004 | 7 | NOTICE of Change of Address by Frank W. Dearstyne Effective Date 8/2/04 New Address: Franklin Correctional Facility (nas) (Entered: 08/04/2004) |

| 08/06/2004 | 8 | RETURN RECEIPT received as to served on Dearstyne re 6 Order Directing Compliance,, (nas) (Entered: 08/09/2004) |
|---|---|---|
| 08/26/2004 | 9 | AMENDED PETITION for Writ of Habeas Corpus, filed by Frank W. Dearstyne.(nas) (Entered: 08/27/2004) |
| 11/26/2004 | 10 | ORDER, directing response to the Habeas Corpus Petition; response due 60 days from date of service. (Order and Petition and amended petition served by Certified Mail upon respondent and the Attorney General of the State of New York). Signed by Judge Frederick J. Scullin Jr. on 11/24/04. (nas) (Entered: 11/26/2004) |
| 12/01/2004 | 11 | RETURN RECEIPT for Habeas Corpus Petition received as to Office of the Attorney General served on 11/29/04 (nas) (Entered: 12/02/2004) |
| 12/07/2004 | 12 | RETURN RECEIPT for Habeas Corpus Petition received as to William Mazzuca served on 12/3/2004, answer due 2/1/2005. (nas) (Entered: 12/07/2004) |
| 01/07/2005 | 13 | First MOTION permission to file under seal *respondent's memorandum of law, declaration in opposition, and state court transcripts* by William Mazzuca.(Attias, Danielle) (Entered: 01/07/2005) |
| 01/07/2005 | 14 | First MOTION for permission to file under seal *respondent's memorandum of law, declaration in opposition, and state court transcripts* by William Mazzuca.(Attias, Danielle) (Entered: 01/07/2005) |
| 01/11/2005 | 15 | NOTICE of Appearance by Danielle L. Attias on behalf of William Mazzuca (Attias, Danielle) (Entered: 01/11/2005) |
| 01/11/2005 | 16 | Letter from Danielle L. Attias for William Mazzuca requesting extension of time to file respondent's brief. (Attias, Danielle) (Entered: 01/11/2005) |
| 01/13/2005 | 17 | ORDER granting Danielle L. Attias AAG's request for an extension of time on behalf of William Mazzuca to file the response to the petition until 4/1/2005. Signed by SFB as directed by Judge George H. Lowe on 1/13/05. (nas) (Entered: 01/13/2005) |
| 01/19/2005 | 18 | ORDER granting respondent's motion to file the memorandum of law, declaration in opposition and state court transcripts under seal. Signed by Judge George H. Lowe on 1/19/05. (nas) (Entered: 01/19/2005) |
| 03/17/2005 | 19 | Second MOTION for Extension of Time to File Response/Reply *to Petitioner's habeas application* by William Mazzuca.(Attias, Danielle) (Entered: 03/17/2005) |
| 03/18/2005 | 20 | ORDER granting 19 Motion for Extension of Time to File Response/Reply to petition. Response due 6/15/05. Signed by Judge George H. Lowe on 3/18/05. (nas) (Entered: 03/18/2005) |
| 06/08/2005 | 21 | Letter from Danielle L. Attias for William Mazzuca requesting to file an oversized memorandum of law.. (Attias, Danielle) (Entered: 06/08/2005) |
| 06/08/2005 | 22 | ORDER granting 21 Letter Request filed by William Mazzuca, to file a memorandum of law up to 120 pages in response to the petition. Signed by NAS as directed by Judge George H. Lowe on 6/8/05. (nas) (Entered: 06/09/2005) |
| 06/15/2005 | 23 | ***SEALED DOCUMENT – NOT FOR ELECTRONIC VIEWING****MEMORANDUM OF LAW *in opposition to petitioner's application for a writ of habeas corpus* filed by William Mazzuca. (Attias, Danielle) Additional attachment(s) added on 6/16/2005 (nas, ). Modified on 6/16/2005 (nas, ). Additional attachment(s) added on 6/16/2005 (nas, ). (Entered: 06/15/2005) |
| 07/01/2005 | 24 | ORDER that petitioner may file a memorandum of law, not to exceed 25 pages in length, on or before 8/12/05. Petitioner's motion for appointment of counsel will be addressed by separate order of the Court. Signed by SFB as directed by Judge George H. Lowe on 7/1/05. (nas) (Entered: 07/05/2005) |
| 07/01/2005 | 25 | MOTION transcripts and other related materials by Frank W. Dearstyne.(nas) (Entered: 07/06/2005) |
| 07/01/2005 | 26 | MOTION to Appoint Counsel by Frank W. Dearstyne.(nas) (Entered: 07/06/2005) |

| 07/13/2005 | 27 | Letter from Dearstyne to the Court in reference to the memorandum of law that he was granted permission to file, his motion for appoinment of counsel and state court records. (dd 7/7/05). (nas) (Entered: 07/14/2005) |
| 07/14/2005 | 28 | Letter from Judge Lowe to Attorney Attias informing her to file her response to petitioner's motion for transcripts and his letter of July 7, 2005 by August 4, 2005. Petitioner's deadline to file a traverse is adjourned without date. (nas) (Entered: 07/14/2005) |
| 07/14/2005 | 29 | ORDER denying 26 Motion to Appoint Counsel . Signed by Judge George H. Lowe on 7/14/05. (nas) (Entered: 07/14/2005) |
| 08/17/2005 | 30 | Letter from Judge Lowe to Attorney Attias giving her until 8/26/05 to respond to his request of 7/14/05. (nas) (Entered: 08/17/2005) |
| 09/06/2005 | 32 | Letter from Dearstyne requesting the relief he set forth in his motion for transcripts, his letters of 6/28/05 and 7/7/05. (nas) (Entered: 09/12/2005) |
| 09/08/2005 | 31 | Letter for William Mazzuca requesting letter in response to the court's letters of July 14 and August 17 submitted to Judge Lowe. (Martland, Luke) (Entered: 09/08/2005) |
| 09/13/2005 | 33 | Letter from the Court to Luke Martland, in response to his letter of Sept. 8, 2005. (nas) (Entered: 09/13/2005) |
| 09/13/2005 | 35 | ORDER stating that it appears that petitioner wrote this letter prior to his receiving Martland's letter of 9/8/05 (dkt no. 31) and the Court's letter of 9/13/05 (dkt no. 33). Under these circumstances the relief requested in petitioner's letter is denied and the Court will address the underlying issues after receiving the requested response from Mr. Martland. Signed by Judge George H. Lowe on 9/13/05. (nas) (Entered: 09/15/2005) |
| 09/15/2005 | 34 | Letter for William Mazzuca *concerning copies of documents sent to petitioner.* (Martland, Luke) (Entered: 09/15/2005) |
| 09/26/2005 | 36 | LETTER BRIEF *responding to the court's Sept 13th letter* by William Mazzuca. (Martland, Luke) (Entered: 09/26/2005) |
| 09/28/2005 | 37 | DOCUMENT REJECTION ORDER as to returning Dearstyne's letter of 9/25/05 because papers cannot be filed without some indication that they were served on opposing counsel per Local Rule 5.1(a). Courtesy copy of docket sheet provided. Signed by Judge George H. Lowe on 9/28/05. (nas) (Entered: 09/29/2005) |
| 03/31/2006 | 38 | ORDER granting 25 Motion for a copy of trial transcript. Respondent is directed to provide Dearstyne with a copy on or before 4/14/06; ORDERED that petitioner's request to be provided with copies of the documents referred to in Exhibit "A" is denied; ORDERED that petitioner's motion to amend the caption is denied; ORDERED that petitioner's motion to strike respondent's submission of June 15, 2005 is denied; motion to strike the Grimmick affirmation is granted; ORDERED that petitioner's motion to be provided with copies of certain caselaw is granted; ORDERED that petitioner may if he wishes, file a reply to respondent's answer on or before 5/26/06, which shall not exceed 25 pages. Signed by Judge George H. Lowe on 3/31/06. (nas) (Entered: 03/31/2006) |
| 04/05/2006 | 39 | LETTER BRIEF *in response to March 31st order* by William Mazzuca. (Martland, Luke) (Entered: 04/05/2006) |
| 04/27/2006 | 40 | STATUS REPORT *concerning petitioner's April 22, 2006 letter* by William Mazzuca. (Martland, Luke) (Entered: 04/27/2006) |
| 05/04/2006 | 41 | ORDER that petitioner is granted an extension of time until 6/26/06 to file a reply to respondents's response. Petitioner's request that the Court reconsider its decision to limit petitioner's reply to 25 pages is denied. Petitioner's request that respondent be directed to provide copies of specific cases reported only electronically is DENIED as MOOT since respondent has already voluntarily complied. See dkt no. 40. Signed by SFB as directed by Judge George H. Lowe on 5/4/06. (nas) (Entered: 05/14/2006) |
| 05/05/2006 | 42 | Letter Motion from Frank W. Dearstyne requesting full copies of cases electronically reported. (rjb, ) (Entered: 05/25/2006) |

| | | |
|---|---|---|
| 05/25/2006 | | TEXT NOTICE of Hearing on Plaintiff's 42 Letter Motion requesting full copies of cases electronically reported. Response to Motion due by 6/12/2006; Motion Hearing set for 6/26/2006 on submission before Magistrate Judge George H. Lowe. (rjb, ) (Entered: 05/25/2006) |
| 05/25/2006 | | Sent Petitioner a copy of the 5/25/06 text notice by regular mail. (rjb, ) (Entered: 05/25/2006) |
| 05/30/2006 | 43 | LETTER BRIEF *in response to petitioner's May 1, 2006 letter motion* by William Mazzuca. (Martland, Luke) (Entered: 05/30/2006) |
| 06/09/2006 | 44 | ORDER that petitioner is granted an extension of time until 8/28/06 to submit a reply to respondent's response and a motion to expand the record. Signed by SFB as directed by Judge George H. Lowe on 6/9/06. (nas ) (Entered: 06/13/2006) |
| 06/19/2006 | 45 | NOTICE of Change of Address by Frank W. Dearstyne Effective Date 6/15/06 New Address: Altona Correctional Facility (nas) (Entered: 06/21/2006) |
| 07/05/2006 | 46 | NOTICE of Change of Address by Frank W. Dearstyne Effective Date 6/28/06 New Address: Bare Hill Correctional Facility (nas) (Entered: 07/06/2006) |
| 08/03/2006 | 47 | ORDER that petitioner may submit a reply to respondent's response (a traverse) on or before 10/6/06. Signed by SFB as directed by George H. Lowe on 8/2/06. (nas) (Entered: 08/03/2006) |
| 09/12/2006 | 48 | Letter Motion from James V. O'Gara for Frank W. Dearstyne requesting additional time to file reply papers responding to the issues addressed in the State's opposition papers and to file a reply memorandum on behalf of Mr. Dearstyne of not more than 45 pages submitted to Judge George H. Lowe. (O'Gara, James) (Entered: 09/12/2006) |
| 09/12/2006 | 49 | NOTICE of Appearance by James V. O'Gara on behalf of Frank W. Dearstyne (Attachments: # 1 Affidavit of Service)(O'Gara, James) (Entered: 09/12/2006) |
| 09/18/2006 | 50 | ORDER granting 48 Letter Request, reply (traverse) to be filed by November 11, 2006 and granting permission to file a memorandum of law of not more than 45 pages in length. Signed by Judge George H. Lowe on 9/18/06. (nas) (Entered: 09/18/2006) |
| 11/06/2006 | 51 | MEMORANDUM OF LAW re 1 Petition for Writ of Habeas Corpus *Reply in Further Support of Frank Dearstyne, Jr.'s Petition for a Writ of Habeas Corpus* filed by Frank W. Dearstyne. (Attachments: # 1 Affidavit of Service)(O'Gara, James) (Entered: 11/06/2006) |
| 11/06/2006 | 52 | Letter Motion from James V. O'Gara for Frank W. Dearstyne requesting Waiver of Pre-motion Conference requirement under Local Rule 7.1 (b)(2) submitted to Judge Lowe. (Attachments: # 1 Exhibit(s) A# 2 Exhibit(s) B)(O'Gara, James) (Entered: 11/06/2006) |
| 11/06/2006 | 53 | MOTION to Supplement Pleadings *motion to supplement the record with sworn affidavits of Richard A. Leo, Ph.D.,J.D.* by Frank W. Dearstyne. (Attachments: # 1 Affidavit of James V. O'Gara# 2 Exhibit(s) A# 3 Exhibit(s) B# 4 Exhibit(s) C# 5 Exhibit(s) D# 6 Exhibit(s) E# 7 Exhibit(s) F# 8 Exhibit(s) G# 9 Affidavit of Scrvice)(O'Gara, James) (Entered: 11/06/2006) |
| 11/07/2006 | 54 | MEMORANDUM OF LAW re 53 Motion to Supplement Pleadings, filed by Frank W. Dearstyne. (O'Gara, James) (Entered: 11/07/2006) |
| 11/13/2006 | 55 | TEXT NOTICE of Hearing on Motion 53 MOTION to Supplement Pleadings *motion to supplement the record with sworn affidavits of Richard A. Leo, Ph.D.,J.D.*: ON SUBMISSION ONLY, returnable on 12/21/06. Response to Motion due by 12/4/2006 (nas) (Entered: 11/13/2006) |
| 11/13/2006 | 56 | ORDER granting 52 Letter Request, the court accepts for filing petitioner's motion to supplement. Signed by NAS as directed by Judge George H. Lowe on 11/13/06. (nas) (Entered: 11/16/2006) |
| 12/04/2006 | 57 | RESPONSE to Motion re 53 MOTION to Supplement Pleadings *motion to supplement the record with sworn affidavits of Richard A. Leo, Ph.D.,J.D.* filed by William Mazzuca. (Attachments: # 1 Declaration service)(Martland, Luke) (Entered: 12/04/2006) |

| | | |
|---|---|---|
| 02/08/2007 | 58 | Letter Motion from James V. O'Gara for Frank W. Dearstyne requesting that the Court waive the pre–motion conference requirement under Local Rule 7.1 (b)(2) and accept filing of Petitioner's Motion to Seal the Entire Record, or in the alternative, arrange a court conference regarding the Motion to Seal the Entire Record submitted to Judge George H. Lowe. (Attachments: # 1 Affidavit of Service)(O'Gara, James) (Entered: 02/08/2007) |
| 02/08/2007 | 59 | MOTION to Seal the Entire Record by Frank W. Dearstyne. (Attachments: # 1 Declaration of James V. O'Gara# 2 Proposed Order# 3 Affidavit of Service) Motions referred to George H. Lowe. (O'Gara, James) (Entered: 02/08/2007) |
| 02/15/2007 | 60 | Court NOTICE to parties advising of the option to consent to the jurisdiction of a U.S. Magistrate Judge. (Served on Non–ECF parties via mail) (sal, ) (Entered: 02/15/2007) |
| 02/15/2007 | 61 | Letter from Judge Lowe to Attorney O'Gara, waiving the pre–motion conference requirement. (nas) (Entered: 02/15/2007) |
| 03/07/2007 | 62 | UNSEALED DOCUMENT – Letter from Attorny O'Gara. (nas) (Entered: 03/09/2007) |
| 03/30/2007 | 63 | ORDER granting 53 Motion to Supplement Pleadings. Signed by Judge George H. Lowe on 3/30/07. (nas) (Entered: 03/30/2007) |
| 04/16/2007 | 64 | Exhibits A and B to docket no. 53 (nas, ) (Entered: 04/16/2007) |
| 04/25/2007 | 65 | NOTICE of Appearance by Alyson J. Gill on behalf of William Mazzuca (Gill, Alyson) (Entered: 04/25/2007) |
| 04/25/2007 | 66 | ORDER denying 59 Motion for an order sealing the entire record in this proceeding. ORDERED that docket no. 62 be unsealed. Signed by Judge George H. Lowe on 4/25/07. (nas) (Entered: 04/25/2007) |
| 01/24/2008 | 67 | ORDER REASSIGNING CASE. Case reassigned to Judge Victor E. Bianchini for issuance of report and recommendations. Judge George H. Lowe no longer assigned to case. Signed by Judge Norman A. Mordue on 1/24/08. (nas) (Entered: 01/24/2008) |
| 07/03/2008 | 68 | ORDER that Respondent submit a supplemental response to the petition, of no more than 10 pages, within 20 days of the date of this Order. Petitioner may file a reply, of no more than 5 pages, within 10 days after the filing of Respondent's submission. Signed by Magistrate Judge Victor E. Bianchini on 7/3/08. (rjb, ) (Entered: 07/03/2008) |
| 07/22/2008 | 69 | First MOTION for Extension of Time to File Answer *Supplemental Response to Petition* filed by William Mazzuca. Motions referred to Victor E. Bianchini. (Lyons, Paul) (Entered: 07/22/2008) |
| 07/22/2008 | 70 | RESPONSE to Motion re 69 First MOTION for Extension of Time to File Answer *Supplemental Response to Petition* filed by Frank W. Dearstyne. (Attachments: # 1 Affidavit of Service)(O'Gara, James) (Entered: 07/22/2008) |
| 07/23/2008 | | TEXT ORDER granting in part 69 Motion for Extension of Time to Answer. Supplemental response due on or before August 22, 2008. Authorized by RB per direction of Magistrate Judge Victor E. Bianchini on 7/23/08. (rjb, ) (Entered: 07/23/2008) |
| 08/22/2008 | 71 | *Supplemental Memorandum in* RESPONSE to 9 Petition for Writ of Habeas Corpus by William Mazzuca.(Lyons, Paul) (Entered: 08/22/2008) |
| 08/22/2008 | 72 | AFFIDAVIT *In Opposition to Habeas Corpus Petition* by William Mazzuca. (Attachments: # 1 Exhibit 31, # 2 Exhibit 32, # 3 Exhibit 33, # 4 Exhibit 34, # 5 Exhibit 35)(Lyons, Paul) (Entered: 08/22/2008) |
| 09/08/2008 | 73 | MOTION for Leave to File *Reply to Respondent's Supplemental Memorandum and in Support of Petition for a Writ of Habeas Corpus in Excess of Page Limitations* filed by Frank W. Dearstyne. **Attachments: # 1 Exhibit(s) A, # 2 Certificate of Service) Motions referred to Victor E. Bianchini. (O'Gara, James) (Entered: 09/08/2008) |
| 09/10/2008 | 74 | ***VACATED BY TEXT ORDER OF 9/12/08***ORDER denying 73 Motion for Leave to File and striking "Exhibit A" attached to said motion. Signed by Magistrate Judge Victor E. Bianchini on 9/10/08. (nas) Modified on 9/12/2008 (nas, ). (Entered: 09/10/2008) |

| | | |
|---|---|---|
| 09/11/2008 | 75 | Letter Motion from James V. O'Gara for Frank W. Dearstyne requesting a court conference prior to submitting its motion to reconsider the Court's September 10th Order submitted to Judge Victor E. Bianchini. (Attachments: # 1 Certificate of Service)(O'Gara, James) (Entered: 09/11/2008) |
| 09/12/2008 | | TEXT ORDER that DKT NO. 74 is vacated and the reply and Exhibit "A" set forth in DKT NO. 73 are accepted for filing. Authorized by Magistrate Judge Victor E. Bianchini on 9/12/08. (nas) (Entered: 09/12/2008) |
| 09/16/2008 | 76 | MOTION for Leave to File *Reply Brief re DNA Evidence* filed by William Mazzuca. (Attachments: # 1 Reply Brief re DNA Evidence) Motions referred to Victor E. Bianchini. (Lyons, Paul) (Entered: 09/16/2008) |
| 09/18/2008 | | TEXT ORDER granting 76 Motion for Leave to File. The Clerk is to docket the attachment to this letter request as the reply brief. Authorized by NAS as per direction of Magistrate Judge Victor E. Bianchini on 9/18/08. (nas) (Entered: 09/18/2008) |
| 09/18/2008 | 77 | REPLY BRIEF by William Mazzuca. (nas) (Entered: 09/18/2008) |
| 11/03/2008 | 78 | ORDER: Respondent is hereby ordered to procure a sworn declaration or affidavit from Dr. Close regarding the matters referenced in the supplemental memoranda submitted in response to this Courts July 3rd Order. The declaration or affidavit shall be filed with the Court and served upon Petitionerscounsel within thirty (30) days of the date hereof. In the event that Respondent requires a further Order of this Court to obtain the declaration or affidavit, Respondent shall submit a proposed Order in the form required. Respondent is hereby directed to provide this Court with bound, paper copies of the voluminous records attached to the Lyons affidavit. Signed by Magistrate Judge Victor E. Bianchini on 11/3/08. (alh, ) (Entered: 11/03/2008) |
| 11/04/2008 | 79 | Letter Motion from Respondent enclosing Proposed Order for William Mazzuca requesting Entry of Proposed Order submitted to Judge Bianchini. (Attachments: # 1 Proposed Order)(Lyons, Paul) (Entered: 11/04/2008) |
| 11/05/2008 | 80 | ORDER granting 79 Letter Request. ORDERED that Dr. Close is to provide Respondent, no later than December 2, 2008, with a sworn declaration or affidavit to be filed with the Court as described in this Order. Signed by Magistrate Judge Victor E. Bianchini on 11/5/08. (Order served on non−ecf parties by regular mail). (alh) (Entered: 11/05/2008) |
| 11/26/2008 | 81 | AFFIDAVIT *Declaration of Dr. Theodore Close* by William Mazzuca. (Lyons, Paul) (Entered: 11/26/2008) |
| 12/18/2008 | 82 | Letter Motion from James V. O'Gara for Frank W. Dearstyne requesting leave to submit the Memorandum of Law Supplementing the Petition for a Writ of Habeas Corpus submitted to Judge Bianchini. (Attachments: # 1 Memorandum of Law Supplementing the Petition for a Writ of Habeas Corpus, # 2 Certificate of Service)(O'Gara, James) (Entered: 12/18/2008) |
| 12/19/2008 | 83 | LETTER BRIEF by William Mazzuca. (Lyons, Paul) (Entered: 12/19/2008) |
| 12/22/2008 | 84 | ORDER granting 82 Letter Request and the supplemental memorandum is accepted for filing and docket no. 83 is accepted for filing. Petitioner is directed to file a letter brief of no more than 3 pages on the issue of whether the additional arguments raised in the supplemental memorandum of law are properly before this Court on habeas review and shall be filed within 10 days of the date of this Order. Signed by Magistrate Judge Victor E. Bianchini on 12/22/08. (nas) (Entered: 12/22/2008) |
| 01/07/2009 | 85 | LETTER BRIEF *pursuant to 12/22/08 Order* by Frank W. Dearstyne. (Attachments: # 1 Certificate of Service)(O'Gara, James) (Entered: 01/07/2009) |
| 04/19/2010 | 86 | Letter from Attorney James V. O'Gara as to the status of the petition. (mnc) (Entered: 04/19/2010) |
| 04/20/2010 | 87 | Letter from U.S. Magistrate Judge Victor E. Bianchini to Mr. O'Gara in regards to his 86 Letter regarding the status of the action. (Served on parties via ecf) (alh, ) (Entered: 04/20/2010) |
| 07/15/2010 | 88 | DECISION AND ORDER: ORDERED, that Alex Bunin, or his designee, of Federal Defenders of the Northern District of New York is appointed as lead counsel to |

| | | represent Petitioner. By this appointment, pro bono counsel, who has done well to this point in the proceedings, is not relieved unless, after agreement with Petitioner, he wishes to withdraw. ORDERED, that Petitioner Frank Dearstyne's Memorandum of Law Supplementing the Habeas Petition (Dkt. # 82 −1) is GRANTED. ORDERED that Petitioner shall amend to withdraw the unexhausted claim; withdraw the petition in its entirety; or move to stay the petition within thirty (30) days of the date of entry of this Order. Petitioner must notify the Court of his intentions or seek an extension of time to do so within thirty (30) days; otherwise, petitioner risks having the petition dismissed under Rule 4 of the Rules Governing Section 2254 Cases in the United States District Court. Signed by Magistrate Judge Victor E. Bianchini on 7/15/10. (Decision and Order served in accordance with the Local Rules of this Court)(alh, ) (Entered: 07/15/2010) |
|---|---|---|
| 08/04/2010 | 89 | AMENDED PETITION for Writ of Habeas Corpus filed by Frank W. Dearstyne. (Attachments: # 1 Affirmation Eugene P. Grimmick, Esq.)(Bunin, Alexander) (Entered: 08/04/2010) |
| 03/03/2011 | 90 | REPORT AND RECOMMENDATION: RECOMMENDED, that Frank W. Dearstyne's Amended Petition for habeas corpus relief be GRANTED. Specifically, it is recommended that the State of New York be directed to immediately vacate Petitioner's convictions of Attempted Rape in the First Degree, in violation of P.L. §110 and §130.35, and of Endangering the Welfare of a Child, in violation of PL § 260.20, with respect to the alleged victim identified as "T.O." and the convictions of Aggravated Sexual Abuse in the First Degree, in violation of PL § 130.70, and Endangering the Welfare of a Child, in violation of PL § 260.20, with respect to C.C. RECOMMENDED, that the State of New York be directed to release Petitioner within thirty (30) days from the entry of an Order adopting or approving this Report and Recommendation, "unless New York State has, by that point, taken concrete and substantial steps expeditiously to retry" Petitioner with respect to the charges in question. Pavel v. Hollins, 261 F.3d 210, 229 (2d Cir. 2001). RECOMMENDED, that the balance of the claims raised in the Amended Petition be DENIED. RECOMMENDED, that a certificate of appealability issue on the petitioner's prosecutorial misconduct claim. However, because the remainder of Petitioner's claims are without merit, it is recommend that, as to those claims, a Certificate of Appealability not issue. RECOMMENDED, that the District Court consider a bail hearing during the pendency of what might be protracted litigation regarding this Report and Recommendation, based upon the foregoing concerns discussed in the Conclusion and in light of the fact that Petitioner has already served approximately 20 years of his 10 to 30 year indeterminate sentence. Objections to R&R due by 3/17/2011 Case Review Deadline 3/24/2011. Signed by Magistrate Judge Victor E. Bianchini on 3/3/11.(alh, ) (Entered: 03/03/2011) |
| 03/08/2011 | 91 | NOTICE of Appearance by Lisa A. Peebles on behalf of Frank W. Dearstyne (Peebles, Lisa) (Entered: 03/08/2011) |
| 03/10/2011 | 92 | NOTICE by Frank W. Dearstyne Change of Petitioner's Address (Peebles, Lisa) (Entered: 03/10/2011) |
| 03/15/2011 | 93 | MOTION for Extension of Time to File Objections filed by William Mazzuca. Motions referred to Victor E. Bianchini. (Lyons, Paul) (Entered: 03/15/2011) |
| 03/15/2011 | 94 | AFFIDAVIT Regarding Respondent's Motion for Extension of Time by Frank W. Dearstyne. (Peebles, Lisa) (Entered: 03/15/2011) |
| 03/17/2011 | | TEXT ORDER granting 93 and 94 Motion for an Extension of Time to File Objections to the 90 Report and Recommendation. Respondent shall have until 3/28/2011 to file objections as to the consideration for a bail hearing. The Petitioner's response must be filed by 4/4/2011. As to the remainder of the Report and Recommendation, both parties shall have until 4/28/2011 to file their objections. Additionally, Petitioner's request to reserve the right to seek an extension of time beyond the 14−day limit within which to file a response to Respondent's objections that are due 4/28/2011 is Granted. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 4/17/2011. (bjw, ) (Entered: 03/17/2011) |
| 03/17/2011 | | Reset Deadlines as to 90 REPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. DearstyneREPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by |

| | | |
|---|---|---|
| | | Frank W. DearstyneR. Objections to balance of R&R (excluding bail issue)due by 4/28/2011 (bjw, ) (Entered: 03/17/2011) |
| 03/30/2011 | 95 | ORDER: Orders, that the Clerk file under seal respondent's objections and declaration, dated March 28, 2011. Signed by Senior Judge Frederick J. Scullin, Jr on 3/28/11. (alh, ) (Entered: 03/30/2011) |
| 03/30/2011 | 96 | ***SEALED DOCUMENT Objections and Declaration by William Mazzuca dated 3/28/11. (alh, ) (Entered: 03/30/2011) |
| 04/04/2011 | 97 | MEMORANDUM OF LAW re 96 Sealed Document *In Response To Respondent's Objections to Magistrate Judge Bianchini's Recommendation Regarding A Bail Hearing* filed by Frank W. Dearstyne. (O'Gara, James) (Entered: 04/04/2011) |
| 04/04/2011 | 98 | AFFIDAVIT re 90 REPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. DearstyneREPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. DearstyneREPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. DearstyneREPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. DearstyneREPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. DearstyneREPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. DearstyneREPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. Dearstyne, 96 Sealed Document *AFFIDAVIT in response to Respondent's Objections to the Magistrate Judge's Report and Recommendation Regarding Bail Hearing, and in support of the Report's recommendation for bail hearing* by Frank W. Dearstyne. (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) 2, # 3 Exhibit(s) 3, # 4 Exhibit(s) 4, # 5 Exhibit(s) 5, # 6 Exhibit(s) 6, # 7 Exhibit(s) 7, # 8 Exhibit(s) 8, # 9 Exhibit(s) 9, # 10 Exhibit(s) 10, # 11 Exhibit(s) 11, # 12 Exhibit(s) 12, # 13 Exhibit(s) 13, # 14 Exhibit(s) 14)(O'Gara, James) (Entered: 04/04/2011) |
| 04/04/2011 | 99 | AFFIDAVIT of Service for PETITIONER'S MEMORANDUM OF LAW IN RESPONSE TO RESPONDENT'S OBJECTIONS TO MAGISTRATE JUDGE BIANCHINI'S REOMMENDATION REGARDING A BAIL HEARING and AFFIDAVIT of Frank W. Dearstyne served on Paul B. Lyons, Assistant Attorney General on 04/04/2011, filed by Frank W. Dearstyne. (O'Gara, James) (Entered: 04/04/2011) |
| 04/13/2011 | 100 | REPLY to Response to Motion re 90 REPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. DearstyneREPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. DearstyneREPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. DearstyneREPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. DearstyneREPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. DearstyneREPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. Dearstyne *Respondent's Reply In Further Support of Objections to Report and Recommendations* filed by William Mazzuca. (Lyons, Paul) (Entered: 04/13/2011) |
| 04/14/2011 | 101 | Letter Motion from Lisa A. Peebles for Frank W. Dearstyne requesting Respondent's reply memorandum regarding a bail hearing be stricken submitted to Judge Scullin. (Peebles, Lisa) (Entered: 04/14/2011) |
| 04/14/2011 | 102 | RESPONSE TO LETTER BRIEF filed by William Mazzuca as to 101 Letter Request/Motion filed by Frank W. Dearstyne. (Lyons, Paul) (Entered: 04/14/2011) |
| 04/14/2011 | | TEXT ORDER granting in part and denying in part 101 Letter Request by Petitioner re: 100 Respondent's Reply. The request to strike 100 Reply to 97 Objections to 90 Report and Recommendation regarding the bail hearing is Denied. The request to file a Sur–reply is Granted. The Sur–reply shall be limited to 5 pages and shall address only |

| | | |
|---|---|---|
| | | those issues raised in the Reply. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 4/14/2011. (bjw, ) (Entered: 04/14/2011) |
| 04/19/2011 | 103 | MEMORANDUM OF LAW re 100 Reply to Response to Motion,,,, 96 Sealed Document filed by Frank W. Dearstyne. (Peebles, Lisa) (Entered: 04/19/2011) |
| 04/26/2011 | 104 | Second MOTION for Extension of Time to File *Remaining Objections* filed by William Mazzuca. Motions referred to Victor E. Bianchini. (Lyons, Paul) (Entered: 04/26/2011) |
| 04/26/2011 | | TEXT ORDER granting 104 Motion for Extension of Time to File the remaining objections to 90 Report and Recommendation. Respondent shall have until 5/9/2011 to file these objections. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 4/26/2011. (bjw, ) (Entered: 04/26/2011) |
| 04/26/2011 | | Reset Deadlines/Hearings: Objections by petitioner and respondent to remaining issues in R&R due by 5/9/2011 (bjw, ) Modified on 4/26/2011 (bjw, ). (Entered: 04/26/2011) |
| 04/26/2011 | | TEXT ORDER amending Text Order issued this date Granting Motion for Extension of Time for Respondent to File Objections. The order is amended to allow Petitioner to have the same extension of time to file objections to the issues remaining in 90 Report and Recommendation. Objections due for both parties on 5/9/2011. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 4/26/2011. (bjw, ) (Entered: 04/26/2011) |
| 05/05/2011 | 105 | MOTION for permission to file oversized Objections and to file such Objections under seal filed by William Mazzuca. (Attachments: # 1 Proposed Order/Judgment) Motions referred to Victor E. Bianchini. (Lyons, Paul) (Entered: 05/05/2011) |
| 05/05/2011 | | TEXT ORDER granting 105 Motion by Respondent for permission to file an oversized objection brief. The brief shall not exceed 65 pages and shall be filed under seal. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 5/5/2011. (bjw, ) (Entered: 05/05/2011) |
| 05/05/2011 | 106 | Letter Motion for Frank W. Dearstyne. (Peebles, Lisa) (Entered: 05/05/2011) |
| 05/06/2011 | | TEXT ORDER granting 106 Letter Request by Petitioner to file an oversized objection brief consisting of 30 pages. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 5/6/2011. (bjw, ) (Entered: 05/06/2011) |
| 05/09/2011 | 107 | OBJECTION to 90 Report and Recommendations by Frank W. Dearstyne. (O'Gara, James) (Entered: 05/09/2011) |
| 05/12/2011 | 108 | ***SEALED*** OBJECTION to 90 Report and Recommendations by William Mazzuca. (Objections are sealed and are located in the Syracuse Clerk's Office) (alh, ) Modified on 5/12/2011 to assign docket number(alh, ). (Entered: 05/12/2011) |
| 05/18/2011 | 109 | MOTION for Extension of Time to File Response/Reply *to Respondent's Objections* filed by Frank W. Dearstyne. Motions referred to Victor E. Bianchini. (Peebles, Lisa) (Entered: 05/18/2011) |
| 05/18/2011 | | TEXT ORDER granting 109 Motion for Extension of Time to File Response/Reply re 90 REPORT AND RECOMMENDATIONS re 89 Amended Petition for Writ of Habeas Corpus filed by Frank W. Dearstyne Response/Reply by both parties due by 6/13/2011. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 5/17/2011. (bjw, ) (Entered: 05/18/2011) |
| 06/08/2011 | 110 | MOTION permission to file oversized Memorandum of Law filed by Frank W. Dearstyne. Motions referred to Victor E. Bianchini. (Peebles, Lisa) (Entered: 06/08/2011) |
| 06/09/2011 | | TEXT ORDER granting 110 Motion by Petitioner to file an oversized brief/reply to 108 objections. The brief shall not exceed 30 pages. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 6/9/2011. (bjw, ) (Entered: 06/09/2011) |
| 06/10/2011 | 111 | MOTION For Order Directing That Memorandum of Law Be Filed Under Seal filed by William Mazzuca. (Attachments: # 1 Proposed Order/Judgment) Motions referred to Victor E. Bianchini. (Lyons, Paul) (Entered: 06/10/2011) |

| 06/13/2011 | | TEXT ORDER denying 111 Motion to file Memorandum of Law under seal due to references made to victims of sex offenses. Alternatively, the Court directs that the document either be redacted where appropriate or initials are put in place of the name(s).. IT IS SO ORDERED by Senior Judge Frederick J. Scullin Jr on 6/13/2011. (bjw, ) (Entered: 06/13/2011) |
|---|---|---|
| 06/13/2011 | 112 | MEMORANDUM OF LAW re 108 Objection to Report and Recommendations *Petitioner's Response in Opposition to Respondent's Objections to the Magistrate Judge's Report and Recommendations* filed by Frank W. Dearstyne. (O'Gara, James) (Entered: 06/13/2011) |
| 06/13/2011 | 113 | MEMORANDUM OF LAW *In Support of Respondent's Response to Petitioner's Objections to the Magistrate Judge's Report & Recommendation* filed by William Mazzuca. (Lyons, Paul) (Entered: 06/13/2011) |
| 06/29/2011 | 114 | Letter Motion from James V. O'Gara for Frank W. Dearstyne requesting corrections be made to the dates in Affidavit dated April 1, 2011 submitted to Judge Frederick J. Scullin, Jr.. (O'Gara, James) (Entered: 06/29/2011) |
| 06/30/2011 | | TEXT ORDER granting 114 Letter Request to correct 98 affidavit. Counsel shall submit a corrected affidavit. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 6/30/2011. (bjw, ) (Entered: 06/30/2011) |
| 07/19/2011 | 115 | AFFIDAVIT re Order on Letter Request by Frank W. Dearstyne. (Attachments: # 1 Affidavit, # 2 Redline Affidavit)(O'Gara, James) (Entered: 07/19/2011) |
| 02/13/2012 | 116 | ***RESCINDED BY ORDER DATED 2/16/12*** ORDER REASSIGNING CASE. Case reassigned to Chief Judge Gary L. Sharpe. Senior Judge Frederick J. Scullin, Jr. no longer assigned to case. Signed by Chief Judge Gary L. Sharpe on 2/13/12. (alh, ) Modified on 2/16/2012 (alh, ). (Entered: 02/13/2012) |
| 02/15/2012 | 117 | Letter Motion from James V. O'Gara for Frank W. Dearstyne requesting bail hearing submitted to Judge Sharpe . (O'Gara, James) (Entered: 02/15/2012) |
| 02/16/2012 | 118 | ORDER OF REASSIGNMENT: ORDERED, that this case was reassigned to Chief Judge Gary L. Sharpe by order issued February 13, 2012. The reassignment order of February 13, 2012, docket # 116 , is hereby rescinded, and the case is reassigned to the Honorable Frederick J. Scullin, Jr. Signed by Chief Judge Gary L. Sharpe on 2/16/12. (alh, ) (Entered: 02/16/2012) |
| 02/16/2012 | | TEXT ORDER reserving on 117 Letter Request for a bail hearing. As this case has been reassigned back to Senior Judge Scullin, the Court will consider this letter a renewed request to hold a bail hearing, which is reserved at this time. Counsel will promptly be notified of any further scheduling or if any further briefing is needed. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 2/16/2012. (bjw, ) (Entered: 02/16/2012) |
| 03/05/2012 | 119 | Letter Motion from Respondent for William Mazzuca . (Lyons, Paul) (Entered: 03/05/2012) |
| 03/05/2012 | | TEXT ORDER denying 119 Letter Request by respondent for reconsideration of bail hearing. As to the scope of the hearing, all parties will be required to submit witness and exhibit lists in advance of the hearing for the Court's review. The Clerk is, therefore, directed to issue a scheduling notice accordingly. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 3/5/2012. (bjw, ) (Entered: 03/05/2012) |
| 03/05/2012 | | NOTICE of Bail Hearing: On 3/2/2012 the parties were notified by the Court that it intended to schedule a bail hearing in this case and provided the parties with dates that the Court is available. Having heard from both parties, the Court has set the following schedule. The bail hearing is set for 3/21/2012 at 10:00 AM in Syracuse before Senior Judge Frederick J. Scullin Jr. The parties shall file a witness list that must contain a clear summary of the testimony that each witness intends to offer at the hearing. Additionally, the parties shall submit an exhibit list. Both lists are to be filed by 3/14/2012. Further, the Court will issue a writ of habeas corpus directing the petitioner's appearance on the hearing date. (bjw, ) (Entered: 03/05/2012) |
| 03/05/2012 | | TEXT ORDER directing that the Clerk of the Court issue a Writ of Habeas Corpus Ad Testificandum for petitioner Frank W. Dearstyne to be served upon Gowanda |

| | | |
|---|---|---|
| | | Correctional Facility requiring the petitioner's presence for a hearing to be held on March 21, 2012.. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 3/5/2012. (bjw, ) (Entered: 03/05/2012) |
| 03/05/2012 | [120](#) | WRIT of Habeas Corpus Ad Testificandum issued for 3/21/2012 as to petitioner. [sent to USM for service upon Gowanda CF] (bjw, ) (Entered: 03/05/2012) |
| 03/06/2012 | [121](#) | Letter Motion from James V. O'Gara for Frank W. Dearstyne requesting a two-month stay of the March 14, 2012 deadline to file witness disclosures/list of exhibits and the March 21, 2012 bail hearing submitted to Judge Frederick J. Scullin . (O'Gara, James) (Entered: 03/06/2012) |
| 03/07/2012 | | TEXT ORDER granting 121 Letter Request by Petitioner for a two month stay of the bail hearing in light of the new circumstances as detailed in the 121 Letter. If necessary, the bail hearing will be held on 5/15/2012 at 10:00am in Syracuse. If necessary, the filing of the witness and exhibit lists will be due by 5/8/2012. Counsel for the petitioner is directed to provide the Court with a Status Report by 5/1/2012. Further, the Clerk is directed to cancel the writ of habeas corpus ad testificandum for petitioner. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 3/7/2012. (bjw, ) (Entered: 03/07/2012) |
| 03/08/2012 | [122](#) | ORDER Cancelling Writ of Habeas Corpus Ad Testificandum as to Petitioner Frank Dearstyne.. Signed by Senior Judge Frederick J. Scullin, Jr on 3/8/2012. [served upon Gowanda CF- inmate records](bjw, ) (Entered: 03/08/2012) |
| 04/05/2012 | [123](#) | NOTICE by Frank W. Dearstyne *to Judge Scullin dated April 5, 2012 regarding status of Petitioner* (O'Gara, James) (Entered: 04/05/2012) |
| 05/01/2012 | [124](#) | Letter Motion from James V. O'Gara for Frank W. Dearstyne requesting an additional one month stay of bail hearing and deadline for the exchange of witness and exhibit lists submitted to Judge Scullin . (O'Gara, James) (Entered: 05/01/2012) |
| 05/01/2012 | | TEXT ORDER granting 124 Letter Request by Petitioner for a one month stay of the bail hearing in light of the circumstances as set forth in the 124 Letter. If necessary, the Bail Hearing is reset for 6/13/2012 10:00 AM in Syracuse. If necessary, the filing of the witness and exhibit lists will be due by 6/6/2012. Counsel for the petitioner is directed to provide a status report by 5/30/2012. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 5/1/2012. (bjw, ) (Entered: 05/01/2012) |
| 05/30/2012 | [125](#) | STATUS REPORT *per the Court's order dated May 1, 2012* by Frank W. Dearstyne. (O'Gara, James) (Entered: 05/30/2012) |
| 05/31/2012 | | TEXT ORDER granting 125 Letter Request by petitioner for a stay of the bail hearing in light of the circumstances as set forth in the 125 Letter. If necessary, the bail hearing is reset for 7/24/2012 at 10:00am in Syracuse. Filing of the witness and exhibit lists are due by 7/17/2012. This is a final adjournment. By 7/17/2012 counsel shall advise the Court whether petitioner will go forward with the bail hearing or withdraw his request for a hearing.. IT IS SO ORDERED by Senior Judge Frederick J. Scullin, Jr on 5/31/2012. (bjw, ) Modified on 6/7/2012 (bjw, ). (Entered: 05/31/2012) |
| 06/07/2012 | | CLERK'S CORRECTION OF DOCKET ENTRY re 5/31/12 Text Order. Order has been modified to clarify the intent of the order..By 7/17/2012 counsel shall advise the Court whether petitioner will go forward with the bail hearing or withdraw his REQUEST FOR A HEARING. (withdraw his request for a hearing replaces withdraw his habeas corpus petition) (bjw, ) (Entered: 06/07/2012) |
| 07/17/2012 | [126](#) | STATUS REPORT *advising Judge Scullin that Petitioner waives bail hearing scheduled on July 24, 2012* by Frank W. Dearstyne. (O'Gara, James) (Entered: 07/17/2012) |
| 08/21/2015 | [127](#) | ORDER: ORDERED that Magistrate Judge Bianchini's Report and Recommendation, see Dkt. No. 90 , is ACCEPTED in part and REJECTED in part. ORDERED that Petitioner's amended petition is DENIED and DISMISSED in its entirety. ORDERED that a Certificate of Appealability will not issue with regard to any of the grounds that Petitioner raised in his amended petition because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). ORDERED that the Clerk of the Court shall enter judgment and close this case. Signed by Senior Judge Frederick J. Scullin, Jr on 8/20/15. (alh, ) (Entered: 08/21/2015) |

| 08/21/2015 | 128 | JUDGMENT entered pursuant to the order of the Honorable Judge Frederick J.Scullin, Jr., dated the 20th day of August, 2015 and filed the 21st day of August, 2015. (alh, ) (Entered: 08/21/2015) |
| 09/17/2015 | 129 | NOTICE OF APPEAL as to 128 Judgment, 127 Order on Report and Recommendations,, by Frank W. Dearstyne. Filing fee $ 505, receipt number 0206-3418998. (Merkl, Neil) (Entered: 09/17/2015) |
| 09/17/2015 | 130 | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals re 129 Notice of Appeal (nas, ) (Entered: 09/17/2015) |

# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

FRANK W. DEARSTYNE,

                Petitioner,

    V.

WILLIAM MAZZUCA, Superintendent,
Fishkill Correctional Facility,

                Respondent.

**REPORT AND
RECOMMENDATION**

**No. 04-CV-741(FJS/VEB)**

## TABLE OF CONTENTS

I.     Introduction ................................................................................................1

II.    Background ................................................................................................1

    A.    Facts ................................................................................................1

    B.    State Court Proceedings ................................................................3
                1.    Pre-Trial Proceedings ................................................3
                2.    Trial Proceedings ......................................................4
                3.    Appellate Proceedings ..............................................5

    C.    Federal Habeas Corpus Proceedings ..........................................7

III.   Discussion ................................................................................................9

    A.    Ground One – Speedy Trial ........................................................11

                1.    State Court Proceedings ............................................11
                2.    Habeas Review ..........................................................15
                     a.    State Law Claim ..............................................15
                     b.    Federal Constitutional Claim ..........................15
                         I.    Reason for the Delay ..............................16
                        ii.    Petitioner's Delay in Asserting Claim ...17
                        iii.   Lack of Prejudice ....................................19
                3.    Ineffective Assistance of Trial Counsel ....................21

    B.    Ground Two – Admission of Petitioner's Statement to Police ....24

|   |   | 1. | Factual Background ........................................................24 |
|   |   | 2. | State Court Proceedings ................................................27 |
|   |   | 3. | Habeas Review ...............................................................29 |
|   |   |   | a. Voluntariness of the Confession ..........................29 |
|   |   |   | b. Failure to Comply with CPL § 710.60(6) ..............36 |
|   |   |   |   I. State Court Proceedings and Rulings ..................37 |
|   |   |   |   ii. The Trial Court's Failure to Adjudicate the Voluntariness Issue Was an Unreasonable Application of Clearly Established Supreme Court Law, *Jackson v. Denno* ...........................................................41 |

C.  Ground Three – DNA Evidence ...........................................................47

|   |   | 1. | Factual Background ........................................................48 |
|   |   | 2. | Habeas Review ...............................................................49 |
|   |   |   | a. *Brady* Violation .................................................49 |
|   |   |   |   i. Exhaustion and Procedural Default .......................49 |
|   |   |   |   ii. Merits Analysis ..................................................52 |
|   |   |   | b. Requests for DNA Testing ....................................64 |
|   |   |   | c. Ineffective Assistance of Counsel – Failure to Seek Forensic Testing of the Fluid Sample .................................................73 |
|   |   |   | d. Ineffective Assistance of Counsel – Failure to Object to Dr. Close's Testimony .................................................76 |

D.  Ground Four – Alleged Bias of Appellate Justice ...................................77

|   |   | 1. | Factual Background ........................................................77 |
|   |   | 2. | State Court Proceedings ................................................78 |
|   |   | 3. | Habeas Review ...............................................................78 |
|   |   |   | a. Judicial Bias .......................................................78 |
|   |   |   | b. Ineffective Assistance of Appellate Counsel .......81 |

E.  Ground Five – Prosecutorial Misconduct ...............................................82

|   |   | 1. | Prosecution's Failure to Call H.O., T.O.'s Father ............82 |
|   |   | 2. | Trial Counsel's Failure to Request Missing Witness Charge as to H.O. ..................................................85 |
|   |   | 3. | The Prosecution's Failure to Present Testimony of Expert Medical Witnesses ..................................................90 |
|   |   | 4. | Ineffective Assistance of Trial Counsel - Failure to Request Missing Witness Charge Regarding Medical Witnesses ..................................92 |
|   |   | 5. | Violations of the Prosecution's Duty to Disclose *Brady* and *Rosario* Material ..................................................93 |
|   |   |   | a. Prosecution's Failure to Disclose Fluid Sample from T.O. .................................................93 |
|   |   |   | b. Ineffective Assistance of Trial Counsel ..............94 |

6.    Lack of Specificity Regarding Date of Offenses ............................95
     a.    Factual Background ..............................................95
     b.    State Court Proceedings ......................................96
     c.    Habeas Review ...................................................97
7.    Presentation of False Testimony ...................................100
8.    Improper Summation Comments .....................................104
     a.    Factual Background ............................................104
     b.    State Court Proceedings ....................................106
     c.    Habeas Review .................................................107
9.    Failure to File Timely Replies ....................................111
10.   Failure to Disclose Potential Civil Action ..........................112

F.    Ground Six – Discovery Manipulation ...........................................114

G.    Ground Seven – Jury Charge ......................................................115

     1.    State Court Proceedings ...............................................115
     2.    Habeas Review ........................................................117
        a.    Clearly Established Supreme Court Precedent on the Definition
            of "Reasonable Doubt" ......................................118
        b.    Merits Analysis .................................................122

H.    Ground Eight – Ineffective Assistance of Counsel – Failure to Protect Right to Testify
at the Grand Jury ...................................................................124

I.    Ground Nine – Improper Joinder and Failure of Trial Counsel
to Request Severance ...............................................................125

     1.    New York Law Regarding Joinder ...............................127
     2.    Habeas Review ........................................................127
J.    Ground Ten – Violation of CPL §60.20 – Lack of Corroboration of the Testimony of
an Unsworn Child Witness .........................................................131

K.    Ground Eleven – Ineffective Assistance of Counsel – Failure to Challenge the
Indictment ...........................................................................133

     1.    The Indictment ........................................................133
     2.    State Court Proceedings .............................................134
     3.    Habeas Review ........................................................137

L.    Ground Twelve – Ineffective Assistance of Counsel – Failure to Present Expert
Testimony ............................................................................139

     1.    False Confessions Expert ...........................................139
        a.    State Court Proceedings ....................................139
        b.    Habeas Review .................................................141

2. Medical Expert .................................................................143
   a. State Court Proceedings ......................................143
   b. Habeas Review .....................................................145
      I. The "Performance" Prong of *Strickland* .................145
      ii. The "Prejudice" Prong of *Strickland* ....................148
         a. Prejudice – Charges Involving T.O. ..........149
         b. Prejudice – Charges Involving C.C. ..........158
3. Behavioral/Psychological Expert ...................................164
   a. State Court Proceedings ......................................164
   b. Habeas Review .....................................................167
4. Failure to Seek DNA Testing .........................................172

M. Ground Thirteen – Denial of Due Process – Post-Conviction Motions ...................173

1. Subpoenas *Duces Tecum* ...............................................173
2. County Law § 722-c Motion ...........................................174

N. Ground Fourteen – Due Process – Failure to Render Decisions in Accordance with Law ..........................................................................................176

1. Conclusory Claims ..........................................................177
2. Alleged Errors in Post-Conviction Proceedings .............178
3. Alleged Violations of State Law ....................................179
4. Judicial Misconduct .......................................................180
5. Restated Claims ..............................................................180

O. Ground Fifteen – Ineffective Assistance of Counsel .............................181

1. Claims Involving Attorney Grimmick ...........................181
   a. Opening Statement ...............................................181
   b. Reconsideration of *Huntley* Decision ...............182
   c. Alibi Defense .......................................................183
   d. Pre-Trial Investigation ........................................186
   e. Sufficiency of the Evidence ................................187
   f. Attorney Connors .................................................187
   g. Arraignment .........................................................191
   h. Conflict of Interest ..............................................191
   i. Jury Foreperson ....................................................194
   j. Alibi Defense .......................................................195
   k. Sidebar Conferences ............................................195
   l. False Testimony ...................................................199
   m. Remittal Hearing .................................................199
   n. Ineffective Assistance Claims on Appeal ...........202
   o. "Extraneous" Issues on Appeal ..........................203
   p. Federal Laws ........................................................204
   q. Leave to Appeal Application ...............................204

2.   Claims Involving Attorney Korkosz .................................................204
    a.   Verification .........................................................................205
    b.   Experts ...............................................................................206

3.   Claims Involving Attorney Bauer .....................................................206
    a.   Recusal of Appellate Justice .............................................206
    b.   Brief and Argument ...........................................................206
    c.   Application for Leave to Appeal ......................................207

P.   Ground Sixteen – Request for Leave to Amend ...................................207

IV.   Conclusion ...................................................................................................208

V.   Recommendations .......................................................................................211

# I. INTRODUCTION

Petitioner Frank W. Dearstyne ("Dearstyne" or "Petitioner") is an inmate at the Bare Hill Correctional Facility. In 1991, he was convicted in a New York State court of Attempted Rape in the First Degree, Aggravated Sexual Abuse in the First Degree, and two counts of Endangering the Welfare of a Child. Petitioner contends that his conviction was imposed in violation of his constitutional rights and should therefore be vacated.

The Honorable Norman A. Mordue, Chief United States District Judge, referred this matter to this Court for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) regarding the disposition of Dearstyne's petition. (Docket No. 67). For the reasons that follow, it is recommended that the petition be granted in part and denied in part.

# II. BACKGROUND

The factual and procedural history of this matter is lengthy and complex. The following is a brief summary. Further details are set forth in the discussion of Petitioner's claims for relief.

## A.     Facts

On June 13, 1987, M.O.[1] discovered blood in the underwear of her three-year old daughter, T.O. (TT Vol. 2, at 252).[2] T.O. was examined later that day by her pediatrician, Dr. Theodore Close. (TT Vol. 2, at 258). Following his examination, Dr. Close referred T.O. to the Child Sexual Abuse Clinic at the Albany Medical Center in Albany, New York. (TT Vol. 2, at 391-392). After examining T.O., the staff at the Albany Medical Center concluded that she had been sexually abused and contacted the Rensselaer Police Department. (TT Vol. 2, at 263).

---

[1]      In accordance with New York Civil Rights Law § 50-b, the surnames of the alleged victims and their family members have been abbreviated.

[2]      References preceded by "TT" are to the transcript of Petitioner's trial.

1

Detective Frank Petrucci of the Rensselaer Police Department was assigned to investigate the case. (TT Vol. 2, at 23-24). Based upon interviews with T.O. and her family, Detective Petrucci, working with Patricia Donovan, a New York State Trooper assigned to a special rape task force, concluded that Petitioner, the sixteen-year-old son of T.O.'s babysitter, was the prime suspect. (TT, Vol. 2 at 86).

On June 19, 1987, Detective Petrucci and Trooper Donovan made arrangements to interrogate Petitioner at the state police barracks in Loudonville, New York. (TT, Vol. 2 at 51-52, 88, 130). After speaking with Petitioner's mother and obtaining her permission to speak with Petitioner, Petrucci and Donovan located Petitioner at the home of a family friend and transported him to the police barracks. (TT Vol. 2, at 34, 41).

Petitioner was interrogated at the Loudonville barracks by Trooper Donovan and Investigator Edmond W. Girtler. As discussed in detail below, the participants offer dramatically different accounts concerning the nature and conduct of the interrogation.

However, it is undisputed that, at the conclusion of the interrogation, Petitioner signed a written confession, in which he made a series of statements admitting sexual contact with T.O. (TT, Vol. 2 at 145, 168). Petitioner was arrested and charged with various sexual crimes involving T.O.. (TT, Vol. 2 at 88-91, 122-23, 158).

Subsequent investigations and interviews led the police to conclude that Petitioner had sexually abused two other girls whose parents also used Petitioner's mother as a babysitter during the spring months of 1987–C.C., who was two years-old at the time, and her four-year-old sister, E.C.

**B.     State Court Proceedings**

2

### 1.   Pre-Trial Proceedings

Petitioner was arrested following his interrogation on June 19, 1987, and charged via felony complaint with Rape in the First Degree and two (2) counts of sexual abuse for crimes allegedly committed against T.O.  On November 18, 1987, a Rensselaer County Grand Jury returned a ten-count indictment, charging Petitioner with sex-related offenses against the three victims, who were identified in the indictment under their first names, but will be identified in this report and recommendation as "T.O.", "C.C." and "E.C".  Petitioner was arraigned on November 24, 1987.

On May 9, 1990, the Rensselaer County Court dismissed the indictment.  As discussed in greater detail below, although the grand jury proceedings included videotaped testimony from two of the alleged victims, the prosecution never had that testimony transcribed by a stenographer, as required under § 190.32 (6) of the New York Criminal Procedural Law ("CPL").  The court dismissed the indictment due to the prosecution's failure to comply with CPL § 190.32 (6).[3]

On May 18, 1990, Petitioner was re-indicted when a Rensselaer County Grand Jury returned sealed Indictment Number C-8138, charging Petitioner with ten (10) crimes against the three (3) victims.  With respect to T.O., Petitioner was charged with Rape in the First Degree, two (2) counts of Sexual Abuse in the First Degree, and three (3) counts of Endangering the Welfare of a Child.  With respect to C.C., Petitioner was charged with Aggravated Sexual Abuse and Endangering the Welfare of a Child.  With respect to E.C., Petitioner was charged with Sexual Abuse in the First Degree and Endangering the Welfare of a Child.  Petitioner was arraigned on the second indictment on May 23, 1990.

---

[3]      Section 190.32 (6) of the New York Criminal Procedure Law, requires that "[w]hen a videotape is introduced into evidence and played in the grand jury, the grand jury stenographer shall record the examination in the same manner as if the witness had testified in person." N.Y. Crim. Proc. Law § 190.32(6).

Prior to trial, Petitioner, through his trial attorney, Eugene Grimmick, Esq., moved to suppress the confession. On May 7, 1991, the Honorable M. Andrew Dwyer, Rensselaer County Court Judge, conducted a *Huntley* hearing,[4] at which both parties were permitted to call witnesses and introduce evidence. The hearing lasted three (3) days, with the prosecution calling Detective Petrucci, Investigator Donovan, and Investigator Girtler. Petitioner testified in his own behalf and called both of his parents as witnesses. Following the hearing, both sides submitted lengthy memoranda to the court.

On July 8, 1991, Judge Dwyer issued a Decision and Order denying the suppression motion and finding that there was a "sharp issue of fact" with respect to the voluntariness of the confession, which issue was to be submitted to the jury. (Exhibit J to Petitioner's Exhibits in Support of Motion to Vacate Judgment).

### 2.    Trial Proceedings

Petitioner's trial began on July 10, 1991, and lasted for eight (8) days. The prosecution presented testimony from the police investigators, all three of the alleged victims, members of the alleged victims' families, and testimony from Dr. Close (T.O.'s pediatrician), Carole West (a nurse involved in T.O.'s treatment), and Dr. Richard D. Cimma (E.C.'s pediatrician). Petitioner testified in his own defense and also presented testimony from his parents, his sister, and a school administrator.

At the conclusion of the trial, the jury found Petitioner guilty of Attempted Rape in the First Degree, in violation of New York Penal Law ("PL") §110 and §130.35, with respect to T.O.;

---

[4]      In New York, a hearing pursuant to *People v. Huntley*, 255 N.Y.S.2d 838 (1965), is held to determine the voluntariness of a criminal defendant's statements to the police.

Aggravated Sexual Abuse in the First Degree, in violation of PL § 130.70, with respect to C.C.; and two counts of Endangering the Welfare of a Child, in violation of PL § 260.20, with respect to both T.O. and C.C.

Petitioner was acquitted of the charge of Rape in the First Degree with respect to T.O. and was acquitted on all charges with respect to the third victim, E.C. (TT Vol. 3, at 758-766).

On August 14, 1991, Petitioner was sentenced to consecutive, indeterminate terms of four (4) to twelve (12) years for the attempted rape of T.O.; six (6) to eighteen (18) years for the aggravated sexual abuse of C.C., to be served concurrently with a determinate one year term for each of the endangering convictions. (S at 10).[5] Therefore, Petitioner's total aggregate sentence was ten (10) to thirty (30) years.

### 3. Appellate Proceedings

Petitioner, represented by Attorney Grimmick, appealed his conviction to the Appellate Division, Third Department, of the New York State Supreme Court. Petitioner asserted seven arguments before the Appellate Division: (1) the indictment should have been dismissed because his statutory speedy trial rights were violated; (2) the forty-nine month delay between Petitioner's arrest and trial violated his constitutional right to a speedy trial; (3) Petitioner's confession should have been suppressed; (4) the unsworn testimony of a child-victim was not sufficiently corroborated; (5) the trial court erroneously denied Petitioner's mistrial motion based on the People's withholding of *Brady*[6] material;(6) the prosecutor's summation comments deprived Petitioner of a fair trial; and (7) Petitioner's sentence was unduly harsh.

---

[5]        References preceded by "S" are to the transcript pages of Petitioner's sentencing proceedings.

[6]        *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In a ruling issued on May 18, 1995, the Appellate Division withheld its decision on Petitioner's appeal and remanded the matter to the County Court for a hearing with respect to Petitioner's speedy trial claim. *People v. Dearstyne*, 215 A.D.2d 864 (3d Dep't 1995) ("*Dearstyne I*"). On remand, the Honorable Patrick J. McGrath, Rensselaer County Court Judge, conducted a hearing and issued a written Decision and Order, dated April 29, 1996, making detailed findings of fact and determining that Petitioner's statutory and constitutional speedy trial rights had not been violated.

On appeal from that decision, the Appellate Division affirmed Petitioner's conviction and sentence. *People v. Dearstyne*, 230 A.D.2d 953 (3d Dep't 1996) ("*Dearstyne II*"). Petitioner's application for leave to appeal to the Court of Appeals was denied on December 20, 1996. *People v. Dearstyne*, 89 N.Y.2d 921(1996).

On November 26, 1997, Petitioner brought a motion pursuant to CPL § 440.10 and §440.20 to vacate the judgment of conviction entered against him and to set aside the sentence imposed on the basis of (1) ineffective assistance of trial counsel, (2) prosecutorial misconduct, and (3) other errors of law. On October 13, 1999, Judge McGrath issued a lengthy written decision, denying Petitioner's motion (the "CPL § 440.10 Order"). Petitioner was granted leave to appeal to the Appellate Division, Third Department.

On May 22, 2000, Petitioner, proceeding *pro se*, supplemented his previous § 440 motions with a motion for DNA testing in compliance with the procedural requirements of CPL §440.30. This motion was denied by the County Court on September 22, 2000. Petitioner was also granted leave to appeal this decision.

On October 30, 2000, the Appellate Division granted Petitioner's motion to consolidate his

6

appeal from the denials of his various post-conviction motions, including the state court's denial of

his CPL §440 motion and including a denial of his motion for DNA testing.  Petitioner was

represented by Kevin J. Bauer, Esq. with respect to this consolidated appeal.

The Appellate Division, Third Department unanimously affirmed the denial of Petitioner's

post-conviction motions. *People v. Dearstyne*, 305 A.D.2d 850 (3d Dep't 2003) ("*Dearstyne III*").

Leave to appeal to the New York Court of Appeals was denied on August 26, 2003.  *People v.

Dearstyne*, 100 N.Y.2d 593 (N.Y. 2003).

On November 26, 2003, Petitioner, proceeding *pro se*, filed a motion for a writ of error *coram

nobis*, alleging ineffective assistance of appellate counsel. The Appellate Division, Third Department

denied his application on January 16, 2004. The Court of Appeals denied leave to appeal on May 10,

2004. *People v. Dearstyne*, 2 N.Y.3d 798 (N.Y. 2004).

## C.  Federal Habeas Corpus Proceedings

Petitioner, proceeding *pro se*, commenced this action on May 26, 2004, by filing a Petition

for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Docket No. 1).

On August 26, 2004, Petitioner filed an Amended Petition after an Order issued by the

Honorable Frederick J. Scullin, Jr., United States District Judge, directed him to clarify the dates and

dispositions of his state court motions and appellate proceedings.  (Docket Nos. 6 & 9).  The

Amended Petition provides additional factual and procedural background information, but does not

actually set forth Petitioner's claims for habeas relief.  It appears that Petitioner intended to

incorporate the grounds raised in his Petition in the Amended Petition. Given his *pro se* status at the

time of filing, this Court will deem the grounds raised in the Petition to have been raised in the

Amended Petition.  Thus, for the sake of clarity, this Court will simply refer to Petitioner's claims

as having been raised in his "Petition" for habeas relief.

Respondent filed a Memorandum of Law in opposition to the Petition on June 15, 2005.
(Docket No. 23). Thereafter, on September 12, 2006, James V. O'Gara, Esq. filed a Notice of
Appearance on behalf of Petitioner. (Docket No. 49).  On November 6, 2006, Attorney O'Gara
submitted a forty-five (45) page reply memorandum of law in support of the Petition. (Docket No.
51).

On January 24, 2008, the Honorable Norman A. Mordue, Chief United States District Judge,
issued an Order referring the instant case to this Court for a Report and Recommendation. (Docket
No. 67).

On July 3, 2008, this Court issued an Order directing the parties to submit supplemental
memoranda of law concerning certain issues raised by the Petition. (Docket No. 68). Respondent
filed a supplemental memorandum of law (Docket No. 71), affidavit (Docket No. 72), and reply brief
(Docket No. 77) in response to this Court's Order. Petitioner filed a reply memorandum of law in
response to this Court's Order and in further support of the Petition. (attached as Exhibit A to Docket
No. 73).

On November 3, 2008, this Court issued an Order directing Respondent to submit a
declaration from Dr. Close providing information regarding the disposition and location of certain
potential DNA evidence. (Docket No. 78). Respondent complied with the Order and submitted a
declaration from Dr. Close on November 26, 2008. (Docket No. 81).

Petitioner moved for leave to submit supplemental briefing to respond to various issues raised
by Dr. Close's declaration. This Court permitted both parties to submit supplemental memoranda
and letter briefs. (Docket Nos. 82, 83, 85).

8

Concerned with the ability of Petitioner to navigate his petition through the complexities of habeas processes, particularly with respect to appropriate choices regarding stays and abeyances, the Court appointed Alex Bunin, Esq., the Federal Defender for the Northern District of New York to represent Petitioner in this matter.

### III. DISCUSSION

Federal habeas corpus review of a state court conviction is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, federal courts must give substantial deference to a state court determination that has adjudicated a federal constitutional claim "on the merits." 28 U.S.C. § 2254(d); *Sellan v. Kuhlman*, 261 F.3d 303, 309-10 (2d Cir. 2001). The Second Circuit has stated that an "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan,* 261 F.3d at 313 (quotation omitted). The Second Circuit has also held that even a one-word denial of a petitioner's claim is sufficient to constitute an "adjudication on the merits" for purposes of AEDPA. *Id.* at 312-313.

Specifically, AEDPA requires that where a state court has adjudicated the merits of a Petitioner's federal claim, habeas corpus relief may not be granted unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2).

9

Both AEDPA and its predecessor statute recognize that a presumption of correctness shall apply to state court findings of fact, *Whitaker v. Meachum*, 123 F.3d 714, 715 n. 1 (2d Cir. 1997), and AEDPA requires a Petitioner to rebut that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *LanFranco v. Murray*, 313 F.3d 112, 117 (2d Cir. 2002). A presumption of correctness applies to findings by both state trial and appellate courts. *Galarza v. Keane*, 252 F.3d 630, 635 (2d Cir. 2001); *Whitaker*, 123 F.3d at 715 n.1.

In *Williams v. Taylor*, 529 U.S. 362, 413 (2000), the Supreme Court defined the phrases "contrary to" and "unreasonable application of" clearly established federal law. A state court decision is "contrary to clearly established federal law . . . if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Court] has on a set of materially indistinguishable facts." *Id.*

A state court decision involves "an unreasonable application of" Supreme Court case law if it "identifies the correct governing legal principle from [the Court's] decisions but unreasonably applies that principle to the particular facts of [a] prisoner's case." *Id.*

Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Matter of Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

As noted above, Petitioner asserts sixteen (16) grounds in support of his request for habeas

10

relief. Petitioner prepared his Petition *pro se* and many of the grounds contain multiple claims and arguments. Subsequent to filing this case, Petitioner obtained counsel, who filed a lengthy reply memorandum of law (in the nature of a Traverse), which addressed some, but not all, of the claims and arguments raised in the *pro se* Petition. This Court will discuss each ground for habeas relief in turn, along with the claims and arguments raised in connection with each ground.

### A.   Ground One – Speedy Trial

In his first claim for habeas relief, Petitioner argues that he was denied his constitutional right to a speedy trial by virtue of the forty-nine (49) month delay between his arrest and trial. During that 49-month period, he remained out of custody on bail. Petitioner further contends that his trial counsel was ineffective because he failed to invoke the New York State Due Process Clause in support of his motion to dismiss the indictment on speedy trial grounds.

#### 1.   State Court Proceedings

As noted above, Petitioner was arrested on June 19, 1987, and charged via felony complaint with Rape in the First Degree and two (2) counts of sexual abuse for crimes allegedly committed against T.O. On November 18, 1987, a Rensselaer County Grand Jury returned a ten (10) count indictment, charging Petitioner with sex-related offenses involving T.O., C.C., and E.C.. Petitioner was arraigned on November 24, 1987, and the prosecution declared its readiness for trial.

On January 24, 1988, Petitioner, through counsel, filed an omnibus motion seeking, *inter alia,* an inspection of the grand jury minutes and dismissal of the indictment due to alleged evidentiary insufficiency. The prosecution agreed to allow the County Court to conduct an *in camera* inspection of the grand jury minutes and delivered the minutes to the County Court on or about March 9, 1988.

Although the grand jury proceedings included videotaped testimony from C.C. and E.C., the

11

prosecution did not provide the County Court with the videotape of that testimony for its *in camera* inspection, apparently in accordance with its standard practice at the time.  In fact, the videotaped testimony, which had not been transcribed by the grand jury stenographer, was not provided to the County Court or to defense counsel until March of 1990, nearly two years later.

Petitioner's counsel thereafter moved to dismiss the indictment pursuant to § 190.32 (6) of the New York Criminal Procedure Law, which requires that "[w]hen a videotape is introduced into evidence and played in the grand jury, the grand jury stenographer shall record the examination in the same manner as if the witness had testified in person." The County Court granted the motion in a decision dated May 4, 1990, and dismissed the indictment based on the prosecution's failure to comply with CPL § 190.32 (6).

On May 18, 1990, Petitioner was re-indicted when a Rensselaer County Grand Jury returned sealed Indictment Number C-8138, charging ten (10) sexual abuse crimes involving the three alleged victims.  Petitioner was arraigned on the second indictment on May 23, 1990, and the prosecution declared its readiness for trial.

On July 18, 1990, Petitioner filed an omnibus motion, which included a request for dismissal of the indictment and *in camera* inspection of the grand jury minutes.  The prosecution consented to such an inspection and provided the minutes to the court on September 27, 1990.[7]  On that same date, the County Court issued an Order denying Petitioner's motion to dismiss the indictment.

On July 9, 1991, on the eve of jury selection, Petitioner, through counsel, moved for dismissal of the indictment on speedy trial grounds, citing violations of Petitioner's statutory and constitutional

---

[7]     Although the original videotapes were not provided to the state court, the testimony had been transcribed and the transcripts were provided along with the grand jury minutes for the trial judge to review *in camera*.

12

rights to a speedy trial. The trial court denied the motion and the case proceeded to trial. As noted above, Petitioner was convicted with respect to the majority of the charges.

Petitioner raised several claims on direct appeal, including the claim that the forty-nine (49) month delay between the filing of the criminal complaints and start of the trial violated his statutory and constitutional right to a speedy trial.

Section 30.30 of the New York Criminal Procedure Law provides that the prosecution must be ready for trial within six (6) months of the "commencement of a criminal action wherein a defendant is accused of one or more offenses, at least one of which is a felony." CPL §30.30(1)(a).

In the present case, on direct appeal, the Appellate Division concluded that "the record [did] not provide an adequate basis to determine if, in view of all of the circumstances, the delay . . . was unreasonable." *Dearstyne I*, 626 N.Y.S.2d at 881. Accordingly, the Appellate Division remanded the case to County Court for a hearing and reconsideration of Petitioner's speedy trial motion.

On remand, the Honorable Patrick J. McGrath, Rensselaer County Court Judge, conducted an evidentiary hearing and issued a written Decision and Order, dated April 29, 1996, making detailed findings of fact and determining that Petitioner's statutory and constitutional speedy trial rights had not been violated.

The matter was then considered again by the Appellate Division, which affirmed Judge McGrath. The Appellate Division held that because "the People's pre-readiness delay did not exceed the statutory six-month period, the issue of whether defendant's statutory right to a speedy trial was violated turns on whether any post-readiness delay is chargeable to the People." *Dearstyne II*, 646 N.Y.S.2d at 1003.

Petitioner argued, *inter alia*, that a post-readiness delay of twenty-seven (27) months should

13

have been charged to the prosecution because of the delay in providing the videotapes of the victims' testimony to the County Court. The Appellate Division rejected this argument, shifting primary responsibility for the delay to the County Court by noting that "County Court was aware of the existence of these videotapes on March 9, 1988 and that they were being retained by the District Attorney." *Id.* The appeals court thus ruled that County Court's failure to obtain the videotapes prior to March of 1990 "cannot be charged to the People since CPL 30.30 addresses prosecutorial readiness, not court readiness." *Id.*

The Appellate Division further concluded that, while certain pre- and post-readiness delays were attributable to the prosecution, the total delay chargeable to the People did not exceed six months and, as such, "County Court's denial of defendant's statutory speedy trial motion was proper." *Id.* at 1004.

With regard to Petitioner's constitutional speedy trial claim, the Appellate Division held that the overall forty-nine (49) month delay was "presumptively prejudicial." *Id.* However, the Appellate Division concluded that "the reason for the delay . . . appears to be attributable to County Court's inattentiveness to this matter despite the People's repeated requests to set it down for trial." *Id.*

The Appellate Division further noted that Petitioner did not assert his speedy trial right until April of 1990, nearly three years after his arrest, which signified that "he did not consider the deprivation of his right to be serious." *Id.* In light of Petitioner's delay in asserting his speedy trial claim and the fact that the delay could not "be attributed to the bad faith or negligence of the People," the Appellate Division held that Petitioner's "constitutional right to a speedy trial was not abridged." *Id.*

Petitioner's application for leave to appeal the Appellate Division's decision to the Court of

14

Appeals was denied on December 20, 1996.

### 2.   Habeas Review

#### a.   State Law Claim

Section 30.30 of the CPL requires the prosecution to be ready for trial within a specified period of time. It is well-settled that a claimed violation of this state law provision does not raise a federal constitutional claim and is therefore not cognizable on habeas review. *See, e.g., Gibriano v. Attorney Gen'l of the State of N.Y.*, 965 F.Supp. 489, 491-492 (S.D.N.Y. 1997) (denying habeas relief and noting that "Section 30.30 [of the New York Criminal Procedure Law] is a statutory time in which the People of New York must be ready for trial; Section 30.30 is not, as such, a statutory embodiment of the constitutional guarantee to a speedy trial."); *Rodriguez v. Miller*, No. 96 Civ. 4723(HB), 1997 WL 599388, at *2 (S.D.N.Y. Sept. 29, 1997) ("[A] C.P.L. § 30.30 claim has been held not to raise the federal constitutional speedy trial claim for purposes of a federal habeas petition."); *Jackson v. McClellan*, No. 92 Civ. 7217(JFK), 1994 WL 75042, at *2 (S.D.N.Y. Mar. 4, 1994) (holding that petitioner failed to fairly present constitutional speedy trial issue to state court where petitioner argued "entirely in terms of New York Statutory law [C.P.L. § 30.30]").

Accordingly, to the extent that Petitioner's claim herein is based upon the assertion that the state courts misapplied CPL § 30.30, the claim fails to present a federal constitutional question and Petitioner is not entitled to habeas relief on that basis.

#### b.   Federal Constitutional Claim

The Sixth Amendment to the U.S. Constitution provides, in pertinent part, that a criminal defendant is entitled to "a speedy and public trial. . . ." When considering speedy trial claims under the Constitution, courts examine four factors: (1) the length of the delay, (2) the reason for the delay,

(3) the timeliness of the defendant's assertion of his right, and (4) the prejudice to the defendant caused

by the delay. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972).

The Supreme Court explained the first of the *Barker* factors, the length of the delay, serves as

a "threshold inquiry." By showing that the length of the delay is "presumptively prejudicial," the

defendant triggers an analysis of the remaining factors. *Doggett v. United States,* 505 U.S. 647, 651-

52, 112 S.Ct. 2686, 2690-91, 120 L.Ed.2d 520 (1992) (citing *Barker,* 407 U.S. at 530-31). The length

of the delay may then be considered in connection with the remaining factors of the speedy trial

inquiry. *Id.* at 652.

The Second Circuit has noted that there is a "general consensus that a delay of over eight

months meets this standard [of presumptive prejudice], while a delay of less than five months does

not." *United States v. Vassell,* 970 F.2d 1162, 1164 (2d Cir.1992) (citing Gregory P.N. Joseph, Speedy

Trial Rights in Application, 48 FORDHAM L.REV. 611, 623 n. 71 (1980)), *see also United States v.*

*Solomon,* No. 95 Cr. 154, 1996 WL 399814, at *4 (S.D.N.Y. July 16, 1996) (concluding that a twenty-

month delay between indictment and arrest is sufficient to trigger judicial review because it is

presumptively prejudicial, but is not uncommonly long).

In the present case, this Court has no difficulty concluding that the forty-nine (49)-month delay

is presumptively prejudicial. Accordingly, consideration of the remaining *Barker* factors is necessary.

## I.      Reason for the Delay

Under the Supreme Court's decision in *Doggett,* when determining the reason for the delay

the court asks "whether the government or the criminal defendant is more to blame for the delay." 505

U.S. at 651. "The court's determination of whether the Government has made sufficient efforts to

satisfy the 'due diligence' requirement is 'fact-specific.'" *United States v. Perez-Cestero,* 737 F.Supp.

16

752, 763 (S.D.N.Y. 1990)(citing *Rayborn v. Scully,* 858 F.2d 84, 90 (2d Cir. 1988)).

In the present case, the state courts concluded, following an evidentiary hearing, that a significant portion of the delay was attributable to "inattentiveness" on the part of the County Court, rather than any bad faith or negligence on the part of the prosecution. *Dearstyne II,* 646 N.Y.S.2d at 1004. In this regard, both Judge McGrath and the Appellate Division noted the prosecution's repeated and documented efforts urging the trial court to set the matter down for trial, which were apparently unsuccessful because of the court's apparent inattentiveness to the case. These factual findings by the state courts are entitled to a presumption of correctness on habeas review. 28 U.S.C. § 2254(e)(1); *Boyette v. Lefevre,* 246 F.3d 76, 88 (2d Cir.2001).

In light of the presumption and given the absence of evidence to the contrary, this Court finds that the state court's conclusion that the prosecution was not responsible for a large portion of the delay did not involve an unreasonable application of clearly established Federal law, as determined by the Supreme Court; nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

ii.    **Petitioner's Delay in Asserting Claim**

The fact that a defendant failed to demand a speedy trial does not *per se* bar the defendant from raising a speedy trial claim at a later date. *See Rayborn,* 858 F.2d at 92 (citing *Barker,* 407 U.S. at 528). However, "the Supreme Court recognized that although failure to assert the right does not act as a waiver, such failure will make it difficult for a defendant to assert his right successfully at some later point in time." *Rayborn,* 858 F.2d at 92.

In *Barker,* the Supreme Court determined that the defendant's speedy trial right had not been violated because the record established that the defendant "did not want a speedy trial." *See id.*

17

(quoting *Barker*, 407 U.S. at 534; *see also United States v. Schreiber*, 535 F.Supp. 1359, 1363 (S.D.N.Y.1982) ("The speedy trial requirements should not operate to reward a recalcitrant and reluctant defendant.").

"In criminal cases where a speedy trial claim is raised, both the conduct of the government *and* the conduct of the *defendant* are to be weighed, . . . and when it is manifestly apparent that a defendant has no serious interest in the speedy prosecution of the charges against him, a court need not ignore the defendant's fugitivity or recalcitrance in determining whether his sixth amendment rights have been violated." *Rayborn*, 858 F.2d at 92. (emphasis in original)(citing *Barker*, 407 U.S. at 530).

There is no dispute that Petitioner waited a substantial period of time before asserting his speedy trial rights. This delay, while not dispositive, weighs significantly in favor of a finding that Petitioner's speedy trial rights were not violated. *United States v. Fassanaro*, 471 F.2d 717, 718 (2d Cir. 1973); *see also United States v. Vasquez*, 918 F.2d 329, 338 (2d Cir.1990) (finding that the third *Barker* factor "weigh[ed] heavily" against petitioners where they "waited roughly 22 months before advancing their speedy trial claim," which "hardly render[ed] plausible their contention that an expeditious resolution of their cases was a matter of pressing constitutional importance for them"); *United States v. McGrath*, 622 F.2d 36, 41 (2d Cir.1980) (finding that "third [*Barker*] factor weigh[ed] against [petitioners who] waited until immediately before trial to file their motion to dismiss on speedy trial grounds"); *United States v. Lane*, 561 F.2d 1075 (2d Cir.1977) (finding that petitioner's "eve of trial" speedy trial motion was "indicative of an interest in having the indictment dismissed, rather than of an interest in expediting the proceedings"); *Burress v. Henderson*, 814 F.Supp. 313, 322 (W.D.N.Y.1993)(holding that petitioner's delay in assertion of right until commencement of trial was not "the type of 'aggressive' assertion of speedy trial rights necessary to warrant the relief sought").

### iii.   Lack of Prejudice

Potential prejudice to the defendant is the last of the *Barker* factors.  The presumption of prejudice that arises with a long delay must be analyzed in connection with the reason for the delay. *See Doggett*, 505 U.S. at 655.

"[I]n the absence of particular prejudice, 'presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria . . . it is part of the mix of relevant facts.'" *United States v. Solomon*, No. 95 Cr. 154(LAP), 1996 WL 399814, at *5 (S.D.N.Y. July 16, 1996) (quoting *Doggett*, 505 U.S. at 655).

When analyzing the reason for delay, "*Doggett* noted that government negligence is less prejudicial than deliberate delay and explained that 'the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows.'" *United States v. Ramos*, 420 F. Supp.2d 241, 245 -248 (S.D.N.Y.2006) (quoting *Doggett*, 505 U.S. at 657).  "In other words, the longer [the] period of delay that is attributable to the government, the more important the presumption of prejudice." *Ramos*, 420 F.Supp.2d at 248.

Furthermore, the Second Circuit has explained that "[a]lthough 'a showing of prejudice is not a prerequisite to finding a sixth amendment violation, courts generally have been reluctant to find a [constitutional] speedy trial violation in the absence of genuine prejudice.'" *United States v. Jones*, 129 F.3d 718, 724 (2d Cir.1997) (quoting *Rayborn v. Scully*, 858 F.2d 84, 94 (2d Cir. 1988)).

Petitioner does not articulate any particular prejudice arising from the delay or explain how the delay even arguably affected his ability to present a defense. *Cf. United States v. Blanco*, 861 F.2d 773, 780 (2d Cir.1988) ("[S]ince delay can just as easily hurt the government's case, [petitioner's] general claim that the delay impaired her defense also lacks force."); *Rayborn*, 858 F.2d at 94

19

("[C]ourts generally have been reluctant to find a speedy trial violation in the absence of genuine

prejudice."); *Dunavin v. Leonardo*, No. 95-CV-296, 1997 WL 151771, at *3 (N.D.N.Y. Mar. 31,

1997) ("In the absence of a showing of prejudice, courts generally will not find a speedy trial violation

unless all of the remaining *Barker* factors weigh heavily in favor of the appellant.").

The fact that the prosecution continually urged the court to set the matter down for trial, while

Petitioner rested on his speedy trial rights, is the best evidence that both parties considered the passage

of time and the concomitant fading of memories harmful to the prosecution's case and helpful to the

defense.

Moreover, there is no allegation in the Petition that Petitioner was incarcerated during the

period of delay and the record indicates that Petitioner was released on bail pending trial. (TT Vol.

1, Arraignment, at p. 6-7).

In addition, as noted above, the fact that the bulk of the delay is not attributable to any bad

faith on the part of the prosecution renders the presumption of prejudice less important. *Cf. Lane*, 561

F.2d at 1079 (finding no speedy trial violation because, *inter alia*, "[w]hile the record here contain[ed]

some rather long unexplained delays, there [wa]s no indication that these [we]re attributable either to

deliberate procrastination or even negligent inaction on the part of the Government").

Although this Court certainly shares the sentiment expressed by the Appellate Division that

the approximately four (4) year delay cannot be "condone[d]," the mere fact of such a delay does not,

under the circumstances, establish a violation of Petitioner's constitutional speedy trial right. *See*

*Barker*, 407 U.S. at 533-34 (holding that delay of over five years did not violate right to speedy trial);

*Rayborn*, 858 F.2d 84, 89 (2d Cir.1988) (delay of over seven years); *Lane*, 561 F.2d at 1078 (delay

of over four and one-half years).

In sum, this Court finds that Petitioner has failed to establish that the Appellate Division's decision, which discussed and analyzed the *Barker* factors, was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

### 3.    Ineffective Assistance of Trial Counsel

Petitioner also argues that his trial counsel was ineffective for failing to "utilize" the due process clause of the New York State Constitution in support of his speedy trial claim. This argument was originally advanced in Petitioner's CPL § 440 motions, which were denied by Judge McGrath in a Decision and Order dated October 13, 1999. With regard to this particular ineffective assistance of counsel argument, Judge McGrath noted that "both state and federal constitutional issues were considered at a hearing pursuant to CPL §§ 30.20 and 30.30, and in a decision by this court dated April 29, 1996." (CPL § 440.10 Order, October 13, 1999, at p. 12).

When considering Petitioner's ineffective assistance of counsel claims as part of a consolidated appeal,[8] the Appellate Division held that "even assuming that defendant's claims of ineffective assistance of counsel are not based on facts appearing in the record and could not have been raised in a prior appeal, . . . his claims are either moot, unsupported by sworn allegations of fact or meritless." *Dearstyne III*, 761 N.Y.S.2d at 121.

To prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a habeas petitioner must satisfy a two-part test. First, the petitioner must demonstrate that counsel's

---

[8]      As noted above, Petitioner unsuccessfully brought numerous post-conviction motions and proceedings, several of which were combined and heard by the Appellate Division as part of a consolidated appeal.

performance was so deficient that counsel was not functioning as "counsel" within the meaning of the Sixth Amendment to the Constitution. *Id.* at 688. In other words, a petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." *Id.*

Second, the petitioner must show that counsel's deficient performance prejudiced him. *Id.* at 694. To establish the "prejudice" prong of the *Strickland* test, a petitioner must show that a "reasonable probability" exists that, but for counsel's error, the outcome of the trial would have been different. *Id.* at 694. The issue of prejudice need not be addressed, however, if a petitioner is unable to demonstrate first that his counsel's performance was inadequate. "[T]here is no reason for a court deciding an ineffective assistance claim to    . . . address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

In the present case, Petitioner has failed to show that the Appellate Division's decision with regard to this ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of the *Strickland* standard; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

First, it appears that Attorney Grimmick did, in fact, assert Petitioner's state constitutional speedy trial right. In his oral application before the trial court, Attorney Grimmick argued that the delay raised "constitutional speedy trial concerns." (Transcript of July 9, 1991 proceedings, at p. 2). Although he did not specifically reference the New York State Constitution, Attorney Grimmick never expressly limited his argument to the federal constitution. Further, the record indicates that Grimmick's written motion to dismiss the indictment noted that Petitioner's right to a speedy trial was

22

"guaranteed by statute . . . [and] by state doctrines of due process."[9]

Second, even assuming *arguendo* that Attorney Grimmick either failed to raise the New York State Due Process Clause or failed to properly emphasize that clause in support of his speedy trial arguments, Petitioner has failed to satisfy the prejudice prong under *Strickland* because he has not established any reasonable likelihood that the motion would have been granted if the New York Due Process claim had been raised and/or more strongly emphasized.

Although the New York State Constitution does not contain a specific "speedy trial" clause, Article 1, § 6 of the State Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law." The New York Court of Appeals has held that an "unreasonable delay" in commencing the prosecution of a defendant may constitute a violation of due process under Article 1, §6. *See People v. Singer*, 44 N.Y.2d 241, 376 N.E.2d 179 (N.Y. 1978).

However, Petitioner has not provided any support for the suggestion that a motion to dismiss based primarily upon state due process grounds would have succeeded. The *Singer* line of cases relates to delays occurring prior to the commencement of the criminal action. The delays in the present case occurred after the filing of an accusatory instrument, *i.e.*, the indictment. *See generally Erdheim v. Greiner*, 22 F. Supp.2d 291, 296 (S.D.N.Y. 1998) (discussing *Singer* and related cases). There was no issue in this case concerning pre-indictment delay. Indeed, the police arrested Petitioner almost immediately following his written confession.

Accordingly, given the lack of unreasonable pre-commencement delay and the findings of the

---

[9]     Attorney Grimmick's written motion to dismiss the indictment was not provided to this Court. This quotation is drawn from the People's Affirmation in Opposition to the CPL § 440.10 motion at ¶ 98, which was provided. That affirmation, in turn, quotes from the affidavit-memorandum filed by Attorney Grimmick in support of the motion to dismiss. There is no suggestion in the record that the quotation found in the People's Affirmation is inaccurate.

state courts regarding the reasons for the post-commencement delay, no reasonable probability exists that a motion to dismiss the indictment based upon state constitutional due process ground would have succeeded. This Court recommends finding that Petitioner is not entitled to habeas relief on this basis.

**B.      Ground Two – Admission of Petitioner's Statement to Police**

Petitioner contends that his constitutional rights were violated by the trial court's denial of a motion to suppress his written statement to the police. Petitioner argues that the statement was procured in violation of his constitutional rights and should accordingly have been suppressed.

**1.      Factual Background**

In early June 1987, Detective Petrucci of the Rensselaer Police Department, working with New York State Trooper Patricia Donovan, identified Petitioner as the prime suspect in the sexual abuse of T.O. (TT Vol. 2, at 23-24, 86).

On June 19, 1987, Petrucci and Donovan made arrangements to interrogate Petitioner at the state police barracks in Loudonville, New York. (TT Vol. 2, at 51-52, 88, 130). They traveled in plain clothes and unmarked cars to Petitioner's home. (TT Vol. 2, at 32). After identifying themselves to Petitioner's mother, Detective Petrucci asked for permission to speak with Petitioner, telling Mrs. Dearstyne that she had nothing to worry about and that her son was not in trouble. (TT Vol. 2, at 51, 122, 123). Mrs. Dearstyne said that the police could speak with her son, but explained that he was at the home of a friend (the "Blauers"). (TT Vol. 2, at 34). Petrucci and Donovan did not tell Mrs. Dearstyne that they intended to take her son to the state police barracks in Loudonville for interrogation and did not explain that he was the target of their investigation. (TT Vol. 2, at 51, 58).

Detective Petrucci and Investigator Donovan traveled to the Blauers' residence, where Petitioner was swimming with friends. (TT Vol. 2, at 36-37). At the request of the officers, Petitioner

24

was summoned and approached Petrucci and Donovan still wet and dripping from the pool. (TT Vol. 2, at 37). The officers explained that they were conducting an investigation and wanted to speak with Petitioner, who agreed to be interviewed. (TT Vol. 2, at 38). Petitioner changed his clothes and rode with Detective Petrucci to the state police barracks in Loudonville, while Donovan followed in another vehicle. (TT Vol. 2, at 41).

The officers brought Petitioner into the barracks through a back entrance that was typically reserved for state troopers. (TT Vol. 2, at 41, 60). Although troopers were required to place the name of any non-trooper visiting the barracks on a "blotter," Donovan did not follow this procedure when Petitioner was brought in for questioning. (TT Vol. 2, at 107).

Petitioner was interrogated by Trooper Donovan and Investigator Edmond W. Girtler. The testimony of the witnesses differed sharply regarding the nature and conduct of the interrogation. The following is a summary of the testimony given by the prosecution witnesses:

Investigator Girtler advised Petitioner of his *Miranda* rights and Petitioner signed a written acknowledgment indicating that he understood his rights. (TT Vol. 2, at 100-102, 142-43). Girtler told Petitioner that one of the children that his mother provided day care for had made an allegation against him. (TT Vol. 2, at 141). For approximately thirty (30) minutes, Girtler engaged in general conversation with Petitioner about sexual intercourse, masturbation, and sexual fantasies, until he asked Petitioner if he had ever engaged in sexual conduct with the children for   whom his mother babysat. (TT Vol. 2, at 168, 177). Petitioner shrugged and after further questioning made a series of statements admitting sexual contact with a three-year girl named T.O. (TT Vol. 2, at 145, 168). Investigator Girtler then took a written statement from Petitioner. (TT Vol. 2, at 180). The statement was signed by Petitioner and Investigator Girtler and notarized by Trooper Donovan. (TT Vol. 2, at 161).

Petitioner's account of the interrogation was dramatically different and may be summarized as follows:

Detective Petrucci and Investigator Donovan took Petitioner into an interrogation room and told him he was being charged with rape. (H at 189).[10] Petitioner denied committing any crime. (H at 189-190). Petrucci told Petitioner that they had evidence of the crime and that a rape "specialist" was being brought in. (H at 190). Investigator Girtler arrived shortly thereafter, holding a large yellow envelope. (H at 191). Girtler told Petitioner that the envelope contained "all the evidence to put you away for 25 years." (H at 191). Petitioner continued to deny committing any crime, which angered Girtler, who slammed his fist onto the desk. (H at 191). Petitioner asked to make a telephone call and was told to "shut up" and sit down. (H at 191). Investigator Girtler continued to press the issue and Petitioner continued denying any criminal conduct, until Investigator Girtler left the room in anger, leaving Petitioner alone with Detective Petrucci. (H at 192).

Petitioner was frightened and began to cry. (H at 192). Petrucci told him that he would receive only probation if he confessed. (H at 192). Detective Petrucci then told Petitioner: "When you are in jail, you are going to have big guys who are going to come make you his [sic] baby. Bring a supply of vasoline [sic], and everything." (H at 192). Investigator Girtler then re-entered the room and continued to question Petitioner, who repeatedly denied any wrongdoing. After a time, Petitioner indicated that he did not commit the crime but told Investigator Girtler that "out of your satisfaction [sic], I will say 'yes' to it."(H at 194-95). Investigator Girtler then read several allegations to Petitioner from a written statement. When Petitioner denied the allegations, Investigator Girtler told him they could prove that he had done it. Petitioner eventually relented and signed the statement, believing he

---

[10]     References preceded by "H" are to the transcript pages of the *Huntley* hearing.

would receive probation by doing so. (H at 195-97).

There is no dispute that after signing the statement, Petitioner was arrested and charged with various sexual crimes involving T.O. (TT at 88-91, 122-23, 158).

### 2.    State Court Proceedings

Prior to trial, Petitioner moved to suppress his statement. The trial court conducted a *Huntley* hearing, at which both parties were permitted to call witnesses and introduce evidence. The hearing lasted three days, with the prosecution calling Detective Petrucci, Investigator Donovan, and Investigator Girtler. Petitioner testified in his own behalf and called both of his parents as witnesses.

On July 8, 1991, the trial court issued a Decision and Order denying the suppression motion and finding simply that there was a "sharp issue of fact" with respect to the voluntariness of the statement. The trial judge declined to rule on whether the statement was voluntary, directing that the statement was to be submitted to the jury to determine voluntariness in the first instance. (Exhibit J to Petitioner's Exhibits in Support of Motion to Vacate Judgment).

At trial, the prosecution called Detective Petrucci, Investigator Donovan, and Investigator Girtler as witnesses. The signed statement was introduced into evidence and read into the record. (TT, Vol. 2 at 157-161). As noted above, the statement indicated that Petitioner understood his constitutional rights, but wanted to waive those rights and make a statement. The written statement contained several explicit admissions regarding sexual contact between Petitioner and T.O.

During the defense case, Petitioner called his parents and sister, Cindy Dearstyne, to testify in support of his claim that the police investigators deliberately isolated him from his family to coerce him into making a false confession. Petitioner also denied the admissions set forth in the statement, repeating his claim from the *Huntley* hearing that he confessed as a result of coercion.

27

Following his conviction, Petitioner challenged the trial court's refusal to suppress the statement on direct appeal. The Appellate Division discussed the facts surrounding the interrogation, as established through the *Huntley* hearing and trial testimony, and concluded that "these facts do not warrant suppression of defendant's statement for they do not establish that his isolation resulted from official deception or trickery." *Dearstyne II*, 646 N.Y.S.2d at 1005.

Specifically, the appeals court noted that "because the defendant was legally an adult, there was no requirement that his family be present during the questioning." *Id.* (This Court notes that at the time of the interrogation, Dearstyne was only sixteen-years-old.) In addition, the appeals court found that suppression was not warranted because "the police had obtained the consent of defendant's mother to speak to him and there is no indication that his father made any effort to contact an attorney to represent him." *Id.*[11] The Court of Appeals denied Petitioner's request for leave to appeal.

Petitioner raised several challenges concerning the admission of his statement in support of his *pro se* CPL §440 motions. Specifically, Petitioner argued that the statement was taken in violation of his *Miranda* rights, that the trial court's *Huntley* decision failed to comply with CPL § 710.60 (6), and that the statement was involuntary, unreliable, and uncorroborated.

As noted above, Judge McGrath denied Petitioner's §440 motion in a Decision and Order dated October 13, 1999. Judge McGrath rejected Petitioner's arguments concerning the admission of his statement on several procedural grounds. First, he found that Petitioner's claim that he was deliberately isolated from his parents had been decided by the Appellate Division and was thus barred by CPL § 440.10 (2)(a), which provides for the denial of claims previously decided on the merits on direct appeal.

---

[11]     Petitioner also argued that suppression was warranted because his statement was obtained during an impermissible delay in his arraignment. The Appellate Division rejected this argument, finding that it lacked any support in the record. *Dearstyne II*, 646 N.Y.S.2d at 1005.

28

Second, to the extent that Petitioner was raising claims regarding his statement that were not raised on direct appeal, Judge McGrath denied those claims pursuant to CPL § 440.10 (2)(c), which provides for the denial of claims that could reasonably have been raised on direct appeal, but were not. Lastly, Judge McGrath stated that even if consideration of Petitioner's claims was not otherwise procedurally barred, he would exercise his discretion to deny the claims under CPL § 440.10 (3)(b), which provides for the discretionary denial of claims "previously determined on the merits upon a prior motion or proceeding . . . , other than an appeal from the judgment." CPL § 440 Order, October 13, 1999, at p. 6).

As part of the consolidated appeal, the Appellate Division did not discuss the claims regarding Petitioner's statement specifically, but summarily rejected many of Petitioner's claims, including (presumably) his arguments concerning the failure to suppress his statement, finding them "unpersuasive." *Dearstyne III*, 761 N.Y.S 2d at 121. This determination constitutes a denial on the merits and Petitioner's claims regarding the suppression of his statement are therefore subject to AEDPA review. *See Sellan*, 261 F.3d at 312-13 (holding that one word denial is sufficient to constitute an "adjudication on the merits" for purposes of AEDPA).

### 3.   Habeas Review

#### a.   Voluntariness of the Confession

As the Supreme Court explained in *Jackson v. Denno*,

> It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760, and even though there is ample evidence aside from the confession to support the conviction. *Malinski v. New York*, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; *Stroble v. California*, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872; *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975. Equally clear is the defendant's constitutional right at some stage in the proceedings to object

29

to the use of the confession and to have a fair hearing and a reliable determination
on the issue of voluntariness, a determination uninfluenced by the truth or falsity of
the confession. *Rogers v. Richmond, supra.*

*Jackson v. Denno*, 378 U.S. 368, 377 (1964). In *Dickerson v. United States*, 530 U.S. 428, 434, 120

S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Supreme Court held that to determine whether a statement

was voluntary, the trial court must decide whether a defendant's will was overborne by the

circumstances of the interrogation.

"No single criterion controls whether an accused's confession is voluntary: whether a

confession was obtained by coercion is determined only after careful evaluation of the totality of the

surrounding circumstances." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir.1997). Voluntariness is

a question is a mixed question of law and fact. "Without exception, the [Supreme] Court's

confession cases hold that the ultimate issue of "voluntariness" is a legal question requiring

independent federal determination." *Miller v. Fenton*, 474 U.S. 104 (1985) (citing *Haynes v.

Washington*, 373 U.S., at 515-516; *Ashcraft v. Tennessee*, 322 U.S., at 147-148. The Supreme Court

explained, "In short, an unbroken line of cases, coming to this Court both on direct appeal and on

review of applications to lower federal courts for a writ of habeas corpus, forecloses the Court of

Appeals' conclusion that the 'voluntariness' of a confession merits something less than independent

federal consideration." *Miller*, 474 U.S. at 112. The *Miller* court reiterated that subsidiary factual

questions, such as whether a drug has the properties of a truth serum, or whether in fact the police

engaged in the intimidation tactics alleged by the defendant, are entitled to an evidentiary

presumption of correctness set forth in former 28 U.S.C. § 2254(d), now 28 U.S.C. § 2254(e)(1).

*Id.* (citing, *inter alia, LaVallee v. Delle Rose*, 410 U.S. 690, 693-95 (1973) (*per curiam*). However,

the Supreme Court reaffirmed in *Miller*,"the ultimate question whether, under the totality of the

30

circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination." 474 U.S. at 112.

Although the Supreme Court has not established any *per se* rules concerning the admissibility of statements made by adolescent defendants, it has stated that "[t]he totality approach permits– indeed, it mandates–inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

Petitioner asserts the following arguments in support of his claim that his statement was admitted into evidence in violation of his constitutional rights. First, Petitioner contends that his statement was involuntary because the police investigators deliberately and intentionally isolated him, placing him beyond the reach and assistance of his parents. Second, Petitioner argues that he signed the statement due to fear and fatigue and, thus, it should have been suppressed as involuntary. Third, Petitioner argues that the police investigators used "coercive techniques," including false promises and trickery, that resulted in an involuntary confession.

Numerous courts have observed that the "petitioner's age is a factor that may enter into a court's determination of whether a confession was coerced." *Dowtin v. Cohen*, No. 99-CV-0323, 2003 WL 21912681, at *2 (E.D.N.Y. June 10, 2003); *see also Hemingway v. Henderson*, 754 F. Supp. 296, 304 (E.D.N.Y. 1991) (noting that "[c]lose scrutiny is always required of any confession that has been given by a 16-year old during custodial interrogation") (citing *Haley v. Ohio*, 332 U.S. 596, 599 (1948) (holding that murder confession by 15-year-old African-American boy after five

31

hours of interrogation, starting at midnight, by police officers working in relays; without warning him regarding his rights; and without his having had benefit of the advice of friends, family or counsel, should have been excluded because it was involuntary and was extracted by methods violative of due process requirements of Fourteenth Amendment; "when, as here, a mere child–an easy victim of the law–is before us, special care in scrutinizing the record must be used"). The Supreme Court has described the need to exercise "special caution" when assessing the voluntariness of a juvenile confession, particularly where there is prolonged or repeated questioning or where the accused in interrogated without having a parent, lawyer, or other friendly adult present. *See In re Gault*, 387 U.S. 1, 45, 87 S. Ct. 1428, 18 L. Ed.2d 527 (1967); *Gallegoes v. Colorado*, 370 U.S. 49, 53-55, 82 S. Ct. 1209, 8 L. Ed.2d 325 (1962) ( holding that "The youth of the petitioner, the long [five-day] detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend-all these combine to make us conclude that the formal confession on which this conviction may have rested *(see Payne v. Arkansas*, 356 U.S. 560, 568, 78 S.Ct. 844, 850, 2 L.Ed.2d 975) was obtained in violation of due process")

The question before this Court on habeas review is whether the Appellate Division's conclusion that the statement was not coerced was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. For the reasons that follow, this Court finds that Petitioner has established that the Appellate Division's ruling was an unreasonable application of clearly established Supreme Court law.

32

In the present case, Petitioner was sixteen-years-old at the time of the interrogation and there is no dispute concerning the fact that his parents were not present. Further, it is undisputed that Petitioner's parents did not know where Petitioner was during the interrogation. The testimony established that, although the investigators did request and obtain her permission to speak with Petitioner, they employed a subterfuge to obtain the consent of Petitioner's mother without providing her with all of the details concerning the investigation. Indeed, they falsified their true intentions concerning their focus on Petitioner as a perpetrator, telling Petitioner's mother that she had nothing to worry about and that her son was not in trouble, even though at the time of their representations to her he was the target of the troopers' criminal investigation. (TT Vol. 2, at 51, 122, 123). The troopers did not inform Petitioner's mother that they intended to take her son to the state police barracks to conduct the interrogation. Thus, Petitioner's mother did not know where her son was during the time he was in police custody. The troopers continued their deceptive practices when they arrived at the barracks, essentially "sneaking" Petitioner into the building through a back entrance reserved for officers. (TT Vol. 2, at 41, 60). Furthermore, police regulations required that the name of anyone visiting the barracks who was not a state trooper be placed on a "blotter." However, Trooper Donovan admitted in his sworn trial testimony that he did not follow this procedure when Petitioner was brought in for questioning. (TT Vol. 2, at 107). In this Court's opinion, the state troopers clearly used deceptive means to conceal Petitioner's location and to isolate him from his parents. *See Gallegoes*, 370 U.S. at 51("Confessions obtained by 'secret inquisitorial processes' (*Chambers v. Florida*, 309 U.S. 227, 237, 60 S.Ct. 472, 477, 84 L.Ed. 716) are suspect, since such procedures are conducive to the use of physical and psychological pressures.")

Petitioner admitted that he received a preprinted form describing his *Miranda* rights, that he read the form, and understood his rights. (TT Vol. 3, at p. 617-620). Petitioner also acknowledged that he never asked for an attorney during the course of the interrogation. (TT Vol. 3, at p. 619-620). The Court recognizes that Petitioner was sixteen-years-old, and under New York law an individual who passes that age-threshold is considered to be legally an adult for purposes of being charged with a crime, understanding the panoply of constitutional rights involved in a *Miranda* warning, and the ramifications of waiving those rights. However, this Court cannot avoid noting the incongruity that Petitioner, at age sixteen, nevertheless was still not legally able to vote, drink alcohol, or drive a car by himself at night, and is viewed at that age by the great majority of jurisdictions as lacking the maturity, judgment and experience to be considered an adult for almost any purpose. Notably, Petitioner had no previous experience with the police or the criminal justice system and though there is no indication that he was not of normal intelligence, he was not "street smart". *See Gallegoes*, 370 U.S. at 54 ("But a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protest his own interests or how to get the benefits of his constitutional rights."). That Petitioner admitted to being read his *Miranda* warnings and signed the card is not, in this Court's opinion, sufficient to alleviate the concern that Petitioner was taken advantage of by the police, given Petitioner's young age and lack of experience with criminal justice system.

Although Petitioner testified that he reviewed the statement and initialed corrections on certain portions thereof, (TT Vol. 3, at 621), the written statement was transcribed by Investigator

Girtler. That the statement was not in Petitioner's own writing tends to support Petitioner's version of events of the interrogation. According to Petitioner, he eventually relented after being told repeatedly by Girtler that they knew he had done it. Petitioner told Investigator Girtler that though he did not commit the crime he would "say 'yes' to it" to satisfy Girtler. At that point, Girtler read several allegations to Petitioner from a written statement. When Petitioner denied the allegations, Girtler told him they could prove that he had done it. Earlier in the interrogation, according to Petitioner, the police had lied to Petitioner about all the evidence of his guilt that they possessed. Detective Petrucci told Petitioner that they had evidence of the crime and that they had a so-called "rape specialist" working on the case. (H at 190). When Investigator Girtler arrived, he was brandishing a large yellow envelope, (H at 191), which he said contained "all the evidence to put [Petitioner] away for 25 years." After Girtler left the interrogation room, angered by Petitioner's denials, Petitioner states that he was frightened and began to cry. Detective Petrucci promised him that he would not receive any jail time if he confessed, and then proceeded to paint a graphic picture of the rapes to which Petitioner would be subjected to by the older inmates if he did go to prison. Although he was never subjected to any physical force, the interrogation was fairly lengthy (it lasted between three to four hours) and not free from coercive tactics. If Petitioner's testimony is credited, Petitioner was subjected to psychological pressure, lies, and manipulation, to which he was more vulnerable given his relative youth and inexperience. Indeed, the troopers' deceptive practices in making sure that Petitioner's whereabouts were a secret lends credence to Petitioner's version of the interrogation. Petitioner testified that he eventually relented and signed the statement, believing he would receive probation by doing so. (H at 195-97). (TT Vol. 3, at 628-629). *Cf. Fare v. Michael C.*, 442 U.S. at 725 (the Supreme Court concluded that a confession was voluntary where the 16-

35

year-old suspect had a prior criminal record, had no signs of insufficient intelligence and had not been subjected to threats, intimidation or trickery).[12]

In light of these undisputed facts, this Court finds that Petitioner has established that the Appellate Division's conclusion that Petitioner's statement did not result from intentional isolation designed to overbear Petitioner's will was an unreasonable determination of the facts, in light of the evidence presented in the State court proceeding. As discussed above, the police intentionally isolated petitioner from his mother by not informing her where they were bringing him and then deliberately bringing him into the barracks by means of an entrance not used by the public, and contravening established police procedure by not signing him in on the sign-in log at the barracks, so there was no record that he was in the building.

### b. Failure to Comply with CPL § 710.60(6)

In his habeas petition, Petitioner argues that the trial court's suppression decision failed to comply with CPL § 710.60(6), which requires that the court, upon determining a suppression motion, "set forth on the record its findings of fact, its conclusions of law and the reasons for its determination." N.Y. CRIM. PROC. LAW § 710.60(6). The trial court's Decision and Order denying

---

[12]     Petitioner also argues that the statement should have been suppressed pursuant to *People v. Rivera*, 431 N.Y.S.2d 1015 (2d Dep't 1980), in which the Appellate Division, Second Department held that "when a suspect is a minor still residing in his parent's home and presumably still reliant on him or her for guidance, the police have an obligation to establish and maintain procedures so that the suspect is not deliberately or inadvertently held beyond the reach of his parent." *Id. See also, e.g., People v. Bevilacqua*, 45 NY2d 508 (N.Y. 1978) ("It was found as a fact at the pretrial hearing that when Bevilacqua was first apprehended, he waived his right to a lawyer, but asked to see his mother. As previously noted, defendant was 18 years old at the time. It was only natural that he should regard his mother, rather than a lawyer, as a primary source of help and advice.").

In *Bevilacqua*, the defendant might have expected his mother to call his lawyer; he might not have. The point is that by not telephoning his mother, despite an at least once repeated request, until after Bevilacqua had been interrogated and had confessed, the police foreclosed the possibility, and even the likelihood, that he would receive adequate counsel before responding to police questioning. The point of *Rivera* really goes to the constitutional right to counsel, guaranteed by both New York State and the United States constitutions. Petitioner appears to advance the argument that the police tactics were coercive in that they were deliberately trying to frustrate his exercising his right to counsel.

the motion to suppress Petitioner's statement was limited to a brief recitation of the procedural

history and the following findings:

> During the taking of testimony at the Suppression Hearing and in the arguments set
> forth in the memoranda a sharp question of fact has arisen. There are no clear cut
> legal issues without resolving the questions of fact. Accordingly, the motion to
> suppress is denied. A question of fact as to voluntariness has been presented for
> determination by the trial jury.

County Court Decision and Order, dated July 8, 1991, attached as Exhibit J to Petitioner's Exhibits

in Support of the CPL § 440.10 Motion to Vacate the Judgment.

## I.    State Court Proceedings and Rulings

Prior to trial, Dearstyne's counsel moved to suppress the statement made at the state police

barracks and requested a suppression hearing pursuant to *People v. Huntley*.[13] The trial court

conducted a *Huntley* hearing and, on July 8, 1991, the trial court issued a cursory Decision and

---

[13]     *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (N.Y. 1965), was issued
following the Supreme Court's decision in *Jackson v. Denno*, 378 U.S. 368, 386, n. 13, 84 S.Ct. 1774, 1785, n. 13,
12 L.Ed.2d 908 (1964), which struck down as unconstitutional New York's prior procedure of allowing the jury, in
the first instance, to determine the voluntariness defendant's confession, at the same time it determined its reliability.
The Supreme Court explained, "Under the New York procedure, the evidence given the jury inevitably injects
irrelevant and impermissible considerations of truthfulness of the confession into the assessment of voluntariness.
Indeed the jury is told to determine the truthfulness of the confession in assessing its probative value." *Jackson*, 378
U.S. at 386. The Supreme Court further criticized the New York procedure under which "the fact of a defendant's
confession is solidly implanted in the jury's mind, for it has not only heard the confession, but it has been instructed
to consider and judge its voluntariness and is in position to assess whether it is true or false. If it finds the confession
involuntary, does the jury—indeed, can it–then disregard the confession in accordance with its instructions? If there
are lingering doubts about the sufficiency of the other evidence, does the jury unconsciously lay them to rest by
resort to the confession? Will uncertainty about the sufficiency of the other evidence to prove guilt beyond a
reasonable doubt actually result in acquittal when the jury knows the defendant has given a truthful confession?" *Id.*
at 388. The New York procedure, concluded the *Jackson v. Denno* court, "poses substantial threats to a defendant's
constitutional rights to have an involuntary confession entirely disregarded and to have the coercion issue fairly and
reliably determined," "hazards [which it] cannot ignore." *Id.* at 389.

As far as a remedy, the Supreme Court held that the state, rather than the federal habeas court, should first
provide Jackson "with that which he has not yet had and to which he is constitutionally entitled–an adequate
evidentiary hearing productive of reliable results concerning the voluntariness of his confession." *Id.* at 393-94. It
did not necessarily follow, however, that Jackson was automatically entitled to a second full trial on his guilt or
innocence. *Id.* at 394. "By the responsible followup to *Jackson* in *Huntley*, the highest court of New York detailed
procedures enumerated for the guidance of the trial courts of New York to hear separately and determine
voluntariness of confessions before submission of such confession to a jury again on the same issue of
voluntariness." *United States ex rel. Schompert v. LaVallee*, 238 F. Supp. 265, 265 (N.D.N.Y. 1965).

Order denying the suppression motion. As noted above, the trial court, finding that there was a "sharp issue of fact," decided that it accordingly could not resolve the legal issue of voluntariness. It therefore ordered that the confession be admitted into evidence at trial and that the voluntariness issue be left for the jury to decide in the first instance. *See* Exhibit J to Petitioner's Exhibits in Support of CPL § 440.10 Motion to Vacate the Judgment.

On direct appeal, Petitioner's trial counsel (Attorney Grimmick) also acted as appellate counsel. Attorney Grimmick raised two arguments relative to the suppression of the statement in his appellate brief: (1) that Petitioner was improperly isolated from his family and (2) that the statement was obtained during an impermissible delay in Petitioner's arraignment. *See* Exhibit 31 to Docket No. 72).

After discussing the factual circumstances of the interrogation, as presented at the *Huntley* hearing and trial, the Appellate Division concluded that "these facts do not warrant suppression of defendant's statement for they do not establish that his isolation resulted from official deception or trickery." *Dearstyne II*, 646 N.Y.S.2d at 1005. The Appellate Division held that "because the defendant was legally an adult, there was no requirement that his family be present during the questioning." *Id.* In addition, the Appellate Division found, suppression was not warranted because "the police had obtained the consent of defendant's mother to speak to him and there is no indication that his father made any effort to contact an attorney to represent him." *Id.* The court also rejected the "impermissible delay argument." *Id.* The New York Court of Appeals denied Petitioner's request for leave to appeal.

In his subsequent *pro se* CPL §440.10 motion, Petitioner raised several challenges concerning the admission of his statement to the police. One of these arguments was that the trial

38

court failed to comply with the requirements of CPL § 710.60(6), which requires a hearing court to set forth its fact-findings, legal conclusions, and reasons for its determination regarding the voluntariness of a defendant's confession "regardless of whether a hearing was conducted," N.Y. CRIM. PROC. LAW § 710.60(6)); *accord, e.g., People v. Jeffreys,*284 A.D.2d 550, 727 N.Y.S.2d 626, 627 (App. Div. 2d Dept. 2001).

In his CPL §440 motion, Dearstyne asserted that the trial court failed to comply with the requirements of CPL § 710.60 (6), rendering trial court's decision "fundamentally flawed" because the court "never set forth . . . his reasons for allowing the involuntary and false confession into the trial." (Petitioner's Memorandum of Law in Support of the CPL § 440.10 Motion to Vacate the Judgment ("Pet'r CPL § 440.10 Mem."), at p. 141). In his discussion of that argument, Petitioner cited *Jackson v. Denno,* 378 U.S. 368, 386, n. 13, 84 S.Ct. 1774, 1785, n. 13, 12 L.Ed.2d 908 (1964), in support of his claim that the trial court should not have allowed the jury to decide the issue of voluntariness without making a threshold voluntariness finding. *See* Pet'r CPL § 440.10 Mem., at p. 142. *Jackson* struck down as unconstitutional New York's prior procedure of allowing the jury, in the first instance, to determine the voluntariness defendant's confession, at the same time it determined its reliability. Dearstyne also cited *Crane v. Kentucky,* 476 U.S. 683 (1986), in which the Supreme Court the state courts "erred in foreclosing petitioner's efforts to introduce testimony about the environment in which the police secured his confession," especially where the "[p]etitioner's entire defense was that there was no physical evidence to link him to the crime and that, for a variety of reasons, his earlier admission of guilt was not to be believed." *Id.* at 691. *See* Petitioner's Memo of Law in support of his CPL § 440.10 motion, at p. 142 (citing *Crane* and *Jackson*).

In his decision denying Petitioner's 440 motion, Judge McGrath specifically rejected the foregoing argument pursuant to CPL § 440.10 (2)(c) on the grounds that it could have been raised on direct appeal, but was not. Judge McGrath stated that "sufficient facts appear on the record for all issues related to defendant's confession to have been addressed on appeal" and, as such, the claim was required to be dismissed pursuant to CPL § 440.10 (2)(c).

Represented by new counsel, Attorney Bauer, Petitioner appealed the decision denying CPL § 440.10 relief, along with other related orders, as part of a consolidated appeal to the Appellate Division. The Appellate Division did not specifically address the issue concerning the trial court's failure to decide whether Petitioner's statement to the police was voluntary or not. Notably, the Appellate Division did not refer at all to Judge McGrath's invocation of CPL § 440.10(2)(c) as grounds for dismissal of the claims pertaining to Petitioner's statement. At the conclusion of its decision, the Appellate Division denied the balance of Petitioner's arguments as "unpersuasive." *Dearstyne III,* 761 N.Y.S 2d at 121.

In his habeas petition, Petitioner argues that the "[t]rial Court allowed the confession to go to the jury, without first determining these matters as required by law." In his opposition brief, Respondent states that the Appellate Division's summary denial of Petitioner's remaining claims as "unpersuasive" constituted a denial on the merits with respect to Petitioner's claims regarding suppression of his statement. *See* Respondent's Memorandum of Law ("Resp't Mem."), at p. 43. The Second Circuit clearly has stated that where, as here, " 'there is no basis either in the history of the case or the opinion of the Appellate Division for believing' that the claim at issue 'was denied on procedural or any other nonsubstantive grounds,' a terse statement that 'remaining contentions are without merit' suffices to trigger AEDPA's heightened standard of review." Dallio v. Spitzer,

40

343 F.3d 553, 560 (2d Cir.2003) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir.2001)).

"AEDPA deference is no less due to unexplained rulings than to explained rulings." *Jimenez v.*

*Walker,* 458 F.3d 130, 143 n.12 (2d Cir. 2006) (citing *Sellan v. Kuhlman*, 261 F.3d 303, 311-14 (2d

Cir.2001)). The Appellate Division's summary denial of Dearstyne's claim as "unpersuasive" thus

constitutes an "adjudication on the merits" for purposes of AEDPA.

> ii.   **The Trial Court's Failure to Adjudicate the Voluntariness Issue Was an Unreasonable Application of Clearly Established Supreme Court Law,** *Jackson v. Denno*

The issue is whether it was proper for Judge McGrath to decline to make a final adjudication

regarding the voluntariness issue after the suppression hearing, instead leaving it as a factual

question for the jury to resolve at Dearstyne's trial. This very same issue was discussed in the

seminal case of *Jackson v. Denno,* in which the Supreme Court explained the old, pre-*Huntley* New

York rule as follows:

> Under the New York rule, the trial judge must make a preliminary determination regarding a confession offered by the prosecution and exclude it if in no circumstances could the confession be deemed voluntary. But if the evidence presents a fair question as to its voluntariness, as where certain facts bearing on the issue are in dispute or where reasonable men could differ over the inferences to be drawn from undisputed facts, the judge "must receive the confession and leave to the jury, under proper instructions, the ultimate determination of its voluntary character and also its truthfulness." *Stein v. New York,* 346 U.S. 156, 172, 73 S.Ct. 1077, 1086, 97 L.Ed. 1522. If an issue of coercion is presented, the judge may not resolve conflicting evidence or arrive at his independent appraisal of the voluntariness of the confession, one way or the other. These matters he must leave to the jury.

*Jackson,* 378 U.S. at 378 (footnotes omitted); *see also Owens v. Treder,* 873 F.2d 604, 609 (2d Cir.

1989) ("New York law [prior to *Jackson v. Denno*] originally permitted the jury to decide the

voluntariness issue whenever the trial court made a preliminary determination that the evidence on

involuntariness presented a factual conflict."). The Supreme Court explained, "Under the New York procedure, the evidence given the jury inevitably injects irrelevant and impermissible considerations of truthfulness of the confession into the assessment of voluntariness. Indeed the jury is told to determine the truthfulness of the confession in assessing its probative value." *Jackson*, 378 U.S. at 386.

*Jackson* thus repudiated the same procedure employed by Judge McGrath in Dearstyne's case, because it "did not afford a reliable determination of the voluntariness of the confession offered in evidence at the trial, did not adequately protect Jackson's right to be free of a conviction based upon a coerced confession and therefore cannot withstand constitutional attack under the Due Process Clause of the Fourteenth Amendment.

The Supreme Court explained in *Jackson* that New York's old procedure had "a significant impact upon the defendant's Fourteenth Amendment rights" since a "New York jury returns only a general verdict upon the ultimate question of guilt or innocence[,] and "[i]t is impossible to discover whether the jury found the confession voluntary and relied upon it, or involuntary and supposedly ignored it." *Id.* Significantly, the New York procedure gave no "indication of how the jury resolved disputes in the evidence concerning the critical facts underlying the coercion issue" and in fact there was "nothing to show that these matters were resolved at all, one way or the other." *Id.* at 380; *see also id.* ("A defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined. But did the jury in Jackson's case make these critical determinations, and if it did, what were these determinations?").

The problem with New York's old procedure, as the Supreme Court put it, was that

42

"[t]he New York jury is at once given both the evidence going to voluntariness and all of the corroborating evidence showing that the confession is true and that the defendant committed the crime. The jury may therefore believe the confession and believe that the defendant has committed the very act with which he is charged, a circumstance which may seriously distort judgment of the credibility of the accused and assessment of the testimony concerning the critical facts surrounding his confession.

In those cases where without the confession the evidence is insufficient, the defendant should not be convicted if the jury believes the confession but finds it to be involuntary. The jury, however, may find it difficult to understand the policy forbidding reliance upon a coerced, but true, confession, a policy which has divided this Court in the past, *see Stein v. New York, supra,* and an issue which may be reargued in the jury room. That a trustworthy confession must also be voluntary if it is to be used at all, generates natural and potent pressure to find it voluntary. Otherwise the guilty defendant goes free. Objective consideration of the conflicting evidence concerning the circumstances of the confession becomes difficult and the implicit findings become suspect.

*Jackson,* 378 U.S. at 381-82. In sum, the Supreme Court found, "[u]nder the [former] New York procedure, the evidence given the jury inevitably injects irrelevant and impermissible considerations of truthfulness of the confession into the assessment of voluntariness. Indeed the jury is told to determine the truthfulness of the confession in assessing its probative value. As a consequence, it cannot be assumed, as the *Stein* Court assumed, that the jury reliably found the facts against the accused." 378 U.S. at 387.

Thus, in *Jackson,* "the Supreme Court held that [New York's former] procedure to be constitutionally flawed because it allowed the jury to determine the issue of voluntariness in the first instance, despite the danger that the jury might be improperly swayed by the reliability or truthfulness of the confession. To avoid this danger, the Supreme Court required that decisions on voluntariness must be made by the trial court alone." *Owens,* 873 F.2d at 609.

"In response to *Jackson v. Denno,* the New York Court of Appeals, in *People v. Huntley,* 15 N.Y.2d 72, 78, 255 N.Y.S.2d 838, 843, 204 N.E.2d 179, 183 (1965), adopted the so-called

43

'Massachusetts procedure' under which the trial judge alone must first find voluntariness beyond
a reasonable doubt before the confession may even be submitted to the jury, but the issue of
voluntariness may thereafter again be tried to the jury."*Owens*, 873 F.2d at 610. As the Second
Circuit noted, "[t]he decision to adopt this two-tiered approach to determining the voluntariness of
a confession was based, in part, on the fact that art. I, § 2 of the New York state constitution
mandates a jury trial on the issue of voluntariness." *Id.* (citing *People v. Huntley*, 15 N.Y.2d at 78,
255 N.Y.S.2d at 843, 204 N.E.2d at 183; *People v. Hamlin*, 71 N.Y.2d 750, 761, 530 N.Y.S.2d 74,
78, 525 N.E.2d 719, 723 (1988)).

In this Court's opinion, the *Jackson v. Denno* error was significant and obvious. The trial
judge in this case followed the old, unconstitutional, pre-*Huntley* procedure in Dearstyne's case,
whereby the trial court submitted to jury, along with other issues in case, the question as to
voluntariness of the defendant's confession on which evidence was in conflict, telling the jury that
if the confession was involuntary it was to disregard it entirely and to determine question of guilt
from other evidence and that, alternatively, if it found confession voluntary, to determine truth and
reliability and to afford it weight accordingly. This procedure was unequivocally rejected by the
Supreme Court in *Jackson v. Denno*–decided decades before Dearstyne's trial– because it did not
afford a reliable determination of voluntariness, did not adequately protect the defendant's right to
be free of conviction based on a coerced confession, and could not withstand constitutional attack
under the due process clause of Fourteenth Amendment. Plainly, the trial court's suppression ruling
was contrary to clearly established Supreme Court precedent. After confronting a materially
indistinguishable set of facts, the suppression court ruled in a manner contrary to *Jackson v. Denno*.
The Court believes that 28 U.S.C. § 2254(d)(1)'s "contrary to" clause applies; but, at the very least,

44

the trial court's ruling unreasonably applied *Jackson v. Denno* for purposes of Section 2254(d)(1)'s "unreasonable application" clause.

The Appellate Division found that Dearstyne's confession was voluntarily, essentially finding that the suppression court's error was harmless. The Court finds that is was objectively erroneous for the Appellate Division to make a credibility determination that the trial court was unwilling to make after hearing the witnesses give live testimony. The Appellate Division, Second Department, in *People v. Dallio*, 671 N.Y.S.2d 985, 1998 N.Y. Slip Op. 04503 (App. Div. 2d Dept. May 4, 1998), ordered a second *Huntley* hearing after it found that the trial judge had failed to comply with CPL § 710.60(6):

> The court did not adequately follow the statutory mandate of CPL 710.60(6), which requires it to set forth on the record its findings of fact, its conclusions of law, and the reasons for its determination. Although the court, at the *Huntley* hearing, made some findings of fact and conclusions of law, they were incomplete and not specific enough for this court to review the nature and basis of the court's determinations as to the defendant's arguments concerning his alleged invocation of his right to counsel, his right to remain silent, *and the issues of credibility in connection therewith.*

*People v. Dallio*, 671 N.Y.S.2d at 985 (emphasis supplied). The Second Department remitted the matter to the trial court (Supreme Court, Queens County) for the "court to make the appropriate findings of fact and conclusions of law." *Id.* In the interim, however, the trial judge who had conducted the first *Huntley* hearing, retired. *Dallio v. Spitzer*, 170 F. Supp.2d 327, 335 n. 4 (E.D.N.Y. 2001). Upon learning of the trial judge's retirement, "the appellate court decided that it was in the best position to make credibility findings" and therefore "it vacated its previous order and proceeded to the merits." *Id.* It bears emphasizing that the Appellate Division in *Dallio* did not, in the first instance, proceed to review the claim even though it had before it a transcript of a complete *Huntley* hearing because it could not determine the credibility issues from a cold record. Similarly,

45

here, when Judge McGrath noted that there were "sharp issues of fact," what he really meant was that there were sharp issues of *credibility*.

The Court recognizes the most relief on this claim it could grant Dearstyne would be a new *Huntley* hearing in state court. *See Jackson*, 378 U.S. at 394. Under *Jackson v. Denno*, a new trial becomes a possibility only after an evidentiary hearing has a resulted in a finding of involuntariness. Here, the Court believes that a new *Huntley* hearing is required even though Dearstyne did have an evidentiary hearing prior to trial at which was voluntariness of the statement was litigated–although not finally resolved by the judge prior to trial, as *Jackson v. Denno* requires. This is because the critical credibility determination cannot be made upon a cold appellate record.

*Key v. Artuz*, No. 99-CV-161JG, 2002 WL 2002 WL 31102627, at *7 (E.D.N.Y. Sept. 16, 2002), provides an illustrative contrast. There, the habeas court reviewed a Jackson claim with the following facts: the suppression motion was denied without any findings of fact by the trial court; the Appellate Division thereafter affirmed the trial court, and in so doing made findings of fact concerning the statement based upon the trial record. The habeas court in *Key* rejected the petitioner's *Jackson* claim for two reasons: first, waiver (which is not the case with Dearstyne) and second, because any error by the trial court in failing to make a finding as to voluntariness was rendered harmless by the Appellate Division's subsequent finding that the statement was, in fact, voluntary. *Id.* at *7 In *Key*, however, there were two confessions, one of which was videotaped; that was the one for which there was no *Jackson v. Denno* finding. The *Key* court stated, ("Moreover, any error in the failure to make a finding on the voluntariness of the videotaped confession [under *Jackson v. Denno*] was vitiated by the finding of voluntariness on the first confession to the police officer. That finding was made explicitly by the Appellate Division and implicitly by Judge

46

Lombardo after the *Huntley* hearing."). This is not the case where the "relevant facts are already before the court from the trial or other proceedings." *United States v. Kaba*, 999 F.2d 47, 50-51 (2d Cir.1993); *United States v. Oliver*, 626 F.2d 254, 260 (2d Cir.1980)). The critical, relevant facts cannot determined without first determining each witness' demeanor and credibility. Unlike *Key*, there is no audiotaped or videotaped memorialization of the confession from which a reviewing court could glean the necessary information to make a reliable credibility determination. Unlike *Key*, there is only the one confession, the voluntariness of which is hotly disputed, highly questionable and far from clear. Thus, the Court finds that the *Jackson v. Denno* error did have a "substantial and injurious effect" on the verdict, therefore, it was not harmless or rendered so by the Appellate Divisions after-the-fact, uninformed credibility determination. I find that Dearstyne's due process rights suffered actual prejudice by the trial court's failure to comply with *Jackson v. Denno*.

Accordingly, I recommend that Dearstyne should be granted a new *Huntley* hearing before a different trial judge.

### C.    Ground Three – DNA Evidence

Petitioner argues that his constitutional rights were violated in several respects by the prosecution's alleged withholding of DNA evidence, his trial counsel's failure to object to testimony and argument concerning the alleged presence of sperm in T.O.'s vagina, and the state courts' repeated denials of his requests for DNA testing.

#### 1.    Factual Background

At trial, the prosecution offered the testimony of Dr. Theodore Close, T.O.'s pediatrician. On June 13, 1987, T.O.'s parents brought her to see Dr. Close after discovering blood in her underwear.   Declaration of Theodore Close, M.D. ("Close Decl."), ¶4 (Docket No 81). Dr. Close

47

testified that he examined T.O. and noted "drainage" in her vagina. (TT Vol. 2, at p. 389); Close

Decl., ¶8. He took a swab of the drainage and examined it under a microscope and "saw what

appeared to be sperm." (TT Vol. 2, at p. 391); Close Decl., ¶8. After completing his examination,

Dr. Close referred T.O. to the Albany Medical Center. Immediately after his examination, he

disposed of all physical samples that he had taken from T.O., including swabs and microscopic

slides, by placing them in a waste depository. Close Decl., ¶10. Dr. Close averred that he "saw no

need at that time to preserve the samples because T.O. was immediately being taken to Albany

Medical Center, which would preserve any relevant evidence via a 'rape kit.'" Close Decl. ¶11.[14]

To rebut Dr. Close's testimony, Petitioner's trial counsel introduced the results of a "Johnson

rape kit" test performed at Albany Medical, which indicated that a slide taken from T.O.'s vaginal

wall was negative for sperm. T.O.'s underwear was also tested by the New York State Police

Headquarters Crime Laboratory and the test was negative for sperm. (TT Vol. 3, at 481 (admission

of the rape kit results); Petitioner's Appendix Vol. 2, at A583-584 (copy of the exhibit)).

During his summation, Petitioner's trial counsel attacked Dr. Close's credibility, noting that the

doctor believed he had observed sperm in T.O.'s vagina, even though the forensic tests indicated that

there was no sperm present. (TT Vol. 3, at 683). The prosecutor responded to this argument by noting

that the rape kit sample was "taken a few hours after Dr. Close's examination" and was based upon a

"vaginal wall slide." (TT Vol. 3, at 705-706). In contrast, the prosecution argued, "Dr. Close examined

the sample of drainage found inside the panties of [T.O.]." (TT Vol. 3, at p. 706). In sum, the prosecutor

suggested that the negative rape kit results and Dr. Close's conclusion that the drainage was sperm were

---

[14]     Dr. Close also stated in his post-trial Declaration (Docket No. 81) that "neither the police nor the
prosecution ever possessed the samples" or had "any involvement in the disposal and/or destruction of the samples."
Close Decl. ¶¶12-13 (Docket No. 81).

not mutually exclusive, as the two determinations were based upon different samples. The prosecutor

thus argued that the evidence showed that sperm was, in fact, present in T.O.'s vaginal region. (TT Vol.

3 at p. 707).

### 2.    Habeas Review

Petitioner raises several claims with regard to the physical evidence described above, which he

characterizes as exculpatory DNA evidence. Each claim will be addressed in turn.

#### a.    *Brady* Violation

Petitioner contends that the prosecution failed to disclose the fluid sample examined and

discarded by Dr. Close, in violation of his constitutional rights as set forth in *Brady v. Maryland*, 373

U.S. 83, 87 (1963).

### I.    Exhaustion and Procedural Default

Although Petitioner raised a *Brady* claim on direct appeal, the claim did not relate to the fluid

sample examined by Dr. Close. (Petitioner's Brief on Direct Appeal, attached as Exhibit 31 to Docket

No. 72, at p. 74-80). While Petitioner referenced the allegedly withheld samples in support of one of his

*pro se* post-conviction motions seeking DNA testing pursuant to CPL § 440.30, Respondent argues that

this was insufficient to fairly present the *Brady* claim to the state courts for purposes of habeas review.

In addition, while Petitioner argued the prosecution was violating *Brady* by opposing his post-conviction

efforts to obtain DNA testing, Respondent contends that Petitioner failed to fairly present his claim that

the prosecution offended *Brady* by failing to disclose the fluid sample *at trial*.

Exhaustion requires that a petitioner "fairly present[ ]" his federal claims to the highest state

court available. *Weaver v. Thompson*, 197 F.3d 359, 365 (9th Cir.1999); *O'Sullivan v. Boerckel*, 526

U.S. 838, 844-45, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) ("Section 2254(c) requires only that state

prisoners give state courts a *fair* opportunity to act on their claims.") (emphasis in original)). Fair

presentation requires that the petitioner "describe in the state proceedings both the operative facts and

the federal legal theory on which his claim is based so that the state courts have a 'fair opportunity' to

apply controlling legal principles to the facts bearing upon his constitutional claim." *Kelly v. Small*, 315

F.3d 1063, 1066 (9th Cir. 2003), *overruled on other grounds by Robbins v. Carey*, 481 F.3d 1143, 1149

(9th Cir.2007). Thus, "for purposes of exhausting state remedies, a claim for relief in habeas corpus must

include reference to a specific federal constitutional guarantee, as well as a statement of the facts that

entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162-63, 116 S.Ct. 2074, 135 L.Ed.2d

457 (1996).

   In response to Respondent's failure-to-exhaust argument, Petitioner contends that, given his *pro

se* status at the time, his passing references to *Brady* should be deemed sufficient for exhaustion

purposes and that the claim should therefore be reviewed. *See Edkin v. Travis*, 969 F. Supp. 139, 142

(W.D.N.Y. 1997) (Larimer, D.J.) (finding that "mere mention of the term *Brady*, . . . a pertinent federal

case employing constitutional analysis[,] was sufficient to alert the state court to the federal

constitutional nature of this claim"). This Court agrees with the district court in *Edkin* that a passing

reference to *Brady* is sufficient to fairly apprise the state court of the legal basis for a claim that

favorable evidence was suppressed; however, the question here is whether Dearstyne also fairly apprised

the state courts of the factual bases for the claim. *See Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008)

(" The State concedes that Davis fairly presented the legal basis of his claim, in that Davis' petition

included a reference to a specific federal constitutional guarantee, but it contends, and the district court

agreed, that Davis failed to exhaust the factual basis of his claim.").

   The exhaustion requirement is not supposed to be a trap for the unwary *pro se* litigant, and

Respondent's construction of it with regard to this claim would do exactly that. The alleged *Brady*

violation here involved the fluid sample taken by Dr. Close from T.O. prior to trial. The fair import of

Dearstyne's allegations is that the unlawful failure to disclose commenced at the time of Dr. Close's

examination and continued throughout the entire time the prosecution failed to disclose the fluid sample

(which, as noted above, had been destroyed by Dr. Close at the time of his examination).  It cannot be

seriously argued that the state court considering the CPL § 440.30 motion was not put on notice that

alleged *Brady* violation concerning the fluid sample was of a continuing nature–beginning at the time

of trial and lasting throughout the criminal proceeding.

Furthermore, the claim that the prosecutor improperly failed to disclose the fluid sample at the

time of trial versus after trial does not contain new factual allegations that "fundamentally alter the legal

claim already considered by the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 260, 106 S.Ct. 617, 88

L.Ed.2d 598 (1986)). The exhaustion doctrine "does not require that a habeas petitioner . . . present to

the state courts *every piece of evidence* supporting his federal claims in order to satisfy the exhaustion

requirement." *Davis v. Silva*, 511 F.3d at 1009 (emphasis in original). Rather, the allegation of a new

fact does not render a claim unexhausted unless the fact "substantially improves the [claim's]

evidentiary basis." *Aiken v. Spalding*, 841 F.2d 881, 883 (9th Cir. 1988). The timing of the non-

disclosure– prior to trial or after trial–is not an allegation that "fundamentally alters" the *Brady* claim;

nor does it "substantially improve[ ]" the claim's evidentiary basis. Therefore, I conclude that the

*Brady* claim concerning the failure to disclose the fluid sample at the time of trial is not unexhausted.

*See Vasquez*, 474 U.S. at 260; *Aiken*, 841 F.2d at 883.

### ii.     Merits Analysis

The Supreme Court has held that it is a violation of the accused's constitutional right to due

51

process for the Government, in good faith or in bad faith, to withhold any material, exculpatory evidence regardless of whether the defendant explicitly requests such evidence. *See Brady v. Maryland*, 373 U.S. at 87 (holding that the prosecution's suppression of requested evidence favorable to the defendant violates due process, notwithstanding the prosecution's good faith); *United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (holding that prosecution's failure to disclose material, exculpatory evidence, even if it is not requested by the defendant, constitutes a due process violation); *United States v. Bagley*, 473 U.S. 667, 682, 684, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (holding that the prosecution's failure to disclose evidence, which, if admitted, would have had a reasonable probability of resulting in a different verdict, is grounds for granting a petition under 28 U.S.C. § 2255).

The Supreme Court has explained that "[t]here are three components to a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

Although Petitioner "cast[s] this case as one of failure to disclose exculpatory material, like *Brady* and *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), it really involves the loss or destruction of evidence," *United States v. Bakhtiar*, 994 F.2d 970, 975 (2d Cir. 1993), and therefore "poses problems slightly different from *Brady* and *Bagley*," *id*. First, any due process error cannot be cured by ordering a new trial that includes the missing or destroyed evidence as the evidence in question is, of course, unavailable. *Bakhtiar*, 994 F.2d at 975. Second, because the evidence is, for some reason, unavailable, it is more difficult to determine whether it was "material" to the case. *Id*.

"To address the problem of the loss or destruction of evidence by the prosecution, 'the Supreme Court has developed a framework to analyze 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" *Olszewski v. Spencer*, 466 F.3d 47, 55 (3d Cir. 2006) (quoting *United States v. Femia*, 9 F.3d 990, 993 (1st Cir.1993) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) and *Arizona v. Youngblood*, 488 U.S. 51, 55, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)). The Supreme Court's decisions in *Trombetta* and *Youngblood* govern the analysis in due process challenges based on prosecutorial non-disclosure of evidence in cases wherein the government "'no longer possesses the disputed evidence.'" *Olszewski*, 466 F.3d at 55 (quoting *Femia*, 9 F.3d at 993); *see also Bakhtiar*, 994 F.2d at 975.

In *California v. Trombetta*, the defendants were stopped in unrelated incidents on the suspicion of driving while intoxicated; each defendant submitted to a breath-analysis test and registered a blood-alcohol concentration high enough to be presumed to be intoxicated under California law. Although it was technically feasible to preserve samples of the defendants' breath, the arresting officers, as was their ordinary practice, did not do so. The defendants were then charged with driving while intoxicated and, prior to trial, the state court denied each defendant's motion to suppress the breath-analysis test results on the ground that because the arresting officers had failed to preserve samples of defendants' breath samples, their right to present a defense was impaired because they could not conduct their own tests on the samples so as to impeach the incriminating test results. Ultimately, in consolidated proceedings, the California Court of Appeal ruled in defendants' favor, concluding that due process demanded that the arresting officers preserve the breath samples.

The Supreme Court reversed, holding that although the due process clause of the Fourteenth Amendment guaranteed the defendants a meaningful opportunity to present a complete defense,

53

*Trombetta*, 467 U.S. at 485, it did not require that law enforcement agencies preserve breath samples in order to introduce the results of breath-analysis tests at trial. Thus, the State's failure to preserve breath samples for defendants did not constitute a violation of the Federal Constitution.

First, the *Trombetta* court found, there was no "bad faith" on the part of the State–that is, the California police authorities "did not destroy the breath samples in a calculated effort to circumvent the due process requirement of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 and its progeny." *Trombetta*, 467 U.S. at 488. To the contrary, in failing to preserve the breath samples, the police acted "in good faith and in accord with their normal practice"; in particular, the record contained "no allegation of official animus towards [defendants] or of a conscious effort to suppress exculpatory evidence" such as to demonstrate bad faith. *Id.*

More importantly, the *Trombetta* court stated, the police department's policy of not preserving breath samples was not constitutionally defective. *Id.* The Supreme Court declined to specify the contours of the prosecution's duty to preserve evidence, *id.* at 488, but held that whatever constitutional duty the Constitution imposed on the States to preserve evidence, it was limited to evidence that might be expected to play a role in the suspect's defense, *id.* In other words, the missing evidence had to meet a threshold standard of "constitutional materiality". *Id.* (citing *United States v. Agurs*, 427 U.S. at 109-10). This was described by the *Trombetta* court as follows: the evidence must possess an exculpatory value that was apparent *before* it was destroyed, and must also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *Id.* at 488-89 (citing *Agurs*, 427 U.S. at 109-11) & *id.* at 489 n.8.

The *Trombetta* court found that defendants could not meet either of these conditions. First, the samples were not "apparently exculpatory" because "the chances [were] extremely low that preserved

54

samples would have been exculpatory." 467 U.S. at 489. The second condition of materiality—what some courts have called the "irreplaceability" requirement, *Olzsewski*, 466 F.3d at 55 —was not met because the defendants had "alternative means of demonstrating their innocence," such as by inspecting the calibration of the breath-analysis machine or cross-examining the officer who administered the test. *Trombetta*, 467 U.S. at 490.

Four years later, in *Arizona v. Youngblood*, 488 U.S. 51, the Supreme Court was presented with a due process challenge to a sexual assault conviction entered in a case in which the State had failed to collect and preserve enough evidence of sexual assault for serological testing. The young victim was molested and sodomized by his assailant for 1 ½ hours. After the assault, the victim was taken to a hospital where a physician used a swab from a "sexual assault kit" to collect semen samples from his rectum. A police criminologist later performed some tests on the rectal swab and the clothing, but he was unable to obtain information about the identity of the assailant. The police also collected the victim's clothing, which they failed to refrigerate. Because the state failed to preserve the samples by refrigeration, the defendant could not conduct his own tests. At trial, expert witnesses testified that defendant might have been completely exonerated by timely performance of tests on properly preserved semen samples. The jury, although instructed that they could draw an evidentiary inference adverse to the prosecution, convicted Youngblood of child molestation, sexual assault, and kidnaping.

The Arizona Court of Appeals reversed the conviction on the ground that the State had breached a constitutional duty to preserve the semen samples from the victim's body and clothing, and held that when identity is an issue at trial and the police permit the destruction of evidence that could eliminate the defendant as the perpetrator, such loss is material to the defense and is a denial of due process. *Youngblood*, 88 U.S. at 55 (citation to lower court decision omitted).

The Supreme Court reversed the state courts and reinstated Youngblood's conviction, holding that the negligent destruction of semen samples by the police did not deprive the defendant of a fair trial. Although recognizing that "the Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence," the Supreme Court determined that a "different result" was required when dealing with the State's failure to preserve "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57; *accord Illinois v. Fisher*, 540 U.S. 544, 547 (2004). The Supreme Court ultimately held in *Youngblood* that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially* useful evidence does not constitute a denial of due process of law." *Id.* at 58 (emphasis added).

The *Youngblood* court found that the semen samples and clothing evidence were not apparently exculpatory, even though it had potentially greater value than the breath samples in *Trombetta*, because "[t]he *possibility* that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality in *Trombetta*." 488 U.S. at 56 n. * (emphasis supplied).The *Youngblood* court reiterated the importance of the materiality standard set forth in *Trombetta*–that the exculpatory value of the lost or destroyed evidence be "'apparent'" "'before'" spoliation or loss of such evidence occurs. *Id.* at 56 n* (quoting *Trombetta*, 467 U.S. at 89); *accord Illinois v. Fisher*, 540 U.S. at 547; *see also, e.g., Olszewski*, 466 F.3d at 56.

The *Youngblood* court then set forth a new standard for lost evidence that is only "*potentially useful*": "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58 (emphasis

56

supplied); *accord Fisher*, 540 U.S. at 547; *see also, e.g., Bakhtiar*, 994 F.2d at 975; *Olszewski*, 466 F.3d at 56.

The Supreme Court revisited *Trombetta* and *Youngblood* in its 2004 decision, *Illinois v. Fisher*, 540 U.S. 544 (2004). Defendant Fisher, who was charged with possession of cocaine, filed a discovery motion requesting all physical evidence, including the cocaine, that the State intended to use at trial. *Id.* at 545. Before the prosecutor turned over the cocaine to defense counsel, Fisher "jumped bond" and became a fugitive. *Id.* Upon Fisher's capture a decade later, the Sate reinstated the indictment charging him with possession of cocaine. In the interim, however, the State had, in good faith, already destroyed the alleged drugs. *Id.* at 546. The Supreme Court held that substance seized from Fisher was "plainly the sort of 'potentially useful evidence' referred to in *Youngblood*, not the material exculpatory evidence addressed in *Brady* and *Agurs* because "[a]t most, [Fisher] could hope that, had the evidence been preserved, a fifth test conducted on the substance would have exonerated him." *Id.* at 548 (citing *Youngblood*, 488 U.S. at 57).

The Supreme Court reiterated that "the applicability of the bad-faith requirement in *Youngblood* depended . . . on the distinction between 'materially exculpatory' evidence and 'potentially useful' evidence." *Id.* at 549. Bad faith was not necessary if the evidence was "materially exculpatory." *Id.* In *Fisher*, because the cocaine was only "potentially useful evidence", there was no due process violation because the defendant did not allege that the police acted in bad faith. *Id.* at 547-48.

Petitioner here makes essentially the same argument made by the defendant in *Youngblood*—that there is a <u>possibility</u> that the missing semen sample could have exonerated him in that it potentially could have contained semen of a DNA-type different from Petitioner's. The Supreme Court rejected such an argument in *Youngblood*, stating that the "*[p]ossibility* that the semen samples *could have*

57

exculpated [defendant] if preserved or tested is not enough to satisfy the constitutional standard of materiality in *Trombetta*." 488 U.S. at 57 n.* (emphases supplied); *see also, e.g., Colon v. Kuhlman*, 1988 WL 61822, at *4 (S.D.N.Y. 1988) ("[Habeas petitioner] Colon argues that this materiality standard is met here because serological testing of the semen samples at issue could have established his innocence to a scientific certainty, and because no other comparable evidence could accomplish this end. I do not reach the materiality question, however, because the facts of this case do not establish the *Trombetta* threshold requirement that evidence have been destroyed or otherwise undermined by conduct of the prosecution.") (internal citation omitted), *aff'd*, 865 F.2d 29 (2d Cir. 1988).

Based upon its review of *Youngblood, Trombetta*, and *Fisher*, the Court concludes that the fluid sample must fall into the "potentially exculpatory", rather than the "apparently exculpatory" category. This is because there is only the "[p]ossibility that the semen samples could have exculpated [defendant] if preserved or tested," which "is not enough to satisfy the constitutional standard of materiality in *Trombetta*." *Youngblood*, 488 U.S. at 57 n. *. In such cases of "potentially exculpatory", despoliated evidence, the Supreme Court requires "bad faith" on the part of the prosecution or police be demonstrated. *Illinois v. Fisher*, 540 U.S. at 547-48 (citations omitted). *Accord, e.g., Jones v. McCaughtry*, 965 F.2d 473, 477 (7th Cir. 1992) ("Criminal defendants must satisfy a threshold requirement before reviewing courts consider the constitutional materiality of the [missing] evidence in question. In *Arizona v. Youngblood*, 488 U.S. [at] 58 . . . , the Supreme Court held that 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'").

Thus, in *Jones*, the Seventh Circuit held that the defendant alleging a due process violation as a result of the government's destruction of a sperm sample first was required to show bad faith on the

58

part of the government in connection with the spoliation of the evidence. *Id.* Only if defendant could satisfy that burden would the court move to the next step of the analysis, which required the defendant to show materiality–that the evidence possessed exculpatory value apparent before it was destroyed and that it was of such a nature that he was unable to obtain comparable evidence by other means. *Id.* (citing *Youngblood*, 481 U.S. at 58; *Balfour v. Haws*, 892 F.2d 556, 565 (7th Cir. 1989)).

In determining whether bad faith on the part of the government is present in this case, *Youngblood* and *Trombetta* provide some guidance, although I note that no Supreme Court case has concluded that the government acted in bad faith in these types of missing evidence cases. *Youngblood* linked the "bad faith" requirement to the materiality standard articulated earlier in *Trombetta*, stating that "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." 488 U.S. at 57 n.* (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). In *Youngblood*, the defendant could not show that the police *knew* the semen samples would have exculpated him when they failed to perform certain tests or to refrigerate the victim's clothing. *Id.* (emphasis supplied). Thus, the Supreme Court explained, the missing evidence was "simply an avenue of investigation that might have led in any number of directions," including, presumably, further incriminating the defendant. *Id.*

Such is the case here; Dearstyne has not shown that sample collected and discarded by Dr. Close would have exculpated him. *See Youngblood*, 488 U.S. at 57 n.*. The Supreme Court in *Trombetta* found no evidence of bad faith on the part of the police officers who did not retain the defendants' breath samples because the defendants did not produce any evidence of "official animus" or a "conscious effort to suppress exculpatory evidence." 467 U.S. at 488; *accord, e.g., Jones v. McCaughtry*, 965 F.2d at 477

59

(petitioner protested that the discovery of a single sperm in a urine specimen from the victim was received against him at trial despite the fact that the specimen had been destroyed without his having had the opportunity to examine it; court declined to find "bad faith" where there was nothing in the record to suggest that the hospital laboratory technician was "acting in bad faith or in an attempt to circumvent disclosure requirements or otherwise frustrate the defense when she destroyed the sperm sample" which was disintegrating and technician testified that she lacked knowledge of how to "fix" the microscope slide so as to preserve the sample).

In *Youngblood* situations, "[m]ere negligence does not constitute bad faith". *LaGrassa v. Walker*, NO. CV 07-2464PA(AJW), 2009 WL 2413736, at *7 (C.D. Cal. Aug. 3, 2009) (citing *Youngblood*, 488 U.S. at 58); *Edmonds v. Purdy*, No. 08 Civ. 8808(DLC)(AJP), 2009 WL 483189, *14 (S.D.N.Y. Feb. 26, 2009) (denying due process claim under *Youngblood*; "Second, and most important, despite Edmonds' allegation of bad faith, the record does not show bad faith–as opposed to sloppy procedures–on the part of the police in losing the videotape.") (collecting cases; citations omitted), *report and recommendation adopted*, 2008 WL 4369314 (S.D.N.Y. Sep 25, 2008); *Johnson v. Berghuis*, No. 2:06-CV-14098, 2009 WL 2777309, at *5 (E.D. Mich. Aug. 26, 2009) ("The mere fact that the police had control over evidence and failed to preserve it is insufficient, by itself, to establish bad faith, nor will bad faith be found in the government's negligent failure to preserve potentially exculpatory evidence. 'The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the law enforcement's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.' *Youngblood*, 488 U.S. at 56, n. *1. Petitioner's claim fails because he does not demonstrate in his habeas pleadings that the police acted in bad faith in failing to preserve the gun for trial. *Malcum [v. Burt]*, 276 F. Supp.2d [664,] [] 683 [(E.D.N.Y. 2003)].").

60

The Court now turns to the question of whether the facts of the present case illustrate "bad faith" on the part of Dr. Close. In his affidavit, Dr. Close explained that he destroyed the fluid sample (including the swabs and microscope slides) immediately after conducting the examination in June of 1987. (Close Aff., Docket No. 81). 81). Dr. Close explained that he did not believe it was necessary to preserve the samples because victim T.O. was being taken to the hospital immediately thereafter, and he expected the medical personnel there to examine T.O. and preserve any relevant evidence by means of a "rape kit." *Id.* (Docket No. 81).

The Court believes that Dr. Close's handling of this matter was professionally disgraceful, inexcusable, and falling well below the level of competent practice one would expect from a physician of his obvious experience.

However, without any direct or circumstantial evidence to the contrary, the Court is compelled to conclude that Dr. Close is a private actor. The *Youngblood* analysis requires a finding of "bad faith" on the part of the police or prosecution. Dr. Close averred that neither the police nor the prosecution ever had possession of the samples or any involvement in their disposal. *See* Close Aff. (Docket No. 81). The critical question is whether Dr. Close's disposal of the evidence can be said to be chargeable to the state. *See United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999). In *Rahman*, the Second Circuit noted that while the Government's loss of evidence may deprive a defendant of the right to a fair trial, "[w]hether that loss warrants sanctions depends on the Government's culpability for the loss and its prejudicial effect." *Id.* (citing *United States v. Bakhtiar*, 994 F.2d 970, 975-76 (2d Cir.1993); *see also Colon v. Kuhlmann*, 865 F.2d 29, 30 (2d Cir.1988), *cert. denied*, 120 S.Ct. 439 (1999) (explaining that the record must first show that evidence has been lost and that this loss is "chargeable to the State.").

In *Colon*, the Second Circuit considered a *Trombetta/Youngblood* claim in which a rape victim

61

was brought to the hospital by police officers, who "asked the attending physician to follow the standard procedures for gathering rape evidence." 865 F.2d at 30. *Youngblood* had just been decided during the pendency of Colon's appeal.

According to the rape kit procedures, the doctor should have preserved the victim's underpants; however, the victim responded with extreme embarrassment to his initial request for them, and the doctor decided not to press her further. *Id.* The physician collected some fluid from the victim's vagina and placed some on a slide and some in a vial. *Id.* However, that slide later became useless for serological analysis after a police lab test for the presence of sperm, and the vial subsequently was found not to contain enough sperm for analysis. *Id.* Thus, there was no evidence that would allow Colon's expert to determine whether the rapist had Colon's serological characteristics. *Id.*

The Second Circuit affirmed the district court's denial of habeas corpus "because it [was] clear that there was no police bad faith in this case." *Colon*, 865 F.2d at 30. The Second Circuit specifically endorsed the state court's reasoning that they never unnecessarily destroyed either through negligence or by design any evidence that was gathered, in part because the emergency room doctor's actions were not chargeable to the police. *Id.* (quotation from lower court case omitted). The district court had found that "the facts of this case [did] not establish the *Trombetta* threshold requirement that evidence have been destroyed or otherwise undermined by conduct of the prosecution." *Id.* (quotation to district court case omitted).

The Second Circuit "[s]pecifically . . . affirm[ed] [the district judge's] reasoning as to the three potential sources of evidence–namely, that the doctor's failure to preserve the underwear was not chargeable to the State, that conducting the test for sperm on the slide did not amount to destroying evidence, and that there was no evidence that the State was in any way responsible for the disappearance

of the remaining quantity of fluid." *Id.* Although the Second Circuit concluded with a caveat to the police that they should expect to be held to "higher standards" in such cases in the future, it did not explain what those would be. *Id.* at 30.

Subsequently, district courts in this Circuit have found no *Youngblood* violation where the defendant has failed to show that the despoliation of the evidence was chargeable or attributable to the police or the prosecution. *E.g., McPherson v. Greiner*, No. 02 Civ.2726 DLC AJP, 2003 WL 22405449, at *21 n.52 (S.D.N.Y. Oct. 22, 2003) ("[Habeas petitioner] McPherson fails to set forth a constitutional claim because he has not alleged, and the record does not show, bad faith on the part of the police or prosecution or that the destruction or loss of the gloves was attributable to the police or prosecution. Rather, [the two victims] testified that when they retrieved some of the stolen property from police custody, in addition to their own gloves, they received a pair of old, torn and "grimy-looking" men's gloves, which [one victim] threw away since these gloves did not belong to them.") (citations omitted); *Brock v. Artuz*, 99 Civ.1903, 2000 WL 1611010, at *7 (S.D.N.Y. Oct. 27, 2000) ("Second, and most important, Brock has not alleged, and the record does not show, bad faith on the part of the police or prosecution or that the destruction of the videotape or loss of the photographs was attributable to the police or prosecution. Rather, Slane's undisputed testimony established that the videotape was destroyed by Chase Manhattan Bank in the regular course of its business after Slane had determined it was not worth preserving. Similarly, the hearing court found, and this Court agrees, that there was insufficient evidence to establish whether the photographs were lost by Chase or the police.") (citations omitted).

In this Court's opinion, Dr. Close's professionally egregious conduct and unconvincing explanation regarding why he disposed of the sample raises questions unanswerable within the record before this court, but is nevertheless conduct inexcusable in the extreme. The Court also notes that the

police investigators engaged in deception by secreting Petitioner from his parents and used coercive

tactics to secure his confession; these actions demonstrate bad faith on the part of the police. Based on

the appearance created by Dr. Close's conduct, the Court understands why Dearstyne has suggested that

Dr. Close might have been conspiring with or acting at the behest of the police in effort to frame him.

However, there is no record evidence to show a nexus between the police investigator's bad faith and

the misconduct of Dr. Close. Accordingly, I reluctantly conclude that Petitioner cannot demonstrate

that his due process rights were violated by Dr. Close's disposal of the semen sample.

### b.      Requests for DNA Testing

Petitioner filed several post-trial motions requesting court-ordered DNA testing pursuant to CPL

§ 440.30(1-a) on the rape-kit and T.O.'s underwear. The motions were denied by the County Court and

appealed to the Appellate Division as part of Petitioner's consolidated appeal. The Appellate Division

affirmed the denials, finding that Petitioner had failed to demonstrate "that within 'a reasonable

probability' the test results would have resulted in a verdict that was more favorable to the defendant

had they been admitted in to evidence." *Dearstyne III*, 761 N.Y.S.2d at 121. Petitioner contends that

"the courts below have erroneously and shockingly determined Petitioner isn't entitled to have tested

[sic] to prove his innocence, a determination that misapplied the law and misconstrued the facts

presented." (List of Grounds Raised, annexed to Petition at p. 3). Petitioner's claim appears to be that

the state courts violated CPL § 440.30(1-a), which provides, in pertinent part, that a court may direct

that DNA testing be conducted, upon a defendant's motion requesting the performance of such a test

"on specified evidence, and upon the court's determination that any evidence containing [DNA] was

secured in connection with the trial resulting in the judgment [and] upon its determination that if a DNA

test had been conducted on such evidence, and if the results had been admitted in the trial resulting in

the judgment, there exists a reasonable probability that the verdict would have been more favorable to the defendant." N.Y. CRIM. PROC. LAW § 440.30(1-a).

" Because § 440.30(1-a) is a New York state statute, a state court decision applying or interpreting it can only be challenged under AEDPA if the denial of the procedural right implicates an interest that is protected by the Due Process Clause of the Constitution." *McDonald v. Smith*, No. 02-CV-6743, 2003 WL 22284131, at *8 (E.D.N.Y. Aug. 21, 2003). *See also Estelle v. McGuire*, 502 U.S. at 67-68 (noting it is well settled that a claim that a state court improperly interpreted or applied a state statute is not cognizable on habeas review).

Recently, in *District Attorney's Office for the Third Judicial Dist. v. Osborne*, __ U.S. __, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009), the Supreme Court addressed the question of whether a defendant had a Due Process Clause right to obtain post-conviction access to the state's evidence for DNA testing. Osborne, who had been convicted of kidnaping, assault, and sexual assault convictions years previously, brought suit under 42 U.S.C. § 1983[15] to compel the state of Alaska to release biological evidence to him so that it could be subjected to DNA testing. Osborne claimed both a substantive and procedural due process right to the evidence under the Federal Constitution, as well as a procedural due process right stemming from an Alaskan state statute that provided for post-conviction access to evidence. *Osborne*, 129 S. Ct. at 2318.

The Supreme Court agreed that Osborne possessed a liberty interest, created by Alaska's statute, in demonstrating his innocence with new evidence: Under the relevant state statute, "those who use 'newly discovered evidence' to 'establis[h] by clear and convincing evidence that [they are] innocent'

---

[15]     The Supreme Court pointedly declined to address whether such a challenge should be brought as a 42 U.S.C. § 1983 civil rights action or a 28 U.S.C. § 2254 habeas corpus action, and assumed without deciding that the Ninth Circuit had properly decided Osborne could bring his claim regarding the constitutional right of access to DNA testing under Section 1983.

may obtain 'vacation of [their] conviction or sentence in the interest of justice.'" *Id.* (quoting ALASKA STAT. §§ 12.72.020(b)(2), 12.72.010(4) (alterations in original). The Supreme Court explained that this "'state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right.'" *Osborne*, 129 S.Ct. at 2319 (quoting *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 463 (1981) and citing *Wolff v. McDonnell*, 418 U.S. 539, 556-558 (1974)). However, the Supreme Court cautioned, the question for the federal courts is whether, "consideration of such a claim within the framework of the state's procedures for postconviction relief offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgresses any recognized principle of fundamental fairness in operation." *Osborne*, 129 S. Ct. at 2320 (internal quotation marks and quotations omitted). Only in such cases would federal judicial intervention with the state's procedures be warranted. *Id.*

The Supreme Court proceeded to examine Alaska's post-conviction procedures and found "nothing inadequate about how those procedures apply to those who seek access to DNA evidence", *id.*, noting that Alaska law provided a "substantive right to be released on a sufficiently compelling showing of new evidence that establishe[d] innocence[;]" "exempt[ed] such claims [of innocence] from otherwise applicable time limits[;]" and, by judicial decision, specified that discovery was also available in post-conviction proceedings involving access to DNA evidence. *Id.* (citing *Patterson v. State*, No. A-8814, 2006 WL 573797, at *4 (Alaska App. Mar. 8, 2006)). The Supreme Court observed that the State of Alaska's procedures were "similar" to those procedures regarding access to DNA evidence embodied in federal law, *e.g.*, 18 U.S.C. § 3600(a), and in the "law of other States." *Osborne*, 129 S. Ct. at 2321. The Supreme Court determined that Alaska's procedures were "adequate on their face[,]" *id.* at 2321, and it was Osborne's burden, as a § 1983 plaintiff, "to demonstrate the inadequacy of the state-law

66

procedures available to him in state postconviction relief[,]" *id.*

Finally, the Supreme Court explicitly rejected Osborne's substantive due process claim, refusing to expand that arena to provide for a "freestanding" substantive right to post-conviction DNA testing. *Id.* at 2322.

District courts in this Circuit have concluded that "[t]here is no question after *Osborne* that CPL § 440.30(1- a)(a) conferred on [petitioner] a liberty interest in vacating his conviction by accessing evidence in the state's possession for the purpose of DNA testing." *Newton v. City of New York*, No. 07 Civ. 6211(SAS), 2010 WL 323050, at *__ (S.D.N.Y. Jan. 27, 2010) (section 1983 claim seeking access to DNA evidence); *see also Figueroa v. Morgenthau*, 2009 WL 3852467, *2 (S.D.N.Y. Nov. 18, 2009). These courts further have found that, as in *Osborne*, "New York's procedures for obtaining such access, on their face, appear to comport with recognized principles of fundamental fairness." *Newton v. City of New York*, 2010 WL 323050, at *__; *accord Figueroa v. Morgenthau*, 2009 WL 3852467, at *2 ("Figueroa[, a § 1983 plaintiff] has not shown the New York state post-conviction relief procedure to be inadequate. On its face, the New York statute is more permissive in allowing access to evidence for DNA testing than the Alaskan procedures that the Court found constitutional in *Osborne*. Whereas Alaskan procedures allow post-conviction relief only where the DNA testing can establish innocence by 'clear and convincing evidence,' *Osborne*, 129 S.Ct. at 2317 (citation omitted), the New York statute allows access to evidence for DNA testing when 'there exists a reasonable probability that the verdict would have been more favorable to the defendant.' N.Y. CRIM. PROC. L. § 440.30(1-a)(a).  If the Alaskan post-conviction relief procedures pass constitutional muster, then the more permissive New York procedures certainly do. Moreover, Figueroa has not identified any way in which the state procedures were applied in violation of his constitutional rights.") (some internal citations omitted).

In the wake of *Osborne*, claims by Section 2254 habeas petitioners alleging an erroneous denial of access to DNA material have been rejected by the district courts in this and other circuits. The reasons cited are that there is no substantive federal constitutional right to DNA testing, that New York's procedures are facially adequate to comply with procedural due process requirements, and that the defendants have not shown that the state courts misapplied C.P.L. § 440.30(1-a) to their cases. *E.g.*, *Charriez v. Greiner*, 265 F.R.D. 70, 88 (E.D.N.Y. Mar. 23, 2010) (Weinstein, D.J.) ("The [Supreme] Court held [in *Osborne*] that there is no such federal constitutional right. *See generally* 129 S.Ct. at 2312-23 (majority opinion, rejecting right to post-conviction access to biological evidence). In the absence of such a right, defendant's claim states no basis for federal habeas relief [under § 2254]."); *Fuentes v. Superintendent, Great Meadow Corr. Fac.*, No. 04-CV-0737 (JS), 2009 WL 2424206, at *9 (E.D.N.Y. Aug. 2, 2009) ("Petitioner's new claims, concerning the failure to obtain DNA testing on the hair found in the victim's pubic combing, are similarly without merit. Petitioner's sixth ground for relief alleges that New York violated his federal due process rights by refusing to perform post-conviction DNA testing on the hair under a state statute, N.Y. C.P.L. § 440.30(1-a). However, in *District Attorney's Office for the Third Judicial Dist. v. Osborne*, ___ U.S. ___, 129 S.Ct. 2308, 2322, 174 L.Ed.2d 38 (2009), the Supreme Court held that convicted criminals have no federal 'substantive due process right' to post-conviction DNA testing. And the Supreme Court likewise found no fault with Alaska's procedural due process used to decide when convicted criminals may obtain post-conviction DNA testing. In this regard, the Alaskan procedural due process protections that the Supreme Court found permissible in *Osborne* are, if anything, less friendly to convicted criminals than the New York

procedures at issue here.[16] Alaska afforded rights to post-conviction DNA testing only if the evidence was 'newly available . . . diligently pursued, and . . . sufficiently material.' New York's Second Department, on the other hand, did not inquire into whether Petitioner's requested DNA testing was 'newly available' or 'diligently pursued.' Instead, it required only that Petitioner show a 'reasonable probability that the verdict would have been more favorable to him had the DNA test results been admitted into evidence at trial'–and denied Petitioner's request for failing to show this required 'reasonable probability.' Thus, Petitioner's due process rights were not violated by New York's refusal to afford him post-conviction DNA testing.") (some internal citations omitted); *Herndon v. Bell*, No. 1:07-cv-285, 2010 WL 1172549, at *23 (W.D. Mich. Feb. 22, 2010) ("Petitioner's second claim for habeas relief, again repeated verbatim from his state appellate briefs, asserts that his right to due process of law was abridged by the trial court's denial of petitioner's motion for post-trial access to the murder weapon. . . . The Supreme Court of the United States has never held that the Constitution guarantees a right of post-trial discovery to a state criminal defendant. Indeed, to the extent that the Court has opined in this area, its decisions point in the opposite direction. [This] claim for relief is a pure state-law claim, not cognizable in a federal habeas corpus case."); *Yandell v. Horel*, No. C 06-6332 MHP (PR), 2010 WL 1655801, at *12 (N.D. Cal. Apr. 22, 2010) ("Petitioner claims that the trial court violated his right to due process when it denied his post-trial request for DNA testing. Petitioner states, without elaboration, that the state court's denial was 'wrongful.' . . . Petitioner's post-conviction motion for DNA testing after a hearing . . . was denied on grounds that Petitioner had not shown a reasonable probability that the DNA evidence would have been helpful to his defense. Petitioner has not shown that he is entitled

---

[16]     Under New York law, a postconviction defendant need only make a motion requesting access to evidence for DNA testing. The District Attorney's Office then consents to access or a court must make a determination as to whether the defendant can show a "reasonable probability that the verdict would have been more favorable to him had the DNA test results been admitted into evidence at trial."

to habeas relief on this claim. Firstly, there is no substantive due process right to post-conviction access to the state's evidence for DNA testing purposes. Secondly, however, if a state creates a statutory right for DNA testing of the state's evidence, a petitioner has a limited federal procedural due process right to obtain such evidence for testing. California Penal Code § 1405 provides an elaborate scheme under which a person in prison may seek and obtain DNA testing of evidence. The Court concludes that there is nothing constitutionally inadequate about the procedures California has provided. In fact, California's procedures are similar to Alaska's, which were cited with approval by the Supreme Court. Specifically, California has established a non-waivable right to request DNA discovery, an opportunity to be heard on the matter, and to have counsel appointed. The law also establishes criteria under which the court is to examine the merits of the request, as well as the procedures for laboratory selection, cost-allocation, and for further judicial review. The Court cannot say that the statute, which provides many protections and establishes appropriate procedures, is constitutionally inadequate.") (citing *Osborne*, 129 S.Ct. at 2316; other some internal citations omitted).

Given the Supreme Court's holding in *Osborne* and the cases discussed in the foregoing paragraphs applying *Osborne* in the habeas context, I recommend finding that the state courts did not violate Petitioner's constitutional rights in denying the request for post-trial discovery in the form of access to victim T.O.'s rape-kit underwear. As other district courts in this Circuit have observed, New York's DNA-access statute, C.P.L. § 440.30(1-a), demands from defendants a lesser evidentiary showing than Alaska's statute, which the Supreme Court found in *Osborne* to be facially adequate for procedural due process purposes. *Osborne*, 129 S.Ct. at 2320 ("We see nothing inadequate about the procedures Alaska has provided to vindicate its state right to postconviction relief in general, and nothing inadequate about how those procedures apply to those who seek access to DNA evidence.").

The Court cannot find a basis for finding, and Petitioner has not attempted to show, that New York's statute is constitutionally inadequate on its face.

Because the Supreme Court found that plaintiff Osborne had not actually invoked Alaska's post-conviction procedures for accessing DNA testing, it did not have occasion to determine whether the Alaska state courts applied them in a fundamentally unfair manner. *See id.* ("But it is Osborne's burden to demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief. These procedures are adequate on their face, and without trying them, Osborne can hardly complain that they do not work in practice."). In this respect, *Osborne* differs from the present case, as petitioner Dearstyne did invoke New York's procedures–although without success. Thus, the question that apparently remains after *Osborne* is this–when, if ever, will a state court's refusal to allow DNA testing warrant federal habeas relief?

Although Petitioner ultimately hopes that the DNA testing he seeks would establish his innocence; however, it must be conceded that such testing could inculpate him, exculpate him, or be inconclusive. Even if there was some biological evidence found on these physical items that contained DNA matching that of someone other than Dearstyne, such a result would not necessarily exonerate him, nor would there have been a reasonable probability that the outcome of the trial would have been different. The Appellate Division noted that Petitioner "was convicted . . . of attempted rape of this victim [T.O.] and there were no allegations that ejaculation or penetration occurred." *Id.* Thus, the Appellate Division concluded that "a showing that defendant's semen was absent from the victim's underwear would not necessarily have impacted the verdict." *Id.*

Further, the Appellate Division noted that "a rape kit and the victim's underwear tested negative for the presence of seminal fluid and, thus, DNA testing could not have resulted in a more favorable

verdict at trial." *Id.* In other words, the Appellate Division concluded, there was no biological evidence in the rape kit or on the underwear to submit to DNA testing.

*Osborne* clearly stated that federal due process is not violated unless the state court procedures for access to such evidence "'offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgress[ ] any recognized principle of fundamental fairness in operation.'" *Osborne*, 129 S.Ct. at 2319-20 (quoting *Medina v. California*, 505 U.S. 437, 446, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)). The Supreme Court expressly rejected the Ninth Circuit's conclusion that a defendant had a limited constitutional right to post-conviction access to physical evidence in order to conduct DNA testing which was not available at the time of trial, and stated that the *Brady* standard of materiality did not apply in such a situation, contrary to the Ninth Circuit's conclusion.

Here, the New York statute essentially parallels the *Brady* materiality requirement, in that it requires a defendant seeking access to DNA evidence to show that there is a "reasonable probability" that the verdict would have been more favorable to him had the DNA test results been admitted into evidence at trial. *Compare* N.Y. CRIM. PROC. LAW § 440.30(1-a) *with Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (explicating *Brady*'s materiality standard). Given that the state courts gauged Petitioner's request against the *Brady* standard, which the Supreme Court stated in *Osborne* did *not* apply in DNA-access cases, this Court cannot find that the denials of Petitioner's requests for DNA testing by the state courts were an unreasonable application of clearly established Supreme Court precedent or arbitrarily abrogated his statutorily created liberty interest in accessing such evidence. Accordingly, the Court recommends that this claim be dismissed.

72

      c.     **Ineffective Assistance of Trial Counsel – Failure to Seek Forensic Testing of the Fluid Sample**

Petitioner argues that Attorney Grimmick was ineffective because he failed to obtain the fluid sample from the prosecution prior to trial and because he never sought to have the sample tested for the presence of sperm. According to Petitioner, Attorney Grimmick advised him that such testing was unnecessary because the rape kit results were negative for sperm. This was consistent with the strategy employed by Attorney Grimmick at trial, namely, to use the negative rape kit results to impeach Dr. Close and use the apparent contradiction between Close's testimony and the forensic evidence to question the doctor's credibility. (TT Vol. 3, at 683).

As noted above, to establish ineffective assistance of counsel, Petitioner must satisfy the two-prong test set forth in *Strickland*. Petitioner must first demonstrate that his "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. Second, he must show that counsel's deficient performance prejudiced his defense. *Id.* at 692.

Defense counsel's decision to use the conflict between Dr. Close's observations and the rape kit results to impeach Dr. Close's credibility, rather than risking the discovery of potentially inculpatory evidence through DNA testing, was the sort of strategic decision that courts are very reluctant to second guess on habeas review. *See Strickland*, 466 U.S. at 690-91 (holding that the strategic choices of trial counsel "are virtually unchallengeable" in habeas corpus proceedings). This Court finds that Attorney Grimmick's decision not to obtain DNA testing of the fluid sample did not fall below the objective standard of reasonableness. In light of Petitioner's written confession, which had been held to be admissible at trial, Attorney Grimmick might very reasonably have been concerned that DNA testing could yield *inculpatory* evidence. *See Neil v. Walsh*, No. 07 Civ. 6685(DLC), 2009 WL 382637, at *19 (S.D.N.Y. Feb. 17, 2009) ("The record is, of course, silent with respect to the extent of the investigation,

73

if any, that defense counsel conducted regarding the feces left at the scene of [the] rape. However,

defense counsel established through cross-examination that the police failed to collect a sample of the

feces, emphasizing that point during his summation. In the absence of any reason to believe that the

police refrained from collecting or testing the feces in bad faith, there was nothing further that counsel

might usefully have investigated with respect to this subject. Moreover, even if a fecal sample had been

available, counsel could reasonably have decided not to have it examined for DNA for fear that the

results would inculpate [petitioner] Neil. In these circumstances, the failure to conduct a further

investigation regarding the unavailability of [the victim's] feces was not ineffective assistance.") (citing,

*inter alia, Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) ("We will not normally fault counsel for

foregoing a potentially fruitful course of conduct if that choice also entails a 'significant potential

downside.' ") (quoting *Sacco v. Cooksey*, 214 F.3d 270, 275 (2d Cir.2000); internal citation to record

omitted)).

    Under the circumstances of this case, the Court concludes that trial counsel's strategic choice

not to obtain DNA testing did not constitute a professionally unreasonable decision so as to satisfy the

first prong of the *Strickland* test for ineffective assistance of counsel. *See Sturdivant v. Barkley*, No.

04-CV-5659, 2007 WL 2126093, at *7 (E.D.N.Y. July 24, 2007) (finding that "defense counsel's

strategic decision not to seek DNA testing on the bags of cocaine was both reasonable and proper given

that it was likely that the testing would have revealed adverse evidence"); *cf. also Johnson v. People of

State of New York*, 02-CV-3752, 2003 WL 23198785, at *15 (E.D.N.Y. Nov. 5, 2003) ("The record is

devoid of any request by defense counsel for additional forensic testing or claim of prejudice on the

ground that no further examinations were done. Strategically this position made sense since it was likely

that testing would have revealed adverse evidence."); *see also Manino v. Artus*, No.

74

06-CV-3078(ARR)(JO), 2009 WL 1117301, *18 (E.D.N.Y. Apr. 24, 2009) ("The fact that Manino's

trial counsel did not test the bandana for DNA evidence did not constitute ineffective assistance.

Counsel 'has a duty to make reasonable investigations or to make a reasonable decision that makes

particular investigations unnecessary .' Any 'particular decision not to investigate must be directly

assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

judgments.' *Strickland*, 466 U.S. at 691. Here, trial counsel's decision not to test the bandana for DNA

was reasonable in light of the other evidence tending to identify Manino as [the victim]'s assailant, as

the results may have further incriminated Manino. *See, e.g., Samatar v. Clarridge*, 2006 WL 355684,

at *19 (S.D. Ohio Feb.16, 2006) (acknowledging failure to seek expert testimony may be tactical

because expert might uncover evidence that further inculpates defendant); *Harris v. Metrish*, 2006 WL

1313804, at *5 (E.D. Mich. May 12, 2006) (counsel not ineffective for failing to test crime scene for

DNA as petitioner's theory of unknown perpetrator highly speculative in light of identification testimony

against defendant). Moreover, not testing the bandana was consistent with trial counsel's strategy of

underscoring the lack of scientific evidence in the prosecution's case. *See Loliscio v. Goord*, 263 F.3d

178 (2d Cir.2001) (counsel not ineffective for failing to perform unconventional scientific test and

instead calling to the jury's attention the prosecution's failure to employ such testing).").

The Court notes that Dearstyne has not demonstrated any reasonable probability or possibility

that the DNA testing would have yield exculpatory results. Thus, he has not shown his defense was

prejudiced by trial counsel's decision not to submit the material for DNA testing. *See Manino v. Artus*,

No. 06-CV-3078(ARR)(JO), 2009 WL 1117301, at *18 & n. 12 ("Even if [trial counsel] had performed

unreasonably in failing to test the bandana, Manino would still not be entitled to relief on this part of

his claim. To show that he was prejudiced by his appellate counsel's failure to argue that his trial counsel

75

was ineffective, Manino would have to show a reasonable probability that a test of the bandana would have produced a different outcome at trial. Without knowing what such a test would have shown, Manino cannot possibly carry that burden."). Accordingly, this claim should be dismissed as without merit.

### d. Ineffective Assistance of Counsel – Failure to Object to Dr. Close's Testimony

In a supplemental memorandum of law (Docket No. 82) and letter brief (Docket No. 85), Petitioner asserts that Attorney Grimmick was ineffective because he allowed Dr. Close to testify regarding his examination of the fluid samples, when those samples were not in evidence and unavailable for examination.

In sum, Petitioner argues that, as a matter of New York evidentiary law, Dr. Close should not have been able to testify about his examination unless and until the samples were admitted into evidence. Petitioner asserts that Attorney Grimmick erred by failing to object to the testimony on this basis.

This claim is distinct from the ineffective assistance claim discussed above. Here, rather than arguing that Attorney Grimmick unreasonably failed to have the samples submitted for testing, Petitioner contends that Attorney Grimmick should have objected to Dr. Close's testimony about the samples because they were never admitted in evidence, and thus by implication, there was no foundation for the doctor's testimony. The Court found this claim to be unexhausted and subject to a potential procedural bar. After giving Petitioner the option of abandoning the claim or moving for a stay in order to return to the state courts to institute exhaustion proceedings, Petition, through his attorneys, has elected to withdraw the claim. Therefore, it is no longer a part of the habeas petition and it shall not be considered by the Court.

76

**D.     Ground Four – Alleged Bias of Appellate Justice**

Petitioner contends that he was denied due process of law because one of the Justices on the Appellate Division panel that decided his consolidated appeal was related to victim E.C. Petitioner further argues that his attorney with respect to that appeal, Kevin J. Bauer, Esq., was ineffective for failing to seek recusal of the Justice.

**1.     Factual Background**

Petitioner filed several post-trial appeals, some of which were ultimately heard in a consolidated appeal by the Appellate Division, Third Department. The panel that decided Petitioner's consolidated appeal included a Justice who shares the same surname as victim E.C.[17]

Petitioner asserts that, prior to oral argument with respect to the appeal, he advised his appellate attorney, Kevin J. Bauer, Esq., that the Justice was related to E.C.[18] Attorney Bauer told Petitioner that he would move for recusal in the event that the Justice was assigned to the panel designated to hear the consolidated appeal. However, no such motion was ever filed. After receiving the Appellate Division's decision and noticing that the Justice was part of the panel that issued the decision, Petitioner contacted Attorney Bauer to inquire as to why the Justice had remained on the panel notwithstanding the apparent conflict.

In a letter dated July 10, 2003, Attorney Bauer advised Petitioner that he failed to seek the Justice's recusal "due to inadvertence." Attorney Bauer further noted that he only learned of the Justice's "presence on the panel on the morning of the argument." (Letter from Attorney Bauer to Petitioner, attached as Exhibit 3A to Petitioner's *Pro Se* Application for Writ of Error *Coram Nobis*).

---

[17]     Because the Justice and victim E.C. share the same surname, this Court will not identify the particular Justice, but will refer to him simply as "the Justice."

[18]     Petitioner was acquitted on all charges involving E.C.

77

2.      **State Court Proceedings**

Petitioner first raised the issue of judicial bias in his application to the Court of Appeals for leave

to appeal from the Appellate Division's decision denying the consolidated appeal. Assistant District

Attorney Bruce E. Knoll ("A.D.A. Knoll") filed a response to Petitioner's application, stating that he

had spoken with the Justice, who told A.D.A. Knoll that "he did not have any knowledge of nor did he

know the victim in question." (Letter Response by A.D.A. Knoll, dated August 21, 2003, attached as

Exhibit 3B to Petitioner's *Pro Se* Application for Writ of Error *Coram Nobis*). The Court of Appeals

denied Petitioner's application for leave to appeal without opinion. *People v. Dearstyne*, 766 N.Y.S.2d

169 (Table) (2003).

Petitioner thereafter filed a *pro se* application for writ of error *coram nobis*, alleging, *inter alia*,

that Attorney Bauer's failure to seek the recusal of the Justice constituted ineffective assistance of

appellate counsel. The Appellate Division denied the writ on January 16, 2004. The Court of Appeals

denied Petitioner's application for leave to appeal without opinion. *People v. Dearstyne*, 814 N.E.2d

469 (2004).

3.      **Habeas Review**

Petitioner contends that the Justice's presence on the appellate panel violated his constitutional

rights, depriving him of due process of law. In addition, Petitioner asserts that his appellate counsel was

unconstitutionally ineffective for failing to seek the Justice's recusal, despite having pledged to do so.

a.      **Judicial Bias**

To establish that a judge has engaged in misconduct sufficient to warrant redress, a party must

demonstrate that the judge displayed "such a high degree of favoritism or antagonism as to make fair

judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Withrow v. Larkin*,

78

421 U.S. 35, 47 (1975) (holding that to succeed on a judicial misconduct claim, a party must "overcome a presumption of honesty and integrity in those serving as adjudicators").

In reviewing a judicial misconduct claim, courts are to presume that public officials have properly discharged their official duties. *See Bracy*, 520 U.S. at 909 (internal quotations and citations omitted); *see also Campbell v. Greene*, 440 F. Supp.2d 125, 156 (N.D.N.Y. 2006). Moreover, "federal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts and lack such authority with respect to state courts." *Daye v. Attorney Gen'l of N.Y.*, 712 F.2d 1566, 1571 (2d Cir. 1983) (*en banc*). "The only commands that federal courts can enforce in state courts are those of the Constitution." *Id.*

Accordingly, "to prevail on a claim of judicial misconduct, petitioner must show that the state trial judge's conduct was so fundamentally unfair as to deprive him of his constitutional right to due process." *Brown v. McKinney*, 358 F. Supp.2d 161, 172-73 (E.D.N.Y. 2005) (citing *Gayle v. Scully*, 779 F.2d 802, 806 (2d Cir.1985)). In the present case, Petitioner asserts that the Justice's presence on the Appellate Division panel was so fundamentally unfair as to deprive him of his constitutional right to due process. However, Petitioner's argument is fundamentally flawed in three respects.

First, Petitioner has not established what the nature of the relationship was, if any, between the Justice and victim E.C. Aside from the fact that they share the same surname, there is no evidence linking the Justice with victim E.C. or explaining how they are related, if at all.

The only evidence presented to this Court is A.D.A. Knoll's letter of August 21, 2003, in which A.D.A. Knoll states that the Justice advised him that he "did not have any knowledge of . . . [or] know" the victim. This statement is of limited assistance, in that it is hearsay and does not actually contain a flat denial that the two are related. However, the statement was a representation by an attorney as an

79

officer of the court that the Justice had denied knowing E.C. It certainly is more persuasive as to this

issue than Petitioner's conclusory assertion that the Justice is a close relative of E.C., which appears to

be based almost entirely upon the fact that the two people share a surname.[19]  The limited evidence

presented regarding the relationship indicates that there was no close relationship between the Justice

and the victim.

Second, and more importantly, even assuming *arguendo* that the Justice and victim E.C. were

related, Petitioner has failed to show that he was prejudiced by the Justice's presence on the appellate

panel. The decision on Petitioner's consolidated appeal was a unanimous ruling by all five justices on

the panel.[20]  Accordingly, Petitioner cannot establish that the Justice cast the deciding vote or in any way

improperly influenced the outcome of the proceedings.

Third, even if the Justice should have recused himself on the basis of consanguinity pursuant to

section 14 of the New York Judiciary Law,[21] Petitioner has not cited, and this Court has not found, any

authority for the proposition that a violation of that statute raises a federal due process claim for which

habeas review is available. *See Knight v. Walsh*, 524 F. Supp.2d 255, 289 (W.D.N.Y. 2007) (noting lack

of precedent for proposition that violation of New York Judiciary Law § 14, without more, constitutes

---

[19]     Petitioner also offers the self-serving and unsupported statement that an unidentified fellow inmate "knows the family" and told Petitioner that the Justice and victim E.C. were related.

[20]     The Justice also served on the Appellate Division panel that affirmed the County Court's denial of Petitioner's motions for issuance of judicial subpoenas *duces tecum*. *See In the Matter of Dearstyne v. Rensselaer County District Attorney*, 691 N.Y.S.2d 628, 629 (1999). It is not clear whether Petitioner also claims he was deprived of due process by the Justice's presence on that panel. In any event, this decision was also unanimous and any claim as to this decision would fail for the reasons set forth above.

[21]     Section 14 of the Judiciary Law provides, in pertinent part, as follows: "A judge shall not sit as such in, or take any part in the decision of, an action, claim, matter, motion or proceeding . . . if he is related by consanguinity or affinity to any party to the controversy within the sixth degree. The degree shall be ascertained by ascending from the judge to the common ancestor, descending to the party, counting a degree for each person in both lines, including the judge and party, and excluding the common ancestor." N.Y. JUDICIARY LAW § 14.

a denial of due process). Accordingly, this Court recommends finding that Petitioner is not entitled to habeas relief based upon his judicial bias claim.

### b.    Ineffective Assistance of Appellate Counsel

Petitioner contends that Attorney Bauer's failure to seek the Justice's recusal amounted to ineffective assistance of appellate counsel. As noted above, Attorney Bauer admitted in a letter to Petitioner that his failure to make a recusal request was "due to inadvertence," indicating that he intended to make the request and simply forgot to do so.

To establish ineffective assistance of appellate counsel, Petitioner must satisfy the two-prong test set forth in *Strickland*. Petitioner must first demonstrate that his "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. Second, he must show that counsel's deficient performance prejudiced his defense. *Id.* at 692. To demonstrate prejudice, Petitioner must establish that, but for counsel's errors, there is a reasonable probability that the outcome of the appeal would have been different. *Id.* at 694. Failure to satisfy either requirement of *Strickland*'s test is fatal to a claim of ineffective assistance. *See id.* at 696. ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."). Although *Strickland*'s two-pronged test was originally formulated to judge trial counsel's performance, it applies in the context of evaluating the effectiveness of appellate counsel's representation as well. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

In the present case, Attorney Bauer apparently had no strategic justification for failing to seek recusal. In fact, he acknowledged that he simply forgot to make the request. However, even if one assumes that Attorney Bauer should have made a recusal request, Petitioner cannot show any prejudice arising from counsel's failure to make the request. As noted above, the decision in question was

unanimously decided by a five-judge panel. Petitioner has not provided any evidence to remotely suggest that the outcome would have been different if the Justice in question had not participated. Further, Petitioner has not provided any evidence that the recusal motion would have been granted or that the Justice harbored any bias. Accordingly, this Court recommends finding that Petitioner is not entitled to relief on this basis.

**E.      Ground Five – Prosecutorial Misconduct**

Petitioner alleges that the prosecution engaged in numerous acts of misconduct, depriving him of his right to a fundamentally fair trial. Petitioner also asserts in Ground Five that his trial counsel was ineffective for having failed to object to, or otherwise address, certain instances of prosecutorial misconduct. Each claim will be addressed in turn below.

**1.      Prosecution's Failure to Call H.O., T.O.'s Father**

Petitioner contends that the prosecution was obligated to call T.O.'s father, as a witness at trial. According to Petitioner, T.O.'s father "possessed non-cumulative information that would proven [sic] that one of the Prosecution's witnesses . . . . provided false testimony to [sic] court." (List of Grounds Raised, attached to Petition, at p. 4). Specifically, Petitioner argues that the father's testimony would have demonstrated that the testimony of T.O.'s older sister, S.O., was false. Thus, Petitioner asserts that the prosecution had a duty to call the father and that its failure to do so constituted prosecutorial misconduct.

This claim does not appear to have been exhausted. As discussed below, Petitioner argued in his CPL § 440.10 motion that his trial counsel was ineffective for failing to request a missing witness charge with respect to T.O.'s father, but did not specifically allege that the prosecution's failure to call that witness amounted to prosecutorial misconduct. These two claims are legally distinct; the ineffective

assistance claim derives from the Sixth Amendment's guarantee of effective counsel, while the prosecutorial misconduct claim stems from the general due process right to a fundamentally fair trial. *See Grant v. Scully*, No. 90 Civ. 4429 (RJW), 1993 WL 88207, at *4 (S.D.N.Y. Mar. 19, 1993) ("Petitioner's concluding contention that the prosecutor's misconduct together with counsel's ineffectiveness 'denied defendant a fair trial' failed to put the state court on notice that it was to decide a federal constitutional claim in reviewing the prosecutor's alleged improprieties. *See Petrucelli v. Coombe*, 735 F.2d 684, 687-88 (2d Cir.1984)."). Thus, the Court does not believe that the prosecutorial misconduct claim has been fairly presented to the state courts.

However, the claim should be deemed exhausted, but procedurally defaulted, because Dearstyne has no available means to obtain redress in the state courts on this claim. It appears that Petitioner has no remaining avenues through which to exhaust this claim in state court. First, it does not appear that Dearstyne has a second chance at a "direct appeal" under New York law. Former New York Court of Appeals Rule 500.10(a) "permit[ted] only one application for direct review[.]" *Spence v. Superintendent, Great Meadow Correctional Facility*, 219 F.3d 162, 170 (2d Cir. 2000) (quoting N.Y. Ct. App. R. 500.10(a) (1999)). The rule has since been amended, and criminal leave applications are now addressed in N.Y. Court of Appeals Rule 500.20. *Colon v. Connell*, No. 07 Civ. 7169(BSJ)(JCF), 2009 WL 2002036, at *6 n.4 (S.D.N.Y. July 9, 2009) While this section does not specifically state that there may be only one application for appeal, see N.Y. Ct. App. R. § 500.20, "such a restriction may be inferred." *Colon*, 2009 WL 2002036, at *6 n.4. First, N.Y. Court of Appeals Rule 500.20(d) and C.P.L. § 460.10(5) provide a 30-day window for any such application to be filed, and "this time limit would be meaningless were multiple applications permitted." *Colon*, 2009 WL 2002036, at *6 n.4. Second, N.Y. Court of Appeals Rule 500.20(d) provides that a request for re-argument or reconsideration of an appeal may not

83

raise any new points, implying that a wholly new request for leave to appeal would be impermissible. *Colon*, 2009 WL 2002036, at *6 n.4 (citing *Roa v. Portuondo*, No. 02 Civ. 6116, 2007 U.S. Dist. LEXIS 74387, at *32-33 (S.D.N.Y. Oct. 5, 2007) (declining to review issue that petitioner had failed to raise on direct appeal); *Murray v. Williams*, No. 05 Civ. 9438, 2007 WL 430419, at *8 (S.D.N.Y. Feb. 8, 2007) (same); *Oquendo v. Senkowski*, 452 F. Supp.2d 359, 368 (S.D.N.Y. 2006) (same)); *see also Harden v. LaClaire*, No. 07 Civ. 4592(LTS)(JCF), 2008 WL 783538, at *14 & n.12 (S.D.N.Y. Mar. 26, 2008) (same), *report and recommendation adopted, Harden v. LaClaire*, 07CIV4592LTSJCF, 2008 WL 4735231 (S.D.N.Y. Oct. 27, 2008).

Secondly, collateral review of his claim via a CPL § 440.10 motion is unavailable because the claim is a matter of the trial record and could have been raised on direct review. *See* N.Y. Crim. Proc. Law §§ 440.10(2)(a), 440.10(2)(c) (barring review if claim could have been raised on direct review). Accordingly, this procedurally defaulted claim is "deemed exhausted." *See Grey*, 933 F.2d at 120-21. Dearstyne has not established the requisite cause and prejudice to excuse the default; nor has he come forward with new, scientifically reliable evidence of actual innocence so as to qualify for the fundamental-miscarriage-of-justice exception. Thus, he cannot overcome procedural bar.

In any event, even if this claim were not subject to an unexcused procedural default, the Court would recommend denying it on the merits. Neither the Petition nor the reply memorandum of law provide any authority for the proposition that the prosecution's decision not to call a particular witness can constitute prosecutorial misconduct. In fact, the case law is to the contrary. *See Brown v. McKinney*, 358 F. Supp.2d 161, 170 (E.D.N.Y. 2005) (denying habeas claim based upon prosecution's failure to call witnesses whose testimony may have been favorable to petitioner because "[i]t is up to the accused and the accused's counsel to present defense witnesses, if they so choose"); *Funches v. Walsh*, No. 05 Civ.

84

2839, 2006 WL 1063287, at *14 (S.D.N.Y. Apr. 21, 2006) ("Surely, a prosecutor is not obligated to call every possible witness. If petitioner believed Felix Diego would have been helpful to his case, he certainly could have subpoenaed Mr. Diego himself. Petitioner's own failure to call a witness cannot be attributed to prosecutorial misconduct."); *Simms v. Moscicki*, No. 06 Civ.2056, 2006 WL 2466811, at *20 (S.D.N.Y. Aug. 25, 2006) ("The prosecutor is not obligated to call witnesses, particularly those who would testify favorably for the defense, and Simms' trial counsel could have called the other officers to testify at trial."); *Bennett v. Spitzer*, No. 05-CV-1399, 2007 WL 389213, at *10 (E.D.N.Y. Jan. 31, 2007) ("It was petitioner's responsibility to present witnesses in his own defense, and he has made no showing that he was denied the right to do so."). Accordingly, this Court recommends finding Petitioner is not entitled to habeas relief on this basis.

### 2.    Trial Counsel's Failure to Request Missing Witness Charge as to H.O.

Petitioner claims that Attorney Grimmick's failure to request a missing witness charge as to T.O.'s father, H.O., amounted to ineffective assistance of counsel. As noted above, Petitioner asserts that H.O. could have presented "non-cumulative" testimony indicating that one of the prosecution's other witnesses was lying.

However, neither the Petition nor the reply memorandum of law contain any details regarding what the alleged "non-cumulative information" possessed by T.O.'s father was or how such information would have contradicted the testimony given by T.O.'s older sister, S.O. As such, this claim should be denied without further analysis for failure to state a claim, as it lacks any meaningful factual details. In any event, even if this Court were to construe the Petition as incorporating the arguments asserted in support of Petitioner's CPL §440.10 motion, the claim fails for the reasons set forth below.

"Under certain circumstances, the failure of a party to produce at trial a witness who presumably

85

has evidence that would 'elucidate the transactions,' requires a trial court, upon a timely request, to instruct the jury that an unfavorable inference may be drawn from the failure of the party to call such witness." *People v. Gonzalez*, 502 N.E.2d 583, 585-86, (N.Y. 1986). "Of course, the mere failure to produce a witness at trial, standing alone, is insufficient to justify the charge. Rather, it must be shown that the uncalled witness is knowledgeable about a material issue upon which evidence is already in the case; that the witness would naturally be expected to provide noncumulative testimony favorable to the party who has not called him, and that the witness is available to such party." *Id.*

In the present case, the prosecution called T.O.'s sister, S.O., as a witness. T.O.'s sister testified that on June 12, 1987, she drove with her father (H.O.) and her other sister, A.O. (who was not one of the three victims) to the Dearstyne house to pick up T.O. (TT Vol. 2, at p. 197). S.O. testified that Petitioner was present at the residence when they picked T.O. up. (TT Vol. 2, at p. 221). On cross-examination, S.O. explained that she had just remembered the events in question the evening before giving her trial testimony. (TT Vol. 2, at p. 223-24). S.O. explained that she had overheard her parents discussing the June 12th encounter with the prosecuting attorney and remembered her father saying that he did not recall seeing Petitioner on June 12th. (TT Vol. 2, at p. 224).

The date of June 12, 1987, is significant because one day later, June 13th, T.O.'s mother discovered blood in her underwear, starting the chain of events that led to Petitioner's arrest. (TT Vol. 2, at p. 254). S.O.'s testimony was offered to show that Petitioner had access to T.O. during the time period immediately preceding the discovery of blood in her underwear. Attorney Grimmick sought to undermine S.O.'s testimony (a) by noting that she waited until the night before her trial testimony before telling anyone that she had seen Petitioner on June 12th and (b) by introducing Petitioner's school attendance records, which showed that he attended school on June 12th (TT Vol. 3, at p. 550-52).

86

As noted above, S.O. also indicated that she overhead her father, H.O., telling the prosecuting attorney that he did not remember seeing Petitioner at the Dearstyne home on June 12th. Petitioner speculates, based upon S.O.'s testimony, that H.O.'s testimony would have been favorable to his defense. Specifically, Petitioner opines that the victim's father would have testified that he did not remember seeing Petitioner on June 12th, which would have undermined S.O.'s testimony and corroborated Petitioner's argument that he was in school on that date.

However, even assuming that H.O. would have testified as S.O. indicated, his testimony would not have materially aided Petitioner's defense. As noted above, S.O. herself testified that her father said he did not remember seeing Petitioner at the Dearstyne home on that date. The jury heard this testimony, which was received into evidence without a hearsay objection. Under the circumstances, direct testimony from H.O. to the effect that he did not "remember" seeing Petitioner on June 12th would hardly have been conclusive as to whether Petitioner was present on that date. Even more importantly, given the other evidence in the case, and in particular, Petitioner's signed confession, there is no reasonable probability that the jury's verdict would have been different if H.O. had testified in the manner suggested.

Moreover, and more fundamentally, the claim at issue is that defense counsel's failure to request a missing witness charge as to H.O. constituted ineffective assistance of counsel. As noted above, a missing witness charge is appropriate when the missing witness "would naturally be expected to provide noncumulative testimony *favorable to the party who has not called him.*" *Gonzalez*, 502 N.E.2d at 586 (emphasis added). There is no suggestion that H.O.'s testimony would have been favorable to the prosecution. Indeed, Petitioner's argument is to the contrary, i.e., that H.O.'s testimony would have been favorable to the defense.

Thus, defense counsel's failure to request a missing witness charge was entirely reasonable given

the facts presented and, in any event, there is no reasonable probability that the trial court would have granted such a request.

Petitioner has therefore failed to establish a claim of ineffective assistance of counsel on this basis. *See Horton v. Ercole*, 557 F. Supp.2d 308, 330 (N.D.N.Y. 2008) ("Horton has not set forth any evidence that [the uncalled witnesses] would have provided favorable testimony for the prosecution. In fact, his argument is exactly the opposite-that they would provide testimony that would support Horton's misidentification defense."); *see also Moore v. West*, No. 03-CV-0053, 2007 WL 1302426, at *18 (N.D.N.Y. May 1, 2007) (denying habeas claim based upon trial court's failure to give missing witness charge because petitioner did not provide any evidence that proposed witnesses "would have provided favorable testimony for the prosecution").

Section 440.30 (4)(b) provides that "upon considering the merits" of a 440 motion, the court may deny the motion without a hearing if "[t]he motion is based upon the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts."

As part of the consolidated appeal, the Appellate Division "reject[ed] defendant's argument that County Court improperly refused to consider facts alleged in unsworn documents submitted in connection with his . . . 440 motion." *Dearstyne III*, 761 N.Y.S.2d at 121.

The Appellate Division's ruling raises the threshold question of whether Petitioner's claim is procedurally barred because the claim was rejected based upon an independent and adequate state law ground, namely CPL § 440.30(4).

There is a split of authority within the Second Circuit as to whether denial of a motion pursuant to CPL § 440.30(4) is an "independent and adequate" state procedural bar. Some courts have concluded

88

that claims denied on this basis are procedurally barred for purposes of habeas review. *See Skinner v. Duncan*, 2003 WL 21386032, at *27-28 (S.D.N.Y. June 17, 2003) (finding that petitioner procedurally defaulted his claim by failing to comply with § 440.30(4)(b)); *White v. Keane*, 2001 WL 699053, at *2 (S.D.N.Y. June 21, 2001) (holding that "a violation of [§ 440.30(4)(b) ] would create a procedural bar"); *Roberts v. Scully*, 875 F.Supp. 182, 192-93 n. 9 (S.D.N.Y.1995) (concluding that denial under § 440.30(4)(b) due to inadequacy of petitioner's papers would be an independent and adequate state law ground)).

Other decisions, however, find that denial pursuant to § 440.30(4)(b) is a decision on the merits that may be subject to habeas review. *See, e.g. Lou v. Mantello*, 2001 WL 1152817, at *9 n. 9 (E.D.N.Y. Sept. 25, 2001) (finding that claims rejected pursuant to § 440.30(4)(b) were not procedurally barred); *Ortiz v. Keohane*, 1995 WL 669904, at *4 n. 5 (E.D.N.Y. Nov.5, 1995) (same); *Muhammad v. Kirk*, 1993 WL 37502, at *4 & n. 5 (S.D.N.Y. Feb.8, 1993); *see also Smart v. Scully*, 787 F.2d 816, 820 (2d Cir.1986) (holding that state court's denial of *pro se* defendant's motion to vacate for failure to comply with N.Y.Crim. Proc. Law § 440.30 by omitting sworn allegations was not " 'an adequate and independent state ground' warranting a federal habeas court to refuse to consider the underlying federal issues").

This Court has previously agreed with the case law authority holding that a denial under §440.30(4) does *not* constitute a procedural bar to habeas review. *See Gonzalez-Pena v. Herbert*, 369 F. Supp.2d 376, 388 (W.D.N.Y. 2005) (Bianchini, M.J.).

Section 440.30 of the Criminal Procedure Law refers to the procedures for deciding § 440 motions, and subparagraph 4 of that section specifically states that "*[u]pon considering the merits of the motion*, the court may deny it without conducting a hearing." (emphasis added). This reference to consideration of the motion on the merits is indicative of the fact that review and denial of a motion

89

pursuant to that subsection constitutes a decision on the merits.

Accordingly, this Court finds that the denial pursuant to CPL §440.30(4) was a denial on the merits and, thus, Petitioner's ineffective assistance of trial counsel claim as to the missing witness charge is not procedurally barred. However, for the following reasons, the claim fails on its merits.

### 3.     The Prosecution's Failure to Present Testimony of Expert Medical Witnesses

As an additional argument under Ground Five, Petitioner asserts that he was deprived of due process of law due to the prosecution's failure to call two (2) expert witnesses, "who could have testified to the inconsistency of the medical reports/statements that were admitted into evidence . . ." (List of Grounds attached to Petition, at p. 5). Petitioner also claims that his trial counsel was ineffective for failing to request a missing witness charge as to these two (2) uncalled medical witnesses. Both claims should be denied, as discussed further below. The Court assumes that the Petition, filed when Dearstyne did not have representation, incorporates the arguments raised in Petitioner's CPL § 440.10 motion regarding the doctor who examined victim C.C. and the doctor who had prepared victim T.O.'s medical records.

The doctor who examined C.C. was out of the country at the time of trial and, thus, unavailable for testimony. The prosecution introduced into evidence the medical record that the physician made after examining C.C., which detailed the following findings: "Redness seen at 3:00 to 9:00 o'clock in the peri-hymenal. Hymen is not attached. Old healer seen at 1:00 o'clock position." (TT Vol. 2, at p. 426). The report also contained the doctor's conclusion that the findings were "indicative of attempted vaginal penetration and would be consistent with the history of alleged sexual abuse." (TT Vol. 2, at p. 428-29). Petitioner's trial counsel objected to the admission of the report, on the grounds that he could not confront the witness who prepared the report. (TT Vol. 2, at p. 426).

After hearing argument from counsel, the trial court ruled that the portions of the report

90

containing the physical findings from the examination were admissible, but that the doctor's conclusions regarding the fact that the findings were consistent with sexual abuse were inadmissible and would be redacted. The trial court reasoned that "the physiological findings at the time of the examination were noted on a hospital record kept in the due course of business" and were, thus, admissible as a business record. (TT Vol. 2, at p. 430).

In addition, on the final day of trial, the prosecution announced that it intended to call Dr. Cynthia Ylagen, who had prepared T.O.'s medical records. However, Dr. Ylagen was ill and unable to testify. (TT Vol. 3, at p. 450). With the consent of defense counsel, T.O.'s medical records were admitted into evidence, subject to the same redactions and limitations as applied to C.C.'s records. (TT Vol. 3, at p. 450-51).

To the extent that Petitioner claims that the prosecution's failure to call the two doctors constituted prosecutorial misconduct, this claim fails because, as discussed above in Section III.E.1, the prosecution has no affirmative duty to present witnesses favorable to the defense.

Moreover, Petitioner has not shown that the testimony of the witnesses in question would have been favorable to him.

Lastly, there appears to be no dispute that the witnesses in question were unavailable to testify and that their unavailability was caused by circumstances beyond the prosecution's control. There is also no showing that Petitioner ever attempted to subpoena the witnesses himself.[22] Accordingly, this Court

---

[22]     It bears noting that Petitioner does not claim that the admission of the redacted medical records violated his right under the Confrontation Clause to cross-examine the witnesses against him. It further appears that no such claim was presented in the state courts. In any event, because the medical records in question were admissible as business records, there was no Confrontation Clause violation as a matter of law. *See United States v. Feliz*, 467 F.3d 227, 233-34 (2d Cir. 2006) (holding that findings in autopsy report qualified as business records and therefore not subject to Confrontation Clause requirements); *see also Singh v. Greiner*, No. 02-CV-1324, 2002 WL 31641608, at *4 (E.D.N.Y. Nov. 18, 2002) ("I cannot conclude that the trial court's admission of these underlying facts from the victim's medical records was erroneous. At the very least, the state court's rejection of petitioner's Confrontation Clause claim cannot be characterized as 'an unreasonable application of, clearly established Federal

recommends finding that Petitioner is not entitled to habeas relief on this basis.

### 4.    Ineffective Assistance of Trial Counsel - Failure to Request Missing Witness Charge Regarding Medical Witnesses

Also under Ground Five, Petitioner argues that Attorney Grimmick was unconstitutionally ineffective for failing to request a missing witness charge as to the medical witnesses that the prosecution failed to call. However, Attorney Grimmick did, in fact, request a missing witness charge with respect to both medical witnesses. (TT Vol. 3, at p. 655). The trial court denied the request on the ground that neither of the witnesses were "in the control of the prosecution." (TT Vol. 3, at p. 655). Accordingly, because trial counsel did request a missing witness charge, Petitioner cannot claim ineffective assistance of counsel on this basis.

Furthermore, defense counsel noted during summation that the prosecution had failed to call an expert and argued that the jury should draw an adverse inference from such failure, which ameliorated any alleged error arising from the trial court's refusal to provide a missing witness charge. (TT Vol. 3, at p. 685, 687). *See Brown v. Spitzer*, No. 05 Civ 1553, 2007 WL 2406870, at *3 (E.D.N.Y. Aug. 21, 2007) ("[P]etitioner's trial counsel was granted the right to argue in closing that the jury should draw an adverse inference from the failure to call Harrell, for whatever that was worth, and the cases have recognized that counsel's closing argument as to an allegedly missing witness cures the failure to charge, if one would be required."). Habeas relief should not issue on this claim.

### 5.    Violations of the Prosecution's Duty to Disclose *Brady* and *Rosario* Material

Petitioner argues under Ground Five that the prosecution failed to turn over DNA evidence,

---

law.").

92

namely a semen sample[23] that "the defense would have tested to exonerate Petitioner." (List of Grounds attached to Petition, at p. 5). Petitioner contends that the prosecution's failure to disclose this information constituted a violation of their *Brady* and *Rosario*[24] duties.

In addition, Petitioner asserts that trial counsel never requested the fluid sample, which amounted to ineffective assistance of counsel.

### a.    Prosecution's Failure to Disclose Fluid Sample from T.O.

This claim essentially duplicates Petitioner's third claim for relief, which also contained the allegation that the prosecution committed a *Brady* violation based upon the non-disclosure of the fluid sample examined by Dr. Close.  For the reasons discussed in Section III.C.2, Petitioner has not established a claim of prosecutorial misconduct on this basis.  In sum, Petitioner has not demonstrated that the prosecution ever had possession or control of the sample in question, that the prosecution participated in the destruction of the sample, or that the disclosure of the sample would have created a reasonable doubt that did not otherwise exist.

Moreover, to the extent that Petitioner argues that the prosecution had an expanded duty of disclosure under *Rosario*, any alleged violation of that state law standard is not cognizable on habeas review. *E.g.*, *Lyon v. Senkowski*, 109 F. Supp.2d 125, 139 (W.D.N.Y.2000) (Larimer, D.J.).  Unlike a *Brady* claim, a *Rosario* claim is based solely upon a New York state law right. *Id.*; *see also Copes v. Schriver*, No. 97-CIV-2284, 1997 WL 659096, at *4 (S.D.N.Y. Oct. 22,1997) (holding that a violation of the *Rosario* rule does not establish a constitutional violation). To the extent that it exceeds federal

---

[23]     Although Petitioner characterizes the sample as a "semen sample" or "sperm sample," the only evidence that the sample, in fact, contained semen or sperm was Dr. Close's testimony regarding his examination of "drainage" taken from T.O.'s vaginal area. Dr. Close testified that he examined the fluid and observed what appeared to be sperm.  As noted above, the forensic tests were negative for the presence of sperm.

[24]     *People v. Rosario*, 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (N.Y.1961).

93

constitutional requirements, *Rosario* defines state law, and the prosecutor's failure to turn over *Rosario* material is not cognizable on federal habeas review. *Id.*; *see also Green v. Artuz*, 990 F. Supp. 267, 274 (S.D.N.Y. 1998) (citing *United States ex. rel. Butler v. Schubin*, 376 F. Supp. 1241, 1247 (S.D.N.Y. 1974)).

For the foregoing reasons, I recommend finding that Petitioner is not entitled to habeas relief based upon his claims under *Brady* and *Rosario* concerning the alleged withholding of DNA evidence (i.e., the fluid sample).

### b.   Ineffective Assistance of Trial Counsel

Petitioner further argues under Ground Five that his trial counsel was ineffective for allowing Dr. Close to testify regarding the fluid sample without demanding that the prosecution turn the sample over to the defense for examination.  There is no indication that Attorney Grimmick was aware of the existence of the fluid sample prior to trial or that the prosecution ever had possession of the sample. Indeed, as noted above, it is now known that the sample was destroyed by Dr. Close immediately after the examination and long before trial.  Attorney Grimmick obtained the Johnson rape kit results during the course of discovery (TT Vol. 3, at p. 479), which indicates that he was diligently pursuing discovery and obtaining disclosure of available test results in the prosecution's possession.

Further, to the extent that Petitioner's claim is construed as asserting that Attorney Grimmick was ineffective for failing to seek discovery of the sample from Dr. Close in order to perform DNA testing on it, the decision not to obtain such discovery could very reasonably have been motivated by a concern that testing of the fluid would produce inculpatory evidence. *See Sturdivant v. Barkley*, No. 04-CV-5659, 2007 WL 2126093, at *7 (E.D.N.Y. July 24, 2007) (finding that "defense counsel's strategic decision not to seek DNA testing on the bags of cocaine was both reasonable and proper given that it was likely that the testing would have revealed adverse evidence"); *cf. also Johnson v. People of State of New York*,

02-CV-3752, 2003 WL 23198785, at *15 (E.D.N.Y. Nov. 5, 2003) ("The record is devoid of any request by defense counsel for additional forensic testing or claim of prejudice on the ground that no further examinations were done. Strategically this position made sense since it was likely that testing would have revealed adverse evidence.").

Attorney Grimmick elected to use the forensic test results to impeach Dr. Close's testimony regarding the presence of sperm and argued in his summation argued that the negative results cast doubt on the credibility of Dr. Close's methods and conclusions. (TT Vol. 3, at 683-84). As discussed above, trial counsel's decision to pursue this line of attack, rather than obtaining test results that were potentially incriminating, was the sort of strategic decision that will not be second-guessed on habeas review. *See Sturdivant v. Barkley*, 2007 WL 2126093, at *7.

6. **Lack of Specificity Regarding Date of Offenses**

As an additional allegation under Ground Five, Petitioner argues that the indictment lacked specificity regarding the date on which the alleged crimes involving T.O. occurred. Further, he contends that the prosecution failed to disclose a particular date at issue, in violation of its obligations under *Brady* and *Rosario*. Petitioner also contends that his trial counsel was ineffective for failing to adequately address this issue.

a. **Factual Background**

This claim relates to the testimony of T.O.'s sister, S.O. As noted above, S.O. testified that, on June 12, 1987, she saw Petitioner when she went with her father to pick T.O. up at the Dearstyne home. (TT Vol. 2, at p. 196-97, 221). T.O.'s mother testified that she discovered blood in T.O.'s underwear the following day, June 13th. (TT Vol. 2, at p. 254).

During the trial, Petitioner's trial counsel objected and moved to preclude S.O.'s testimony, which placed Petitioner in the company of T.O. on June 12, 1987, on the grounds that the last date referenced

95

in Count 1 of the indictment (which charged Petitioner with raping T.O.) was June 10th. (TT Vol. 2, at

p. 216-17).  Defense counsel argued that "in view of the fact that we have struggled mightily to try to pin

these times down, to allow this testimony placing the defendant in the company of the child on June 12th

is improper.  It's a violation of *Brady*.  It harms the defense's ability to prepare." (TT Vol. 2, at p. 216-

17).

      The trial court overruled the objection, noting that the fifth count of the indictment alleged sexual

abuse occurring in "early June 1987" and indicating that the reference to June 12th fell within that time

period.  The trial court also concluded that the testimony was not *Brady* material in that it did not tend

to exculpate Petitioner.  (TT Vol. 2, at p. 218-220).

      Following the trial court's ruling, S.O. continued with her testimony.  On cross-examination, she

explained that, although she had met with the prosecution in preparation for her testimony, she never

mentioned the June 12th encounter.  (TT Vol. 2, at p. 223).  S.O. testified that she had just remembered

the encounter the evening before her testimony, during a conversation with her parents.  (TT Vol. 2, at

p. 223-24).

### b.      State Court Proceedings

      In support of his CPL § 440.10 motion, Petitioner argued that the indictment lacked the necessary

specificity regarding the dates of the alleged offenses, which rendered the indictment defective.  In

addition, he asserted that the prosecution withheld the information regarding the June 12th date from the

defense, in violation of *Brady* and *Rosario*.  Lastly, Petitioner contended that Attorney Grimmick was

ineffective for failing to seek an adjournment or move for a mistrial based upon this issue.

      With respect to the challenges to the indictment and *Brady* and *Rosario* claims, Judge McGrath

concluded that those claims could have been raised on direct appeal and, thus, would be denied pursuant

to CPL § 440.10 (2)(c).  Regarding Petitioner's ineffective assistance of counsel claim, Judge McGrath

denied the claim pursuant to CPL § 440.30(4)(b), on the grounds that it was unsupported by sworn allegations of fact. (CPL § 440.10 Decision, at p. 5).

As previously noted, the Appellate Division affirmed Judge McGrath's decision as part of the consolidated appeal. *Dearstyne III*, 761 N.Y.S.2d at 121. Although the Appellate Division did not specifically discuss these particular claims, the court stated that it had "considered defendant's remaining arguments and [found] them unpersuasive." *Id.* The Appellate Division's description of the claims as "unpersuasive" indicates that the reviewing court has examined their merits. There is no indication that the Appellate Division relied upon the procedural bar invoked by the CPL § 440.10 court. Thus, it appears to this Court that the Appellate Division's blanket denial of the remaining claims (which included the lack of specificity issue, the withholding of S.O.'s testimony regarding the fact that she saw Petitioner in T.O.'s presence on June 12th, and trial counsel's failure to seek an adjournment or move for a mistrial based upon this issue) as "unpersuasive" constitutes a ruling on the merits.

### c.  Habeas Review

Regarding the claim that the indictment lacked the requisite specificity regarding the date of the alleged criminal conduct, this Court finds that Petitioner has failed to establish that any constitutional violation occurred. "A due process claim in a federal habeas petition alleging that a state prisoner was unable, based on lack of notice in the indictment, to adequately prepare his defense resulting in actual prejudice 'is largely one of state law, subject only to the general fourteenth amendment guarantees of due process.'" *Chandler v. Moscicki*, 253 F. Supp.2d 478, 486 (W.D.N.Y. 2003) (quoting *United States ex rel. Corozzo v. Attorney Gen. of State of N.Y.*, 475 F. Supp. 707, 709 (E.D.N.Y.1979)).

In the present case, the indictment alleged that Petitioner raped T.O. "on or about the 10th day of June, 1987," and that he sexually abused her "sometime in early June, 1987." (TT Vol. 1, at pp. 2, 4). The indictment provided a reasonable degree of specificity under the circumstances and particularly

97

given the extremely young age of the victim at the time of the alleged offenses (three years old).

Although T.O.'s sister, S.O., provided testimony regarding Petitioner's access to the victim on June 12th, this testimony did not rise to the level of an impermissible amendment of the indictment. The witness did not testify that any particular sexual acts occurred on June 12th, merely that Petitioner had access to the victim on that date. The indictment stated that the rape allegedly occurred "*on or about* the 10[th] day of June, 1987," and that the sexual abuse occurred "sometime in *early June*, 1987." June 12th was within the time period of "early June". The trial court specifically limited S.O.'s testimony concerning the June 12th date to demonstrating that Dearstyne had access to T.O. in "early June", not as evidence that an additional crime–besides the one alleged in the indictment to have occurred on June 10th–was committed on June 12th. Any arguable variance between the particular date testified to and the time period referenced in the indictment was insufficient to rise to the level of a constitutional violation. *See Chandler*, 253 F. Supp. 2d at 487 ("While a constructive amendment of an indictment can violate the right to fair notice, 'not all alterations of the indictment are unconstitutional'. A defendant must be given notice of the 'core of criminality to be proven at trial', while permitting the prosecution significant flexibility in the nature of the proof adduced at trial."); *see also LanFranco v. Murray*, 313 F.3d 112, 119 (2d Cir. 2002); *People v. Jones*, 829 N.Y.S.2d 364, 365 (4th Dep't 2007).

Furthermore, Petitioner has not sufficiently explained how he was prejudiced by the alleged lack of specificity regarding the June 12th date. For example, he does not articulate an alternate defense strategy that would or could have been adopted if the defense had received advance notice of S.O.'s testimony. As such, Petitioner has failed to establish any reasonable probability that the results of the trial would have been different if the indictment had been more specific or if the defense had received earlier notice concerning the June 12th date.

In addition, with respect to the prosecution's alleged failure to disclose S.O.'s testimony regarding

98

the June 12th date, Petitioner has not established a violation of *Brady* because the testimony that Petitioner

had access to the victim on that particular date was neither exculpatory nor impeachment evidence. To

the contrary, the testimony tended to inculpate Petitioner by placing him in contact with the alleged

victim during the relevant time period.

Moreover, the witness's testimony indicated that the prosecution itself had no notice of the

specific testimony until shortly before it was offered. (TT. Vol. 2, at p. 223-24). As such, there has been

no showing that the prosecution had possession of the information prior to trial, which is required to

establish a *Brady* violation. *See Sturdivant v. Barkley*, No. 04-CV-5659, 2007 WL 2126093, at *6

(E.D.N.Y. July 24, 2007) (noting that "the prosecution is not required to disclose evidence it does not

possess or of which it is not aware") (citing *Smith v. Edwards*, No. 98 Civ. 7962, 2000 WL 709005, at

*6 (S.D.N.Y. May 31, 2000)).

Further, even assuming *arguendo* that the testimony in question was *Brady* material, Petitioner

has failed to establish any reasonable probability that the outcome of the trial would have been different

if the prosecution had disclosed the information to the defense prior to trial.        Petitioner simply offers

the conclusory assertion that the alleged *Brady* violation "prevented an array of legal complexities that

hampered the Defendant's avenues of relief . . . namely, Defendant's right to rely on a specific date to

present an alibi defense." (List of Grounds attached to Petition, Docket No. 1, at p. 5). This conclusory

allegation is insufficient to establish prejudice arising out of the alleged *Brady* violation.

Petitioner's ineffective assistance of counsel claim as to this issue also lacks merit. Petitioner's

trial counsel objected to S.O.'s testimony and argued, albeit unsuccessfully, that the testimony should

have been precluded. (TT Vol. 2, at p. 198-220). Petitioner's unsupported and conclusory claim that trial

counsel's performance with respect to this issue was ineffective does not justify habeas relief.

In sum, Petitioner's allegations under Ground Five concerning the lack of specificity issue, the

withholding of S.O.'s testimony regarding the fact that she saw Petitioner in T.O.'s presence on June 12th,

and trial counsel's failure to seek an adjournment or move for a mistrial based upon this issue, do not

demonstrate any constitutional violation, and habeas relief on them should be denied.

### 7.    Presentation of False Testimony

Petitioner alleges that the prosecution "failed to correct the false and misleading presentation of

medical evidence by Dr. Close." (List of Grounds, at p. 5). Petitioner raised this claim in support of his

CPL § 440.10 motion and consolidated appeal.

Essentially, Petitioner relies upon a journal article and affidavit from Dr. Robert Fay (respectively

attached as Exhibit L to Petitioner's Exhibits in Support of CPL § 440.10 Motion and Exhibit C to

Petitioner's *Pro Se* Supplemental Brief in Support of Consolidated Appeal). Dr. Fay questioned the

methods and conclusions used by Dr. Close in connection with his examination of T.O. In particular, Dr.

Fay found "questionable on its face" the conclusion of Dr. Close that the "yellow material" in T.O.'s

vaginal area was semen. Dr. Fay stated that in his professional experience, semen is white, and yellowish

material in a child's vagina is usually discharge, frequently from an infection. Fay Aff., ¶3.

Dr. Fay also found the methods used by Dr. Close in examining the victims were "questionable,"

*id.*, ¶4. Dr. Fay did not believe it would have been possible for Dr. Close to see the scratches in T.O.'s

vagina that he claimed to have seen without the use of a speculum, which Dr. Close did not have. Fay

Aff., ¶5. According to Dr. Fay, it is "extremely difficult" to see a vaginal abrasion unaccompanied by

active bleeding *without* the use of a speculum. *Id.*

In addition, Dr. Fay found it hard to believe that Dr. Close would not have seen the hymenal clefts

and notches observed by the Albany Medical Center, at which the victims were examined following Dr.

Close's examination. *Id.* According to Dr. Fay, one or both of the examinations contained serious errors,

but he could not say which one was faulty based solely upon the records he had reviewed. *Id.* Finally,

Dr. Fay found Dr. Close's methodology deficient in that he failed to take any photographs of T.O.'s alleged injuries. *Id.*

In its decision denying the CPL § 440.10 motion, the County Court held that Dearstyne had submitted only "bald allegations unsupported by sworn facts." CPL § 440.10 Decision at p. 11. With regard to "the affidavits and reports by experts presented to the court in support of this motion," the County Court found that they "do not establish that the medical evidence against defendant, and defendant's statement, are false. They only suggest the possibility that they are false." CPL § 440.10 Decision, at p. 12). The County Court held that the submissions were insufficient to warrant a hearing on the perjury issue and denied the claim pursuant to CPL § 440.30(4)(b). The Appellate Division summarily dismissed this argument as "unpersuasive" when it was raised as part of the consolidated appeal. *Dearstyne III*, 761 N.Y.S.2d at 121. This constitutes an adjudication on the merits for purposes of habeas review under AEDPA. See Harrington v. Richter, ___ U.S. ___, 131 S. Ct. 770, 785, 2011 WL 148587, at **9 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.") (*comparing with Harris v. Reed*, 489 U.S. 255, 265, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (stating that the presumption of a "merits determination" arises when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)).

The knowing presentation of perjured testimony constitutes prosecutorial misconduct. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).. However, to establish such a claim, a habeas petitioner has the initial "burden of demonstrating, by a preponderance of evidence, that the witness committed perjury, and, in determining whether perjury

occurred, a court must 'weigh all the evidence of perjury before it.'" *Anekwe v. Phillips*, 05-CV-2184,

2007 WL 1592973, at *6 (E.D.N.Y. May 31, 2007) (quoting *Ortega v. Duncan*, 333 F.3d 102, 106-07

(2d Cir. 2003)).

Then, the petitioner must establish that "the prosecution knew, or should have known, of the

perjury," and "there is any reasonable likelihood that the false testimony could have affected the

judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976)). However, "even a direct conflict

in testimony does not in itself constitute perjury." *United States v. Gambino*, 59 F.3d 353, 365 (2d

Cir.1995); *see also United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir.2001) ("A witness commits

perjury if he gives false testimony concerning a material matter with the willful intent to provide false

testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty

memory. Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury.")

(internal citations omitted)).

In the present case, as noted above, the state courts concluded that Petitioner had not met this

burden and had not established that Dr. Close's testimony was false. This was not an objectively

unreasonable determination of the facts in light of the evidence presented; nor did it objectively apply

clearly established Supreme Court precedent concerning the presentation of perjured testimony. On the

one hand, Dr. Fay stated that it was "extremely difficult" to see a vaginal abrasion unaccompanied by

active bleeding *without* the use of a speculum, as Dr. Close claimed to have done. One the other hand,

Dr. Fay found it difficult to believe that Dr. Close would not have seen the hymenal clefts and notches

observed by the Albany Medical Center, at which the victims were examined following Dr. Close's

examination. *Id.*  However, since Dr. Close did not use a speculum, it raises the question whether he

would have been able to see hymenal clefts and notches without it, if, as Dr. Fay opined, he would not

have been able to see abrasions without it. Significantly, Dr. Fay does not say that Dr. Close should have

102

been able to see these characteristics (hymenal notches and clefts) without the use of a speculum. Nor does Dr. Fay describe the extent of the examination performed at Albany Medical Center, such as whether a speculum or colposcope or other specialized type of viewing instrument was used. According to Dr. Fay, one or both of the examinations contained serious errors. Notably, however, he could not say which examination was erroneous. Dr. Fay, in his affidavit reviewing Dr. Close's methodology and conclusions, was highly critical of Dr. Close's handling of T.O.'s examination. Clearly, Dr. Fay would have taken a far different approach than Dr. Close did.  Dr. Fay's critique would have been valuable fodder for cross-examination of Dr. Close at trial, but it does not establish that Dr. Close falsely reported the results of his examination.

There is no direct evidence to suggest that Dr. Close's testimony was knowingly false or that Dr. Close might have had a motive or interest in presenting perjured testimony. However, his departure from acceptable medical and forensic practices was extensive and dramatic, as claimed by Dr. Fay. Although the state trial judge suggested that the medical findings by Dr. Close "were possibly false," if Dr. Fay's affidavit was credited, the record simply cannot support a finding that the prosecution knowingly presented false testimony from this witness.  Although this Court is deeply troubled by the conduct of Dr. Close, as stated above, it finds that Petitioner has not met his threshold burden of establishing, beyond a preponderance of the evidence that Dr. Close committed perjury. Furthermore, even assuming that Dr. Close did testify falsely, Dearstyne has not demonstrated that the prosecutor knew of the perjury or had reason to know that Dr. Close was going to perjure himself. Thus, I cannot conclude that the state courts' rulings were an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States. Therefore, I recommend concluding that Petitioner is not entitled to habeas relief on this basis.

103

**8.     Improper Summation Comments**

Petitioner alleges that he was deprived of a fundamentally fair trial because of allegedly improper comments made by the prosecutor during summation. Specifically, Petitioner contends that the prosecutor shifted the burden of proof and improperly commented on evidence not previously disclosed to the defense.

     **a.     Factual Background**

During his summation, Petitioner's trial counsel argued strenuously that the prosecution had failed to meet its burden of proof in a number of material respects. In particular, defense counsel attacked the credibility of the medical evidence and noted the lack of expert medical testimony to explain much of the evidence. (TT Vol. 3, at p. 685).

For example, referring to the hospital records concerning T.O., defense counsel noted that "[t]hey weren't interpreted by a physician, so who knows what they mean? We don't have expert testimony that tells what they mean." (TT Vol. 3, at p. 685). Regarding the medical records introduced concerning C.C., defense argued that "those medical records, again, are unaccompanied by any explanatory proof, anybody who will tell you how to interpret those." (TT Vol. 3, at p. 687).

In response, the prosecutor made the following comment during his summation:

> What's also interesting, in my mind's eye, Ladies and Gentlemen – and I submit this to you for your deliberations – is that during Defense's summations [sic], he elaborated that there is no explanatory proof for some of the victim's medicals. If you are going to hold People to that proof, Ladies and Gentlemen, I would submit to you it's only fair to hold the defense to that type of proof.

(TT Vol. 3, at p. 706).

Petitioner's trial counsel immediately objected to this improper burden-shifting comment and a discussion was held off the record between counsel and the court. (TT Vol. 3, at p. 706-707).

The trial court then gave the following curative instruction:

104

Ladies and Gentlemen, there is no obligation upon the defense to prove or disprove anything. The obligation is upon the prosecution to prove each and every element of each crime and guilt of the defendant beyond a reasonable doubt. There's no such burden upon the defense.

(TT Vol. 3, at p. 707).

The prosecutor also responded to attacks made by Petitioner's trial counsel upon Dr. Close's credibility. As discussed above, Dr. Close testified that he examined a sample of a liquid discharge from T.O.'s vaginal area under a microscope and concluded that the discharge was sperm. Petitioner's trial counsel noted that Dr. Close's testimony appeared to be contradicted by the Johnson rape kit results, which were negative for sperm. Specifically, defense counsel argued that Dr. Close was "try[ing] a little too hard" and that the doctor had erred when he concluded that the fluid discharge was sperm. (TT Vol. 3, at p. 683-84).

The prosecutor responded to this line of attack with the following argument:

> Curiously enough, Dr. Close also discovered some drainage in the child's panties, and that drainage consisted of blood. He tested to find it to be blood, puss [sic] and sperm. And he testified to a medical certainty that it was sperm, and he testified that the drainage could be caused by inflammation, infection and physical trauma. I would submit to you, Ladies and Gentlemen, that this is consistent with Rape in the first degree.
>
> The defense submitted, Ladies and Gentlemen, state police crime lab . . . the Johnson Rape Kit – that the vaginal wall slide was tested for sperm and came out negative, and the seminal fluids packet was tested for seminal fluid, and it came out negative.
>
> But this Johnson Rape Kit, ladies and Gentlemen, was taken at Albany Medical Center after Dr. Close had examined the child. This Johnson Rape Kit, Ladies and Gentlemen, was taken a few hours after Dr. Close's examination and that the exam conducted was a smear in the Johnson Rape Kit, - - -

(TT Vol. 3, at p. 705).

Petitioner's trial counsel objected and a discussion was held off the record. The court then instructed the jury that there was "no testimony from physicians as to how this Johnson Rape Kit

105

examination was conducted." (TT Vol. 3, at p. 706). The prosecutor then completed his argument on this point as follows:

> Again, Ladies and Gentlemen, I note that the examination was conducted hours after Dr. Close's, and that Johnson Rape Kit was a vaginal wall slide. Dr. Close examined the sample of drainage found inside the panties of [T.O.] . . . . Therefore, I would submit to you, Ladies and Gentlemen, that the specimen examined by Dr. Close is not the same specimen examined by the New York State Police Lab.

(TT Vol. 3, at p. 706).

### b.   State Court Proceedings

Petitioner raised a prosecutorial misconduct claim on direct appeal, citing that the prosecutor's statement about "hold[ing] the defense to that type of proof." The Appellate Division rejected the claim, holding that "[t]he allegedly improper statement made by the prosecutor during summation did not deprive defendant of a fair trial because County Court gave prompt curative instructions which defendant accepted." *Dearstyne II*, 646 N.Y.S.2d at 1005. Thus, the Appellate Division considered this first prosecutorial misconduct claim on the merits.

In his CPL § 440.10 motion, Petitioner broadened his prosecutorial misconduct claim to include the statements quoted above regarding the Johnson rape kit test results. The County Court denied the claim pursuant to CPL § 440.10 (2)(c), on the grounds that it could have been raised on direct appeal. (CPL § 440.10 Decision, at p. 9-10). The Appellate Division summarily denied the claim as part of the consolidated appeal, including it among the claims it found "unpersuasive." *Dearstyne III*, 761 N.Y.S.2d at 121. As noted above, this summary disposition amounts to an adjudication on the merits of the second prosecutorial misconduct claim.

In sum, all of Dearstyne's claims of prosecutorial misconduct have been adjudicated on the merits by the state courts and, accordingly, are subject to the deferential standard of review set forth in 28 U.S.C. § 2254(d)(1) and (2). Dearstyne must demonstrate that the state courts unreasonably

applied the clearly established Supreme Court precedent concerning claims of prosecutorial misconduct in order to be entitled to habeas relief.

### c.   Habeas Review

For habeas relief to be granted based on a claim of prosecutorial misconduct, the alleged errors must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181(1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). For reversal to be warranted based upon the prosecutor's closing argument, a petitioner must show "'that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict.'" *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir.1998) (quoting *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir.1994)). Thus, the Supreme Court has explained, criminal convictions are not to be lightly overturned on the basis of a prosecutor's inappropriate comments standing alone in an otherwise fair proceeding. *United States v. Young*, 470 U.S. 1, 10 (1985) (stating that the context in which remarks were made must be examined to determine their probable effect on the jury's ability to judge the evidence fairly); *accord, e.g., United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir. 1985) ("The test is whether the statements, viewed against 'the entire argument before the jury,' deprived the defendant of a fair trial.") (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 242 (1940)).

Thus, the "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Accordingly, the Second Circuit has "adopted a contextual approach that considers the following factors: 'the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.'" *United States v. Biasucci*, 786 F.2d

504, 514 (2d Cir.1986) (quoting *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981), *cert. denied*, 456 U.S. 989 (1982)).

The Court turns first to the prosecutor's attempt to shift the burden of proof onto the defense. A prosecutor crosses the line into improper comment by "suggest[ing] that the defendant has the burden of producing evidence." *United States v. Bautista*, 23 F.3d 726, 733 (2d Cir.1994) (citing *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990) (stating that it is impermissible for the prosecutor to "suggest that the defendant has any burden of proof or any obligation to adduce any evidence whatever").

The prosecutor's remark was plainly improper. However, any implication that the defendant had a burden to produce evidence in this case was blunted by the trial court's prompt, clear, curative instruction to the contrary, following defense counsel's timely objection. *Bautista*, 23 F.3d at 733. Consequently, "whatever ambiguity may have been caused by the remark with respect to the burden of proof was undoubtedly clarified by the [trial] court's instruction that the government bore the burden of proof as to every element and that the burden never shifted to the defendants." *Id.*; *accord, e.g.*, *Stone v. Stinson*, 121 F. Supp.2d 226, 243 (W.D.N.Y. 2000) ("Thus, any attenuated inference from the prosecutor's statement suggesting the defense had any burden to establish innocence was overcome by the court's unequivocal instruction establishing the contrary.").

The Court turns next to Dearstyne's allegation that the prosecutor strayed from the four corners of the evidence by commenting on the manner in which the Johnson rape kit testing was conducted. Clearly, this was improper. However, trial counsel quickly objected and the trial court provided a curative instruction. *See McRae v. New York*, 271 F. Supp.2d 402, 408 (E.D.N.Y. 2003) (denying habeas claim because "[w]here the prosecutor strayed from the four corners of the evidence objections were sustained by the trial court"); *see also Cruz v. Greiner*, 98 Civ. 7839, 1999 WL

108

1043961 at *31 & n. 26 (S.D.N.Y. Nov. 17, 1999) (rejecting petitioner's argument that "if you throw a skunk into the jury box, you can't instruct the jury not to smell it" and finding that the court's instruction to disregard inadmissible evidence rendered harmless any prosecutorial misconduct); *Brown v. Greiner,* No. 02-CV-2043, 2003 WL 22964395, at *10 (E.D.N.Y. Oct. 2, 2003) ("None of the prosecutor's remarks, either singly or cumulatively, was sufficient to have denied petitioner a fundamentally fair trial. Sound objections from defense counsel were sustained. Curative instructions were delivered by the court where appropriate.").

The curative instruction is significant because, as the Supreme Court has held consistently, jurors are generally presumed to follow their instructions. *Smith v. Texas,* 543 U.S. 37, 46 (2004) (quoting *Penry v. Johnson,* 532 U.S. 782, 799 (2001)); *see also Greer v. Miller,* 483 U.S. 756, 766 n. 8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence . . . , unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions."); *Richardson v. Marsh,* 481 U.S. 200, 211 (1987) (stating that "juries are presumed to follow . . . instructions"); *Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 367 (1963) (When a limiting instruction is clear, "[i]t must be presumed that the jury conscientiously observed it.").

In sum, the first *Modica* factor, which looks at the severity of the misconduct, weighs in Petitioner's favor–the prosecutor's comments infringed upon a defendant's constitutional right to hold the prosecution to the burden proving every element of each offense beyond a reasonable, based only upon facts *in evidence.* On the other hand, the misconduct did not pervade the entire proceeding.

The second *Modica* factor–the curative measures taken–weighs in favor of the State, because the trial court promptly provided specific curative instructions, tailored to address the particular

error committed each time by the prosecutor. Had the jury heard only the trial judge's pattern jury instructions concerning the allocation of the burden of proof, this Court would recommend granting relief because the third *Modica* factor–prejudice–weighs in Dearstyne's favor.

The prejudice inquiry necessarily takes into account the strength of the prosecution's case against a defendant; the reviewing court is to evaluate "the certainty of conviction absent the improper statements.'" *United States v. Biasucci*, 786 F.2d at 514. As discussed above in this Report and Recommendation, the evidence against Dearstyne was not overwhelming. If one removes Dearstyne's coerced confession from the pool of evidence presented to the jury, all that remains is the conflicting medical evidence and ambiguous behavioral testimony that went unchallenged by any defense expert. There was no sworn testimony from any of the child complainants.

The prosecutor's deliberate misconduct is troubling. In a case where the evidence does not strongly support guilt, a prosecutor's improper comments are more likely to be prejudicial. On the other hand, this was not a proceeding marred by pervasive misconduct on the prosecutor's part, and the trial court properly dealt with the offensive comments. Thus, the Court cannot say that the state courts' rulings unreasonably applied clearly established Supreme Court precedent in finding that Dearstyne was not prejudiced by the prosecutor's misconduct, and therefore the Court recommends that habeas relief not issue. However, the Court recommends that a certificate of appealability be granted as to this issue.

9.    **Failure to File Timely Replies**

Petitioner alleges that during the post-conviction proceedings, the prosecution failed to file timely replies to his motions pursuant to Section 2214 of the New York Civil Practice Law and Rules ("the CPLR"). Petitioner contends that the prosecution's alleged disregard for this state procedural rule amounted to a violation of due process and equal protection because it deprived him

of the ability to submit responses for consideration by the state courts.

As a threshold matter, this Court notes that Petitioner provides no specific details concerning the post-conviction proceedings to which he is referring, how the prosecution's alleged untimely responses prevented him from providing further argument to the state courts, and what arguments he would have provided if given the opportunity.

Moreover, Petitioner can scarcely complain that he was unable to offer arguments with respect to the post-conviction proceedings. He submitted a 232-page memorandum of law in support of his CPL § 440.10 motion, along with voluminous exhibits and affidavits. Petitioner likewise submitted lengthy *pro se* submissions in support of his consolidated appeal and various post-conviction motions. Further, Petitioner has failed to demonstrate any reasonable likelihood that the outcome of the post-conviction proceedings would have been different if he had been permitted to submit further briefing and arguments.

Lastly, and most importantly, Petitioner's claimed violation of a state procedural rule is not cognizable on habeas relief. It is well-settled that "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). In this regard, the United States Supreme Court has indicated that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). To the contrary, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." 502 U.S. at 68 (citations omitted); *see also Smith v. McGinnis*, No. 01Civ.1363, 2004 WL 350755, at *1 (S.D.N.Y. Feb. 24, 2004) ("A fundamental aspect of habeas corpus review is that only violations of federal law are cognizable in a federal habeas corpus proceeding; a violation of state law provides no basis for habeas relief."); *cf. also Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002) (noting that "not 'every error of state law can be

111

transmogrified by artful argumentation into a constitutional violation.'"). Accordingly, the Court

recommends dismissing this claim as not cognizable on federal habeas review.

### 10.    Failure to Disclose Potential Civil Action

Petitioner claims that the prosecution engaged in misconduct by failing to disclose that a

family member of one of the victims was awaiting the outcome of Petitioner's criminal trial before

filing a civil action against Petitioner and his family.  Petitioner presented this claim as part of his

CPL § 440.10 motion.  The County Court denied the claim and explained its decision as follows:

> [D]efendant has presented the court with no sworn testimony whatsoever to support
> his allegations that they [the prosecution] know, or should have known, about the
> lawsuit.  Moreover, and more significantly, defendant has presented the court with
> no sworn facts indicating that the lawsuit was ever brought.  His statement related
> to the bringing of the lawsuit is nothing more than a bald allegation.

CPL § 440.10 Decision, at p. 13.  The Appellate Division summarily denied this claim as part of the

consolidated appeal, including it among the claims found to be "unpersuasive." *Dearstyne III*, 761

N.Y.S.2d at 121. This summary denial constitutes an adjudication on the merits of Dearstyne's

supposed constitutional claim.

As noted above, it is well-settled that *Brady* does not require the prosecution to "disclose

evidence it does not possess or of which it is not aware." *Sturdivant*, 2007 WL 2126093, at *6.  The

Petition before this Court contains no details concerning which of the victim's family members

intended to file a lawsuit, whether these family member(s) testified at trial, whether a civil suit was

ultimately filed, or whether there is any indication that the prosecution knew or even reasonably

should have known about the intention to file a lawsuit prior to trial.

Accordingly, Petitioner's claim is based solely upon speculation, which is insufficient to

sustain a *Brady* claim. *Mallet v. Miller*, 432 F. Supp.2d 366, 377 (S.D.N.Y. 2006) ("[T]he mere

speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief.") (citing

*Strickler v. Greene*, 527 U.S. 263, 286 (1999)).

Lastly, Petitioner also summarily asserts that "[c]ounsel's errors in this regard" support a

claim for ineffective assistance of counsel. This claim is likewise based upon pure speculation and

must fail for that reason. *See Mallet*, 432 F. Supp.2d at 388 ("A claim of ineffective assistance

cannot be supported by conclusory assertions alone. It is too easy for a defendant to claim after the

fact, without supporting evidence, that he provided leads and information to his counsel that would

have resulted in his exoneration if used.").

For the foregoing reasons, the Court recommends dismissing as wholly meritless Dearstyne's

claim that the prosecutor improperly failed to disclose a putative lawsuit by a victim's family

member.

**F.    Ground Six – Discovery Manipulation**

Petitioner argues that the trial court "erred in refusing to grant a Defense Motion for a

Mistrial relative to the prosecution's manipulation of Discovery and withholding of *Brady* material

to the Prejudice of" Petitioner. In support of this claim, Petitioner references the arguments raised

by Attorney Grimmick on direct appeal.

On direct appeal, Attorney Grimmick argued that the prosecution had improperly failed to

disclose the testimony of T.O.'s sister, S.O. prior to trial, characterizing the prosecution's attempt

to elicit testimony from S.O. as "pure and unprincipled gamesmanship dedicated to the prejudice

of the appellant." Petitioner's Brief on Direct Appeal, attached as Exhibit 31 to Docket No. 72, at

p. 77. Grimmick asserted that the prosecution's conduct was contrary to its obligations under New

York law and *Brady*. The Appellate Division rejected the claim, finding that "[t]here was no

113

violation of the *Brady* rule because the claimed *Brady* material was not exculpatory." *Dearsytne II*, 646 N.Y.S.2d at 1005.

As discussed above, "[t]here are three components to a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82.

In the present case, Petitioner's *Brady* claim fails. First, and most importantly, Petitioner has not demonstrated that S.O.'s testimony was favorable. To the contrary, by establishing Petitioner's access to one of the victims, S.O.'s testimony tended to *inculpate* Petitioner. Second, there is no indication that the prosecution suppressed the evidence. As noted above, S.O. testified on cross-examination, that, although she had met with the prosecution in preparation for her testimony, she never mentioned the June 12th encounter. (TT Vol. 2, at p. 223). Furthermore, defense counsel had the opportunity to make use of this impeachment material on his cross-examination. Because Petitioner has failed to establish the suppression of favorable evidence, his *Brady* claim is defect in at least two respects. Accordingly, the Court recommends concluding that Petitioner is not entitled to habeas relief on this basis.

**G.     Ground Seven – Jury Charge**

Petitioner contends that the trial court erred by failing to deliver an appropriate instruction to the jury regarding reasonable doubt. Specifically, Petitioner argues that the reasonable doubt charge did not "coincide" with the "Criminal Juror Instructions." He further claims that the charge given "has consistently been deemed a violation" of New York state and federal law.

114

1.   **State Court Proceedings**

The relevant portion of the trial court's instructions to the jury with respect to the burden of

proof is as follows:

> The burden of proving the defendant guilty beyond a reasonable doubt always rests
> with the People. There is no burden upon the defendant here to prove his innocence.
> The law accords him the presumption of innocence and requires that you give him
> the benefit of that presumption throughout the trial and until the People have proven
> his guilt to your satisfaction beyond a reasonable doubt.
>
> When and if the evidence measures up that point, then the presumption of innocence
> is destroyed, and the defendant should be found guilty. Otherwise, he should be
> acquitted. . .
>
> Now, the expression 'reasonable doubt' means just what the words imply. It is a
> doubt based upon reason which arises out of the evidence or lack of evidence in this
> or any other case. It is not a doubt based upon sympathy, whim or the reluctance of
> a Juror to perform a disagreeable duty.
>
> *It is a doubt for which there must be a reason and an honest doubt, one that leaves
> your mind in such a state of suspense or uncertainty that you cannot say you are
> convinced of the defendant's guilt to a moral certainty.*
>
> If you have such a doubt, you must acquit the defendant, and in considering the
> evidence, you must apply the same good judgment that you would apply in your own
> business or social relationships in your daily lives.
>
> If you do this and you believe the defendant is guilty, then you've been satisfied
> beyond a reasonable doubt, and it's your duty to convict him.
>
> Now, do not get the impression from what I said that the People are required to
> prove the defendant's guilt to a mathematical certainty. In courts of law where cases
> rest upon human memory and human recollection and testimony, you cannot
> establish a defendant's guilt to a mathematical certainty or beyond all possible or
> conceivable doubt, and the People are not required to do so. They are, however,
> required to prove guilt beyond a reasonable doubt.
>
> When a Jury is convinced of a defendant's guilt beyond a reasonable doubt, that Jury
> must vote to convict the defendant. In this regard, I charge you that a defendant is
> entitled to every inference in his favor which can be reasonably drawn from the
> evidence, and where two inferences may be drawn from the same facts – one
> consistent with guilt and one consistent with innocence – a defendant is entitled to

the inference which is consistent with innocence.

(TT Vol. 3, at p. 720-722) (emphasis supplied).

Petitioner's trial counsel did not object to the trial court's instructions. However, in his CPL § 440.10 motion, Petitioner argued that the trial court improperly lowered the burden of proof imposed upon the prosecution by incorrectly defining the term "reasonable doubt."

The County Court rejected the claim pursuant to CPL § 440.10(2)(c), on the grounds that it could have been raised on direct appeal. In addition, County Court denied the claim because it was addressed only in Petitioner's unsworn memorandum of law, rather than in his supporting affidavits. The Appellate Division summarily denied this claim as part of the consolidated appeal, including it among the claims dismissed as "unpersuasive." *Dearstyne III*, 761 N.Y.S.2d at 121 As noted above, this summary ruling constitutes an adjudication on the merits for AEDPA purposes.

### 2.    Habeas Review

The Due Process Clause of the Fourteenth Amendment protects state-court defendants from conviction unless the prosecution "persuade[s] the factfinder 'beyond a reasonable doubt' of the facts necessary to establish" each element of the offense charged. *Vargas v. Keane*, 86 F.3d 1273, 1276 (2d Cir.1996) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (citations omitted) and citing *In re Winship*, 397 U.S. 358, 364 (1970)).

As the Second Circuit has explained, a jury instruction that permits conviction on a lesser standard, such as by shifting the burden of proof from the prosecution to the defendant, or by suggesting that a higher degree of doubt than "reasonable doubt" is necessary for acquittal, is constitutionally deficient. *Vargas*, 86 F.3d at 1276. However, "not every unhelpful, unwise, or even erroneous formulation of the concept of reasonable doubt in a jury charge renders the instruction

116

constitutionally deficient." *Id.* Rather, the reviewing court must examine the jury instruction "as a whole," and "assess 'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet' the standard of proof beyond a reasonable doubt [.]" *Id.* (quoting *Victor v. Nebraska*, 511 U.S. 1, 6 (1994) and citing *Chalmers v. Mitchell*, 73 F.3d 1262, 1267 (2d Cir. 1996) ("Sometimes, erroneous portions of the jury instructions are offset when considered in context or explained by the trial court in later sections of the instruction. [At][o]ther times, a seemingly innocuous incorrect statement becomes extremely damaging when coupled with other sections of the jury instructions or with improper conduct by counsel during the trial.") (citations omitted in original) (alterations in original)).

>           a.      **Clearly Established Supreme Court Precedent on the Definition of "Reasonable Doubt"**

The Second Circuit has held that "instructions tying 'reasonable doubt' to a doubt 'for which you can give a reason'–or, in the more passive formulation, 'for which a reason can be given'–may well be unwise, because of the possibility that such an instruction will 'intimidate a juror by suggesting that he may be called upon to explain his doubts.'" *Vargas*, 86 F.3d at 1277 (quoting *United States v. Davis*, 328 F.2d 864, 867 (2d Cir.1964)). However, in *Vargas*, the Second Circuit ultimately concluded that the "unwise" instruction did not justify habeas relief because, upon "[p]lacing the challenged language in the context of the full charge, [there was] no reasonable likelihood that the jurors would have understood the instruction to increase the degree of doubt necessary for acquittal." *Vargas*, 86 F.3d at 1278; *see also Davis*, 328 F.2d at 867 (observing that although some of its "decisions . . . have held that the instruction here given is 'not approved' and 'perhaps unwise' . . . [the instruction] is 'not erroneous.'") (quoting *United States v. Woods*, 66 F.2d 262, 265 (2d Cir. 1933) ("The court charged that a reasonable doubt was one for which a reason

117

could be assigned. While we do not approve such a definition, it has in this circuit been held not to be erroneous.") (citations omitted)); *see also United States v. Kelly*, 349 F.2d 720, 764 (2d Cir. 1965) (approving charge that reasonable doubt is "a doubt for which a reason can be given").

In *Chalmers v. Mitchell*, the petitioner challenged that "the trial court's description of a reasonable doubt as 'a doubt for which some good reason can be given.'" *Chalmers*, 73 F.3d at 1268. The Second Circuit held that "in the context of the whole instruction . . . it [was] not reasonably likely that the jurors misunderstood the proper burden of proof." *Id.* This was the case because "the trial court made it clear in the closing of its instruction that the burden of proof never shifts to the defendant and that no defendant is ever required to prove his innocence." *Id.*[25]

After *In re Winship*, 397 U.S. 358 (1970), it is now the well-established rule that the Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364. The Supreme Court has explained that the rule "symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself." *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reasonable doubt standard's importance lies in the "concrete" support it gives to "the presumption of innocence–that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law." *Winship*, 397 U.S. at 363 (internal quotation marks omitted).

Due process does not require that a uniform articulation of the reasonable doubt standard be given in a jury charge in every case, however:

The beyond a reasonable doubt standard is a requirement of due process, but the

---

[25]     Both *Vargas* and *Chalmers* were pre-AEDPA habeas petitions brought under Section 2254.

> Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. *Cf. Hopt v. Utah*, 120 U.S. 430, 440-441, 7 S.Ct. 614, 30 L.Ed. 708 (1887). Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, *see Jackson v. Virginia*, 443 U.S. 307, 320, n. 14, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. *Cf. Taylor v. Kentucky*, 436 U.S. 478, 485-486, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978). Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

*Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). *Accord, e.g., Estelle v. McGuire*, 502 U.S. at 72-73 & n. 4 (reaffirming that the single standard for reviewing the constitutionality of jury instructions is whether a particular instruction created a "reasonable likelihood" that the jury misapplied the People's burden) (citing *Boyde v. California*, 494 U.S. 370, 378-80, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

The Supreme Court clearly has held that in determining whether a jury instruction has run afoul of constitutional due process requirements, the court must keep in mind that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). The reviewing court's query is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. at 72 & n. 4 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

Only once has the Supreme Court found a reasonable-doubt instruction to be unconstitutional. In *Cage v. Louisiana*, 498 U.S. 39 (1990) (*per curiam*), the state trial court instructed the jury that a reasonable doubt "must be such doubt as would give rise to a grave uncertainty. . . . It is an actual substantial doubt," *id.* at 40 (quotation omitted). The Supreme Court

119

observed, "It is plain . . . that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard." *Id.* at 41.[26] The charge at issue in *Cage* impermissibly lowered the burden of proof and violated the Due Process Clause because, when read as a whole, it equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty.

By way of contrast, in *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)., the Supreme Court upheld two jury instructions that were similar to the one found to be defective in *Cage* four years previously.  Both of the challenged instructions in *Victor*–a consolidated petition with two defendants, Sandoval and Victor–included phrases deemed to be problematic in the *per curiam Cage* opinion, such as "a substantial doubt" and "proof to a moral certainty." The Supreme Court concluded that, when the reasonable doubt instructions were evaluated as a whole, "[t]here [wa]s no reasonable likelihood that the jurors who determined petitioners' guilt applied the instructions in a way that violated the Constitution." *Victor*, 511 U.S. at 22-23.

With regard to the "moral certainty" and "moral evidence", the Supreme Court noted that while such terms were "ambiguous in the abstract, the rest of the instruction given in [defendant]'s case lends content to the phrase." This is because "[t]he jurors were told that they must have 'an abiding conviction, to a moral certainty, of the truth of the charge[,]'" and "[a]n instruction cast in terms of an *abiding conviction* as to guilt, without reference to moral certainty, correctly states the

---

[26]     Until its decision in *Cage v. Louisiana,* 498 U.S. 39 (1990), the Supreme Court had approved the use of the phrase "moral certainty" in defining the concept of reasonable doubt. *See Fidelity Mut. Life Assn. v. Mettler*, 185 U.S. 308, 317 (1902) ("Proof to a 'moral certainty' is an equivalent phrase with 'beyond a reasonable doubt.'"); *Wilson v. United States*, 232 U.S. 563, 570 (1914) (approving reasonable doubt instruction cast in terms of moral certainty).

government's burden of proof." *Victor*, 511 U.S. at 15 (emphasis supplied) (citing *Hopt v. Utah*, 120

U.S. at 439) ("The word 'abiding' here has the signification of settled and fixed, a conviction which

may follow a careful examination and comparison of the whole evidence")). The Supreme Court

distinguished the instruction found unconstitutional in *Cage*, which also referenced the "moral

certainty" phraseology, on the basis that "the jurors [in *Cage*] were simply told that they had to be

morally certain of the defendant's guilt; there was nothing else in the instruction to lend meaning

to the phrase," while in Sandoval's case, the jury was told that a reasonable doubt is "that state of

the case which, *after the entire comparison and consideration of all the evidence*, leaves the minds

of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral

certainty, of the truth of the charge." *Victor*, 511 U.S. at 16 (quotation omitted) (emphasis supplied).

The Supreme Court clearly expressed, "[W]e do not condone the use of the phrase [moral

certainty]." *Id.* However, because of the other language in the instruction, the Supreme Court stated

that it did "not think it reasonably likely that the jury understood the words 'moral certainty' either

as suggesting a standard of proof lower than due process requires or as allowing conviction on

factors other than the government's proof."

####        b.       Merits Analysis

Here, Petitioner contends that the prosecution's burden of proof was impermissibly lowered

by the trial court's instruction that a reasonable doubt is "a doubt for which there must be an honest

reason" and the reference to the jurors' need to be convinced "of the defendant's guilt to a moral

certainty." As noted above, the challenged portion of the reasonable doubt instruction read at

Petitioner's trial is as follows:

> [Reasonable doubt] is a doubt *for which there must be a reason and an honest doubt*, one that leaves your mind in such a state of suspense or uncertainty that *you cannot*

*say you are convinced of the defendant's guilt to a moral certainty.*

(TT Vol. 3, at p. 720-722) (emphases supplied). The instruction contains three types of disfavored language. First, it refers to a doubt for which there must be a reason. *See Chalmers, supra; Vargas, supra.* Second, it states that the doubt must be "honest." *Cf. Victor,* 511 U.S. at 19 ("Victor's primary argument is that equating a reasonable doubt with a 'substantial doubt' overstated the degree of doubt necessary for acquittal. We agree that this construction is somewhat problematic."). Third, it utilized the phrase, "to a moral certainty." *See Cage,* 398 U.S. at 39-41.

The Court has scrutinized the remainder of the reasonable doubt jury charge, as Supreme Court precedent instructs, and concludes that the state courts did not unreasonably apply clearly established Supreme Court precedent in rejecting Dearstyne's challenges to the reasonable doubt instruction. When read as a whole, it is not objectively unreasonable to conclude that the reasonable doubt instruction effectively shifted the burden of proof or suggested a higher quantum of doubt than is required for an acquittal. *See Victor,* 511 U.S. at 13-17, 19-23.

Significantly, the instruction explained that a reasonable doubt is "a doubt based upon reason which arises out of the evidence or lack of evidence in this or any other case." At another point, the trial court instructed the jurors that the doubt must be based upon a reason that "arises out of the evidence or lack of evidence." The Supreme Court in *Victor* found that similar language ameliorated the ambiguity created by the "moral certainty" language. There, the jurors were told that they must be convinced of Victor's guilt "after full, fair, and impartial consideration of all the evidence" and "[i]n determining any questions of fact presented in this case, you should be governed solely by the evidence introduced before you." 511 U.S. at 22 (quotation omitted). The Supreme Court concluded that there was "accordingly no reasonable likelihood that the jurors understood the

122

reference to moral certainty to allow conviction on a standard insufficient to satisfy *Winship*, or to allow conviction on factors other than the government's proof." *Id.* It is not reasonably likely that a juror hearing the instruction in this context would believe that it was related to the degree or amount of doubt necessary for acquittal. Rather, the juror would understand, correctly, that the "reason" that he or she would have to provide for the doubt in his or her mind would need to be a reason rooted in the evidence or lack thereof. *See Vargas*, 86 F.3d at 1278 ("[T]he jury was unlikely to have understood the challenged language to bear upon the degree or quantum of doubt necessary for acquittal, but rather, upon the appropriate basis for the formulation of a doubt sufficient for acquittal.").

Although this Court concludes that the instruction was unwise because it contained potentially confusing, disfavored language, the Court nevertheless is compelled to find that Petitioner has not demonstrated that the Appellate Division's decision as to this issue was contrary to, or involved an unreasonable application of *Victor v. Nebraska*, which constitutes the pertinent clearly established Federal law as determined by the Supreme Court. Accordingly, the Court recommends concluding that Petitioner is not entitled to habeas relief on this basis.

**H.    Ground Eight – Ineffective Assistance of Counsel – Failure to Protect Right to Testify at the Grand Jury**

Petitioner asserts that his trial counsel was ineffective because he failed to inform Petitioner of his right to testify before the grand jury.

Although defendants generally have a right under New York state law to testify before the grand jury, habeas courts in this Circuit have uniformly rejected constitutional ineffective assistance of counsel claims based on the failure to effectuate this state statutory right. *See, e.g., Turner v. Fischer*, Nos. 01-CV-3251, 03-MISC-0066, 2003 WL 22284177 at *6 (E.D.N.Y. Aug. 20, 2003)

123

(Even "[a]ssuming . . . counsel waived [petitioner's] right to appear before the grand jury without petitioner's permission, petitioner cannot demonstrate that he was prejudiced thereby. He was afforded a jury trial and was convicted by a petit jury after testifying before it. Any prejudice suffered by petitioner was rendered harmless by his conviction at trial by the petit jury, which assessed his guilt under a heightened standard of proof."); *Keeling v. Varner*, Nos. 99-CV-6565, 03-MISC-0066, 2003 WL 21919433 at *7 (E.D.N.Y. June 17, 2003); *Wilson v. Breslin*, 217 F.R.D. 119, 126 (E.D.N.Y. 2003); *Bingham v. Duncan*, 01 Civ. 1371, 2003 WL 21360084 at *4 (S.D.N.Y. June 12, 2003); *Hutchings v. Herbert*, 260 F.Supp.2d 571, 578 & n. 2 (W.D.N.Y.2003) (Larimer, D.J.) ; *Cates v. Senkowski*, 02 Civ. 5957, 2003 WL 1563777 at *3 (S.D.N.Y. Mar. 17, 2003); *see also Acosta v. Couture*, 99 Civ. 9727, 2003 WL 272052 at *8 (S.D.N.Y. Jan. 23, 2003) ("Although [petitioner] had a state statutory right to testify before the grand jury, he did not have a constitutional right and counsel's decision not to have him testify does not render his performance deficient.") (quoting *Boyd v. Hawk*, 965 F. Supp. 443, 451 (S.D.N.Y.1997)).

Dearstyne has not demonstrated that but for trial counsel's failure to have him testify before the grand jury, there is a reasonable probability of a different outcome--that is, an indictment on no or fewer charges. It bears emphasizing that the petit jury which convicted him had the opportunity to hear his testimony and, after applying a less prosecution-friendly evidentiary standard than did the grand jury, voted to convict him on some, but not all, of the charges; and acquitted him of all of the charges with regard to one of the victims. In sum, Dearstyne has failed to demonstrate how he was prejudiced by not testifying before the grand jury. Dearstyne's inability to fulfill the prejudice prong of *Strickland* is fatal to his ineffective assistance claim. Therefore, the Court recommends that this claim be dismissed.

I.     **Ground Nine – Improper Joinder and Failure of Trial Counsel to Request Severance**

Petitioner argues that he was denied due process of law because the offenses were improperly joined in a single indictment and tried together. In addition, he contends that his trial counsel's failure to move for severance of the indictment constituted ineffective assistance of counsel.

Petitioner initially presented these arguments in his CPL § 440.10 motion. The County Court denied the claims pursuant to CPL § 440.30 (4)(b), on the grounds that Petitioner failed to set forth any supporting factual allegations in the affidavits submitted in support of the motion. CPL § 440.10 Decision at p. 4-5. On appeal, the Appellate Division "reject[ed] defendant's argument that County Court improperly refused to consider facts alleged in unsworn documents submitted in connection with his . . .440 motion." *Dearstyne III*, 761 N.Y.S.2d at 121.

As noted above, this Court has concluded that a denial pursuant to CPL §440.30(4) is a denial on the merits. Accordingly, Petitioner's severance claims will be reviewed on the merits under the AEDPA standard of review.

Under both state and federal law, decisions to sever charges contained in an indictment "are committed to the broad discretion of the trial court, and will be reversed only upon a showing of substantial prejudice." *United States v. Alvarado*, 882 F.2d 645, 655 (2d Cir.1989) (direct review of conviction; holding that denial of severance was not erroneous). Improper joinder does not, in itself, amount to a constitutional violation. *United States v. Lane*, 474 U.S. 438, 446 n. 8 (1986).

Joinder "has long been recognized as a constitutionally acceptable accommodation of the defendant's right to a fair trial." *Herring v. Meachum*, 11 F.3d 374, 377 (2d Cir. 1993 (citing, *e.g.*, *Bruton v. United States*, 391 U.S. 123, 134 (1968); *Zafiro v. United States*, 506 U.S. 534, 540

125

(1993)). Thus, erroneous joinder of offenses violates the Constitution "only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Lane*, 474 U.S. at 446; *see also Herring*, 11 F.3d at 377 ("Joinder of offenses rises to the level of a constitutional violation only if it actually render[s] petitioner's state trial fundamentally unfair and hence, violative of due process.") (quoting *Tribbitt v. Wainwright*, 540 F.2d 840, 841 (5th Cir. 1976)).

A habeas petitioner claiming a due process violation based upon joinder of offenses "must, to succeed, go beyond the potential for prejudice and prove that actual prejudice resulted from the events as they unfolded during the joint trial." *Herring*, 11 F.3d at 377-78 (quoting *Tribbitt*, 540 F.2d at 841).

### 1.     New York Law Regarding Joinder of Offenses

Section 200.20 (2) of the New York Criminal Procedural Law provides that two offenses are "joinable" for purposes of trial under one of the following circumstances: (a) when they are "based upon the same act or upon the same criminal transaction;" (b) when the offenses are based upon different criminal transactions, but the offenses, or the criminal transactions underlying them, are of such a nature that "proof of the first offense would be material and admissible as evidence in chief upon a trial of the second" or *vice versa*; (c) when the offenses are based upon different criminal transactions, but are "defined by the same or similar statutory provisions and consequently are the same or similar in law"; or (d) when the two offenses at issue, while not subject to joinder with each other, are each joinable to a third offense contained in the indictment. N.Y. CRIM. PROC. LAW § 220.20 (2) (a)-(d).

However, even in cases where the offenses are subject to joinder pursuant to the statutory criteria set forth in CPL § 200.20(2), the trial court must also conclude that combining the offenses

126

for a single trial is an "appropriate exercise of discretion" under CPL § 200.20(4). *See People v. Lane*, 56 N.Y.2d 1, 7, 436 N.E.2d 456 (N.Y.1982); N.Y. CRIM. PROC. LAW § 200.20(5) ("A court's determination of an application for consolidation pursuant to subdivision four [C.P.L. § 200.20(4)] is discretionary.").

### 2.    Habeas Review

The indictment charged Petitioner with the following offenses regarding victim T.O.: (1) Rape in the First Degree (New York Penal Law ("PL") § 130.35 (3); and Endangering the Welfare of a Child (P.L. § 260.10 (1))

The indictment charged the following offenses regarding victim C.C.: (1) Aggravated Sexual Abuse (PL § 130.70 (1)(c)); and (2) Endangering the Welfare of a Child (PL § 260.10 (1)).

The following offenses pertained to victim E.C.: (1) Sexual Abuse in the First Degree (PL § 130.65 (3)); and (2) Endangering the Welfare of a Child (PL § 260.10 (1)).

These offenses were "joinable" under CPL § 200.20(2)(c) because, while they were based upon different criminal transactions, the offenses were "defined by the same or similar statutory provisions and consequently [were] the same or similar in law [.]" N.Y. Crim. Proc. Law § 200.20(2)(c).

Accordingly, to establish that joinder was improper, Petitioner must show that it was an abuse of discretion for the trial court to permit a joint trial and that he was entitled to severance under CPL § 200.20(3), which provides that the court, "in the interest of justice and for good cause shown," may "in its discretion, order that any such offenses be tried separately from the other or others thereof." N.Y. Crim. Proc. Law § 200.20(3).

"Good cause" includes, but is not limited to, situations where there is "[s]ubstantially more

127

proof on one or more such joinable offenses than on others and there is a substantial likelihood that the jury would be unable to consider separately the proof as it relates to each offense." N.Y. Crim. Proc. Law § 200.20(3)(a).[27]

Although "[t]here is indeed always a danger when several crimes are tried together, that the jury may use the evidence cumulatively," the Supreme Court has "explicitly accepted that '[t]his type of prejudicial effect is acknowledged to inhere in criminal practice, but it is justified on the grounds that (1) the jury is expected to follow instructions in limiting this evidence to its proper function, and (2) the convenience of trying different crimes against the same person ... in the same trial is a valid governmental interest.'" *Herring*, 11 F.3d at 377 (quoting *Spencer v. Texas*, 385 U.S. 554, 562 (1967)); *see also United States v. Carpentier*, 689 F.2d 21, 27 (2d Cir.1982) ("A certain amount of prejudice to a defendant is regarded as acceptable given the judicial economies that result from joinder.").

In his CPL §440.10 motion, Petitioner asserted that joinder was improper because (a) substantially less proof was presented with respect to the charges involving C.C., and (b) due to the egregious nature of the charges, joinder presented the risk that the jurors would use the evidence of the crimes against one victim to make an impermissible "propensity" inference with respect to the charges involving the other victims.

Concerning the egregiousness of the charges, the offenses with which Petitioner was charged were without question of an extraordinarily inflammatory nature. However, New York courts have

---

[27]     The other listed "good cause" criterion pertain to situations where the "defendant has both important testimony to give concerning one count and a genuine need to refrain from testifying on the other, which satisfies the court that the risk of prejudice is substantial," and is not applicable in this case. N.Y.Crim. Proc. Law § 200.20(3)(b). Petitioner testified in his own defense as to all of the counts charged, denying that he had committed the offenses alleged.

consistently held that in determining whether to consolidate offenses for trial, the fact that "a sex crime is involved is not a sufficient basis for the granting of a severance." *People v. Telford*, 134 A.D.2d 632, 633, 521 N.Y.S.2d 523 (2d Dept.1987). Indeed, to the contrary, New York courts routinely allow joinder of counts alleging sexual offenses against infant complainants. *See, e.g., People v. Johnson*, 268 A.D.2d 891, 891-92, 703 N.Y.S.2d 545 (3d Dept.2000) (three counts of second degree sodomy, three counts of second degree sexual abuse, five counts of third degree sexual abuse, three counts of endangering the welfare of a child involving three minor male children properly joined under C.P.L. § 200.20(2)(c)); *People v. Halm*, 180 A.D.2d 841, 842, 579 N.Y.S.2d 765 (3d Dept.1992) (five counts of sodomy in the third degree and three counts of endangering the welfare of a child involving four minor male children properly joined under C.P.L. § 200.20(2)(c). Although this Court strongly disagrees with the holdings of these cases, habeas courts do not sit to review errors of state law. The Court believes that in such cases involving multiple inflammatory allegations of child abuse, trial counsel should move for severance because of the potential for "spillover prejudice". While the Court finds that trial counsel lacked a strategic justification for not moving for severance, Petitioner has not demonstrated that there is a reasonable probability of a different result in this case, given the decisional law in New York State holding that joinder of multiple counts of child sexual abuse against multiple victims does not constitute an abuse of discretion. In other words, trial counsel's motion to sever in all likelihood would have been denied.

The Court also notes that the fact that the jury acquitted Petitioner of the charges against E.C. while convicting him on the charges with respect to T.O. and C.C. suggests that the jurors were able to consider each charge and each victim separately. Furthermore, the jury was able to separate the evidence presented with regard to each charge for each individual victim, as evidenced by the jury's

acquittal on the rape charge against T.O.  Under these circumstances, the state courts were not

objectively unreasonable in concluding that any anger or outrage the jury felt over the charges

involving T.O. and C.C. did not "spill over" to its consideration of the charges involving E.C. *See*

*Herring*, 11 F.3d at 378 (noting that the jury's acquittal on the charge petitioner had moved to sever

"[went] far toward answering any claim that corroboration on that count improperly motivated the

jury's verdict as to the other charges"); *see also Reed v. Great Meadow Correctional Facility*, 981

F. Supp. 184, 189 (W.D.N.Y. 1997); *Pacyon v. New York State Parole*, No. 90-CV-0796,1996 WL

528812, at *2 (W.D.N.Y. Sept. 3, 1996).

Accordingly, Petitioner has not established that the Appellate Division's decision in this

regard was contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States.  Therefore, the Court recommends that

Petitioner's claim regarding the failure to grant severance be denied.

**J.     Ground Ten – Violation of CPL §60.20 – Lack of Corroboration of the Testimony of an Unsworn Child Witness**

Petitioner contends that his convictions with respect to C.C. should be vacated because they

were based solely upon the uncorroborated and unsworn testimony of a child.  Section 60.20 of the

New York Criminal Procedure Law permits a child witness to give unsworn testimony, but provides

that a defendant may not be convicted "solely upon" such testimony.

In the present case, C.C. identified Petitioner at trial and testified that he "hurt [her] with a

stick" and "put the stick between [her] legs" when she was not wearing underwear. (TT Vol. 2, at

298-299, 301, 303).  She explained that it felt "bad" and when asked where Petitioner put the stick,

C.C. said "[b]etween my legs." (TT Vol. 2,  at 299, 304).  C.C. also testified that Petitioner told her

not to tell her mother about the incident.  (TT Vol. 2, at p. 306).

`C.C.'s mother testified that Petitioner's mother babysat for C.C. during the first six months of 1987. (TT Vol. 2, at 310). She explained that from January until March of that year, C.C. had no objections or negative reactions to being left at the Dearstyne house. (TT Vol. 2, at 313-14). However, beginning in April 1987, C.C. began to cry when she was dropped off and did not want to be left at the Dearstyne's home. (TT Vol. 2, at 313, 315). At or about the same time, C.C.'s mother testified, her daughter began having nightmares, talking like a baby, and wanting to wear diapers again. (TT Vol. 2, at 316).

In addition, although Petitioner did not affirmatively admit to sexual contact with C.C. in his signed confession, he did acknowledge having access to her and having sexual desires when he was around C.C. and the other young girls. (TT Vol. 2, at 158).

This claim was presented on direct appeal. The Appellate Division concluded that "[v]iewing the testimony of [C.C.'s] mother, the applicable medical record and defendant's statement in a light most favorable to the People, . . . this evidence sufficiently corroborated [C.C.] testimony since it established that defendant had the opportunity to commit the crimes and that these crimes were committed." *Dearstyne II*, 646 N.Y.S. 2d at 1005.

Petitioner has failed to cite, and this Court did not locate, any United States Supreme Court precedent establishing that the unsworn testimony of a child witness must be corroborated as a matter of federal constitutional law. This requirement is imposed as a matter of New York law pursuant to CPL § 60.20(3). Petitioner has not established that any of his rights under federal law were violated or that the Appellate Division's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. *See, e.g., Rodriguez v. Greiner*, 274 F. Supp.2d 264, 267 (E.D.N.Y.2003) (holding that

131

"[w]hether the properly admitted unsworn testimony of the victim was sufficiently corroborated in accordance with the requirements of New York C.P.L. 60.20(3) is a matter left to the state courts").

The Supreme Court has clearly and repeatedly held that "[i]t is not the province of a federal habeas court to reexamine state-court determination on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *see also Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). Accordingly, to the extent that Dearstyne simply claims a violation of a state law rule, the claim should be dismissed as not cognizable on habeas review.

## K.   Ground Eleven – Ineffective Assistance of Counsel – Failure to Challenge the Indictment

The eleventh ground asserted in support of the Petition is that his trial counsel, Attorney Grimmick, was unconstitutionally ineffective because he failed to seek dismissal of the indictment on the grounds of lack of specificity, duplicity, and multiplicity. In particular, Petitioner argues that Attorney Grimmick should have attacked the indictment because it failed to allege specific dates and times with respect to each of the crimes charged. Further, Petitioner asserts that the indictment should have been challenged because it allegedly charged more than one offense in a single count and the same offense in multiple counts.

### 1.   The Indictment

The indictment, which was attached as Exhibit Q to Petitioner's exhibits in support of his § 440 motion, set forth the following charges:

> (1)   "[O]n or about the 10th day of June 1987, on a weekday, between 9:00 a.m. and 5:00 p.m., at 1552 Broadway located in the City of Rensselaer, County of Rensselaer, State of New York, [Petitioner] . . . engage[d] in sexual intercourse with a female who was less than 11 years old [T.O.];"

> (2)   "[S]ometime in April or May 1987, a weekday, between 8:00 a.m. and 4:00 p.m., at 1552 Broadway in the City and County of Rensselaer and

132

the State of New York, [Petitioner] . . . insert[ed] a foreign object in the vagina of another person, causing physical injury to such person when the other person is less than 11 years old [C.C.]" . . . in that, at the above-said time and place, [Petitioner] . . . insert[ed] a blue stick in the vagina of [C.C.] . . . ."

(3)      "[S]ometime in March or April, 1987, on a weekday, between 8:00 a.m. and 4:00 p.m., at 1552 Broadway, located in the City and County of Rensselaer, State of New York, [Petitioner] . . . subject[ed] another person to sexual contact, and that other person is less than 11 years old . . . [i]n that, at the above-said time and place, [Petitioner] . . . subject[ed] [E.C.] . . . to sexual contact by inserting a red stick into the victim's vagina;"

(4)      [S]ometime in May, 1987, on a weekday, between the hours of 9:00 a.m. and 5:00 pm, at 1552 Broadway, located in the City and County of Rensselaer, and State of New York, [Petitioner] . . . subject[ed] another person to sexual contact and the other person is less than 11 years old . . . in that, at the above-said time and place, [Petitioner] . . . subject[ed] [T.O.] . . . . to sexual contact by touching her vagina with his hands and placing her hands on his penis . . . ."

(5)      "[S]ometime in early June, 1987, on a weekday, between the hours of 9:00 a.m. and 5:00 pm, at 1552 Broadway, located in the City and County of Rensselaer, and State of New York, [Petitioner] . . . subject[ed] another person to sexual contact and the other person is less than 11 years old . . . in that, at the above-said time and place, [Petitioner] . . . subject[ed] [T.O.] . . . . to sexual contact by placing his penis next to her vagina and moving her around a bit . . . ."

(6)      "[O]n June 10, 1987, on a weekday, between 9:00 a.m. and 5:00 p.m., at 1552 Broadway located in the City of Rensselaer, County of Rensselaer, State of New York, [Petitioner] . . . act[ed] in a manner likely to be injurious to the physical, mental or moral welfare of a female child less than 17 years old . . . [i]n that, at the above-said time and place, [Petitioner] took off [T.O.'s] . . . shorts, took off his pants, put his finger inside her vagina and attempted to insert his penis in her vagina;"

(7)      "[S]ometime in May, 1987, on a weekday, between 9:00 a.m. and 5:00 p.m., at 1552 Broadway located in the City of Rensselaer, County of Rensselaer, State of New York, [Petitioner] . . . act[ed] in a manner likely to be injurious to the physical, mental or moral welfare of a female child less than 17 years old . . . [i]n that, at the above-said time and place, [Petitioner] fondle[d] [T.O.'s] . . . vagina and placed her hand on his erect penis."

133

2.     **State Court Proceedings**

As noted above, the prosecution called T.O.'s sister, S.O., as a witness at trial. S.O.

testified that on June 12, 1987, she drove with her father (H.O.) and sister (A.O.) to the Dearstyne

house to pick up T.O. (TT Vol. 2, at p. 197). S.O. testified that Petitioner was present at the

residence when they picked T.O. up. (TT Vol. 2, at p. 221).

This testimony drew an objection from Attorney Grimmick on the grounds of relevancy. In

support of his objection, Grimmick noted that the last date mentioned in the indictment with respect

to T.O. was June 10th, making S.O.'s testimony regarding June 12th irrelevant. (TT Vol. 2, at p. 198).

The jury was excused and a discussion was held on the record regarding the nature and purpose of

S.O.'s testimony. The prosecutor explained that they had just learned of S.O.'s testimony regarding

the June 12th incident that morning. (TT Vol. 2, at p. 200). He further stated that the purpose of

offering her testimony was to demonstrate that Petitioner had access to T.O. on weekdays during the

relevant period. The prosecution also noted that count five of the indictment referenced crimes that

occurred in "early June" and argued that June 12th could be considered early June. (TT Vol. 2, at p.

202).

The trial court noted that there was "nothing to prevent the District Attorney [from] showing

through [a] witness under oath when [T.O.] was in the defendant's house during the month of June

. . . ." (TT Vol. 2, at p. 203). However, the court made it clear that while the prosecution could offer

the evidence related to June 12th to show that Petitioner had access to [T.O.] during the month of

June, the prosecution could not suggest that any of the physical or psychological indicators of sexual

abuse (which were discovered later) were caused by anything that occurred on June 12th. (TT Vol.

2 at 204).

134

Attorney Grimmick objected to this ruling, noting that the indictment only gave notice of alleged crimes on June 10th and arguing that the testimony concerning June 12th would be prejudicial to the defense. (TT Vol. 2 at 204-205, 208-209, 214-215). The trial court acknowledged the concern, but also noted that the prosecution was entitled to "every latitude because of the age of the alleged victims . . . ." (TT Vol. 2 at 209).

Attorney Grimmick continued to object and moved for a mistrial, arguing that S.O. should not be permitted to testify. (TT Vol. 2 at 216-218). The trial court overruled the objection and denied the motion, noting that the fifth count of the indictment referenced "early June" and finding that the prosecution was entitled to establish that Petitioner had access to T.O. during that period, including on June 12th. (TT Vol. 2 at 219-220).

In his CPL § 440.10 motion, Petitioner argued, *inter alia*, that he was deprived of the effective assistance of counsel due to Attorney Grimmick's failure to seek an adjournment to enable him to review, investigate, "and mount a vigorous defense around the fatal flaws in the prosecution's suggestion that June 12, 1987 was the date in question." (Petitioner's Memorandum of Law in Support of 440 motion, at p. 73). Petitioner likewise argued that his trial counsel was "remiss" for failing to object to the indictment on the grounds of duplicity and multiplicity. *Id.* at 85.

In its decision denying Petitioner's CPL § 440.10 motion, the County Court rejected Petitioner's ineffective assistance of counsel claim because the facts supporting that claim were alleged in the memorandum of law, and were not sworn to. Accordingly, the County Court denied the claim pursuant to CPL § 440.30 (4)(b).[28] CPL § 440.10 Decision, at p. 5.

---

[28]     As noted previously, CPL § 440.30 (4)(b) provides that "upon considering the merits" of a 440 motion, the court may deny the motion without a hearing if "[t]he motion is based upon the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts."

The County Court denied Petitioner's duplicity and multiplicity challenges to the indictment for the same reason, *i.e.*, because the claims were set forth only in the memorandum of law and also were not asserted in a sworn pleading. *Id.* The County Court further stated that, even if Petitioner had raised the claims in an affidavit, they could have been raised on direct appeal and, accordingly were barred pursuant to CPL § 440.10 (2)(c). CPL § 440.10 Decision, at p. 5-6.

As part of the consolidated appeal, Petitioner argued that the trial court's denial of Petitioner's claims pursuant CPL § 440.30 (4)(b) was improper. The Appellate Division did not specifically discuss Petitioner's·claims regarding the alleged ineffectiveness of trial counsel with regard to the indictment. However, the Appellate Division did reject Petitioner's "argument that County Court improperly refused to consider facts alleged in unsworn documents submitted in connection with his CPL article 440 motion." *Dearstyne III*, 761 N.Y.S.2d at 121. In addition, the Appellate Division found that even if Petitioner's claims of ineffective assistance of counsel were considered on the merits, such claims were "either moot, unsupported by sworn allegations of fact or meritless." *Id.*

### 3.    Habeas Review

As discussed previously, this Court has adopted the reasoning of the line of cases in this Circuit holding that a state court's denial of a CPL § 440.10 motion pursuant to § 440.30(4) is not an "independent and adequate" state procedural bar to habeas review. *See Mantello*, 2001 WL 1152817, at *9 n. 9; *Ortiz*, 1995 WL 669904, at *4 n. 5; *Muhammad*, 1993 WL 37502, at *4 & n. 5. Accordingly, this Court finds that the state courts' denial of Petitioner's indictment-related claims pursuant to CPL §440.30(4) was a denial on the merits and, thus, those claims are not procedurally

barred. However, for the following reasons, the claims fail on the merits under AEDPA review.

To establish ineffective assistance of counsel, Petitioner must satisfy the two-prong test set forth in *Strickland*. Petitioner must first demonstrate that his "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. Second, he must show that counsel's deficient performance prejudiced his defense. Id. at 692. Finally, under AEDPA, he must demonstrate that the state court unreasonably applied the *Strickland* standard in denying his claim of ineffective assistance. *See Harrington v. Richter, supra.*

Petitioner's claim that his trial counsel was ineffective for failing to object to the indictment on specificity grounds fails, as a threshold matter, because Attorney Grimmick did, in fact, object strenuously to what he perceived as the prosecution's attempt to add an uncharged count to the indictment through the testimony of T.O.'s sister, S.O.

As summarized above, Attorney Grimmick unsuccessfully argued that the reference in count five of the indictment to "early June" was insufficiently specific and that S.O.'s testimony regarding the events of June 12th constituted unfair surprise. The trial court overruled the objections and allowed the testimony for the limited purpose of establishing that Petitioner had access to T.O. during the early part of June 1987.

Petitioner suggests that Attorney Grimmick should have requested an adjournment, which would have allegedly allowed him to offer a more effective defense to the prosecution's claims regarding the events of June 12th. This suggestion is insufficient to establish a claim for ineffective assistance of counsel. There is no indication that the trial court would have granted such an adjournment, that an adjournment would have materially aided Petitioner's defense, or that there is any reasonable likelihood that additional arguments or evidence concerning the events of June 12th

137

would have changed the jury's verdict.

Moreover, because this claim relates solely to the charges involving T.O., it is extremely difficult for Petitioner to demonstrate prejudice as a result of his trial counsel's alleged errors. It bears noting that the testimony offered regarding June 12th was extremely limited, involving only the brief testimony that S.O. saw Petitioner at the Dearstyne residence at 5:00 pm when she went with her father to pick up T.O. (TT Vol. 2, at p. 221).

Lastly, Petitioner has failed to establish that Attorney Grimmick was ineffective for failing to attack the indictment on the grounds of multiplicity or duplicity. Petitioner has not demonstrated that the indictment was multiplicitous or duplicitous, either facially or in light of the trial evidence, under applicable New York State law. Likewise, he has failed to establish that trial counsel's decision not to challenge the indictment on either of these grounds fell below the objective standard of reasonableness, as required to establish an ineffective assistance of counsel claim under *Strickland*.

L.   **Ground Twelve – Ineffective Assistance of Counsel – Failure to Present Expert Testimony**

Petitioner argues that Attorney Grimmick was unconstitutionally ineffective because he (1) never called or consulted with an expert witness regarding false confessions, (2) failed to call or consult with an expert witness regarding the medical evidence, (3) did not call or consult with an expert witness concerning psychological effects of sexual abuse, and (4) failed to obtain a DNA sample for testing and examination. Each of these arguments will be addressed in turn.

   1.   **False Confessions Expert**

      a.   **State Court Proceedings**

Petitioner contends that Attorney Grimmick should have consulted with an expert in false

138

confessions prior to trial and should have called such an expert to testify. This claim was first presented in Petitioner's CPL § 440.10 motion. Judge McGrath noted that this claim, along with Petitioner's other ineffective assistance of trial counsel claims, had not been raised on direct appeal. However, Judge McGrath declined to deny the claims pursuant to CPL § 440.10 (2)(c).[29] Judge McGrath found that because Attorney Grimmick represented Petitioner at trial and with respect to his direct appeal, this case presented "one of the rare situations" where the defendant's failure to raise a claim on direct appeal could be excused. CPL § 440.10 Decision, at p. 3.

In support of his claim, Petitioner offered a declaration from Richard A. Leo, Ph.D., J.D. Dr. Leo has studied, testified, and published books and articles regarding the psychology of police interrogation and the causes of false confessions. Dr. Leo opined that the outcome of Petitioner's trial "could" have been different if a false confession expert had been called to testify. Dr. Leo's opinion was presented to the CPL §440.10 court in the form of a declaration ("the Leo Declaration") under 28 U.S.C. § 1746 (a provision of federal law permitting the use of an unsworn declaration provided the declarant affirms that the matters contained there are true and correct "under penalty of perjury") and via a document purporting to be an affidavit ("the Leo Affidavit").

In the present case, Dr. Leo opined that an expert in false confessions could have testified that Investigator Girtler's account of the interrogation was less "plausible" than Petitioner's account. (Docket No. 53-4, at 9-17). In addition, Dr. Leo stated that an expert witness could have advised the jury that false confessions do occur and could have described the coercive interrogation techniques that lead to false confessions. (Docket No. 53-4, at p. 18-20).

---

[29]     Claims that could have been raised on direct appeal, but were not, are generally denied by New York courts on collateral review pursuant to CPL § 440.10 (2)(c).

With regard to Dr. Leo's suggestion that Petitioner's version of the facts was more "plausible" than Investigator Girtler's account, this is exactly the sort of factual determination that lies within the particular province of the jury, which had the opportunity to observe the demeanor of the witnesses and evaluate their credibility. In contrast, Dr. Leo conceded in his declaration that his opinion was based solely on a review of the trial transcript, which obviously cannot convey the demeanor, tone, and attitude of the witnesses.

However, the CPL § 440.10 court noted several technical deficiencies in the Leo Declaration and Affidavit and concluded that they were not "sworn documents." As such, the court denied Petitioner's claim regarding the false confession expert pursuant to CPL § 440.30(4)(b) because the claim was not supported by sworn facts.[30]

On appeal, the Appellate Division "reject[ed] defendant's argument that County Court improperly refused to consider facts alleged in unsworn documents submitted in connection with his . . .440 motion." *Dearstyne III*, 761 N.Y.S.2d at 121. Further, the Appellate Division held that "even assuming that defendant's claims of ineffective assistance of counsel are not based on facts appearing in the record and could not have been raised in his prior appeal, his claims are either moot, unsupported by sworn allegations of fact or meritless." *Id.*

This Court has concluded that a denial pursuant to CPL §440.30(4) is a denial on the merits. In any event, the Appellate Division denied Petitioner's ineffective assistance claims on the alternative ground that they lacked merit. Accordingly, Petitioner's ineffective assistance of counsel

---

[30]     Petitioner moved in the instant case for leave to supplement the record by filing two affidavits from Dr. Leo, which affidavits were substantively the same as those submitted to the state courts, but which did not contain the technical issues noted by the CPL § 440.10 court. Petitioner's motion was granted without opposition. (Docket No. 63). As such, the record before this Court contains duly sworn affidavits setting forth Dr. Leo's statements in support of the claim that trial counsel was ineffective.

claim regarding the failure to use a false confessions expert will be reviewed under the AEDPA standard.

### b.    Habeas Review

Because this case is governed by AEDPA, "[f]or [petitioner] to succeed . . . he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance. . . . Rather, he must show that the [Appellate Division] applied *Strickland* to the facts in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).

Turning first to the deficient-performance prong, Petitioner needs to establish that Grimmick's decision not to call a false confessions expert fell below an objective standard of reasonableness. The prejudice prong requires showing that there is a reasonable probability of a more favorable result had the jury heard such testimony. Pertinent to both these questions is the issue of whether such an expert would have been permitted to offer admissible testimony at Dearstyne's trial.

As a threshold matter, Petitioner has not established that the proposed testimony from a false confessions expert would have been admissible under New York law.  There is a long line of authority in which New York courts have rejected attempts by defense counsel to call a false confessions expert and found that the failure to call such an expert does not amount to ineffective assistance of counsel. *See Curry v. Burge*, No. 03-Civ-0901, 2007 WL 3097165, at *18 n. 25 (S.D.N.Y. Oct. 23, 2007) (collecting cases); *see also People v. Wiggins*, 16 Misc.3d 1136, 2007 WL 2598351 (N.Y. Sup. Ct. 2007) (reviewing New York case law and finding that trial counsel was not ineffective for failing to call false confessions expert); *cf. also Shaw v. Miller*, No. 99 CV 5020, 2001 WL 739241, at *3 (E.D.N.Y. June 26, 2001) (finding that petitioner was not entitled to habeas

141

relief based upon claim that state court improperly precluded testimony from false confessions expert).

While there may be other jurisdictions may allow this type of expert opinion based upon a development of their evidentiary rules, Petitioner has offered no support for his claim that an expert would be permitted to offer this type of testimony under New York law. *E.g.*, *People v. Wiggins*, 16 Misc.3d 1136, 2007 WL 2598351 (N.Y. Sup. Ct. 2007) (reviewing New York case law and finding that trial counsel was not ineffective for failing to call false confessions expert).

The Court cannot say that Petitioner was prejudiced by trial counsel's failure to seek to introduce testimony which had little to no likelihood of being admitted under New York evidentiary law. Moreover, trial counsel did not perform unreasonably in regard to the confession issue; he fully litigated the issue of whether Petitioner was induced into a making false statement to the police. In addition to the pre-trial suppression motion, which resulted in a *Huntley* hearing, Attorney Grimmick subjected Detective Petrucci, Investigator Donovan, and Investigator Girtler to vigorous and sustained cross-examination designed to call into question their testimony concerning the events that led to Petitioner's confession and the interrogation itself. As part of his direct case, Attorney Grimmick called Petitioner's parents, sister, and Petitioner himself to testify concerning the circumstances surrounding the interrogation. Attorney Grimmick then spent the majority of his time during summation attacking the credibility of the prosecution's case and asserting that Petitioner's repudiation of his confession should be accepted. (TT Vol. 3, at p. 663-677). The jury was given detailed instructions concerning confessions and the standard for deciding whether the confession was knowing, intelligent, and voluntary. (TT Vol. 3, at p. 722-725).

In light of the foregoing and given the lack of Supreme Court precedent concerning the use

142

of false confession experts, this Court finds that Petitioner has failed to demonstrate that the

Appellate Division's decision denying this particular ineffective assistance of counsel claim was

contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States.

> **2.      Medical Expert**
>
>    **a.      State Court Proceedings**

Petitioner argues that Attorney Grimmick was ineffective because he failed to consult with

an expert regarding the medical evidence presented at trial.   Further, Petitioner contends that

Grimmick's failure to call such an expert to testify at trial was likewise ineffective assistance of

counsel.  This claim was initially presented in support of Petitioner's CPL § 440.10 motion.  As

noted above, the CPL § 440.10 court concluded that because Attorney Grimmick represented

Petitioner at trial and on direct appeal, it would consider Petitioner's ineffective assistance of

counsel claims even though those claims had not been raised on direct appeal.  CPL § 440.10

Decision, at p. 3.

The County Court reviewed the affidavit of Dr. Robert Fay ("the Fay Affidavit"), which

Petitioner presented in support of his claim.[31]  In his affidavit (attached as Exhibit C to Petitioner's

*Pro Se* Supplemental Brief in Support of Consolidated Appeal), Dr. Fay challenges Dr. Close's

testimony and his examination of T.O. Although Petitioner also argues that Attorney Grimmick

should have called an expert to rebut the medical evidence offered with respect to C.C., Dr. Fay's

---

[31]      The CPL § 440.10 court concluded that, unlike the documents originally submitted by Dr. Leo, the
affidavit from Dr. Fay was a valid and proper affidavit. Thus, the court considered this particular ineffective
assistance claim on the merits. For some reason, the copy of Dr. Fay's affidavit provided to this Court is unsigned.
However, there does not appear to be any dispute regarding the fact that Dr. Fay presented a valid and proper
affidavit in the state court proceedings, which affidavit is, in sum and substance, the same as the affidavit provided
to this Court.

affidavit does not address that evidence.

The CPL § 440.10 court concluded that the record demonstrated "a clear strategic pattern" on the part of Attorney Grimmick "to point out the ambiguities of the People's case in every area, emphasizing to the jury that there were no experts to interpret the evidence, and challeng[ing] them to find sexual abuse 'beyond a reasonable doubt.'" CPL § 440.10 Decision, at p. 20. The court accordingly found that Attorney Grimmick's decision with regard to this aspect of trial strategy did not amount to ineffective assistance of counsel.

On appeal, the Appellate Division did not specifically discuss this claim, but addressed all of Petitioner's ineffective assistance claims together. The court found that "even assuming" that the ineffective assistance of counsel claims were "not based on facts appearing in the record and could not have been raised in his prior appeal, [the] claims [were] either moot, unsupported by sworn allegations of fact or meritless." *Dearstyne III*, 761 N.Y.S.2d at 121. As Petitioner's claim in this regard was not moot and was supported by sworn allegations, it appears that the Appellate Division denied the claim on the merits and the claim will therefore be reviewed under the AEDPA standard.

      b.     **Habeas Review**

      I.     **The "Performance" Prong of *Strickland***

Courts reviewing ineffective assistance claims under the *Strickland* standard are generally reluctant to disturb or second guess trial counsel's "strategic" decisions, including a decision regarding whether to call a particular witness. *See, e.g., United States v. Neresian*, 824 F.2d 1294, 1321 (2d Cir. 1987) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial."). Trial counsel has a "duty to make reasonable investigations, and a decision not

144

to investigate will be reasonable only 'to the extent that reasonable professional judgments support the limitations on investigations." *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690-91). The Second Circuit has observed that "[i]n sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel." *Gersten,* 426 F.3d at 607. The Second Circuit has repeatedly held that "when a defendant is accused of sexually abusing a child and the evidence is such that the case will turn on accepting one party's word over another's, the need for defense counsel to, at a minimum, consult with an expert to become educated about the 'vagaries of abuse indicia' is critical." *Eze v. Senkowski*, 321 F.3d 110, 128 (2d Cir. 2003); *see also Pavel v. Hollins*, 261 F.3d 210, 224 (2d Cir. 2001) ("Because of the importance of physical evidence in 'credibility contest' sex abuse cases, in such cases physical evidence should be a focal point of defense counsel's pre-trial investigation and analysis of the matter."); *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001)). Recently, a number of habeas courts have determined that no reasonable strategy supported trial counsel's considered decision, in a criminal prosecution for child sexual abuse, not to consult with or present an expert witness for the purposes of challenging the opinions offered by the prosecution's medical experts concerning the medical evidence of sexual abuse and/or psychological experts with regard to psychological matters pertaining to victims of such abuse. *See, e.g., Gersten v. Senkowski*, 426 F.3d at 607-14; *Lindstadt v. Keane*, 239 F.3d at 202-04; *Burch v. Millas*, 663 F. Supp.2d 151, 185 (W.D.N.Y. 2009) (Bianchini, M.J.).

A court "facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and present evidence in the form of live testimony, affidavits, or briefs." *Sparman v. Edwards*, 154

F.3d 51, 52 (2d Cir. 1998). In the present case, Attorney Grimmick submitted an affirmation dated June 14, 2005 (the "*Sparman* Affirmation").

With regard to the decision not to call any experts, Grimmick explained that "I simply did not believe that it would be prudent to do so given my extensive cross-examination of the People's witnesses, and the fact that some of these witnesses provided testimony favorable to the defense." *Sparman* Affirmation at ¶ 11. There is no indication in Attorney Grimmick's affirmation that, during his preparation of Dearstyne's case, he ever consulted with an expert on any topic.

Given counsel's failure to consult with a medical expert in preparation for trial, his decision not to call such an expert as a witness cannot be considered "strategic" in the true sense of the word. Attorney Grimmick stated that it would not be "prudent" to call an expert. However, having failed to consult with any such expert, trial counsel was in no position to determine the relative "prudence" of offering such testimony. *See Pavel*, 261 F.3d at 223 (finding that counsel's "decision not to call a medical expert was deficient because it was not based on pre-trial consultation with such an expert"). As such, although counsel's "decision was 'strategic' in *some* sense of the word, it was not the sort of conscious, reasonably informed decision made by an attorney with an eye to benefitting his client that the federal courts have denominated 'strategic' and been especially reluctant to disturb." *Pavel*, 261 F.3d at 218; *see also Gersten*, 426 F.3d at 610 ("[B]because defense counsel decided that it would be futile to challenge the medical and psychological evidence without having reasonably investigated whether that was in fact the case, and lacked sufficient information reasonably to determine that such an investigation was unnecessary[,]" he did not make a "reasonable strategic decision[.]").

Furthermore, Attorney Grimmick's Affirmation demonstrates that he did not make, and

146

indeed could not have made, the evaluation of the prudence of calling an expert *before* trial: Counsel states that he decided it would not be prudent to call an expert "given his extensive cross-examination of the People's witnesses". However, he could not have known what his cross-examination was going to elicit until he was in the midst of trial itself and actually questioning the Prosecution's witnesses. This inherent contradiction establishes that Attorney Grimmick did not make a reasonably informed strategic decision not to consult with an expert (at a minimum), or call an expert witness to rebut the prosecution's medical evidence. The Court notes that there is no indication in the record that Attorney Grimmick "had the education or experience necessary to assess relevant physical evidence, and to make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand." *Pavel*, 261 F.3d at 224 (citing *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983) (holding that, in a complex fraud case, "it should have been obvious to a competent lawyer that the assistance of an accountant [was] necessary")).

Under the circumstances, this Court finds that Attorney Grimmick's failure to call or consult with an expert medical witness fell below an objective standard of reasonableness. Furthermore, the state courts unreasonably applied *Strickland* in holding that defense counsel was not deficient where he plainly failed to conduct an adequate pretrial investigation into how best to challenge the medical evidence against Petitioner. *See Gersten*, 426 F.3d at 611 ("The County Court's holding otherwise [i.e., that counsel had acted reasonably], which was not supported by any analysis or argument to justify a conclusion that counsel's decision to settle on a defense without having conducted an adequate pretrial investigation of possible alternative strategies and defenses was objectively reasonable, was an unreasonable application of *Strickland*.").

147

ii.    The "Prejudice" Prong of *Strickland*

In addition to establishing that counsel's failure to call or consult with a medical expert fell below an objective standard of reasonableness, Petitioner must also demonstrate that he was prejudiced by counsel's errors. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To obtain habeas relief, petitioner "must show that the deficient performance prejudiced the defense." *Id.* The requisite level of prejudice "lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'" *Lindstadt*, 239 F.3d at 204 (quoting *Strickland* 466 U.S. at 693). Thus, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The Supreme Court defined "reasonable probability" as one that "undermine[s] confidence in the outcome." *Id.*; *accord, e.g., Pavel*, 261 F.3d at 226 ("[I]n attempting here to show that Meltzer's performance was not deficient, the State emphasizes that the evidence that it mustered at trial against Pavel was relatively weak. We agree. It therefore follows that confidence in the judgment of conviction entered against Pavel may be "undermine[d]" here by a relatively smaller quantity of prejudice than might ordinarily suffice.") (internal citation to record omitted).

Petitioner was convicted of different crimes involving two victims, T.O. and C.C. (As noted above, Petitioner was acquitted of the charges involving E.C.). With regard to T.O., Petitioner was charged with rape, attempted rape, and endangering the welfare of a child. The jury acquitted him of the rape count, but convicted him of the attempted rape and the child-endangerment charges with regard to T.O.  With respect to C.C., Petitioner was convicted on both counts of which he was

148

charged: aggravated sexual abuse and child-endangerment. Notwithstanding the acquittal of the rape charge, trial counsel's failure to call or consult with an expert medical witness affected Petitioner's defense with respect to both victims, because the prosecution presented medical evidence as to both of the victims. However, because different supporting evidence (both in type and in substance) was offered with respect to each of the victims, a separate inquiry must be made as to each victim to determine the nature and extent of the prejudice caused by counsel's failure to consult with or call a medical expert to rebut the prosecution's proof.

a.)      **Prejudice -- Charges Involving T.O.**

As discussed above with regard to Petitioner's third claim (Section III.C.2), the prosecution offered the testimony of Dr. Close with respect to the charges involving T.O. Dr. Close testified that he examined T.O. and noted "drainage" in her vagina. (TT Vol. 2, at p. 389). He took a swab of the drainage, which he described as "yellow" in color. Upon examining it under a microscope, Dr. Close "saw what appeared to be sperm." (TT Vol. 2, at p. 391). However, this sample was never submitted for laboratory testing because Dr. Close destroyed it immediately after his examination of T.O. Dr. Close further testified that he noticed a "small abrasion" inside of T.O.'s vagina, which appeared to have been recently bleeding, but was not actively bleeding at the time. (TT Vol. 2, at p. 389). He further opined that T.O.'s hymen was "a little larger than what would be expected" for a child of her age. (TT Vol. 2, at p. 390). Dr. Close tested a sample of red matter that he found inside T.O.'s underpants, and the results indicated that it was blood. (TT Vol. 2, at p. 390-391). Dr. Close also noted "puss [sic]" cells, which he characterized as "unusual" and indicative of "active inflammation." (TT Vol. 2, at p. 391).

Attorney Grimmick did not call an expert witness to rebut Dr. Close's testimony or challenge

149

his methods.  Moreover, Attorney Grimmick's *Sparman* Affirmation establishes that he did not

consult with an expert witness in preparation for his cross-examination of Dr. Close.

Dr. Fay's affidavit, submitted by Petitioner in support of his § 440 motion, indicates that an

expert witness could have been called at the time of trial to dispute Dr. Close's findings and the

manner in which he examined T.O.  (Fay Affidavit, attached as Exhibit C to Petitioner's *Pro Se*

Supplemental Brief in Support of Consolidated Appeal, at ¶ 3-5).  In particular, Dr. Fay found

"questionable on its face" the conclusion of Dr. Close that the "yellow material" in T.O.'s vaginal

area was semen. Dr. Fay stated that in his professional experience, semen is white, and yellowish

material in a child's vagina is usually discharge, frequently from an infection. Fay Aff., ¶3.

Dr. Fay also found the methods used by Dr. Close in examining the victims were

"questionable," *id.*, ¶4. Dr. Fay did not believe it would have been possible for Dr. Close to see the

scratches in T.O.'s vagina that he claimed to have seen without the use of a speculum, which Dr.

Close did not have. Fay Aff., ¶5. According to Dr. Fay, it is "extremely difficult" to see a vaginal

abrasion unaccompanied by active bleeding *without* the use of a speculum. *Id.*

In addition, Dr. Fay found it hard to believe that Dr. Close would not have seen the hymenal

clefts and notches observed by the Albany Medical Center, at which the victims were examined

following Dr. Close's examination. *Id.* According to Dr. Fay, one or both of the examinations

contained serious errors, but he could not say which one was faulty based solely upon the records

he had reviewed. *Id.*  Finally, Dr. Fay found Dr. Close's methodology deficient in that he failed to

take any photographs of T.O.'s alleged injuries. *Id.*

Attorney Grimmick did obtain some concessions during his cross-examination of Dr. Close.

Attorney Grimmick used the results of the Johnson rape kit, which was negative for the presence of

sperm, to attack Dr. Close's conclusion that a fluid sample obtained during his examination was sperm. (TT Vol. 3, at 683-84). Dr. Close was forced to admit that he could not say for certain that the fluid sample was actually sperm. (TT Vol. 2, at p. 394). Dr. Close also conceded on cross-examination that the drainage that he observed could have been caused by something other than physical abuse or sexual trauma. (TT Vol. 2, at p. 396). Likewise, Dr. Close acknowledged that the abrasion that he noticed in T.O.'s vagina could have been caused by child's own finger. (TT Vol. 2, at p. 398, 403-404).

Attorney Grimmick also demonstrated some medical knowledge concerning the indicia of sexual abuse by asking Dr. Close a series of detailed questions concerning the measurements of T.O.'s hymen and eliciting the admission that the measurements were "borderline" normal.[32] (TT Vol. 2, at p. 398-400).

However, if Attorney Grimmick had consulted with an expert such as Dr. Fay, he potentially could have obtained additional concessions helpful to the defense. About Dr. Close's conclusion that the "yellow material" in T.O.'s vaginal area was semen, Dr. Fay stated that it was "questionable on its face" since, in his professional experience, semen is white in color. According to Dr. Fay, yellowish material in a child's vagina is usually discharge, frequently from an infection. Fay Aff., ¶3.

Dr. Fay could have helped trial counsel demonstrate that Dr. Close's methods were, as Dr. Fay put it, "questionable," id., ¶4. For instance, Dr. Close did not use a speculum (a specialized viewing instrument) in examining T.O. and he failed to take any photographs to document T.O.'s

---

[32]     These cross-examination questions certainly suggest that Attorney Grimmick likely reviewed at least some relevant medical literature in preparation for the trial, although no mention is made of such review in his Sparman affirmation.

alleged injuries. *Id.* Dr. Fay opined that it was "very unusual" and "poor practice to fail to take

photographs of a child who is suspected to be the victim of sexual abuse." *Id.*, ¶4.

Dr. Fay also offered an opinion which likely would have decimated Dr. Close's credibility

as a doctor: Dr. Fay did not believe it would have been possible for Dr. Close to see the scratches

in T.O.'s vagina that he claimed to have seen without the use of a speculum, which Dr. Close did

not have. Fay Aff., ¶4. According to Dr. Fay, it is "extremely difficult" to see a vaginal abrasion

unaccompanied by active bleeding *without* the use of a speculum. *Id.* In addition, Dr. Fay stated that

it was "difficult to understand how Dr. Close, had he conducted the examination that he claimed he

did, could not have noticed the hymenal clefts or notches that the Albany Medical Center physicians

encountered." Fay Aff., ¶4. Although that finding by the Albany Medical Center was not helpful to

the defense, Dr. Fay's opinion that Dr. Close failed to see the notches and clefts could have been

another weapon in the defense arsenal against Dr. Close. Furthermore, Dr. Fay stated that he

believed he could have assisted the defense in rebutting the conclusions of the physicians at the

Albany Medical Center, and he "could have suggested information" to be used in questioning Dr.

Close and the Albany Medical Center physicians "which might have shown that [T.O.] was not

abused as she had claimed." *Id.* ¶4.

The most significant corroborative evidence was the medical expert testimony offered by Dr.

Close that the physical condition of the alleged victim supported a conclusion that she had been

sexually assaulted.

The prosecution also offered the testimony of Carole West, the charge nurse on duty at the

Albany Medical Center, where T.O. was taken following her examination by Dr. Close. (TT Vol.

2, at p. 413-415). Nurse West described T.O. as "extremely emotional [sic] upset" and stated that

T.O. had to be sedated with chloral hydrate. (TT Vol. 2, at p. 416, 436). This testimony was argued by the prosecution to be circumstantial evidence that T.O. had been subjected to some type of previous trauma, for instance, sexual assault. Nurse West was not permitted offer any medical opinions regarding the reasons for T.O. emotional state or the results of the examination. Counsel's failure to consult with or retain a psychological expert also prevented him from challenging the psychological evidence offered to explain the victim's delay in coming forward and failure to recall events in detail as the result of something other than a lack of credibility-which would as a general matter be a common inference to draw from such shortcomings.

The Court has considered whether the existence of Dearstyne's confession to criminal sexual contact with T.O. places this case outside the *Gersten-Pavel-Lindstadt-Eze* line of cases, which the Second Circuit has described as being fundamentally "credibility contests" between the petitioner and alleged victim, where the direct evidence of sexual abuse was "underwhelming" and limited to the alleged victim's testimony. *See Lindstadt*, 239 F.3d at 205 (describing evidence as "underwhelming"); *Gersten*, 426 F.3d at 608 ("[W]e have explained that medical expert consultation or testimony is particularly critical to an effective defense case *where direct evidence is limited to the victim's testimony*.") (emphasis added); *Pavel*, 261 F.3d at 224 (describing facts as similar to those in *Lindstadt* because "[i]n both cases, the only witnesses to the alleged abuse were its victims and the defendant, and there was not substantial circumstantial evidence of abuse"); *Eze*, 321 F.3d at 128 (holding that "when a defendant is accused of sexually abusing a child *and the evidence is such that the case will turn on accepting one party's word over the other's*, the need for defense counsel to . . . consult with an expert . . . is critical") (emphasis added). Based upon the troubling circumstances of this matter, from the arrest forward, the Court finds that this case was

fundamentally a credibility contest where the evidence was underwhelming.

The Court turns first to the keystone of the prosecution's case–Dearstyne's confession. In that confession, Petitioner admitted that he had "play[ed]" with T.O.'s vagina, inserted his finger into T.O.'s vagina, placed her hand on his penis, placed his penis "next to" T.O.'s vagina and unsuccessfully attempted to insert his penis inside her vagina. (TT Vol. 2, at 159-161). Although the statement was transcribed by Investigator Girtler, Petitioner testified that he reviewed the statement and initialed corrections on certain portions thereof. (TT Vol. 3, at 621). As discussed at length above, however, the Court believes that this confession was unconstitutionally obtained by coercion and deception on the part of the police. The suppression court, although noting the "sharp issues" of credibility between Dearstyne's version of events and that of the police, abdicated its constitutional obligation to determine, in the first instance, whether the confession was voluntary, and thus the confession was erroneously submitted to the jury.

Moreover, a defendant cannot be convicted solely on the basis of his pre-trial confession to the police. "It is a long-settled principle that "an accused may not be convicted on his own uncorroborated confession." *Smith v. United States*, 348 U.S. 147, 152 (1954). This rule has been extended to require corroboration of a defendant's inculpatory admissions, *see Opper v. United States*, 348 U.S. 84, 91 1954) (requiring corroboration of "statements of the accused out of court that show essential elements of the crime"); *Smith*, 348 U.S. at 154 (corroboration rule applies to admissions "to crimes in which there is no tangible corpus delicti, where the corroborative evidence must implicate the accused in order to show that a crime has been committed"), including those made outside of the interrogation room*, see United States v. Tourine*, 428 F.2d 865, 867-68 (2d Cir.1970) (applying corroboration requirement to inculpatory admissions made in presence of

154

undercover agent during the commission of the crime).[33] Rather, the modern corroboration rule

requires only that there be "substantial independent evidence which would tend to establish the

trustworthiness of the statement." *United States v. Bryce*, 208 F.3d 346, 354 (2d Cir. 1999) (quoting

*Opper,* 348 U.S. at 93).

As in *Lindstadt*, for example, "the only witnesses to the alleged abuse were its victim[ ] and

the defendant, and there was not substantial circumstantial evidence of abuse." This was the type

of case, *see Eze*, 321 F.3d at 128, where "a defendant is accused of sexually abusing a child and the

evidence is such that the case will turn on accepting one party's word over the other's, the need for

defense counsel to . . . consult with an expert . . . is critical") (emphasis added). It is illogical to say

that this was not a case that turned on accepting one party's word over the other's because the

victim, T.O., although she testified as an unsworn witness, was unable to identify Petitioner or

describe any of the sexual abuse that he allegedly inflicted upon her when she was three-years-old.

(TT Vol. 2, at p. 235). In other words, although the victim did not provide testimony such that the

jury was required to judge her veracity and reliability, the jury still was required to determine

credibility–the credibility of Dearstyne, the credibility of the police, and the credibility of Dr. Close.

Indeed, the trial court noted in its CPL § 440.10 Decision that Dr. Fay's affidavit established that

Dr. Close's testimony was "possibly false." The fact that the alleged victim could not give sworn

testimony about *any* of the alleged incidents to which only she and Dearstyne were witnesses, let

alone identify Dearstyne as the perpetrator, should not insulate the prosecution's proof from attack.

---

[33]      The modern corroboration requirement originated in the English *corpus delicti* rule, which served
the limited function of ensuring that a defendant could not be convicted of a crime to which he had confessed if that
crime never actually occurred. In order to convict of serious crimes of violence, which were then termed "capital
offenses", independent proof was required that someone had indeed inflicted the violence–in other words, the *corpus
delicti*. Once the existence of the crime was established, however, the guilt of the accused could be based on his own
otherwise uncorroborated confession. *Smith*, 348 U.S. at 153-54. "[T]he *corpus delicti* rule no longer exists in the
federal system. . . ." *United States v. Kerley*, 838 F.2d 932, 940 (7th Cir. 1988).

The Court categorically rejects as logically untenable the argument that this was not, fundamentally, a "credibility contest" or that the prosecution's case was not at all based at all upon the jury having to decide credibility issues. The Court thus does not see this case as distinguishable from the *Gersten-Pavel-Lindstadt-Eze* line of cases.

Also of critical importance to the prejudice inquiry is that T.O. was not able to be cross-examined because T.O. could not give competent, sworn testimony about the incident or the perpetrator. The Supreme Court has explained that since the fundamental purpose of the Sixth Amendment's counsel clause is "to ensure a fair trial," the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. at 686, 104 S.Ct. 2052. Because "the adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate[,]' *Anders v. California*, 386 U.S. 738, 743, 87 S.Ct. 1396, 1399, 18 L.Ed.2d 493 (1967) [,][t]he right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). See also, e.g., *Kentucky v. Stincer*, 482 U.S. 730, 737, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) ("The right to cross-examination, protected by the Confrontation Clause, thus is essentially a 'functional' right designed to promote reliability in the truth-finding functions of a criminal trial"); *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact"); cited in *Crawford v. Washington*, 541 U.S. 36, 60-61,

156

124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (observing that the Sixth Amendment "commands, not that evidence be reliable, but that reliability be assessed ... by testing in the crucible of cross-examination ..."). As long-standing Supreme Court precedent makes clear, the importance of cross-examination to the adversarial process in a criminal trial cannot be overstated. See, e.g., *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). As the Supreme Court expressed the notion: "[T]he truthfinding process is better served if the witness' testimony is submitted to 'the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies.' " *Briscoe v. LaHue*, 460 U.S. 325, 333-34, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 440, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (White, J., concurring in the judgment)).

Given the crucial problems with the prosecution's case involving T.O.–namely, the fact that the confession was erroneously admitted, the victim could not provide competent testimony, and that the only other non-medical evidence was behavioral evidence that went unchallenged by a psychological expert–this Court believes that with expert assistance as detailed in Dr. Fay's affidavit, there was a reasonable likelihood of a more favorable result. Trial counsel could have gone much father in undercutting Dr. Close's testimony and exploiting the inconsistencies in the two medical reports. The significance of Dr. Fay's expertise, given the facts of this case, cannot be understated. "In a case where the overall body of evidence against petitioner was 'underwhelming,' as in *Lindstadt*, petitioner was prejudiced by counsel's errors, and the County Court's finding that

157

he was not prejudiced was an unreasonable application of *Strickland*." *Gersten*, 426 F.3d at 614 (citing *Lindstadt*, 239 F.3d at 205).

For the foregoing reasons, this Court recommends finding that Petitioner has shown that he was prejudiced under *Strickland* and that the state court was unreasonable in concluding otherwise. Accordingly, the Court recommends granting habeas relief on this claim with regard to the charges involving T.O.

### b.     Prejudice - Charges Involving C.C.

Dr. Manjunath, the doctor who examined C.C., was out of the country at the time of trial and unavailable to testify. (TT Vol. 2, at p. 438-439). The prosecution introduced into evidence the medical record that Dr. Manjunath prepared in connection with the examination. The report contained the following findings: "Redness seen at 3:00 to 9:00 o'clock in the peri-hymenal. Hymen is not attached. Old healer seen at 1:00 o'clock position." (TT Vol. 2, at p. 426). The report also included the doctor's conclusion that the findings were "indicative of attempted vaginal penetration and would be consistent with the history of alleged sexual abuse." (TT Vol. 2, at p. 428-29).

Petitioner's trial counsel clearly understood the importance of this evidence and the damaging impact it might have upon the jury. To that end, he objected to the admission of the report on the grounds that he could not cross-examine Dr. Manjunath. (TT Vol. 2, at p. 426). The trial court ruled that the portions of the report containing the physical findings from the examination were admissible, but that the doctor's conclusions were inadmissible and would be redacted. The trial court reasoned that "the physiological findings at the time of the examination were noted on a hospital record kept in the due course of business" and were, thus, admissible as a business record. (TT Vol. 2, at p. 430). As such, Dr. Manjunath's report was admitted into evidence, with the

findings concerning attempted vaginal penetration and a sexual abuse history redacted. (TT Vol.

2, at p. 443). However, there appears to be no dispute that the portions of the report referencing

redness, a detached hymen, and an "old healer" were admitted into evidence for consideration by

the jury.

Attorney Grimmick never called an expert to dispute, explain, or provide context to the

findings contained in Dr. Manjunath's report.   Instead, he decided to limit his response to the

following rather insipid argument made during summation:

> There are medical records relating to [C.C.] . . ., and those medical records, again, are
> unaccompanied by any explanatory proof, anybody who will tell you how to interpret
> those. At one point, it indicates there's an old, healed tear in the child's genitalia, and
> old, healed tear.  I don't know if that means a couple of months, six months.  None
> of us know because all we have are the records and nobody to explain that.  So proof
> beyond a reasonable doubt, a record that we're left to interpret ourselves, I don't think
> so.

(TT Vol. 3, at p. 687).

Trial counsel's decision to respond to the medical evidence in the foregoing manner clearly

constituted ineffective assistance of counsel with respect to the charges involving C.C.  First, the

decision cannot be considered "strategic" in the truest sense of the word because it was not based

upon pre-trial consultation with a medical expert. *See Pavel*, 261 F.3d at 223.

Second, it was based upon the assumption that the jury, faced with a medical record detailing

apparent injuries to C.C.'s vaginal area, would discount the evidence simply because no testimony

had been offered to explain exactly what it meant.  Adopting such a "strategy" entailed the

unreasonable risk that the jury would draw its own conclusions regarding the cause of the redness,

detached hymen, and "old healer" noted in the report.  The decision to accept such a risk fell below

an objective standard of reasonableness.  Indeed, without a rebuttal from the defense in the form of

159

expert testimony, the jury was almost certain to conclude that the findings noted in the medical report were consistent with sexual abuse.

In addition, this Court finds that there is a reasonable probability that, but for the foregoing errors by Petitioner's trial counsel, Petitioner would have been acquitted on the charges involving C.C. The charges involving C.C. were, fundamentally, a credibility contest between C.C. and Petitioner.

Like T.O., C.C. testified as an unsworn witness. C.C., however, identified Petitioner at trial and testified that he "hurt [her] with a stick" and "put the stick between [her] legs" when she was not wearing underwear. (TT Vol. 2, at 298-299, 301, 303). She explained that it felt "bad". When asked where Petitioner put the stick, C.C. said "[b]etween my legs." (TT Vol. 2, at 299, 304). C.C. also testified that Petitioner told her not to tell her mother about the incident. (TT Vol. 2, at p. 306).

The other evidence introduced by the prosecution to support the C.C. charges, namely, the medical report and testimony from C.C.'s mother regarding perceived behavioral changes, was indirect evidence offered in an attempt to corroborate C.C.'s testimony.

Petitioner did not confess to any unlawful conduct with respect to C.C. Other than a reference to the fact his mother babysat for several young girls, including a two-year-old named "[C.C.]," and that he had sexual desires related to the girls that his mother watched, there is no indication or admission by Petitioner that he engaged in sexual conduct with anyone other than T.O. (TT Vol. 2, at p. 158-161).

Plainly, the determination of whether the charges involving C.C. had been proven beyond a reasonable doubt was fundamentally a credibility contest between C.C. and Petitioner, who denied having sexual contact with any of the alleged victims, including C.C. (TT Vol. 3, at p. 586-587).

160

This case is essentially indistinguishable from the *Gersten* case in that "the prosecution's entire case rested on the credibility of the alleged victim . . . [a]ll other evidence presented by the prosecution was indirect evidence offered to corroborate aspects of the alleged victim's story." 426 F.3d at 611.

Where, as here, the direct evidence was limited to the alleged victim's testimony, medical expert consultation or testimony is "*particularly critical* to an effective defense." *Id.* at 608 (emphasis added). As the Second Circuit explained in *Eze*,

> [W]hen a defendant is accused of sexually abusing a child and the evidence is such that the case will turn on accepting one party's word over the other's, the need for defense counsel to, at a minimum, consult with an expert to become educated about the "vagaries of abuse indicia" is critical. The importance of consultation and pre-trial investigation is heightened where, as here, the physical evidence is less than conclusive and open to interpretation.

321 F.3d at 128 (internal citations omitted).

In the present case, the jury's determination regarding whether it believed C.C. as opposed to Petitioner surely turned on whether it believed the medical evidence was consistent with sexual abuse. Petitioner's trial counsel correctly recognized that the medical evidence concerning C.C. was less than conclusive and open to interpretation. However, he thereafter made a decision to rely solely upon his arguments in summation to rebut that evidence.

As noted above, by electing to rely exclusively upon an argument in summation to attack the medical evidence, defense counsel assumed an unacceptable risk that the jury would reach its own conclusion regarding the causes of the apparent injuries noted during the examination of C.C.'s vaginal area. The *Sparman* affirmation submitted by counsel fails to articulate any strategic consideration sufficient to justify taking such a risk with respect to the critical piece of evidence supporting the prosecution's case as to these charges. Unlike the arguments raised concerning a false confessions expert, there can be no dispute but that testimony from a defense expert addressing

161

these matters would have been both admissible and highly probative.

Indeed, it is useful to compare the evidence submitted by the prosecution with regard to the charges involving the third victim, E.C., to the evidence presented as to the C.C. charges. E.C. testified at trial, identified Petitioner, and stated that he "stuck a red stick and his fingers in [her] vagina." (TT Vol. 2, at p. 348-349).  The prosecution offered testimony from E.C.'s mother regarding perceived behavioral changes during the relevant time period.  (TT Vol. 2, at 370-378).

The evidence offered with respect to E.C. is nearly identical to the evidence offered as to C.C. *except* for one critical factor – the absence of medical evidence tending to corroborate that E.C. had been sexually abused. When the prosecution called Dr. Richard Cimma, E.C.'s pediatrician, he testified that he examined E.C. and found that her hymen was intact, that there was no evidence of any injuries to her genital area, and no evidence of vaginal penetration.  (TT Vol. 2, at 446-448).

The jury acquitted Petitioner with respect to the charges involving E.C.  This strongly indicates that their decision to convict as to the C.C. charges was based upon their conclusion that the injuries documented in Dr. Manjunath's report were consistent with sexual abuse.  The jury reached this conclusion, in substantial part, because defense counsel failed to offer any expert testimony tending to explain what Dr. Manjunath's notations meant and/or how the injuries noted in the report could have been caused by something other than sexual abuse.

In other words, counsel's failure to call an expert witness prevented an effective challenge to the credibility of the key piece of evidence supporting the charges, namely, Dr. Manjunath's report.  As noted above, in his *Sparman* affirmation, Petitioner's trial counsel  provided the following explanation for his decision not to call any experts: "I simply did not believe that it would be prudent to do so given my extensive cross-examination of the People's witnesses, and the fact

162

that some of these witnesses provided testimony favorable to the defense." *Sparman* Affirmation, at ¶ 11.

As noted above, this does not make sense in that it is clearly an after-the-fact justification by counsel–he could not have known, before trial, how the cross-examination of the witnesses would proceed. Furthermore, this justification simply does not apply to the decision not to call an expert to rebut Dr. Manjunath's report. The report could not be subjected to cross-examination and none of the prosecution witnesses testified favorably to the defense on these issues. As set forth above, defense counsel's failure to rebut the report with expert testimony entailed an unreasonable risk that the jury would draw its own conclusions regarding the causes of the apparent wounds noted in the report. The decision to run that risk as to the only evidence directly corroborating C.C.'s testimony was not supported by an objectively reasonable strategic justification. *See Gersten*, 426 F.3d at 613-14 (finding that prejudice is established when "counsel's failures go to something as important as the medical evidence in [the] case– the only objective evidence that a crime occurred and the only evidence directly corroborating any aspect of the victim's story").

This objectively unreasonable conduct by Petitioner's trial counsel is sufficient to "undermine confidence in the outcome" of the trial with respect to the charges involving C.C. *See Strickland*, 466 U.S. at 694; *Lindstadt*, 239 F.3d at 204-205.

For the foregoing reasons, this Court recommends finding that Petitioner has showed that he was prejudiced under *Strickland* and that the state court was unreasonable in concluding otherwise. The Court recommends granting habeas relief on this claim with regard to the charges involving C.C. because the Appellate Division's denial of this aspect of Petitioner's ineffective assistance of counsel claim involved an unreasonable application of clearly established Federal law,

163

as determined by the Supreme Court of the United States. 28 U.S.C. § 2254 (d)(1). Petitioner should therefore be granted habeas relief as to the convictions for Aggravated Sexual Abuse in the First Degree, in violation of PL § 130.70, and of Endangering the Welfare of a Child, in violation of PL § 260.20, with regard to victim C.C.

### 3. Behavioral/Psychological Expert

Petitioner argues that his trial counsel was ineffective because he failed to call a behavioral/psychological expert to rebut trial testimony regarding the victims' behavioral changes.

#### a. State Court Proceedings

At trial, the prosecution offered testimony from the alleged victims' mothers regarding behavioral changes that occurred at or about the time the alleged abuse occurred. T.O.'s mother testified that, beginning in May 1987, T.O. started exhibiting behavioral changes. For example, she did not want to be left alone (particularly when using the bathroom), became afraid of the dark, started wetting her bed, and began scribbling on the faces of her dolls. (TT Vol. 2, 242-47). T.O.'s mother also explained that T.O. suddenly began begging not to be taken to the Dearstyne home. (TT Vol. 2, at 247).

C.C.'s mother also testified that she noticed behavioral changes beginning in April 1987. For example, she explained that C.C. started having nightmares, crying whenever she was dropped off at the Dearstyne house, wanting to drink from a baby's bottle and wear diapers, and became fearful of being left alone, especially when using the bathroom. (TT at 315-18).

The prosecution offered testimony from E.C.'s mother regarding behavioral changes that she noticed in or about March 1987. E.C.'s mother testified that E.C. began wetting her bed, refusing to go to the bathroom alone, hitting herself, having nightmares, displaying speech problems, and

164

masturbating. (TT at 371-74).

Neither the prosecution nor the defense offered any expert testimony with regard to the significance of the behavioral changes and/or to explain whether such changes were consistent with sexual abuse. Notably, however, the prosecution argued that this was circumstantial evidence that the abuse occurred. In his summation, Petitioner's trial counsel attacked the testimony by noting the lack of expert support, arguing that the mothers' testimony amounted to "dime store psychology" and suggesting that the behavioral changes may have been a normal part of childhood development or at least caused by something other than sexual abuse. (TT at 679-81, 686).

In his CPL § 440.10 motion, Petitioner argued that Attorney Grimmick was ineffective for having failed to call an expert to rebut the testimony concerning behavioral changes. In support of this argument, Petitioner offered an affidavit from Richard A. Gardner, M.D., a board certified child psychiatrist. *See* Gardner Affidavit, attached as Exhibit K to Petitioner's Exhibits in Support of Motion to Vacate Judgment. Dr. Gardner opined that the behavioral changes noted by the alleged victims' mothers "do not necessarily indicate sexual abuse." Gardner Affidavit, at ¶¶13, 16. Dr. Gardner further stated that "[t]he changes testified to are only indicative of normal activity that a young girl can go through during routine changes in her life." *Id.* at ¶ 17. The Court notes that Dr. Gardner did not offer a clinical explanation for the fact that three young girls, all living in separate households, but receiving day care services from the same provider, would begin experiencing very similar behavioral changes at almost exactly the same time. Dr. Gardner's response to this commonality was to suggest that the alleged victims' mothers might have coordinated their testimony after the fact.

The CPL § 440.10 court found that Dr. Gardner's assessment was "ambiguous since it

165

implie[d] that the behavior and psychological changes could be consistent with sexual abuse." CPL § 440.10 Decision, at p. 18. As such, the court concluded that trial counsel reasonably could have decided not to call such an expert, because the expert would likely have testified that, in fact, the behavioral changes *could be* consistent with sexual abuse. The CPL § 440.10 court accordingly considered the decision not to call an expert psychiatric expert as a reasonable part of defense counsel's overall strategy to "point out the ambiguities of the People's case" and challenge the jury to "find sexual abuse 'beyond a reasonable doubt.'" *Id.*, at p. 20.

As noted above, as part of the consolidated appeal, the Appellate Division addressed all of Petitioner's ineffective assistance claims together and did not specifically discuss this particular claim. Specifically, the Appellate Division held the ineffective assistance of counsel claims were "either moot, unsupported by sworn allegations of fact or meritless." *Dearstyne III*, 761 N.Y.S.2d at 121. Because this particular claim was not moot and was supported by sworn allegations of fact, it appears that the Appellate Division's denial was on the merits and the claim will therefore be reviewed under the AEDPA standard.

### b. Habeas Review

The question before this Court is whether the Appellate Division's ruling concerning trial counsel's decision not to call a psychological or behavioral expert was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Initially, it must be noted that, as discussed above, courts reviewing ineffective assistance claims under the *Strickland* standard are generally reluctant to disturb or second guess trial counsel's

166

"strategic" decisions, including choices regarding whether to call a particular witness.

In this particular case, Petitioner's trial counsel does not offer a specific explanation for his decision not to call a behavioral or psychological expert to rebut the testimony of the alleged victims' mothers. Instead, Attorney Grimmick explained that his decision not to call an expert (as to any topic) was based upon his belief that "it would not be prudent to do so," given his "extensive cross-examination of the People's witnesses, and the fact that some of these witnesses provided testimony favorable to the defense." (Grimmick Affirmation, at ¶ 11).

By electing to rely exclusively upon an argument in summation to attack the psychological evidence offered the prosecution, defense counsel assumed an unacceptable risk that the jury would reach its own conclusion regarding the abnormal behaviors observed by all of the three victims about a month before Dearstyne's arrest on sexual abuse charges. The *Sparman* affirmation submitted by counsel fails to articulate any strategic consideration sufficient to justify taking such a risk with respect to a critical piece of evidence supporting the prosecution's case as to all three of the victims. Unlike the arguments raised concerning a false confessions expert, there can be no dispute that testimony from a defense expert addressing these matters would have been both admissible and highly probative. *See Gersten*, 426 F.3d at 611-12. The prosecution offered the testimony of the victims' mothers about the alleged behavioral changes as key corroboration evidence that the sexual abuse actually happened and to bolster the credibility of C.C. and E.C., who did testify about the alleged abuse. Although T.O. did not testify about the abuse, the behavioral evidence was still very important corroborative evidence. In addition to T.O.'s mother's testimony, the prosecution offered the testimony of Carole West, the charge nurse on duty at the Albany Medical Center, where T.O. was taken following her examination by Dr. Close. (TT Vol. 2, at p. 413-415). Nurse West described

167

T.O. as "extremely emotional [sic] upset" and stated that T.O. had to be sedated with chloral hydrate before she could be examined. (TT Vol. 2, at p. 416, 436). Although Nurse West was not permitted to testify as an expert and offer any medical opinions regarding the reasons for T.O.'s emotional state or the results of the examination, the prosecution urged the jury to conclude that this testimony about T.O.'s behavior was indicative of having been victimized sexually.

Attorney Grimmick's affirmation is clearly a hindsight justification because he could not have known, prior to trial, what was going to occur during the cross-examination of any particular witness. "[T]he reasonableness of the purported "strategic decision" on the part of defense counsel" must be judged "in terms of the adequacy of the investigations supporting" it. *Gersten,* 426 F.3d at 610 (quoting *Wiggins,* 539 U.S. at 521 and citing *Strickland,* 466 U.S. at 690-91). Here, defense counsel decided not to challenge the psychological evidence by means of a psychological expert without doing any investigation into whether there existed individuals with expertise to assist the defense. Thus, he lacked sufficient information reasonably to determine that such an investigation was unnecessary. This is not a case where counsel made a reasonable decision to cease further investigation as a result of having "discovered. . . evidence . . . to suggest that" challenging the prosecution's evidence using an expert witness "would have been counterproductive, or that further investigation would have been fruitless." *Wiggins,* 539 U.S. at 525. Nor is this a case of "diligent counsel . . . draw[ing] a line when they have good reason to think further investigation would be a waste." *Rompilla,* 125 S.Ct. at 2463. To the contrary, counsel "here never discovered any evidence to suggest one way or another whether such challenges would be counterproductive or such investigation fruitless, nor did counsel have any reasonable basis to conclude that such investigation would be wasteful." *Gersten,* 426 F.3d at 610.

168

The psychological expert that Dearstyne was able to obtain to support his CPL § 440.10 motion provided evidence demonstrating that consultation with an expert in child psychology and behavior "would have been quite fruitful[,]" *id.* Dr. Gardner opined that the behavioral changes noted by the alleged victims' mothers "do not necessarily indicate sexual abuse." Gardner Affidavit, at ¶¶13, 16. Dr. Gardner further stated that "[t]he changes testified to *are only indicative of normal activity* that a young girl can go through during routine changes in her life." *Id.* at ¶ 17. The County Court unreasonably found that this affidavit was "ambiguous"; Dr. Gardner's opinion clearly supported the defense and would have bolstered defense counsel's "dime store psychology" argument in summation. This represents an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, *see* 28 U.S.C. § 2254(d)(1). Even if the qualifier "not necessarily" implicitly means that Dr. Gardner would have had to concede that the behavioral changes could have been consistent with sexual abuse, that does not negate the benefits of Dr. Gardner's testimony. Expert opinion testimony is not a zero-sum game.

Furthermore, the County Court essentially contradicted itself in the remainder of its ruling when it considered the decision not to call an expert psychiatric expert as a reasonable part of defense counsel's overall strategy to "point out the ambiguities of the People's case" and challenge the jury to "find sexual abuse 'beyond a reasonable doubt.'" The Court is baffled as to how *not* calling an expert witness who would have *assisted* the defense in the strategy of, as the County Court observed, "point[ing] out the ambiguities of the People's case," was a reasonable decision.

Trial counsel's failure to consult with or call an expert on child behavior and psychology an independent and sufficient indication of deficiency. Together with the failure to consult with a medical expert, it presents a serious case of ineffectiveness. The prosecution offered victims' mothers

169

testimony to corroborate the alleged sexual abuse. In failing to call an expert to rebut the mothers' testimony and Nurse West's testimony, trial counsel missed another critical opportunity to damage credibility of numerous prosecution witnesses–the victim's mothers; Nurse West; and the two testifying victims. There is no sound trial strategy that would justify this deficiency. *See id.* Defense counsel's lack of preparation and failure to challenge the credibility of the key prosecution witness could not be based on a sound trial strategy, and it was an objectively unreasonable application of Strickland for the County Court to hold otherwise.

Turning to the question of prejudice, obviously Dearstyne cannot established a reasonable probability of a more favorable result with regard to the charges involving E.C. because he was acquitted on all of those.

However, Dearstyne was convicted of both charges involving C.C., for which the only proof came from the victim herself, the medical record of a non-appearing medical witness, and the victim's mother's testimony about her behavioral changes. The Court's confidence in the verdicts as to C.C. has been undermined by trial counsel's failure to call a psychological expert to assist in debunking the argument that C.C.'s alleged behavioral changes demonstrated that she had been sexually abused. Accordingly, the Court finds that Dearstyne was prejudiced by trial counsel's omission, and it was unreasonable for the state courts to conclude otherwise.

Finally, the Court concludes that Dearstyne was prejudiced with regard to the T.O. convictions, notwithstanding that the jury acquitted him of raping her. The prosecution's case against Dearstyne with regard to T.O. is riddled with deficiencies. The confession was erroneously introduced and, in this Court's opinion, based upon the analysis of the circumstances of the confession, was the product of coercion and deception. The victim herself could not be sworn as a

170

witness, could not identify Dearstyne, and was unable to provide any testimony about any of the acts allegedly committed. Dr. Close's credibility is in serious doubt, occasioned by his willful destruction of critical evidence. His methods and conclusions have been deemed "questionable" by the defense expert witness; at least some of them–such [as] his alleged observation of "yellow" semen and a non-bleeding abrasion visible without a speculum–have been called out as incredible on their face. Without a doubt, testimony from an expert psychological or psychiatric witness such as Dr. Gardner would have more effectively rebutted the behavioral-change testimony. Given the precariousness of the case involving T.O., this omission is sufficient to undermine the Court's confidence in the verdicts with respect to her. The Court believes that there was a reasonable probability of a more favorable result, that is, the jury returning acquittals on the remaining charges involving T.O. Furthermore, the state courts unreasonably applied *Strickland* in concluding otherwise.

For the foregoing reasons, the Court recommends granting relief on Dearstyne's claim that trial counsel was ineffective in failing to consult with or call a psychological or psychiatric expert witness to challenge the behavioral testimony with regard to victims T.O. and C.C.

### 4.   Failure to Seek DNA Testing

Petitioner further suggests that Attorney Grimmick was unconstitutionally ineffective because he failed to obtain the drainage sample examined by Dr. Close and have the sample subjected to DNA testing. This claim is unavailing for two reasons. First, Petitioner cannot establish any prejudice arising from counsel's failure to have the sample tested since, as we now know, the sample was destroyed by Dr. Close long before trial and thus would not have been available for testing in any event.

Second, in light of Petitioner's signed confession admitting to sexual contact with T.O.,

171

Attorney Grimmick might very reasonably have believed that DNA testing would yield inculpatory evidence. Petitioner has never articulated a plausible theory that any of the victims were sexually abused by someone else. The forensic evidence introduced at trial was negative for sperm. Defense counsel elected to rely upon those negative results to attack Dr. Close's testimony, rather than risking the potential for damaging DNA test results.

Viewed in this context, counsel's strategic choice not to obtain DNA testing does not constitute ineffective assistance of counsel. *See Sturdivant v. Barkley*, No. 04-CV-5659, 2007 WL 2126093, at *7 (E.D.N.Y. July 24, 2007) (finding that "defense counsel's strategic decision not to seek DNA testing on the bags of cocaine was both reasonable and proper given that it was likely that the testing would have revealed adverse evidence"); *cf. also Johnson v. People of State of New York*, 02-CV-3752, 2003 WL 23198785, at *15 (E.D.N.Y. Nov. 5, 2003) ("The record is devoid of any request by defense counsel for additional forensic testing or claim of prejudice on the ground that no further examinations were done. Strategically this position made sense since it was likely that testing would have revealed adverse evidence.").

For the foregoing reasons, this Court recommends finding that Petitioner is not entitled to habeas relief based upon the claim that his trial counsel unreasonably failed to seek DNA testing.

**M.      Ground Thirteen – Denial of Due Process – Post-Conviction Motions**

Petitioner argues that he was denied the due process of law when the state courts denied his various post-conviction motions.

**1.      Subpoenas *Duces Tecum***

In August and September of 1997, Petitioner filed motions before the Rensselaer County Court seeking the issuance of subpoenas *duces tecum* pursuant to New York Civil Practice Law and

172

Rules ("CPLR") §§ 2307 and 2302 (b).

In sum, Petitioner sought to compel various parties to turn over certain records that he asserted were relevant to claims he planned to present in support of his CPL § 440.10 motion. The County Court denied the motion, finding that Petitioner had failed to demonstrate that the records sought were relevant and material. Petitioner appealed to the Appellate Division, Third Department.

The Appellate Division affirmed the County Court, noting that under New York law, "[e]xcept in narrowly defined circumstances, not present here, for a judicial subpoena to issue there must be a pending underlying action or proceeding." *Dearstyne v. Rensselaer County Dist. Atty.*, 691 N.Y.S.2d 628, 629 (3d Dep't 1999). The appellate court concluded that because there was no action or proceeding pending at the time of Petitioner's motions, he "was not entitled to the relief requested." *Id.* In addition, the Appellate Division affirmed the County Court's finding that "petitioner failed to meet his burden of demonstrating how the information inquired after was material and relevant." *Id.* The New York Court of Appeals denied Petitioner's request for leave to appeal from the Appellate Division's decision. *Dearstyne v. Rensselaer County Dist. Atty.*, 719 N.E.2d 918 (N.Y. 1999).

Petitioner contends that the state courts' refusal to issue the subpoenas amounted to a denial of his constitutional right to due process. This Court finds that Petitioner's claim must fail for the following three reasons. First, the claim is based upon the deprivation of his alleged right to obtain a particular form of post-conviction discovery under New York law. It is well-settled that habeas relief is not available for errors of state law and that a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)); *see also* 28 U.S.C. §

173

2254(a).

Second, Petitioner has failed to establish that he was even arguably entitled to the requested subpoenas under New York law at the time he made the subject motions. Third, the Petition fails to provide any meaningful specifics as to what records Petitioner sought to obtain or how those records might have arguably impacted the outcome of his post-conviction motions. As such, this Court finds that Petitioner is not entitled to habeas relief as to this claim.

## 2. County Law § 722-c Motion

In June 1998, Petitioner moved for the appointment of experts to assist with his § 440 motion and for the disbursement of funds to pay for the experts pursuant to County Law § 722-c, which allows the court to permit assigned counsel to obtain expert services at taxpayer expense.

In sum, Petitioner sought funds to obtain expert testimony regarding DNA testing, medical evidence, confessions, and psychological evidence, which testimony he planned to offer in support of the ineffective assistance of counsel claim raised in his CPL § 440.10 motion. The County Court denied Petitioner's motion and he appealed to the Appellate Division, Third Department. Petitioner's appeal of this particular decision was heard as part of a consolidated appeal along with Petitioner's appeal of the County Court's denial of his CPL § 440.10 motion.

The Appellate Division affirmed, noting that "to prevail on a motion pursuant to County Law § 722-c, a defendant must show both necessity and, if the compensation sought is in excess of $300, extraordinary circumstances." *Dearstyne III*, 761 N.Y.S. 2d at 120. The court concluded that Petitioner had not made such a showing, explaining as follows:

> Although defendant submitted affidavits-some of which were unsworn-explaining how such expert testimony may have been helpful at trial, he failed to establish that the experts were necessary for him to succeed on his CPL 440.10 motion, how the testimony of some of the experts would show that he received ineffective assistance of

174

counsel or that extraordinary circumstances exist here warranting the expenditure of additional public funds.

*Id.* The Court of Appeals denied Petitioner's request for leave to appeal the Appellate Division's

decision. *People v. Dearstyne*, 100 N.Y.2d 593 (2003).

Under New York Law, the "decision to appoint experts to assist a defendant is left to the sound

discretion of the trial court, upon a defense showing of necessity and inability to afford the expense of

such services." *Johnson v. Harris*, 682 F.2d 49, 50 (2d Cir.1982) (citing N.Y. COUNTY LAW § 722- c).

There is no federal constitutional requirement that a defendant be appointed an expert at the

public expense. *See id.* (citing state and federal statutory authority for appointment of defense experts);

*see also Carter v. Poole*, No. 04-CV-1386, 2008 WL 2949385, at *17 (N.D.N.Y. July 30, 2008) ("This

claim is not cognizable on federal habeas review because there is no federal constitutional requirement

that a criminal defendant be appointed an expert at the public expense."). Contrary to Petitioner's

contention that due process mandated the appointment of an expert, the Second Circuit has held that

such a decision is committed to the sound discretion of the trial court. *See Johnson*, 682 F.2d at 50.

To the extent that Petitioner claims that the County Court abused its discretion under New York

law, habeas relief cannot lie for that alleged error of state law. *See Wilson v. Goord*, No. 00 Civ.4849,

2004 WL 226149, at * 7 (S.D.N.Y. Feb. 6, 2004) ("[T]his Court may not consider the question whether

the Supreme Court abused its discretion by refusing to authorize funds above New York's $300

statutory maximum, as it is an alleged error of state law and not of federal law.").

Moreover, it appears that Petitioner was able to obtain expert services on a *pro bono* basis

because he submitted affidavits from several experts in support of his § 440 motion and in support of

the instant Petition for habeas relief. Petitioner has failed to establish that his ability to pursue his

ineffective assistance of counsel claim was materially harmed by the state courts' denial of his request

175

for relief under County Law § 722-c. Accordingly, this Court finds that he is not entitled to habeas relief on this basis.

**N.    Ground Fourteen – Due Process – Failure to Render Decisions in Accordance with Law**

Petitioner contends that he was denied due process of law because the state courts' decisions did not "conform" to the law and the facts.

Petitioner cites numerous examples of conduct by the state courts that he characterizes as contrary to law: (1) the trial court failed to comply with CPL § 710.60 when rendering its decision following the Huntley hearing; (2) the trial court expressed concern about prosecutorial misconduct, but failed to meaningfully address it; (3) the 440 court improperly denied some of Petitioner's claims on the erroneous basis that his memorandum of law was an unsworn document; (4) the 440 court improperly permitted the prosecution to file a late response to the motion; (5) the 440 court incorrectly determined that Dr. Leo's affidavit was unsworn; (6) the Appellate Division failed to give proper consideration to the *pro se* brief submitted by Petitioner in support of his appeal; and (7) the Court of Appeals' improperly denied his requests for leave to appeal due to the "political nature of Petitioner's case."[34]

**1.    Conclusory Claims**

As a threshold matter, this Court rejects Petitioner's "kitchen sink" approach to seeking habeas relief by listing numerous, conclusory arguments in single-spaced paragraphs. Although the Petition and Amended Petition were prepared *pro se*, Petitioner thereafter obtained counsel, who could have sought to file a Second Amended Petition to clarify the grounds raised and arguments advanced in

---

[34]    Petitioner also suggests that the Appellate Division improperly failed to consider his ineffective assistance of appellate counsel claims. However, that issue is also raised as a separate claim in Ground Fifteen and will be addressed under that heading.

support thereof. Instead, Petitioner's counsel filed a reply memorandum of law (in the nature of a Traverse) outlining additional factual and legal arguments in further support of some, *but not all*, of Petitioner's claims. In a footnote on page 45 of the reply memorandum of law, Petitioner's counsel indicates that Petitioner "restates all of the other grounds contained in his Habeas Petition in their entirety."

With regard to those arguments that Petitioner's counsel chose not to amplify, this Court finds that it is not required to search the voluminous record to discern what Petitioner intended when he set forth his conclusory claims, which were asserted in the form of summary claims of dissatisfaction with the results reached by the state courts. These vague and conclusory claims are insufficient to warrant habeas relief and should accordingly be denied. *See generally Jones v. Poole*, No. 06 Civ. 7172, 2007 WL 2456646, at *11 (S.D.N.Y. Aug. 21, 2007) ("[V]ague and conclusory claims are not sufficient bases for habeas corpus relief"); *Banks v. New York State Dept. of Correctional Services*, No. 01 CIV. 3985, 2001 WL 1448612, at *2 (S.D.N.Y. Nov. 15, 2001) (noting that "a petition may be dismissed if it contains only vague or conclusory allegations").

### 2.      Alleged Errors in Post-Conviction Proceedings

To the extent that the allegations supporting this ground relate to alleged procedural errors in proceedings collateral to the judgment of conviction, they do not set forth a constitutional claim cognizable in this federal habeas proceeding.

As a number of district courts in this Circuit have observed, "[a]ll the circuits that have considered the issue, except one, have held that 'federal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings.'" *Guzman v. Couture*, 99CIV11316, 2003 WL 165746, at *13 (S.D.N.Y. Jan. 22, 2003) (citing *Franza v. Stinson*, 58 F. Supp.2d 124, 151

(S.D.N.Y.1999)) (quoting *Ortiz v. Stewart*, 149 F.3d 923, 939 (9th Cir. 1998), *cert. denied*, 526 U.S. 1123 (1999)).[35]

Although the Second Circuit has not directly addressed this issue, the district court decisions within the Circuit (several of which have been affirmed by the Second Circuit) have followed the majority rule. *See, e.g. Guzman*, 2003 WL 165746, at *13 (citing *Diaz v. Greiner*, 110 F. Supp.2d 225, 235 (S.D.N.Y.2000) ("Petitioner's unsupported assertion that the trial court denied his (third). [sic] CPL § 440.10 motion without a hearing violated due process is not cognizable on federal habeas review."); *Lugo v. Kuhlmann*, 68 F.Supp.2d 347, 376 n. 15 (S.D.N.Y.1999); *Franza v. Stinson*, 58 F. Supp.2d at 152; *Sparman v. Edwards*, 26 F. Supp.2d 450, 468 n. 13 (E.D.N.Y.1997) (stating that "the weight of authority holds that in habeas corpus proceedings federal courts do not have jurisdiction to review state court denials of motions for a new trial"), *aff'd*, 154 F.3d 51 (2d Cir.1998); *Bellamy v. Cogdell*, 802 F. Supp. 760, 772-73 (E.D.N.Y.1991); *Michael v. Dalsheim*, No. CV 90-2959, 1991 WL 99368 at *9 (E.D.N.Y. May 22, 1991); *Turner v. Sullivan*, 661 F. Supp. 535, 540-41 (E.D.N.Y.1987) (claim that trial court violated due process by denying CPL § 440.10 motion without setting out findings, conclusions and its reasoning not cognizable on federal habeas review; "Petitioner has not suggested in what respect the failure to comply with the state rule has violated his federal due process rights. A writ of habeas corpus may not be issued on the basis of a perceived error of state law."), *aff'd*,

---

[35]     *See also Villafuerte v. Stewart*, 111 F.3d 616, 632 n. 7 (9th Cir.1997) (claim that petitioner was denied due process in state habeas proceeding is "not addressable in a section 2254 proceeding"), *cert. denied*, 522 U.S. 1079 (1998); *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir.1996) (*per curiam*) ("Unless state collateral review violates some independent constitutional right, such as the Equal Protection Clause, . . . errors in state collateral review cannot form the basis for federal habeas review."), *cert. denied*, 519 U.S. 907 (1996); *Jenkins v. Houston*, No. 4:05CV3099, 2006 WL 126632, at *1 (D. Neb. Jan.17, 2006) ("The petitioner's second and third § 2254 claims, based on defects in his state postconviction proceedings, must be dismissed. Errors during state postconviction review and claims based on ineffective assistance of counsel and other constitutional deprivations during state postconviction proceedings are not cognizable in a federal habeas corpus action.") (citations omitted)

842 F.2d 1288 (2d Cir.), *cert. denied*, 487 U.S. 1240 (1988).

This Court finds no reason to deviate from the majority view in this case and therefore finds that Petitioner's claims in this regard should be denied.

### 3.    Alleged Violations of State Law

Further, it appears that many of Petitioner's claims raise alleged violations of New York State law, which are not cognizable on habeas review. Federal review of a state court conviction is limited to errors of constitutional magnitude, which denied a criminal defendant the right to a fundamentally fair trial. *Cupp v. Naughten*, 414 U.S. at 146 (1973); *Estelle v. McGuire*, 502 U.S. at 68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). The conclusory claims set forth in Ground Fourteen are insufficient to establish any violation of state law, let alone that Petitioner was deprived of any of the fundamental rights guaranteed by federal law.

### 4.    Judicial Misconduct

To the extent that Petitioner is asserting claims of judicial misconduct on the part of any or all of the state court judges, this Court finds that he is not entitled to relief. Petitioner's conclusory allegations are plainly insufficient to overcome the presumption that the courts properly discharged their duties. *See, e.g. White v. Walker*, 01-CV-0238, 2007 WL 169702, at *17 (N.D.N.Y. Jan. 18, 2007) ("[T]o succeed on a judicial misconduct claim, a party must 'overcome a presumption of honesty and integrity in those serving as adjudicators'") (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464 (1975)); *see also Love v. Kuhlman*, 99-CIV-11063, 2001 WL 1606759, at *5 (S.D.N.Y. Dec. 12, 2001) ("Beyond his mere conclusory allegation, however, Love does not allege any facts that would allow this Court to conclude that his sentencing resulted from an act of judicial misconduct.").

### 5.   Restated Claims

Petitioner's Ground Fourteen also restates several claims already raised in other grounds set

forth in the Petition. For example, this Court addressed Petitioner's claim regarding the trial court's

alleged failure to comply with CPL § 710.60 (6) in Section III.B.3; the issue of prosecutorial

misconduct was discussed in detail in Section III.E; and the 440 court's denial of some of Petitioner's

claims because they were not support by sworn allegations of fact is a moot issue because this Court

found that those claims had been denied on the merits and were therefore reviewable under AEDPA.

Accordingly, this Court finds that Petitioner is not entitled to habeas relief based upon any of the claims

set forth in Ground Fourteen.

### O.   Ground Fifteen – Ineffective Assistance of Counsel

In Ground Fifteen, Petitioner asserts seventeen claims of ineffective assistance of trial counsel

against Attorney Grimmick, two claims of ineffective assistance of appellate counsel against Attorney

Frederick Korkosz, and three claims of ineffective assistance of counsel with respect to Attorney Kevin

Bauer. Each claim will be addressed in turn.

#### 1.   Claims involving Attorney Grimmick

##### a.   Opening Statement

Attorney Grimmick's opening statement contained the following remarks:

*You have to devote yourself to the evidence as it came from the stand* – as it will come from that
stand. Again, the defendant is *presumed to be innocent during the course of this trial*,
presumed to be innocent now. During the course of the testimony and as you go into your
deliberations, *and if during the course of the deliberations you see fit to remove that cloak of
innocence, that is your decision to make.*

(TT Vol. 2, at p. 20) (emphases supplied).

In his § 440 motion, Petitioner argued that his trial counsel's suggestion that the jury could

180

"remove" the "cloak of innocence" was improper and constituted ineffective assistance of counsel. The

440 court rejected the claim pursuant to CPL § 440.30 (4)(b), because it was raised only in Petitioner's

memorandum of law. On appeal, the Appellate Division "reject[ed] defendant's argument that County

Court improperly refused to consider facts alleged in unsworn documents submitted in connection with

his . . . 440 motion." *Dearstyne III*, 761 N.Y.S.2d at 121.

As noted above, this Court has concluded that a denial pursuant to CPL § 440.30 (4)(b)

constitutes a denial on the merits and this claim will therefore be reviewed under the AEDPA standard.

First, trial counsel's statement regarding removal of the "cloak of innocence" was more than

inartful. Although to a certain extent legally accurate, insofar as it represented an effort to explain that

the defendant was presumed innocent and that the presumption could only be removed by the

presentation of evidence, it was frankly inept, given the central role and importance of persuasiveness

before a jury. It is a close question as to whether this statement constitutes conduct falling "below an

objective standard of reasonableness."*Strickland*, 466 U.S. at 687-88. The Court is mindful that it is

considering the claim under AEDPA, however.

Second, Petitioner is required to establish that counsel's deficient performance prejudiced his

defense. Id. at 692. The jury was properly informed regarding the presumption of innocence and

correctly instructed regarding the burden of proof both at the outset of the trial (TT Vol. 2, at p. 4-5)

and as part of the jury charge following the close of proof (TT Vol. 3, at 719-722). Although parts of

the trial court's final jury charge on reasonable doubt were problematic, the Court has concluded that

it did not violate Dearstyne's due process rights so as to warrant habeas relief under AEDPA.

Furthermore, the fact that the jury acquitted Dearstyne of some of the charges tends to demonstrate that

their deliberations were not tainted by counsel's misstep during his opening statement. On the facts of

181

the present case, Dearstyne has not shown that but for counsel's error, there is a reasonable probability

of a more favorable result. Accordingly, the Court recommends dismissal of this ineffective assistance

claim.

### b.     Reconsideration of the *Huntley* Decision

Petitioner argues that Attorney Grimmick "failed to alert the Trial Judge that his ruling during

trial about the facts regarding suppression of the Statement, was in total disregard to the facts elicited

at the Huntley hearing and trial itself." It appears that Petitioner is suggesting that trial counsel should

have moved for reconsideration of the *Huntley* decision based upon the facts presented at trial regarding

the police officers' interrogation tactics and, in particular, their efforts to isolate Petitioner from his

family. However, the Appellate Division considered that evidence and concluded that the facts did not

"warrant suppression of defendant's statement for they do not establish that his isolation resulted from

official deception or trickery." *Dearstyne II*, 646 N.Y.S.2d at 1005. Although, as discussed above, the

Court has found that this was an unreasonable determination of the facts in light of the evidence

presented, Petitioner has not established any reasonable likelihood that a reconsideration motion based

upon those same facts would have been granted by the trial court, given the Appellate Division's

holding quoted above. Accordingly, Petitioner cannot establish that he was prejudiced by Attorney

Grimmick's failure to move for reconsideration. The Court therefore recommends concluding that he

is not entitled to habeas relief on this basis.

### c.     Alibi Defense

In his CPL § 440.10 motion, Petitioner contended that Attorney Grimmick unreasonably failed

to pursue an alibi defense. In support of that argument, Petitioner presented several affidavits from

friends and family, indicating, for example, that Petitioner "usually" engaged in after school activities

and "rarely" returned home immediately following his dismissal from school. These affidavits were offered as part of an effort to show that Petitioner did not have access to the alleged victims during the time periods when his mother was babysitting for them.  In addition, Petitioner offered an affidavit from his mother, Carol Dearstyne, in which she indicated that Petitioner did not arrive home "until late in the evening" on June 10th and 12th of 1987. (Affidavit of Carol Deartsyne, attached as Exhibit C to Petitioner's Exhibits in Support of Motion to Vacate Judgment, at ¶ 47).

The CPL § 440.10 court reviewed this evidence, noted that Mrs. Dearstyne's affidavit was contradicted by her trial testimony, and concluded that Attorney Grimmick's decision not to present an alibi defense through such testimony was "part of a reasonable trial strategy." CPL § 440.10 Decision, at p. 8.

The Appellate Division did not discuss this particular claim, but held that "even assuming that defendant's claims of ineffective assistance of counsel are not based on facts appearing in the record and could not have been raised in a prior appeal, . . . his claims are either moot, unsupported by sworn allegations of fact or meritless." *Dearstyne III*, 761 N.Y.S. 2d at 121.  Because this claim was not moot and was supported by sworn allegations of fact, this Court considers the claim to have been denied by the Appellate Division on the merits.

In his *Sparman* affirmation, Attorney Grimmick states that he does not recall Petitioner "ever generally, or specifically, naming any alibi witnesses or possible other suspects" and indicates that he was not "independently aware of any such witnesses or suspects."  Grimmick Affirmation, at ¶ 8. Attorney Grimmick further notes that he *did* introduce Petitioner's school attendance records to demonstrate that Petitioner did not have "unfettered access" to the alleged victims.

It is well-settled that "[t]he decision whether to call any witnesses on behalf of the defendant,

183

and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997) ("[T]he tactical decision of whether to call specific witnesses-even ones that might offer exculpatory evidence-is ordinarily not viewed as a lapse in professional representation."); *Lawson v. Caspari*, 963 F.2d 1094, 1096 (8th Cir.1992) (finding that counsel was not ineffective for failing to call alibi witnesses he did not believe were credible, where counsel "presented a theory of the case by pointing out the 'weaknesses in the state's case and rais[ing] serious questions about the credibility of the state's sole eyewitness.'").

In the present case, even assuming *arguendo* that Petitioner told Attorney Grimmick about the alleged alibi witnesses, counsel's decision not to call those witnesses would not have amounted to ineffective assistance of counsel.

Petitioner's mother testified that the alleged victims would typically leave her home between 3:00 and 4:00 in the afternoon, and sometimes as late as 5:00 p.m. (TT Vol. 3, at p. 487). She also testified that her children, including Petitioner, would usually arrive home between 4:00 and 4:30 in the afternoon. (TT Vol. 3, at p. 488). On cross-examination, Petitioner's mother acknowledged that her children sometimes returned home from school between 3:30 and 4:30. (TT Vol. 3, at p. 495). Given this testimony, the additional testimony from family and friends regarding Petitioner's "usual" after school practices would have been cumulative and of limited relevance. The testimony of his mother, offered on direct examination, already established that Petitioner would have been home, on occasion, during time periods in which he would have had access to the victims.

Furthermore, the state court found that Mrs. Dearstyne's affidavit, which offered specific details regarding Petitioner's whereabouts on key dates, was "inherently incredible." This factual finding is

184

entitled to a presumption of correctness, 28 U.S.C. § 2254(e)(1), and Petitioner has failed to rebut that presumption by clear and convincing evidence. As noted by the state court, no explanation was offered for how or why Petitioner's mother remembered specific details concerning the events in question many years later or why she did not provide those details during her trial testimony.

Lastly, even if Attorney Grimmick had presented the testimony in question, there is no reasonable likelihood that the jury would have reached a different result, particularly when one considers the written confession and the fact that the testimony would have been offered by witnesses likely to be viewed by the jury as highly biased in favor of Petitioner.

Accordingly, for the foregoing reasons, this Court finds that Petitioner has not established that the Appellate Division's decision in this regard was contrary to, or involved an unreasonable application of, the *Strickland* ineffective assistance standard established by the Supreme Court.

### d.    Pre-Trial Investigation

In a single sentence claim, Petitioner asserts that Attorney Grimmick "failed to conduct adequate pre-trial investigations – especially in light of other suspects that could have been investigated." Petitioner offers no indication as to the identity of the "other suspects."

These vague and conclusory allegations are insufficient to state a claim for ineffective assistance of counsel. *See Polanco v. United States*, Nos. 99 Civ. 5739(CSH), 94 CR. 453(CSH), 2000 WL 1072303, at *10 (S.D.N.Y. Aug. 3, 2000) ("Such undetailed and unsubstantiated assertions that counsel failed to conduct a proper investigation have consistently been held insufficient to satisfy either Strickland prong."); *Matura v. United States*, 875 F. Supp. 235, 237 (S.D.N.Y. 1995) ("Petitioner's bald assertion that counsel should have conducted a more thorough pretrial investigation fails to overcome the presumption that counsel acted reasonably."); *United States v. Vargas*, 871 F. Supp. 623,

185

624 (S.D.N.Y. 1994) (rejecting ineffective assistance claim based on failure to investigate and failure to call character witnesses where there was "no evidence that avenues suggested by the client which might have altered the outcome were ignored" and petitioner "fail[ed] to identify what persuasive character witnesses would have been involved, or to show that counsel was unwise in not opening up such witnesses to cross-examination"); *Madarikan v. United States*, No. 95 Civ.2052, 1997 WL 597085, at *1 (E.D.N.Y. Sept. 24, 1997) (denying ineffective assistance claim based on failure to investigate or interview witnesses where petitioner's allegations of ineffective assistance were "conclusory, and g[a]ve no indication as to what exculpatory evidence may have been revealed by an investigation").

### e.   Sufficiency of the Evidence

Petitioner also claims that Attorney Grimmick failed to pursue claims based upon the alleged legal insufficiency of the evidence. Preliminarily, it is not clear that Petitioner exhausted this particular claim in the state courts. In any event, the claim is denied as lacking in merit. There is no reasonable likelihood that the state courts would have granted a motion to dismiss based upon the alleged insufficiency of the evidence. The evidence was legally sufficient to support the jury's determination regarding the charges against C.C.[36]

Further, viewing the evidence in the light most favorable to the prosecution, and considering Petitioner's signed confession, there is no reasonable likelihood that the courts would have granted a motion to dismiss the charges involving T.O. based upon the alleged legal insufficiency of the evidence. Accordingly, Petitioner cannot satisfy the prejudice prong of the *Sparman* standard and is

---

[36]     This Court has concluded that Attorney Grimmick was ineffective with respect to the charges involving C.C. by virtue of his failure to call or consult with an expert witness. However, this is a separate question from whether Grimmick should have moved to dismiss the charges based upon an alleged lack of sufficient evidence.

not entitled to habeas relief as to this claim. *See United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999) ("Failure to make a meritless argument does not amount to ineffective assistance.").

### f.    Attorney Connors

Petitioner argues that Attorney Grimmick provided ineffective assistance of appellate counsel by unreasonably failing to raise a claim on direct appeal with respect to the alleged ineffectiveness of Petitioner's prior counsel, Lawrence Connors. In support of this claim, Petitioner incorporates by reference the arguments raised in his CPL §440.10 motion.

At the outset of the criminal proceedings, Petitioner was represented by Lawrence Connors. It appears that Attorney Connors thereafter passed away and Petitioner was eventually represented by Attorney Grimmick during the trial and on direct appeal.

In his CPL § 440.10 motion, Petitioner noted that he was arraigned in the absence of counsel on the first indictment on June 19, 1987. Petitioner asserted that this arraignment without counsel deprived him of his right to effective assistance of counsel and that Attorney Connors should have sought dismissal of the indictment on this basis. Petitioner further argued that Attorney Grimmick was ineffective because he failed to argue Attorney Connors's ineffectiveness.

The County Court noted that Petitioner's argument was essentially an ineffective assistance of appellate counsel claim against Attorney Grimmick. The court declined to consider the claim, on the grounds that "[a]ny issues related to ineffectiveness of appellate counsel must be addressed by coram nobis review before the appellate court . . . ." CPL § 440.10 Decision, at p. 3.

The Appellate Division did not specifically address this claim as part of the consolidated appeal, but ruled that "even assuming that defendant's claims of ineffective assistance of counsel are not based on facts appearing in the record and could not have been raised in a prior appeal, . . . his claims are

187

either moot, unsupported by sworn allegations of fact or meritless." *Dearstyne III*, 761 N.Y.S. 2d at

121.

On or about November 26, 2003, Petitioner filed a *pro se* application for wit of error coram

nobis, in which he argued, *inter alia*, that Grimmick was ineffective for failing to raise the alleged

ineffectiveness of Connors on direct appeal. The Appellate Division denied Petitioner's application

on January 16, 2004, without opinion, and the Court of Appeals thereafter denied Petitioner leave to

appeal. *People v. Dearstyne*, 2 N.Y.3d 798, 781 N.Y.S.2d 297 (2004).

Thus, the question before this Court is whether the state court decisions denying Petitioner's

ineffective assistance of appellate counsel claim were contrary to, or involved an unreasonable

application of, the *Strickland* standard established by the United States Supreme Court; or resulted in

a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceedings.

The *Strickland* test applies to the evaluation of appellate counsel. *Mayo v. Henderson*, 13 F.3d

528, 533 (2d Cir.1994); *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir.1992). It is not sufficient for a

petitioner to allege that his appellate attorney omitted non-frivolous arguments, for an appellate

attorney does not have a constitutional duty to advance every potential colorable claim. *Jones v.

Barnes*, 463 U.S. 745, 754 (1983). Where a claim is based on appellate counsel's "failure to raise viable

issues, the district court must examine the trial record to determine whether appellate counsel failed

to present significant and obvious issues on appeal." *Clark v. Stinson*, 214 F.3d 315, 328 (2d Cir. 2000).

As noted above, Petitioner claims that Attorney Grimmick should have argued on direct appeal

that Attorney Connors was ineffective because he failed to seek dismissal of the first indictment.

Petitioner contends that the first indictment was subject to dismissal because he was arraigned on that

188

indictment without legal representation.

It is well-settled that the Sixth Amendment right to counsel attaches "at the initiation of adversary judicial proceedings," such as arraignment or filing of an indictment. *United States v. Yousef*, 327 F.3d 56, 140 (2d Cir. 2003) (*per curiam*) (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)); *see also United States v. Abdi*, 142 F.3d 566, 569 (2d Cir. 1998). New York courts have likewise held that the right to counsel attaches under state law upon arraignment or the issuance of arrest warrant. *See Kirby v. Senkowski*, 141 F. Supp.2d 383, 398 (S.D.N.Y. 2001); *see also* N.Y. CRIM. PROC. LAW § 180.10 (3).

In the present case, even assuming *arguendo* that Petitioner was arraigned on the first indictment without the benefit of counsel and that Attorney Connors should have sought dismissal of the indictment on that basis, Petitioner has not established an ineffective assistance of appellate counsel claim. Critically, Petitioner has not demonstrated any arguable prejudice arising from Connors's failure to move for dismissal of the first indictment.

First, the initial indictment was ultimately dismissed due to the prosecution's failure to have videotaped grand jury testimony transcribed by a stenographer, as required under Section 190.32(6) of the New York Criminal Procedural Law. Petitioner was re-indicted and he was represented by counsel (Attorney Grimmick) at the arraignment on the second indictment. As such, any arguable error with respect to the arraignment on the first indictment was cured by the dismissal of that indictment on other grounds and by the subsequent arraignment on the second indictment.

Second, under New York law, the denial of a defendant's right to have an attorney present at arraignment or a pre-trial hearing is subject to harmless error analysis. *See People v. Young*, 825 N.Y.S.2d 831, 834 (3d Dep't 2006) ("[W]hile it was error to arraign [defendant] in the absence of

counsel, this error had no impact on the case as a whole."). Petitioner has failed to establish that the absence of an attorney at the arraignment on the first indictment had any material impact (or, indeed, any impact whatever) upon the trial proceedings as a whole. As noted above, Petitioner was represented by counsel at the arraignment on the second indictment, at the *Huntley* hearing, throughout the trial proceedings, and on appeal.

In light of the foregoing, Attorney Grimmick's decision not to raise an ineffective assistance of counsel claim regarding Attorney Connors did not amount to the omission of a significant and obvious issue on appeal. Accordingly, Petitioner has not established that the state courts' rejection of his ineffective assistance of appellate counsel claim was contrary to, or involved an unreasonable application of, the *Strickland* standard established by the United States Supreme Court; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Petitioner is therefore not entitled to habeas relief on this basis.

### g. Arraignment

Petitioner also contends that Attorney Grimmick was himself ineffective for failing to seek dismissal of the first indictment on the grounds that Petitioner was arraigned without having an attorney present. This claim was first presented in Petitioner's CPL § 440.10 motion. The County Court denied the claim, noting that Petitioner had "failed to present the court with any facts showing that he was prejudiced in any way by the fact that he had no lawyer at his arraignment." CPL § 440.10 Decision, at p. 6. As noted above, the Appellate Division rejected all of Petitioner's ineffective assistance of counsel claims as part of the consolidated appeal. *See Dearstyne III*, 761 N.Y.S. 2d at 121.

Petitioner's habeas claim fails for the reasons set forth above with respect to Petitioner's

190

ineffective assistance of appellate counsel claim against Attorney Grimmick, which is based upon the same underlying issue.

### h.    Conflict of Interest

Petitioner argues that Attorney Grimmick was ineffective because he failed to alert Petitioner of a conflict of interest.

Following the death of Attorney Connors, Louis J. Catone of the Rensselaer County Public Defender's Office was appointed as Petitioner's attorney.  The prosecution thereafter moved to disqualify Attorney Catone on the grounds that Catone had also worked at the District Attorney's Office while the proceedings against Petitioner were pending.  The court granted the motion and appointed Attorney Grimmick to represent Petitioner.

Petitioner claims that Attorney Grimmick was employed by the Rensselaer County Public Defender's Office and, thus, the conflict applicable to Attorney Catone should have been imputed to Attorney Grimmick.  Petitioner contends that Attorney Grimmick never disclosed this conflict during the course of the representation or explained how the alleged conflict might impact his performance.

Petitioner first raised this claim in support of his CPL § 440.10 motion.  The County Court denied the claim, noting that it was unsupported by sworn facts contained in an affidavit and on the grounds that Petitioner had not demonstrated that Attorney Grimmick's performance was in any way affected by the alleged conflict of interest. CPL § 440.10 Decision, at p. 7.

As noted above, the Appellate Division rejected all of Petitioner's ineffective assistance of counsel claims as part of the consolidated appeal. *See Dearstyne III*, 761 N.Y.S. 2d at 121.  Thus, the question before this Court is whether this decision was contrary to, or involved an unreasonable application of, the *Strickland* standard established by the United States Supreme Court; or resulted in

191

a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

It is well-settled that "[t]he right to counsel under the Sixth Amendment entails 'a correlative right to representation that is free from conflicts of interest.'" *United States v. Levy*, 25 F.3d 146, 152 (2d Cir.1994) (quoting *Wood v. Georgia*, 450 U.S. 261, 271(1981)); *accord Armienti v. United States*, 313 F.3d 807, 811 (2d Cir. 2002).

"A defendant will have suffered ineffective assistance of counsel in violation of his Sixth Amendment rights if his attorney has a 'per se' conflict, a potential conflict of interest that results in prejudice to the defendant, or an actual conflict of interest that adversely affects the attorney's performance." *Armienti*, 313 F.3d at 811 (citing, *inter alia, Levy*, 25 F.3d at 152).

In the present case, Petitioner's claim fails because he has not established any factual predicate in support thereof.    Petitioner's allegation that Attorney Grimmick was employed by the Rensselaer County Public Defender's Office and working under the direction and control of Attorney Catone is directly contradicted by Attorney Grimmick. In his *Sparman* affirmation, Attorney Grimmick explains that he has "never been employed by or affiliated with the Rensselaer County Public Defender's Office." (Grimmick Affirmation, at ¶ 13).    Petitioner has not offered any evidence to rebut this statement.

In addition and in the alternative, even assuming *arguendo* that Grimmick *had* been associated with the Public Defender's Office, Petitioner has not demonstrated that any such arguable relationship adversely impacted the trial.

"A 'per se' conflict of interest exists only where trial counsel is not authorized to practice law, or is implicated in the very crime for which his client is on trial." *Harris v. Smith*, No. 9:04-CV-1268,

2008 WL 3155200, at *6 (N.D.N.Y. Aug. 4, 2008) (citing *Solina v. United States*, 709 F.2d 160, 164 (2d Cir.1983); *United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir.1984)). No such per se conflict is alleged or indicated in the present case.

Accordingly, Petitioner would have to demonstrate that Attorney Grimmick labored under an actual conflict of interest and that the conflict adversely impacted his performance. *See Armienti v. United States*, 234 F.3d at 824; *United States v. Moree*, 220 F.3d 65, 69 (2d Cir. 2000); *United States v. Berger*, 188 F. Supp.2d 307, 333 (S.D.N.Y. 2002). No such showing has been made..

For example, Petitioner has not established that Attorney Grimmick elected not to pursue an alternative, plausible defense strategy as a result of any relationship that he allegedly had with Attorney Catone and/or the Public Defender's Office. Indeed, as noted above, the evidence strongly indicates that no such relationship ever existed. Although this Court has concluded that Attorney Grimmick's performance was deficient in at least one particular respect, namely the failure to call an expert medical witness regarding the charges involving C.C., there is no indication whatever that the deficiency was in any way related to an alleged relationship with either the Public Defender's Office generally or Attorney Catone specifically.

For the foregoing reasons, this Court recommends finding that Petitioner is not entitled to habeas relief as to this claim.

## I.     Jury Foreperson

Petitioner asserts that Attorney Grimmick unreasonably failed to move to disqualify the jury foreperson. In support of his CPL § 440.10 motion, Petitioner alleged that Boulos Barsoum, the jury foreperson, knew Petitioner and his family through his involvement with little league baseball games. Petitioner claimed that he had advised Attorney Grimmick of this relationship, but that Grimmick

elected not to seek Barsoum's disqualification on the theory that his presence would benefit the defense. Petitioner also asserted that Barsoum lied during jury selection when he claimed not to know Petitioner or his family. Petitioner argued that Attorney Grimmick's conduct in this regard constituted ineffective assistance of counsel. Indeed, if Attorney Grimmick knew that information was being withheld by a juror during voir dire, he would have had an ethical duty to disclose it to the court, whether or not helpful to the defense; however, this ethical breach, if there was one, is not addressable here.

The CPL § 440.10 court rejected this claim, noting that Petitioner himself admitted that Attorney Grimmick had a strategic justification for the decision, namely, that Grimmick believed Barsoum was likely to be sympathetic to Petitioner. CPL § 440.10 Decision, at p. 7. As noted above, the Appellate Division rejected all of Petitioner's ineffective assistance of counsel claims as part of the consolidated appeal. *See Dearstyne III*, 761 N.Y.S. 2d at 121. Thus, the question before this Court is whether the state court decision denying this claim was contrary to, or involved an unreasonable application of, the *Strickland* standard; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

This claim is plainly without merit. First, Petitioner has made no showing that the foreperson was biased against him or that Barsoum's presence on the jury in any way prejudiced Petitioner. Such a showing would be necessary to sustain a claim of ineffective assistance on this basis. *See Rivera v. United States*, No. 98 Civ. 7332, 2003 WL 22118976, at *2 (S.D.N.Y. Sept. 11, 2003). In addition, trial counsel's assessment as to whether a particular juror is likely to be favorable to the defense is a "quintessentially tactical decision" that will not be second-guessed on habeas review. *People v. Cordova-Diaz*, 865 N.Y.S.2d 92, 93 (1st Dep't 2008); *Manning v. Strack*, No. CV 99-3874, 2002 WL

194

31780175, at *8 (E.D.N.Y. Oct. 11, 2002); *see generally Strickland*, 466 U.S. at 690-9 (holding that
the strategic choices of trial counsel "are virtually unchallengable" in habeas corpus proceedings).

This Court accordingly recommends finding that Petitioner is not entitled to habeas relief on
this basis.

### j. Alibi Defense

Petitioner restates his claim that Attorney Grimmick was ineffective because he failed to pursue
an alibi defense. For the reasons discussed above in Section III.O.1.3, the Court recommends
concluding that Petitioner is not entitled to habeas relief as to this claim.

### k. Sidebar Conferences

Petitioner argues that Attorney Grimmick was ineffective because he failed to have Petitioner
present at sidebar conferences, during which Petitioner allegedly could have presented information
"essential to the defense" of his case to the Court.

In support of his CPL § 440.10 motion, Petitioner discussed two examples of sidebars where
he allegedly could have provided material information: (1) at a sidebar during jury selection, during
which Petitioner could have advised the court of the fact that the jury foreperson was acquainted with
Petitioner's family and (2) at a sidebar during trial relating to the proposed testimony of T.O.'s sister,
S.O., regarding the events of June 12, 1987, at which Petitioner says he could have told the court that
S.O.'s testimony was false because he had an alibi for that entire day.

The County Court rejected this claim on two grounds. First, the court found that it could have
been raised on direct appeal and therefore was subject to denial under CPL § 440.10 (2)(c), which
provides for the denial of claims that could reasonably have been raised on direct appeal, but were not.
Second, the court noted that, even if the claim was not subject to denial on that basis, it would be

195

rejected because Petitioner lacked any recognized right to be present at the sidebar conferences and because "[t]here is no reason to believe that [Petitioner] was not able to ascertain the nature of the sidebar conference and tell his attorney of his alibi, and his attorney could have taken any steps necessary in relation to the information given him . . . ." CPL § 440.10 Decision, at p. 11.

As noted previously, the Appellate Division rejected all of Petitioner's ineffective assistance of counsel claims as part of the consolidated appeal. *See Dearstyne III*, 761 N.Y.S. 2d at 121. This claim is therefore subject to review under the AEDPA standard.

In *People v. Antommarchi*, 80 N.Y.2d 247, 590 N.Y.S.2d 33, 35, 604 N.E.2d 95 (1992), the New York Court of Appeals held that a defendant is entitled to be present at sidebar discussions when the merits of the case are discussed or where "prospective jurors' backgrounds and their ability to weigh the evidence objectively" are discussed. *Id.* at 250, 590 N.Y.S.2d 33, 604 N.E.2d 95.

However, federal standards regarding a defendant's right to be present at a sidebar during jury voir dire are "'less stringent'" than New York's standards. *Ellis v. Phillips*, No. 04Civ.7988(SHS)(AJP), 2005 WL 1637826, at *13 (S.D.N.Y. July 13, 2005) (quoting *McKnight v. Superintendent Albauch*, No. 97-CV-7415 WK, 2000 WL 1072351, at *6 (S.D.N.Y. Aug. 2, 2000)) (quoting *Nichols v. Kelly*, 923 F. Supp. 420, 425 (W.D.N.Y. 1996)) and citing, *inter alia, Gaiter v. Lord*, 917 F. Supp. 145, 152 (E.D.N.Y. 1996) ("Indeed, the Federal Constitution generally does not require a defendant's presence at sidebar conferences."); *United States v. Feliciano*, 223 F.3d 102, 111 (2d Cir. 2000) (in which the Second Circuit noted that it had found no case "in which an appellate court has found a structural defect where a defendant was present throughout but unable to hear a circumscribed portion of voir dire, and whose counsel was allowed to consult with him about the limited questioning outside his hearing").

Courts in this Circuit have noted that there is no clear Supreme Court precedent supporting a claim that absence from a sidebar conference during voir dire violates the Sixth Amendment. *See, e.g.,* Perez v. Greiner, 00 Civ. 5504, 2005 WL 613183, at *5-6 (S.D.N.Y. Mar. 14, 2005). Others have declined to find that a such claim is even cognizable on habeas review. *See, e.g., Diaz v. Herbert,* 317 F. Supp.2d 462, 473 (S.D.N.Y.2004) ("[E]ven if [petitioner's] rights under *Antommarchi* were violated, it does not rise to the level of a federal constitutional violation. Therefore, any alleged violation of these rights is not cognizable on habeas review."); *Johnson v. McGinnis,* 99 Civ. 11231, 2001 WL 740727, at *3 (S.D.N.Y. June 29, 2001) ("The right to be present at sidebar during voir dire derives from New York state statutory law. Since a federal court on habeas review is limited to considering only violations of the federal Constitution or federal statutory law, 1 am procedurally barred from considering this claim.").

In the present case, Petitioner's claim fails for the following reasons. Petitioner has not demonstrated any arguable prejudice arising from the fact that he was not present at the two sidebar conferences in question. As noted above, Petitioner has not demonstrated that the jury foreperson was biased against him. Accordingly, even if Petitioner was present at the sidebar and even assuming that the foreperson was excused from the jury based upon the information provided by Petitioner, there is no reasonable likelihood that the ultimate outcome of the trial would have been any different. Therefore, even assuming *arguendo* that Attorney Grimmick was ineffective for failing to have Petitioner present at the sidebar, any such alleged ineffectiveness did not materially prejudice Petitioner.

With regard to the sidebar conference concerning S.O.'s testimony, as discussed *supra* in Section III.E.4, Attorney Grimmick objected strenuously to that testimony and argued that the

197

prosecution should be precluded from offering it. Grimmick's objections were overruled and S.O. was permitted to testify. Petitioner's claim that he had an alibi that contradicted S.O.'s testimony, even if presented to the trial court at the sidebar, would not have resulted in the preclusion of the testimony.

In other words, Petitioner's alibi allegation had no bearing on the admissibility of S.O.'s testimony. As such, even if one assumes that Grimmick should have had Petitioner present at the sidebar, Petitioner was not prejudiced by the alleged failure and therefore cannot establish an ineffective assistance claim on this basis. *Cf. Pujols v. Greiner*, No. 98 CIV 0373, 2001 WL 477046, at *5 (S.D.N.Y. May 4, 2001) (rejecting claim that petitioner's exclusion from sidebar conference violated his constitutional rights because petitioner had not "proffered any evidence suggesting that his presence during this sidebar conference would have had any effect on the course of the trial").

### l.      False Testimony

Petitioner alleges that Attorney Grimmick was ineffective because he did not correct "false testimony" presented at trial. This claim restates the claim raised by Petitioner in Ground Twelve, which was discussed above in Section III.L.

### m.      Remittal Hearing

As discussed above in Section III.A, on direct appeal, the Appellate Division remanded Petitioner's case for a hearing on his speedy trial claim on the grounds that "the record [did] not provide an adequate basis to determine if, in view of all of the circumstances, the delay . . . was unreasonable." *Dearstyne I*, 626 N.Y.S.2d at 881.

After conducting an evidentiary hearing on remand, Judge McGrath, made detailed findings of fact and determined that Petitioner's statutory and speedy trial rights had not been violated. The Appellate Division affirmed Judge McGrath. *Dearstyne II*, 646 N.Y.S.2d at 1003-1004.

The Appellate Division noted that CPL § 30.30(1)(a) "requires dismissal of a felony indictment

where the People are not ready for trial within six months of the commencement of a criminal action."

*Id.* at 1003. "Compliance with this statute is generally determined by computing the time elapsed

between the filing of the first accusatory instrument and the People's declaration of readiness,

subtracting any periods of delay that are excludable under the statute and then adding to the result any

postreadiness periods of delay that are actually attributable to the People and are ineligible for an

exclusion." *Id.*

Applying the applicable state law rules with respect to the T.O. charges, the Appellate Division

held that "the speedy trial time clock began to run on June 19, 1987." *Id.* As to the C.C. charges, the

court found that the clock started running on November 18, 1987. *Id.* The Appellate Division further

noted that "[w]hen the People announced their readiness for trial at defendant's arraignment on

November 24, 1987, the time elapsed from the aforementioned dates was 158 days and six days,

respectively." *Id.*

As to the 158-day period with respect to T.O., the Appellate Division "agree[d] with County

Court that the 10-day period the court awaited the results of a competency examination and the 66-day

period during which plea negotiations were being carried out with the consent of defendant's counsel

are excludable, leaving an 82-day period of prereadiness delay chargeable to the People relative to the

charges against [T.O.] contained in the original felony complaint." *Id.* Regarding the C.C. charges, the

Appellate Division found that no time could be excluded from the six-day period between indictment

and arraignment. *Id.*

Accordingly, because the prereadiness delay of the prosecution with regard to both victims "did

not exceed the statutory six-month period, the issue of whether [Petitioner's] statutory right to a speedy

199

trial was violated turn[ed] on whether any postreadiness delay is chargeable to the People." *Id.*

The Appellate Division concluded that the prosecution was responsible for thirty-six (36) days of postreadiness delay, leaving a total of 118 days of chargeable delay relative to the T.O. charges and forty-two (42) days with respect to the C.C. charges. "Having established that the period of delay did not exceed six months," the Appellate Division ruled, the "County Court's denial of defendant's statutory speedy trial motion was proper." *Id.*

In his CPL § 440.10 motion, Petitioner argued that Attorney Grimmick provided ineffective assistance of counsel at the hearing on remand because he failed to adequately rebut the prosecution's claim that sixty-six (66) days of delay were the result of plea bargaining. Petitioner denies that any such plea bargaining occurred and asserts that Grimmick should have called him to testify to that effect. In addition, Petitioner contends that Grimmick should have called Petitioner's mother, father, and unspecified "other witnesses," who would likewise have testified that they were unaware that any plea negotiations occurred.

The County Court rejected this argument, noting that it was based primarily upon Petitioner's self-serving claim that no plea discussions ever occurred. CPL § 440.10 Decision, at p. 13-14. As stated above, the Appellate Division rejected all of Petitioner's ineffective assistance of counsel claims as part of the consolidated appeal. *See Dearstyne III*, 761 N.Y.S. 2d at 121. This claim is therefore subject to AEDPA review to determine whether the Appellate Division's decision was contrary to, or involved an unreasonable application of the *Strickland* standard; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

The state courts' factual finding that plea bargaining occurred over a period of sixty-six days

200

is entitled to a presumption of correctness. Indeed, AEDPA requires that in habeas proceedings "a determination of a factual issue made by a State court shall be presumed to be correct [and][t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005).

In his *Sparman* affirmation, Attorney Grimmick explains that although he does not recall the specific number of days involved, he does "recall engaging in plea discussions with the prosecutor." Grimmick Affirmation, at ¶ 12. Further, Grimmick recalled "an offer, at one point, for petitioner to plead guilty in exchange for a sentence of two to six years imprisonment." *Id.*

This Court finds that Petitioner has failed to establish via clear and convincing evidence that the state courts' finding with respect to the plea negotiations was erroneous. The conclusion that such discussions occurred is supported by Attorney Grimmick's statement, as well as common sense and common practice. Plea discussions occur in nearly every case and one would certainly have expected such discussions to occur, where, as here, the prosecution presumably would have (I) wished to avoid subjecting the very young victims to the ordeal of trial testimony, and (ii) been concerned about the ability of those victims to remember critical details, given their tender years at the time of the alleged criminal acts.

In addition and in the alternative, Petitioner has failed to establish any reasonable likelihood that the outcome of the proceedings would have been different if Attorney Grimmick had called additional witnesses at the remand hearing. The testimony of Petitioner's family and unspecified "other witnesses" would not have been very probative as those individuals would not necessarily have been present for or privy to any or all of the plea discussions. Any testimony from Petitioner would likely have been discounted as self-serving and, as noted above, contrary to common sense, common practice,

and the recollection of counsel.

Accordingly, this Court finds that Petitioner has not established that the Appellate Division's decision in this regard was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. This Court recommends concluding that Petitioner is thus not entitled to habeas relief on this basis.

### n.   Ineffective Assistance Claims on Appeal

Petitioner alleges that Attorney Grimmick "was ineffective in failing to raise his [own] ineffectiveness on appeal." This Court declines to consider Petitioner's conclusory allegations of ineffectiveness. Even *pro se* litigants are not permitted to offer bald assertions in support of their claims and leave the court to scour the record in search of facts and law.[37] "Self-serving conclusory allegations . . . are insufficient to establish ineffective assistance of counsel." *Dedushaj v. Graham*, No. 07 Civ. 5401, 2008 WL 4858242, at *2 (S.D.N.Y. Nov. 7, 2008); *see also Vasquez v. United States*, 96 CIV 2104, 1997 WL 148812, at *1-2 (S.D.N.Y. Mar. 28, 1997) ("[P]etitioner's allegations with regard to alleged counsel errors in pre-trial preparation and investigation and trial advocacy are 'vague, conclusory, and unsupported by citation to the record, any affidavit, or any other source,' and, accordingly, . . . '[t]he vague and unsubstantiated nature of the claims' defeated petitioner's claim of ineffective assistance of counsel. . . ."); *Parnes v. United States*, 94 CIV 2104, 1995 WL 758805, at *3 (S.D.N.Y. Dec. 21, 1995) ("[V]ague allegations do not permit the Court to conclude that the alleged errors of Petitioner's counsel fell below 'prevailing professional norms'. . . Accordingly, the Court

---

[37]     Moreover, as noted above, although Petitioner initially proceeded *pro se*, he subsequently obtained counsel, who elected to supplement and augment some, but not all of the claims.

rejects Petitioner's claim that he received ineffective assistance of counsel."); *Matura v. United States*, 875 F. Supp. at 237-38 (mere conclusory allegations that counsel was ineffective fails "to establish that his counsel's performance was deficient [and] . . . fails to overcome the presumption [under *Strickland*] that counsel acted reasonably. . . ."); *Hartley v. Senkowski*, CV-90-0395, 1992 WL 58766, at \*2 (E.D.N.Y. Mar. 18, 1992) ("In light of this demanding [*Strickland*] standard, petitioner's vague and conclusory allegations that counsel did not prepare for trial or object to errors carry very little weight.").

### o.   "Extraneous" Issues on Appeal

Petitioner claims that Attorney Grimmick failed to raise unspecified "extraneous issues" on appeal. In his *pro se* application for writ of error *coram nobis*, Petitioner identified the "extraneous issues" as (I) Grimmick's failure to assert a federal speedy trial claim, (ii) Attorney Connors's failure to move for dismissal of the indictment on speedy trial grounds; and (iii) Grimmick's failure to call additional witnesses at the remand hearing. Petitioner contends that Attorney Grimmick was ineffective for failing to raise these claims on appeal.

This claim essentially restates arguments raised previously in the Petition regarding the performance and decisions made by Attorney Grimmick. The claim should be denied for the previously discussed reasons, namely that Attorney Grimmick did assert a federal speedy trial claim, and because Petitioner has failed to establish any reasonable likelihood that the outcome of the proceedings would have been different if Grimmick had raised the claims that Petitioner alleges he should have raised.

### p.   Federal Laws

Petitioner asserts an ineffective assistance of counsel claim based upon the bald allegation that

Attorney Grimmick's "failure to utilize Federal laws in regards to some of the issues he raised on appeal, denied Petitioner his Right to the Effective Assistance of Counsel." This conclusory claim should be denied for the reasons set forth above in Section III.O.1.n.

### q.    Leave to Appeal Application

Petitioner also contends that Attorney Grimmick's "Leave to Appeal Application failed to alert the Court of Appeals of the necessary requirements for purposes of Federal Exhaustion." This conclusory claim should be denied for the reasons set forth above in Section III.O.1.n.

### 2.    Claims Involving Attorney Korkosz

Following the direct appeal of his convictions, Petitioner filed a *pro se* motion pursuant to CPL § 440 and sought the appointment of an attorney to assist with post-conviction pleadings. The County Court appointed Attorney Frederick Korkosz to assist Petitioner. It appears that Attorney Korkosz filed a reply in further support of Petitioner's motion. In addition, Korkosz assisted Petitioner with various other post-conviction proceedings, including his County Law § 722-c motion requesting the expenditure of funds for the retention of an expert.

### a.    Verification

As has been discussed at length above, the CPL § 440.10 court denied several of Petitioner's claims because those claims were not supported by sworn factual allegations. In his *pro se* application for a writ of error *coram nobis*, Petitioner claimed that Attorney Korkosz's failure to attach a verification to the CPL § 440.10 motion resulted in a denial of many of Petitioner's claims and constituted ineffective assistance of counsel. The Appellate Division denied the writ on January 16, 2004. The Court of Appeals denied Petitioner's application for leave to appeal without opinion. *People v. Dearstyne*, 814 N.E.2d 469 (2004).

204

Petitioner asserts that he is entitled to habeas relief based upon the ineffective assistance of counsel provided by Attorney Korkosz. However, habeas relief is available for violations of federal law leading to a criminal conviction in state court or on direct appeal from a conviction, but not for violations that occur on collateral review. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings.... Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings. . . ."); *accord Murden v. Artuz*, 497 F.3d 178, 194 (2d Cir. 2007) ("There is no constitutional right, however, to an attorney 'in state post-conviction proceedings' where such proceedings are not the first appeal as of right. As a consequence, 'a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.'").

The rationale behind this is that a claim regarding an infirmity in a state post-conviction proceeding "is collateral to appellant's conviction and detention, and is therefore not cognizable in a 28 U.S.C. § 2254 petition." *Williams-Bey v. Trickey*, 894 F.2d 314, 317 (8th Cir.), *cert. denied*, 495 U.S. 936 (1990).

Accordingly, this Court finds that Petitioner is not entitled to habeas relief based upon this claim.

      **b.**    **Experts**

Petitioner also offers the summary assertion that Attorney Korkosz's alleged "failure to contact the experts in this matter and other agencies, as well as his failure to gather pertinent information" deprived him of the effective assistance of counsel. This claim should be denied for the reasons set forth above in Section 2 (a) of this section, namely, that Petitioner cannot raise an ineffective assistance claim relative to post-conviction proceedings. In addition and in the alternative, this conclusory claim

205

should be denied for the reasons discussed above in Section III.O.1.n.

### 3.   Claims Involving Attorney Bauer

As noted above with respect to Ground Four, Attorney Kevin Bauer represented Petitioner in connection with the consolidated appeal.

#### a.   Recusal of Appellate Justice

This claim restates the argument raised in Ground Four. This claim should be denied for the reasons discussed above in Section III.D. In addition, because Attorney Bauer represented Petitioner in connection with a post-conviction, discretionary appeal, this claim should be denied for the reasons set forth in Section III.O.2.

#### b.   Brief and Argument

Petitioner offers the summary assertion that Attorney Bauer's ineffectiveness is "borne out by his failure in the preparation and argument of Petitioner's briefs." This claim should be denied for the reasons set forth above in Section III.O.2, namely, that Petitioner cannot raise an ineffective assistance claim relative to post-conviction proceedings. In addition and in the alternative, this conclusory claim should be denied for the reasons discussed above in Section III.O.1.n.

#### c.   Application for Leave to Appeal

Petitioner alleges that Bauer's application for leave to appeal to the Court of Appeals "failed to alert the Court of mandatory legal criteria for the purposes of Federal Exhaustion." This claim should be denied for the reasons set forth above in Section III.O.2, namely, that Petitioner cannot raise an ineffective assistance claim relative to post-conviction proceedings. In addition and in the alternative, this conclusory claim is subject to denial for the reasons discussed above in Section III.O.1.n.

**P.** **Ground Sixteen – Reservation of Right to Amend**

Petitioner purports to "reserve" his right to amend the Petition to assert additional grounds for relief. This is not a proper ground for granting a habeas petition, as it does not allege any constitutional infirmity his Petitioner's conviction or sentence. Therefore, it should be denied.

207

## IV. CONCLUSION

At this point in time I believe it is important to consider the possibility that the crimes for which Petitioner has been convicted may not have actually occurred. The Court is not suggesting that the families of the alleged child victims or the children themselves acted with any improper motive or acted unreasonably in the circumstances. The families only reported what they observed to law enforcement agencies and the state courts. However, the child complainants were of such a tender age that a question must be raised as to whether they could have articulated in detail the nature of the crimes committed, untainted by their contact with the numerous law enforcement, prosecutorial personnel and parents. Second, it must borne in mind that the alleged crimes occurred in 1987, and Dearstyne was convicted in 1991–placing the incidents during "the late-1980's and early-1990's, a period in which allegations of outrageously bizarre and often ritualistic child abuse spread like wildfire across the country and garnered world-wide media attention[,]" and were sensationalized to the point that a national perception was generated that these crimes were widespread. *Friedman v. Rehal*, 618 F.3d 142, 155 (2d Cir. 2010 (citing Susan Bandes, *The Lessons of* Capturing the Friedmans: *Moral Panic, Institutional Denial and Due Process*, 3 LAW CULTURE & HUMAN. 293, 294 (2007); *Devil Worship: Exposing Satan's Underground*, Geraldo Rivera (NBC television broadcast Oct. 28, 1988)). "Vast moral panic fueled a series of highly-questionable child sex abuse prosecutions[,]" *id.* (citing, *inter alia*, Samuel P. Gross, *Exonerations in the United States 1989 through 2003*, 95 J. CRIM. L. & CRIMINOLOGY 523, 539-40 (2005); footnote omitted). The Second Circuit, summarizing the literature in *Friedman*, noted that "at least seventy-two individuals were convicted in nearly a dozen major child sex abuse and satanic ritual prosecutions between 1984 and 1995, although almost all the convictions have since been reversed." *Id.* (citing Gross, 95 J. CRIM. L. & CRIMINOLOGY, at 540 & n. 40).

208

Given that the alleged crimes here occurred during a period of national, widespread "moral panic," and that the complainants were so young at the time, one must consider the possibility that the allegations were the product of "confabulation"[38] and "hypersuggestibility"[39] – in other words, that the adults who came in contact with these children may have contaminated their recollections. It bears emphasizing that no effort was made to discover, or subsequently question, the prosecution's nearly five-year period of being in close contact with the complainants. After what must have been numerous conversations with parents, members of the district attorney's office, and law enforcement officials, their clear recollections of what allegedly happened are somewhat dubious. *See Friedman*, 618 F.3d at 156 ("[M]any highly-publicized and large-scale investigations into alleged child abuse conspiracies were also accompanied by a variety of interviewing techniques designed to assist children in recalling abuse-techniques which an extensive body of research suggests can induce false reports.") (citing Thomas D. Lyon, Applying Suggestibility Research to the Real World: The Case of Repeated Questions, 65 Law & Contemp. Probs. 97, 106 (2002)). A number of "[s]cholars have suggested that

---

[38] "Confabulation is 'unconscious filling in of gaps in memory with fabricated facts and experiences . . . . It differs from lying in that the patient has no intention to deceive and believes the fabricated memories to be real.'" *George v. Sec. of HHS*, No. CV-F-92-5098-DLB., 1993 WL 733019, at *5 (E.D. Cal. Mar. 31,1993) (quoting *Dorland's Illustrated Medical Dictionary*, 27th Edition, at 372) (ellipsis in original)).

[39] "In those studies that used an unrelated control group, even 3-year olds did quite well when they were not interviewed suggestively, often recalling 90% accurately. *Thus, when the adults who have access to preschool children do not attempt to usurp their memories to repeated suggestions over long intervals, even very young children to very well.* The suggestibility of any particular child is dependent on a host of cognitive and social factors. . ." Stephen J. Ceci & Mary Lyn Creatteau Huffman, *How Suggestible are Preschool Children? Cognitive and Social Factors*, 36 J. Amer. Acad. Child & Adolescent Psychiatry 948-58 (1997) (emphasis in original) (cited by Evidence in Child Abuse and Neglect Cases: Cumulative Supplement, by John E. B. Myers) (cited in *Day Care Sex Abuse Hysteria*, http://en.wikipedia.org/wiki/Day_care_sex_abuse_hysteria#cite_note-Peggy-8 (last accessed February 21, 2011); *see also Eubanks v. Warden, La. State Penitentiary*, 228 F. Supp. 888 (D. La. 1964) ("Dr. Holbrooke . . . concluded that the defendant had a mental age of between six and seven years, and that he could only tell rights from wrong as a child of six or seven years of age. It was his further conclusion that this defendant was 'readily suggestible, hypersuggestible,' and that he could be led into doing almost anything. He stated that this defendant would probably do just about as he was told to do. . .").

209

each interviewing technique can induce false reports on its own" with a number of studies reporting that "children often change their answer when asked the same question more than once during an interview, either because they assume that the first answer was incorrect or because they would like to please the adult interviewer." *Id.* (citation omitted). In addition to the potential dangers of confabulation and hypersuggestibility given the complainants' ages and national tenor at the time the crimes were reported and investigated, there are other concerning factors in Dearstyne's case. As discussed above, one treating physician purposefully, and inexplicably, destroyed physical evidence after his examination of T.O. Dearstyne's confession was obtained under highly suspect circumstances involving deception by law enforcement officials and coercive interrogation tactics. It is well known that accused individuals often confess to crimes they have not committed, as the result of improper police tactics as has been found here. In addition, the timing of Petitioner's indictment could not have been worse, as alleged sexual abuse cases proliferated in the 80's and early 90's in an atmosphere of widespread hysteria. *See Friedman*, 618 F.3d at 155.

Based upon the foregoing concerns, and given that the Petitioner has already served approximately 20 years of his 10- to 30-year indeterminate sentence, it is respectfully recommended that the District Court consider a bail hearing during the pendency of what might be protracted litigation regarding this Report and Recommendation.

210

## V. RECOMMENDATIONS

For the foregoing reasons, it is respectfully recommended that Frank W. Dearstyne's Amended Petition for habeas corpus relief be GRANTED.

Specifically, it is recommended that the State of New York be directed to immediately vacate Petitioner's convictions of Attempted Rape in the First Degree, in violation of P.L. §110 and §130.35, and of Endangering the Welfare of a Child, in violation of PL § 260.20, with respect to the alleged victim identified as "T.O." and the convictions of Aggravated Sexual Abuse in the First Degree, in violation of PL § 130.70, and Endangering the Welfare of a Child, in violation of PL § 260.20, with respect to C.C.

It is further recommended that the State of New York be directed to release Petitioner within thirty (30) days from the entry of an Order adopting or approving this Report and Recommendation, "unless New York State has, by that point, taken concrete and substantial steps expeditiously to retry" Petitioner with respect to the charges in question. *Pavel v. Hollins*, 261 F.3d 210, 229 (2d Cir. 2001). It is recommended that the balance of the claims raised in the Amended Petition be DENIED.

In addition, the Court recommends that a certificate of appealability issue on the petitioner's prosecutorial misconduct claim. However, because the remainder of Petitioner's claims are without merit, I recommend that, as to those claims, a Certificate of Appealability not issue.

Finally, it is respectfully recommended that the District Court consider a bail hearing during the pendency of what might be protracted litigation regarding this Report and Recommendation, based upon the foregoing concerns discussed in the Conclusion and in light of the fact that Petitioner has already served approximately 20 years of his 10- to 30-year indeterminate sentence.

211

Respectfully submitted,

Victor E. Bianchini
United States Magistrate Judge

DATED:      March 3, 2011
            Syracuse, New York

## V. ORDERS

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as NDNY Local Rule 72.1(c).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** *Thomas v. Arn*, 474 U.S. 140 (1985); *F.D.I.C. v. Hillcrest Associates*, 66 F.3d 566 (2d. Cir. 1995); *Wesolak v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); *see also* 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material *which could have been, but were not*, presented to the Magistrate Judge in the first instance. *See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

SO ORDERED.

Dated:       March 3, 2011

             Syracuse, New York.

Victor E. Bianchini
United States Magistrate Judge

213

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**FRANK W. DEARSTYNE,**

                              **Petitioner,**

                 **v.**                                    **9:04-CV-741**
                                                          **(FJS/VEB)**
**WILLIAM MAZZUCA, Superintendent,**
**Fishkill Correctional Facility,**

                              **Respondent.**

---

**APPEARANCES**                         **OF COUNSEL**

**KELLEY, DRYE & WARREN LLP**          **JAMES V. O'GARA, ESQ.**
101 Park Avenue
New York, New York 10178
Attorneys for Petitioner

**OFFICE OF THE FEDERAL**              **LISA A. PEEBLES, FPD**
**PUBLIC DEFENDER**
The Clinton Exchange, 3rd Floor
4 Clinton Street
Syracuse, New York 13202
Attorneys for Petitioner

**OFFICE OF THE NEW YORK**             **PAUL B. LYONS, AAG**
**STATE ATTORNEY GENERAL**             **ALYSON J. GILL, AAG**
120 Broadway
New York, New York 10271
Attorneys for Respondent

**SCULLIN, Senior Judge**

### ORDER

Petitioner was convicted in a New York State court of attempted rape in the first degree,

aggravated sexual abuse in the first degree, and two counts of endangering the welfare of a child.

Petitioner contended that his conviction was imposed in violation of his constitutional rights and,

therefore, should be vacated. Petitioner filed his petition for a writ of *habeas corpus* pursuant to 28

U.S.C. § 2254, in which he argued that there were multiple errors that warranted habeas relief. In an

extensive, and very thorough, Report and Recommendation, Magistrate Judge Bianchini

recommended, among other things, that this Court

>    (1) direct the State of New York to vacate immediately Petitioner's
>    convictions of Attempted Rape in the First Degree, in violation of
>    New York Penal Law §§ 110 and 130.35 and of Endangering the
>    Welfare of a Child, in violation of New York Penal Law § 260.20,
>    with respect to the alleged victim identified as "T.O."
>
>    (2) direct the State of New York to vacate immediately Petitioner's
>    convictions of Aggravated Sexual Abuse in the First Degree, in
>    violation of New York Penal Law § 130.70, and of Endangering the
>    Welfare of a Child, in violation of New York Penal Law § 260.20,
>    with respect to "C.C."
>
>    (3) direct the State of New York to release Petitioner within thirty
>    days from the entry of an Order adopting or approving this Report and
>    Recommendation "unless New York State had, by that point, taken
>    concrete and substantial steps expeditiously to retry" Petitioner with
>    respect to the charges in question
>
>    (4) deny the balance of the claims that Petitioner raised in his
>    Amended Petition
>
>    (5) issue a Certificate of Appealability regarding the issue of the
>    Petitioner's prosecutorial misconduct claim and not issue a Certificate
>    of Appealability regarding his other claims

Both Petitioner and Respondent filed objections to Magistrate Judge Bianchini's

recommendations.

After reviewing a magistrate judge's recommendations, the district court may accept, reject

or modify those recommendations. *See* 28 U.S.C. § 636(b)(1). The court reviews *de novo* those

portions of the magistrate judge's recommendations to which a party objects. *See Pizzaro v.*

-2-

*Bartlett*, 776 F. Supp. 815, 817 (S.D.N.Y. 1991). ""'If, however, the party makes only conclusory or

general objections, . . . the Court reviews the Report and Recommendation only for clear error."''"

*Salmini v. Astrue*, No. 3:06-CV-458, 2009 WL 179741, *1 (N.D.N.Y. June 23, 2009) (quoting

[*Farid v. Bouey*, 554 F. Supp. 2d 301] at 306 [(N.D.N.Y. 2008)] (quoting *McAllan v. Von Essen*,

517 F. Supp. 2d 672, 679 (S.D.N.Y. 2007))). Finally, even if the parties file no objections, the court

must ensure that the face of the record contains no clear error. *See Wilds v. United Parcel Serv.,*

*Inc.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003) (quotation omitted).

Section 2254 of Title 28 of the United States Code, as amended by the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"), governs federal *habeas corpus* review of a state-

court conviction. Under the AEDPA, federal courts must give substantial deference to a state-court

determination that has adjudicated a federal constitutional claim on the merits. *See* 28 U.S.C.

§ 2254(d); *Sellan v. Kuhlman*, 261 F.3d 303, 309-10 (2d Cir. 2001).

Furthermore, the AEDPA requires that, where a state court has adjudicated the merits of a

Petitioner's federal claim, a court may not grant *habeas corpus* relief unless the state court's

adjudication

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d)(1), (2).

A state-court decision is contrary to clearly established federal law "if the state court arrives

at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state

-3-

court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state-court decision involves "an unreasonable application of" Supreme Court case law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

Under these standards, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "Objectively unreasonable," however, is different from "clear error." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness" (citations omitted)). Thus, federal habeas relief is precluded "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86 (2011) (quotation omitted); *see also White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (stating that a "'state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement'" (quotation omitted)). "This is a 'difficult to meet,' . . ., and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt,' . . . ." *Cullen v. Pinholster*, 563 U.S. 170, ___, 131 S. Ct. at 1398 (2011) (internal citations omitted).

In this case, Petitioner asserted sixteen grounds in support of his request for *habeas* relief, each of which Magistrate Judge Bianchini discussed in great detail. The Court has conducted a *de*

-4-

*novo* review of each of Magistrate Judge Bianchini's recommendations in light of the parties'

objections and the applicable law and concludes that, although the Court may disagree with some of

the state-court decisions, Petitioner has not demonstrated that any of those decisions were contrary

to clearly established Federal law or objectively unreasonable.  Accordingly, having completed its ·

review of the entire record in this matter, as well as the applicable law, the Court hereby

· **ORDERS** that Magistrate Judge Bianchini's Report and Recommendation, *see* Dkt. No. 90,

is **ACCEPTED in part and REJECTED in part**; and the Court further

**ORDERS** that Petitioner's amended petition is **DENIED and DISMISSED in its entirety**;

and the Court further

**ORDERS** that a Certificate of Appealability will **not** issue with regard to any of the grounds

that Petitioner raised in his amended petition because Petitioner has not "made a substantial showing

of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment and close this case.

**IT IS SO ORDERED.**

Dated: August 20, 2015
       Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge

-5-

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x

FRANK W. DEARSTYNE,                        :

                                    **9:04-CV-741 (FJS/VEB)**

         Petitioner,            :

    - against -               :         **NOTICE OF APPEAL**

WILLIAM MAZZUCA, Superintendent   :
**Fishkill Correctional Facility,**

                        :

         Respondent.
------------------------------------------------------------------x

      **NOTICE IS HEREBY GIVEN** that Frank W. Dearstyne, the above-named Petitioner in

the above-named case, hereby appeals to the United States Court of Appeals for the Second Circuit from

the final Order and Judgment entered in this civil action on the 21st day of August, 2015.

Dated: New York, New York
      September 17, 2015

                           KELLEY DRYE & WARREN LLP

                           By: _____

                                James V. O'Gara
                                Pro Bono Counsel
                         101 Park Avenue
                         New York, New York 10178
                         (212) 808-7800

                            -and-

                         Lisa A Peebles, FPD
                         James Egan
                         OFFICE OF THE FEDERAL PUBLIC
                         DEFENDER
                         The Clinton Exchange, 3rd Floor
                         4 Clinton Street
                         Syracuse, New York 13202

                         Attorneys for Petitioner
                         Frank W. Dearstyne

To: LAWRENCE K. BAERMAN, Clerk
United States District Court
Northern District of New York
James T. Foley Courthouse
Suite 509
445 Broadway
Albany, NY 12207
518-257-1800

PAUL B. LYONS, AAG
ALYSON J. GILL, AAG
OFFICE OF THE NEW YORK
STATE ATTORNEY GENERAL
120 Broadway
New York, New York 10271
Attorneys for Respondent