# 15-2950-pr

## United States Court of Appeals

*for the*

## Second Circuit

───────────◆───────────

FRANK W. DEARSTYNE,

*Petitioner-Appellant,*

– v. –

WILLIAM MAZZUCA, Superintendent, Fishkill Correctional Facility,

*Respondent-Appellee.*

───────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PETITIONER-APPELLANT

JAMES V. O'GARA, III
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
(212) 808-7800

– and –

LISA A. PEEBLES
OFFICE OF THE FEDERAL PUBLIC DEFENDER
Four Clinton Square, 3rd Floor
Syracuse, New York 13202
(315) 701-0080

*Attorneys for Petitioner-Appellant*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1

JURISDICTION.....................................................................................1

STATEMENT OF ISSUES ....................................................................1

PROCEDURAL HISTORY.....................................................................2

STATEMENT OF FACTS .....................................................................5

I.     INTRODUCTION ........................................................................5

II.    DEARSTYNE'S STATEMENT ...................................................6

III.   DEARSTYNE'S INVOLUNTARY STATEMENT AND THE
       HUNTLEY HEARING ..............................................................13

IV.    DEARSTYNE'S TRIAL .............................................................17

SUMMARY OF ARGUMENT ..............................................................19

ARGUMENT .........................................................................................20

I.     PETITIONER WAS DENIED DUE PROCESS AND HIS RIGHT
       AGAINST SELF-INCRIMINATION WHEN THE STATE COURT
       FAILED TO SUPPRESS HIS INVOLUNTARY STATEMENT ..............21

       A.     THE STATE COURT'S REJECTION OF DEARSTYNE'S
              JACKSON V. DENNO CLAIM WAS BOTH CONTRARY
              TO, AND AN UNREASONABLE APPLICATION OF,
              CLEARLY ESTABLISHED SUPREME COURT LAW ................23

       B.     THE STATE COURT'S DETERMINATION THAT
              PETITIONER'S STATEMENT DID NOT RESULT FROM
              INTENTIONAL ISOLATION DESIGNED TO OVERBEAR
              HIS WILL WAS AN UNREASONABLE DETERMINATION
              OF THE FACTS ...............................................................33

II.    PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT
       TO EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR
       TRIAL..............................................................................37

       A.     TRIAL COUNSEL ACTED IN AN OBJECTIVELY
              UNREASONABLE AND PREJUDICIAL MANNER WHEN
              HE FAILED TO CONSULT WITH OR CALL MEDICAL
              EXPERT WITNESSES ...................................................41

1.     The Failure to Even Consult With or Interview Potential Medical Experts Has Been Found to be Unreasonable ...........41

2.     The Failure to Call or Interview Any Medical Experts Was Not a "Trial Strategy" .......................................................45

3.     Had Grimmick Consulted With or Presented Testimony of a Medical Expert, the Outcome of the Trial Would Have Been Different .................................................................49

B.     TRIAL COUNSEL ACTED IN AN OBJECTIVELY UNREASONABLE AND PREJUDICIAL MANNER WHEN HE FAILED TO CONSULT WITH OR CALL PSYCHOLOGICAL EXPERT WITNESSES ...................................52

1.     Grimmick Acted Unreasonably by Not Consulting With an Expert on the Psychological Effects of Sexual Abuse ........52

2.     Had Grimmick Consulted With or Presented the Testimony of an Expert on the Psychological Effects of Sexual Abuse, the Outcome of the Trial Would Have Been Different.........................................................54

CONCLUSION .......................................................................................55

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Campaneria v. Reid*,
  891 F.2d 1014 (2d Cir. 1989) ..........................................................................22

*Colorado v. Connelly*,
  479 U.S. 157 (1986)........................................................................................26

*Cortijo v. Bennett*,
  293 F. App'x 794 (2d Cir. 2008) ....................................................................39

*Dickerson v. United States*,
  530 U.S. 428 (2000)........................................................................................22

*Eze v. Senkowski*,
  321 F.3d 110 (2d Cir. 2003) ...............................................................39, 42, 43

*Fare v. Michael C.*,
  442 U.S. 707 (1979)........................................................................................23

*Gaines v. Kelly*,
  202 F.3d 598 (2d Cir. 2000) ...........................................................................20

*In re Gault*,
  387 U.S. 1 (1967)............................................................................................23

*Gersten v. Senkowski*,
  426 F.3d 588 (2d Cir. 2005) ...............................................................39, 42, 54

*Green v. Scully*,
  850 F.2d 894 (2d Cir. 1988) ...........................................................................22

*Holsomback v. White*,
  133 F.3d 1382 (11th Cir. 1998) ......................................................................45

*Jackson v. Coalter*,
  337 F.3d 74 (1st Cir. 2003)...............................................................................6

*Jackson v. Denno*,
  378 U.S. 368 (1964).................................................................................*passim*

*Jones v. Cunningham*,
371 U.S. 236 (1963)..........................................................................6

*Kimmelman v. Morrison*,
477 U.S. 365 (1986)........................................................................40

*Lego v. Twomey*,
404 U.S. 477 (1972)........................................................................26

*Lindstadt v. Keane*,
239 F.3d 191 (2d Cir. 2001) ...........................................................42

*Miller v. Senkowski*,
268 F. Supp. 2d 296 (E.D.N.Y. 2003) ............................................46

*Morgan v. United States*,
298 U.S. 468 (1936)........................................................................30

*North Carolina v. Butler*,
441 U.S. 369 (1979)........................................................................26

*Palmero v. Warden, Green Haven State Prison*,
545 F.2d 286 (2d Cir. 1976) ...........................................................30

*Pavel v. Hollins*,
261 F.3d 210 (2d Cir. 2001) ....................................................*passim*

*People v. Dearstyne*,
230 A.D.2d 953 (3d Dep't 1996).........................................2, 33, 35

*People v. Dearstyne*,
305 A.D.2d 850 (3d Dep't 2003), *lv. denied*, 100 N.Y.2d 593
(2003) ...............................................................................................3

*People v. Dearstyne*,
89 N.Y.2d 921 (1996) .......................................................................2

*People v. Huntley*,
15 N.Y.2d 72 (1965).................................................................25, 26

*Publicker Indus., Inc. v. Cohen*,
733 F.2d 1059 (3d Cir. 1984) .........................................................30

*Queen v. Bertrand*,
  4 Moo. P. C. N. S. 460, 481, 16 Eng. Rep. 391, 399 (1867) ..................30, 31, 32

*Rogers v. Richmond*,
  365 U.S. 534 (1961) ............................................................................................22

*Schneckloth v. Bustamonte*,
  412 U.S. 218 (1973) ...........................................................................................22

*Stein v. New York*,
  346 U.S. 156 (1953) ......................................................................................22, 24

*Strickland v. Washington*,
  466 U.S. 668 (1984) ....................................................................................*passim*

*Swenson v. Stidham*,
  409 U.S. 224 (1972) ......................................................................................28, 29

*United States v. Ceballos*,
  302 F.3d 679 (7th Cir. 2002) ............................................................................30

*United States v. Gordon*,
  156 F.3d 376 (2d Cir. 1998) .............................................................................37

*United States v. Huerta*,
  239 F.3d 865 (7th Cir. 2001) ............................................................................31

*United States v. Raddatz*,
  447 U.S. 667 (1980) ....................................................................................30, 31, 32

*Williams v. Taylor*,
  529 U.S. 362 (2000) ................................................................................19, 37, 38

**Statutes**

28 U.S.C. § 636 ..................................................................................................31

28 U.S.C. § 1291 ..................................................................................................1

28 U.S.C. § 1331 ..................................................................................................1

28 U.S.C. § 2241 ..................................................................................................1

28 U.S.C. § 2254 ..............................................................................................3, 37

28 U.S.C. § 2254 ...................................................................................21

N.Y. CRIM. PROC. LAW § 440.10 (McKinney 2016) ..................................2

N.Y. CRIM. PROC. LAW § 440.20 (McKinney 2016) ..................................2

N.Y. CRIM. PROC. LAW § 710 (McKinney 2016) .....................................25

N.Y. PENAL LAW § 110 (McKinney 2016) ...............................................2

N.Y. PENAL LAW § 130.70 (McKinney 2016) ..........................................2

N.Y. PENAL LAW § 260.20 (McKinney 2016) ..........................................2

**Other Authorities**

U.S. CONST. amend. V. ..........................................................................21

## PRELIMINARY STATEMENT

Petitioner-Appellant Frank Dearstyne, Jr. ("Dearstyne" or "Petitioner") appeals from the August 20, 2015 Order of the Northern District of New York (Judge Frederick J. Scullin, Jr.), denying and dismissing Dearstyne's Verified Petition for Writ of *Habeas Corpus* ("Petition"). (A-18). [1]

## JURISDICTION

The District Court had subject-matter jurisdiction over Dearstyne's Petition pursuant to 28 U.S.C. §§ 1331 and 2241. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because Dearstyne is appealing from a final order of Judge Scullin, dated August 20, 2015 ("August 20 Order"), which denied and dismissed Dearstyne's Petition and a Certificate of Appealability ("COA"). (SPA-1).[2] Dearstyne timely filed a motion for COA with this Court on October 15, 2015 (Doc. 13)[3] which was granted on February 19, 2016. (Doc. 49).

## STATEMENT OF ISSUES

Whether the state court's rulings were contrary to, or an unreasonable application of clearly established federal law, as determined by the United States Supreme Court, in concluding (1) that Petitioner's confession was voluntary, and (2)

---

[1]   References to the Appendix appear as "(A-_)."
[2]   References to the Special Appendix appear as "(SPA-_)."
[3]   References to the Second Circuit Docket in his case appear as "(Doc-_)."

1

that counsel was not ineffective in failing to consult with or call medical experts and/or a behavioral or psychological expert.  (Doc. 49).

## PROCEDURAL HISTORY

Dearstyne was convicted of Attempted Rape in the First Degree, in violation of N.Y. PENAL LAW § 110 and § 130.35, and Endangering the Welfare of a Child, in violation of N.Y. PENAL LAW § 260.20, with respect to the alleged victim identified as "T.O."  (Doc. 7).  He was convicted of Aggravated Sexual Abuse in the First Degree, in violation of N.Y. PENAL LAW § 130.70, and Endangering the Welfare of a Child, in violation of N.Y. PENAL LAW § 260.20, with respect to the alleged victim identified as "C.C."  (Doc. 7).  Dearstyne was acquitted on all charges with respect to the alleged victim identified as "E. C."  (Doc. 7 at 32).

Dearstyne has exhausted all state procedures.  The Appellate Division, Third Department, affirmed Dearstyne's conviction in *People v. Dearstyne*, 230 A.D.2d 953 (3d Dep't 1996).  On December 20, 1996, Dearstyne's application for leave to appeal to the Court of Appeals was denied.  *People v. Dearstyne*, 89 N.Y.2d 921 (1996). On November 26, 1997, Dearstyne brought a motion pursuant to N.Y. CRIM. PROC. LAW § 440.10 and § 440.20 to vacate the judgment of conviction entered against him and to set aside the sentence imposed on the basis of: (1) ineffective assistance of counsel, (2) prosecutorial misconduct, and (3) other errors of law.  (A-

210).  On October 13, 1999, Judge McGrath denied Dearstyne's motion (the "CPL §440.10 Order").  (A-210).

The Appellate Division affirmed the denial of Dearstyne's motion to vacate. *People v. Dearstyne*, 305 A.D.2d 850, 853 (3d Dep't 2003), *lv. denied*, 100 N.Y.2d 593 (2003).  Dearstyne maintains his innocence and seeks a writ of *habeas corpus* vacating his conviction.

Dearstyne filed his Petition *pro se* on June 25, 2004, pursuant to 28 U.S.C. § 2254.  (A-18).  Respondent filed a Response and Memorandum of Law in opposition to the Petition on June 15, 2005. (Dkt. No. 23).  On September 12, 2006, Kelley Drye & Warren LLP appeared as *pro bono* counsel for Dearstyne, and filed a Reply Memorandum of Law in further support of the Petition on November 6, 2006.  (A-44).  On January 24, 2008, Chief Judge Norman A. Mordue of the U.S. District Court for the Northern District of New York referred the case to Magistrate Judge Victor E. Bianchini for a Report and Recommendation.  (A-191).

On March 3, 2011, Magistrate Judge Bianchini issued a 218-page Report and Recommendation (the "Report"), which recommended that *habeas* relief be granted on three of sixteen grounds in the Petition.  (A-200).  The three grounds Judge Bianchini identified as requiring *habeas* relief were: (1) the "voluntariness" of Dearstyne's statement to the police (A-236-240); (2) trial counsel's failure to consult or call a medical expert to counter the state's "highly equivocal medical evidence"

(A-362, 368); and (3) trial counsel's failure to consult or call a child behavioral or psychological expert to rebut trial testimony regarding the victims' behavioral changes purportedly suggestive of sexual abuse. (A-375). The Report finds that the state courts' decisions on these issues were either contrary to clearly established federal law as determined by the Supreme Court or resulted in a decision based on an unreasonable determination of the facts, in light of the evidence presented in the state court proceeding. (A-240, 362, 368 and 375).

In concluding his analysis of the factual record and the various constitutional violations suffered by Petitioner, Judge Bianchini observed, "[a]t this point in time I believe it is important to consider the possibility that the crimes for which Petitioner has been convicted may not have actually occurred." (A-412). While describing the Report as "extensive, and very thorough," Judge Scullin summarily rejected each of its material findings (SPA-2), denied the Petition in its entirety, and declined to issue a COA. (SPA-5).

On October 15, 2015, Dearstyne filed a motion with this Court for a COA. (Doc. 13). In an Order filed February 19, 2016, this Court granted the motion "with respect to whether the state court's rulings were contrary to or an unreasonable application of clearly established federal law, as determined by the United States Supreme Court, (1) in concluding that Petitioner's confession was voluntary, or (2)

4

in concluding that counsel was not ineffective in not consulting or calling medical experts or a behavioral or psychological expert." (Doc. 49).

## STATEMENT OF FACTS

### I.    INTRODUCTION

The criminal charges of which Dearstyne was convicted were investigated in 1987 by Detective Petrucci ("Petrucci").  Following Dearstyne's involuntary confession and arrest, Dearstyne was represented at trial by Eugene Grimmick ("Grimmick").  Grimmick never discussed retaining a medical or psychological expert to rebut the State's evidence with Dearstyne, nor did he ever contact such an expert in preparing for trial.  (A-198-99 at ¶11).  Further, Dearstyne's involuntarily obtained confession was used as evidence against him at trial.  (CA-387:9-391:16).

Dearstyne was convicted on August 14, 1991 of attempted rape in the first degree, aggravated sexual abuse in the first degree, and two counts of endangering the welfare of a child.  (A-18).  Dearstyne's conviction resulted from acts alleged to have taken place when he was only sixteen years old.  (CA-943:2-3)[4].  Dearstyne was sentenced to consecutive terms of four to twelve years on the attempted rape conviction and six to eighteen years on the aggravated sexual abuse conviction, to be served concurrently with one year terms for each endangering the welfare of a

---

[4]    References to the Confidential Appendix (Filed Under Seal) appear as "(CA-__)".

child conviction. (CA-9431-25). In 2014, Dearstyne was released to parole supervision for good behavior.

Dearstyne lost twenty-two years of his life in state prison as a result of these wrongful convictions, and is now on supervised probation and subject to the sex offender registry, and therefore remains "in custody." *Jones v. Cunningham*, 371 U.S. 236, 238–43 (1963); *see also Jackson v. Coalter*, 337 F.3d 74, 78–79 (1st Cir. 2003) (holding that custody includes supervised probation).[5]

## II.  DEARSTYNE'S STATEMENT

In June 1987, T.O., then a three year old girl, was just starting to potty train when her mother found what appeared to be blood in the child's underwear. (CA-482:1-18). Her mother was not sure what it was, and thought that T.O. may have experienced diarrhea and was bleeding from her rectum. (CA-483:1-3). Her mother took T.O. to see a pediatrician, Dr. Theodore Close, later that same day. (CA-487:14-25). Dr. Close examined T.O. and observed a yellowish drainage from the child's vagina. (CA-626:2-23). Dr. Close took a small sample of the drainage and looked at it underneath his microscope. Dr. Close saw what appeared to be sperm in the sample. (CA-628:4-6) Immediately following his examination Dr. Close disposed of all physical samples he had taken from T.O. (A-193).[6]

---

[5]  Dearstyne was physically "in custody" when he filed his Petition, and remains "in custody" due to the current restraints on his liberty.

[6]  The fact that Dr. Close had destroyed the physical samples was not disclosed at

Following his examination, Dr. Close referred T.O. to the Child Sexual Abuse Clinic at Albany Medical Center in Albany, New York for a more thorough examination. (CA-628:21-629:2) T.O.'s parents immediately took the child to Albany Medical Center where, following further physical examination by medical personnel, testing for the presence of seminal fluid and/or human sperm in T.O.'s vagina and underwear was negative. (CA-1014-1015) Notwithstanding these negative findings, the police were alerted that T.O. may have been the victim of sexual abuse and an investigation was commenced.

Detective Frank Petrucci of the Rensselaer Police Department was assigned to investigate the case. (CA-253:10-11). On June 13, 1987, Petrucci, a detective with the City of Rensselaer, arrived at the home of T.O. to investigate the alleged sexual abuse claim. (CA-254:1-4). After meeting with the alleged victim, Petrucci called Patricia Donovan ("Donovan"), a trooper with the New York State Police Department assigned to a special rape task force out of Loudonville, New York. (CA-256:1-20; CA-312:17-313:15). Donovan interviewed T.O. on June 18, 1987.

Following that interview, Petrucci, and Donovan concluded that Appellant, Frank Dearstyne, Jr., the sixteen year old son of T.O's babysitter, was the prime suspect. (CA-316:18-22). Dearstyne's mother ran a babysitting service out of the

---

trial and was only revealed in 2008 in response to an order issued by the District Court in the Habeas case. (A-192).

Dearstyne home, and among the children that were cared for were three-year old T.O., three-year old E.C., and two-and-a-half-year old C.C. (CA-237-238). The police also alerted the parents of other children attending the Dearstyne home daycare center, and two other parents soon came forward.

On June 19, 1987, Petrucci called Donovan and asked her to meet him at the Rensselaer Police Department. (CA-260:25-261:1). Petrucci and Donovan discussed T.O.'s case and decided to pick up Dearstyne for questioning at his home in Rensselaer. (CA-261:5-15). Prior to accompanying Petrucci to the Dearstyne's home, Donovan arranged for Investigator Ed Girtler ("Girtler") to meet them at the Loudonville state police barracks once they picked up Dearstyne. (CA-318:3-8; CA-360:4-11). Donovan previously told Girtler about the allegations and that it was possible, Dearstyne, the son of T.O.'s babysitter was involved. (CA-422:21-423:1).

According to the officers, Dearstyne was "absolutely a suspect" before the officers went to his home. (CA-280:19-281:3). Petrucci also knew that Dearstyne was only sixteen years old. (CA-273:12-16).

Petrucci, who was wearing plainclothes, drove to Dearstyne's home in an unmarked car, and Donovan, who was also not in uniform, followed in a separate unmarked car. (CA-262:2-12). When Petrucci knocked on the door, Mrs. Dearstyne answered. Petrucci introduced himself with his shield and identification card as a police officer with the Rensselaer Police Department, and he introduced Donovan

as a member of the New York State Police. (CA-262:13-263:23). Petrucci did not disclose that Donovan worked out of the state police barracks in Loudonville. (CA-292:25-293:12; CA-747:1-25). Petrucci asked if Petitioner was home, and Mrs. Dearstyne said he was not. (CA-264:3-17). She told Petrucci that Petitioner was at the Blauers' home, and asked why the police were looking for him. (CA-264:18-265:16). Petrucci stated that they were looking for Petitioner in connection with an investigation, but he did not tell Mrs. Dearstyne what type of investigation it was, or that they were investigating allegations of molestation of a child under her care. (CA-265:7-16). Petrucci also failed to tell Mrs. Dearstyne that her son was a suspect. (CA-281:1-4). Rather, Petrucci told Mrs. Dearstyne that she "had nothing to worry about" and that Petitioner "was not in any trouble". (CA-281:12-17; CA-352:14-353:1).

Moreover, Petrucci did not tell Mrs. Dearstyne that he, Donovan, and Girtler had prearranged to take Petitioner to the state police barracks in Loudonville for questioning. (CA-281:18-22: CA-288:18-21). In fact, Petrucci did not tell Mrs. Dearstyne that they would be taking her son anywhere. (CA-281:18-20). Petrucci testified that when Dearstyne's sister, Cindy, offered to show the officers where the Blauers lived, he accepted, and Cindy got into the unmarked car with Donovan. (CA-265:17-266:4; CA-321:5-13). Once the three arrived at the Blauers' home, Petrucci introduced himself to Mrs. Blauers and asked if Petitioner was there. (CA-

9

266:8-267:2). Mrs. Blauers responded in the affirmative and someone went to get Petitioner, who was in the Blauer's swimming pool. (CA-267:6-10). Petrucci told Mrs. Blauers that he had already spoken with Mrs. Dearstyne and that Mrs. Dearstyne knew that they were going to speak with Petitioner. (CA-267:3-5).

When Dearstyne came to the door, wearing his swim trunks, Petrucci introduced himself and asked if Dearstyne would get dressed and come with him. (CA-267:11-268:2). Dearstyne started to go back to the yard to get dressed, then stopped, turned around, and asked what was going on. (CA-268:3-6). Petrucci told Dearstyne that they were conducting an investigation, and that it was important they speak to him and that they would explain to him exactly what was going on when they got to their destination. (CA-268:7-11). Petrucci also told Dearstyne that they had spoken with his mother, and she knew that they were talking to him, and it was okay to talk to them. (CA-268:12-18).

Dearstyne rode with Petrucci for about twenty minutes from Rensselaer to the state police barracks in Loudonville. (CA-271:9-11). Donovan followed in a separate car. (CA-271:3-5). Petrucci did not tell Dearstyne why he was being taken to Loudonville. (CA-268:11-14). En route, Donovan called ahead to Loudonville to alert Girtler that they were on their way with Dearstyne. (CA-327:18-25).

Dearstyne, Petrucci, and Donovan entered the state police barracks in Loudonville through the rear door, which was for troopers only. (CA-271:23-25;

CA-290:21-22). They walked down the hall where they were met by Girtler, whom Petrucci introduced to Dearstyne. (A-272:3-9; CA-327:18-25). Despite having prearranged the pick-up of Dearstyne, his removal to the Loudonville state police barracks for questioning, and his interrogation by Girtler, Donovan failed to follow proper procedure when she and Petrucci entered the state police barracks by failing to sign-in Dearstyne when they arrived at the barracks. (CA-337:5-17). Donovan did not sign the desk blotter to show that Dearstyne was at the Loudonville police barracks being questioned by Girtler. (CA-337:11-17). As a result, none of the other police officers in the Loudonville barracks knew Dearstyne was there. Donovan testified that she was not in the interrogation room for most of the time that Dearstyne was being interrogated by Girtler; yet she did not correct this "mistake" until after 5:00 p.m. that afternoon, *after* Dearstyne had given his statement to Girtler, had been arrested, and had already left the Loudonville police barracks for his arraignment. (CA-337:18-25). In her blotter entry, Donovan wrote 2:30 and "t.c.", to show that the time had been corrected. (CA-338:9-23). This "failure" to sign-in on the desk blotter at the Loudonville state police barracks, and to record the fact that Dearstyne was present at the barracks and was being interrogated by Girtler, made it impossible for Dearstyne's parents to locate where the police had taken their minor son and thwarted their ability to assist Dearstyne in timely obtaining legal counsel or otherwise effectively asserting his constitutional rights.

Frank Dearstyne, Sr. ("Frank, Sr.") testified that after the officers left his house, his wife called him at work. (CA-754:12-19). He immediately left work and headed to the Blauers' residence. (CA-754:20-755:5). By the time he reached the Blauers, Petrucci and Donovan were gone and no one at the Blauers could tell him where the police had taken his son. (CA-755:6-15). Mr. Dearstyne returned to work, changed clothes, and went home where he called the Rensselaer police station at 2:00 p.m. (CA-755:16-756:2). The Rensselaer police said they had no record of Petrucci picking up Dearstyne. (CA-756:12-15). When Frank, Sr. again called the Rensselaer police fifteen minutes later, he was told that Petrucci had radioed that he was heading to Loudonville. (CA-756:18-25). Frank, Sr. then called Loudonville, but he was told that his son was not there, and that he should call East Greenbush, because that was where Donovan was stationed. (CA-757:1-17). Frank, Sr. called Loudonville and Rensselaer again, but no one could tell him where his son was being held. (CA-758:8-15).

At around 4:00 p.m., Frank, Sr. went to the Rensselaer police station, where he was told that Petrucci was usually on his way home at that time of day. (CA-758:16-759:2). Frank, Sr. went home and called Loudonville again around 5:00 p.m., when he was told that his son was there and that Petrucci would call him back. (CA-759:5-17). Around 5:15 p.m. Petrucci called and informed Frank, Sr. that his son, who earlier Petrucci described as being "in no trouble," was being charged with

a crime and that Frank, Sr. had fifteen minutes to get to Loudonville. (CA-759:18-760:6).

When Dearstyne's parents arrived, sometime around 5:00 p.m., they were informed that their son was already under arrest. (CA-347:9-348:22). Donovan had notarized Dearstyne's "statement" at 4:40 p.m. (CA-359:7-9). There is no videotaped record of the interrogation or the process by which the officers obtained Dearstyne's statement.

## III. DEARSTYNE'S INVOLUNTARY STATEMENT AND THE *HUNTLEY* HEARING

Prior to trial, Dearstyne moved to suppress his involuntary statement. On May 7, 1991, County Court Justice Andrew M. Dwyer commenced a hearing as to the voluntariness of the statement. The parties agreed that Dearstyne was questioned by law enforcement officers in an enclosed room for approximately three hours before signing the statement attributed to him. However, the witnesses gave drastically different accounts of the nature of that interrogation.

Dearstyne testified that upon arriving at the Loudonville station he was brought to a room on the second floor by Petrucci and Donovan, who informed him that he was being charged with raping a girl. (CA-199:9-22). When Dearstyne denied committing the alleged act, the officers responded, "Well, we have evidence you did it" and that a rape specialist was soon coming to question him. (CA-200:1-11). Approximately thirty minutes after Dearstyne's arrival at the station, Girtler

(the rape specialist) entered the interrogation room holding a large envelope. (CA-200:21-201:10). All three officers were seated around a table with Dearstyne. (CA-200:22-201:6). When Dearstyne again denied committing the alleged rape, Girtler responded, "In this envelope here I have all the evidence to put you away for 25 years." (CA-201:7-10). When Dearstyne continued to maintain his innocence, the officers grew angry and Girtler slammed his fist on the desk. (CA-201:11-15).

Dearstyne then asked for permission to make a phone call. (CA-201:16-18). As Dearstyne was getting ready to use the phone, Girtler ordered him to "Shut up. Sit your ass down." (CA-201:18-19). Feeling scared and frightened, Dearstyne returned to his seat at the table where Girtler continued to question Dearstyne about the alleged offense. (CA-201:19-23). Dearstyne's repeated denials continued to anger Girtler, who then left the room. (CA-202:4-6).

Dearstyne was then questioned by Petrucci and Donovan. (CA-202:8-13). When Dearstyne continued to maintain his innocence, Petrucci asked Donovan to leave the room. (CA-202:12). Dearstyne, visibly shaken, began to cry. (CA-202:20-21).

Alone in the room with Petrucci, Dearstyne was assured he would only receive probation if he confessed, but he would be imprisoned for 25 years if he failed to confess. (CA-202:15-19). Petrucci then described in graphic detail what life would be like for Dearstyne in prison: "When you are in jail, you are going to have big guys

14

who are going to come make you his baby. Bring a supply of vasoline, and everything." (CA-202:22-203:1). Dearstyne still protested his innocence, agreeing to take a lie detector test. (CA-203:5-6). Petrucci then told him, "We don't have time for that anyway," and that he had better things to do than to talk to Dearstyne, including drinking beer by his pool. (CA-203:2-7). To that end, Petrucci suggested that Dearstyne talk to Girtler, who could help with Dearstyne's "problems." (CA-203:8-10). Feeling trapped, isolated, and frightened, Dearstyne agreed to speak with Girtler. (CA-203:11-13).

When Girtler returned to the room he continued to press Dearstyne about the alleged offense. Dearstyne responded, "I don't have anything to say about the crime. I didn't do it." (CA-204:1-2). After repeating these same exchanges for some time, Dearstyne told Girtler that although he did not commit the crime, "out of your satisfaction, I will say 'yes' to it." (CA-205:14-19). When Girtler read a series of allegations from a statement Girtler had written, Dearstyne initially denied each one, but eventually relented after Girtler told him he could prove them. (CA-205:20-206:19). Believing the officers' statements that he would only receive probation, Dearstyne signed the statement prepared by Girtler. (CA-207:1-9).[7]

---

[7]   Although Respondent has criticized the authenticity of Petitioner's belief that he would receive probation for the crimes outlined in the statement, the District Attorney's Office considered offering a plea to probation shortly after Petitioner was initially charged. (CA-969-970)

Though not contradicting certain details of Dearstyne's account, law enforcement officers provided a dramatically different version of the interrogation. According to the officers, Dearstyne was brought to the Loundonville station, where he was greeted by Girtler in the hallway. (CA-130:6-13). Girtler and Donovan then led Dearstyne into an enclosed room where Girtler advised Dearstyne of his *Miranda* rights and Dearstyne signed a written acknowledgement indicating his understanding of his rights. (CA-133:2-22). Girtler then engaged Dearstyne in a general conversation about Dearstyne's sexual interests and feelings about sex for approximately thirty minutes. (CA-134:11-14). Sensing that Dearstyne was uncomfortable speaking about these subjects in her presence, Donovan then left the room. (CA-135:2-11). A short time later, Girtler told Dearstyne that he would like to "put the story down on paper." (CA-135:12-16). At approximately 4:40 p.m., the statement was signed by Dearstyne and Girtler, and notarized by Donovan. (CA-116:5-10).

At the conclusion of the *Huntley* hearing, on May 9, 1991, the parties were granted permission to submit memoranda of law on the voluntariness of the statement attributed to Dearstyne. On July 8, 1991, the County Court issued a written Order denying Dearstyne's suppression motion, reasoning that "[a] question of fact as to voluntariness has been presented for determination by the trial jury." (CA-7-8).

## IV.   **DEARSTYNE'S TRIAL**

At trial, the prosecution presented evidence it believed sufficient to link Dearstyne to the crimes alleged.  Dearstyne's involuntary statement was admitted at trial and read to the jury.  With respect to the alleged victim, T.O., the prosecution presented the testimony of Dr. Close, who examined T.O. and noted that T.O.'s hymen was slightly larger than normal, and that he saw "some drainage" that he believed to be sperm.  (CA-627:20-628:6).  Tests performed later at the hospital came back negative for sperm, and Dr. Close himself testified on cross examination that he was not 100 percent certain what he saw was sperm.  (CA-631:6-17).

The prosecution also presented the testimony of T.O.'s mother, in which she described various behavioral changes she observed in her three-year-old daughter at about the time in question.  (CA-472:20-478:24).  Neither the prosecution nor the defense presented an expert to testify as to the significance of these purported behavioral changes.  As a result, there was no evidence connecting this testimony to the alleged crime, and the jury could only speculate as to its significance.

The prosecution also presented the unsworn testimony of T.O. herself, but T.O., who was seven at the time of the trial, did not remember events that allegedly took place when she was three years old.  She testified that she did not remember Dearstyne and she did not recognize Dearstyne in the courtroom.  (CA-465:12-24).  Dearstyne's statement, the validity of which is questioned *infra*, was also read into

the record. (CA-387:9-391:16). The prosecution also presented the testimony of Carole West, a nurse who was present during T.O.'s emergency room visit, regarding T.O.'s emotional state. (CA-672:4-673:23). West was not permitted to offer any medical opinions, because she was not licensed to practice medicine in New York. (CA-661:3-20).

While the indictment alleges that the alleged abuse of C.C. occurred "sometime in April or May 1987, on a weekday" (CA-1), C.C.'s mother only took C.C. for a medical examination after she received a phone call from the Rensselaer City Police on June 20, 1987. (CA-555:21-557:3). The only testimony presented as to C.C.'s medical record was the testimony of Carole West to authenticate C.C.'s medical record. The physician who examined C.C. was not available to testify at the trial, and as a result, after some deliberation, the court allowed the inclusion of the redacted medical record of C.C. (CA-662:1-671:9; CA-675:14-676:10). The medical record does not contain any conclusions, and it was left to the jury to speculate as to the significance of the observations in the record without the help of any medical testimony. *Id*. The prosecution also presented testimony from C.C.'s mother regarding behavioral changes she observed in her daughter. (CA-550:16-555:20). Once again, neither the prosecution nor the defense offered expert testimony to aid the jury in their determination of the significance of this testimony. The evidence in support of the allegations involving C.C. also included the unsworn

testimony of C.C., who was six years old at the trial and who testified as to her purported recollection of events that happened when she was thirty-three months old. (CA-526:8-536:19).

## SUMMARY OF ARGUMENT

Dearstyne was denied due process and the right against self-incrimination when his involuntarily obtained statement was used as evidence against him at trial. Dearstyne's involuntarily statement should have been suppressed at the *Huntley* hearing, should never have been introduced at trial, and was highly prejudicial to Dearstyne's defense. If Dearstyne's involuntary statement was properly suppressed, the state would have been left with insufficient shreds of circumstantial evidence that would not have supported an indictment, much less a conviction.

Dearstyne was also deprived of his constitutional rights through defense counsel's failure to consult with or call a medical expert at trial to counter the State's "highly equivocal medical evidence," or a child behavioral or psychological expert to rebut trial testimony regarding the victims' behavioral changes purportedly suggestive of sexual abuse. Grimmick's failures constitute ineffective assistance of counsel under the Supreme Court's holdings in *Strickland v. Washington*, 466 U.S. 668 (1984) and *Williams v. Taylor*, 529 U.S. 362 (2000).

Grimmick unilaterally concluded that the State's evidence against Dearstyne was so weak that he did not need to investigate or call experts at trial to rebut the

State's witnesses. Had counsel investigated and called experts to rebut the State's evidence, Dearstyne would have been acquitted. The experts whom counsel failed to investigate would have given the trial court reliable evidence that, among other things, the victims' medical examinations were questionable and did not prove that the victims had been abused (Fay Aff., CA-9-10, ¶¶2-5); that Dr. Close's testimony was not indicative of abuse (CA-9-10, ¶¶2-4); and that the purported behavioral changes seen in the alleged victims were actually normal toddler behavior (Gardner Aff., CA-998-1004, ¶¶11-17). Grimmick's neglect of his professional duties was "objectively unreasonable" and undeniably prejudiced Dearstyne's defense, thereby depriving him of his Sixth Amendment right to effective assistance of counsel and a fair trial.

The District Court erred in concluding that "Petitioner has not demonstrated that any of th[e state court] decisions were contrary to clearly established Federal law or objectively unreasonable." (SPA-5). Dearstyne is thus entitled to a writ of *habeas corpus* as a matter of law.

## ARGUMENT

This Court reviews *de novo* the denial of a writ of *habeas corpus*. *Gaines v. Kelly*, 202 F.3d 598, 601 (2d Cir. 2000). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a petitioner in custody pursuant to a state court judgment raises "any claim that was adjudicated on the merits in State

court proceedings" as a basis for federal *habeas* relief, a federal court may grant relief only if the "adjudication of the claim . . . (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

As Judge Bianchini's Report states, "the Appellate Division's denial of . . . Petitioner's ineffective assistance of counsel claim involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court." (A-367-368) (citing 28 U.S.C. § 2254(d)(1)). Further, the trial court's suppression ruling and the Appellate Division's finding that Dearstyne's statement was voluntary were equally unreasonable applications of clearly established Supreme Court precedent and an unreasonable determination of the facts in light of the evidence presented. (A-240, 248-49).

## I. PETITIONER WAS DENIED DUE PROCESS AND HIS RIGHT AGAINST SELF-INCRIMINATION WHEN THE STATE COURT FAILED TO SUPPRESS HIS INVOLUNTARY STATEMENT

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. This privilege against self-incrimination and the right to Due Process, protected by the Fourteenth Amendment, guarantees that a confession may only be admitted into

evidence if it is voluntarily given by the defendant. *See Dickerson v. United States*, 530 U.S. 428, 433-34 (2000). The test for determining the voluntariness of a confession examines "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Id.* at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). *See also Rogers v. Richmond*, 365 U.S. 534, 544 (1961) (observing that the question to determine voluntariness is whether the conduct of law enforcement officers "was such as to overbear [the accused's] will to resist and bring about confession not freely self-determined."). Ultimately, the voluntariness "determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'" *Dickerson*, 530 U.S. at 434 (quoting *Stein v. New York,* 346 U.S. 156, 185 (1953)).

In making a voluntariness inquiry, courts assess "the totality of all the surrounding circumstances." *Id.* (quoting *Schneckloth*, 412 U.S. at 226). In general, courts consider "(1) the characteristics of the accused, (2) the conditions of interrogations, and (3) the conduct of law enforcement officials." *Green v. Scully*, 850 F.2d 894, 901–02 (2d Cir. 1988). More particularly, these factors ordinarily include "the accused's age, his lack of education or low intelligence, the failure to give *Miranda* warnings, the length of detention, the nature of the interrogation, and any use of physical punishment." *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir.

1989). However, the Supreme Court "has emphasized that admissions and confessions of juveniles require special caution." *In re Gault,* 387 U.S. 1, 45 (1967). Accordingly, increased focus is given to the juvenile's "age, experience, education, background, and intelligence . . . ." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

### A. THE STATE COURT'S REJECTION OF DEARSTYNE'S *JACKSON V. DENNO* CLAIM WAS BOTH CONTRARY TO, AND AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED SUPREME COURT LAW

Given the importance of admitting only voluntary confessions at trial, the Supreme Court held in *Jackson v. Denno* that a defendant objecting to the admission of a confession has a due process right "to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined." 378 U.S. 368, 380 (1964). Because the state court permitted the prosecution to introduce an involuntary confession without resolving a single contested factual issue concerning the interrogation, this Court should grant Petitioner's *habeas* petition.

Before *Jackson*, courts in New York were only required to "make a preliminary determination regarding a confession offered by the prosecution and exclude it if in no circumstances could the confession be deemed voluntary." *Id*. at 377. However, "if the evidence present[ed] a fair question as to its voluntariness, as where certain facts bearing on the issue [were] in dispute or where reasonable men could differ over the inferences to be drawn from undisputed facts, the judge [was

required to] 'receive the confession and leave to the jury, under proper instructions, the ultimate determination of its voluntary character and also its truthfulness.'" *Id.* (quoting *Stein v. New York*, 346 U.S. at 172). Where, as here, an issue of coercion was presented, "the judge [was not permitted to] resolve conflicting evidence or arrive at his independent appraisal of the voluntariness of the confession, one way or the other. These matters he [was required to] leave to the jury." *Id.* at 377–78.

The *Jackson* Court found that allowing a jury to make the sole voluntariness determination impermissibly risks mixing considerations of a confession's truth with its voluntariness. *Id.* at 386 ("Under the New York procedure, the evidence given the jury inevitably injects irrelevant and impermissible considerations of truthfulness of the confession into the assessment of voluntariness."). Even though a jury was instructed to disregard an involuntary confession, the *Jackson* Court found the confession, once "solidly implanted in the jury's mind," would prove impossible to ignore. *Id.* at 388. Likewise, a defendant deprived of a separate determination of a confession's voluntariness, would find it "difficult, if not impossible, to prove that [the] confession which a jury has found to be involuntary has nevertheless influenced the verdict or that its finding of voluntariness, if this is the course it took, was affected by the other evidence showing the confession was true." *Id.*

In an effort to ameliorate these concerns, the *Jackson* Court required a procedure that is "fully adequate to insure a reliable and clear-cut determination of

the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend." *Id*. at 391. As explained by the *Jackson* Court, this procedure has become increasingly necessary as "police conduct requiring exclusion of a confession has evolved from acts of clear physical brutality to more refined and subtle methods of overcoming a defendant's will." *Id*. at 389. In assessing the voluntariness of a confession, "facts are frequently disputed, questions of credibility are often crucial, and inferences to be drawn from established facts are often determinative." *Id*. at 390. Therefore, the *Jackson* Court held that the voluntariness determination "requires facing the issue squarely, in illuminating isolation and unbeclouded by other issues and the effect of extraneous but prejudicial evidence." *Id*. (citations omitted).

In response to *Jackson v. Denno*, the New York Court of Appeals adopted the so-called Massachusetts procedure in *People v. Huntley*, 15 N.Y.2d 72 (1965). Under this procedure, "'the jury passes on voluntariness only after the judge has fully and independently resolved the issue against the accused' and has made express findings upon the disputed fact question of voluntariness." *Id*. at 78. (quoting *Jackson*, 378 U.S. at 378-79). These requirements are codified in N.Y. CRIM. PROC. LAW § 710. The *Huntley* Court further held that the prosecution carries the burden

of proving voluntariness beyond a reasonable doubt. *Huntley*, 15 N.Y.2d at 78.[8]

Although the County Court considered Petitioner's suppression motion more than thirty-five years after *Jackson v. Denno* and New York State's adoption of a conforming procedure, the court here applied the pre-*Huntley* procedure repudiated by *Jackson*. Following a hearing, the County Court issued a two-page order on July 8, 1991, providing the following explanation for its denial of Petitioner's suppression motion:

> During the taking of the testimony at the Suppression Hearing and in the arguments set forth in the memoranda a sharp question of fact has arisen. There are no clear cut legal issues without resolving the questions of fact. Accordingly, the motion is denied. A question of fact as to voluntariness has been presented for determination by the trial jury.

(A-241).

Respondent has consistently conceded that the County Court violated *Jackson* by failing to make factual findings and to rule on the voluntariness of the alleged confession. (*See*, *e.g.*, Doc. 26 at 4) ("Following a *Huntley* hearing, the county court denied petitioner's motion to suppress evidence of petitioner's confession, and, without determining the factual issue regarding the voluntariness of the confession,

---

[8] Under federal law, the prosecution bears the "heavy" burden of showing voluntariness by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986); *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Lego v. Twomey*, 404 U.S. 477, 486–87 (1972).

submitted that question to the jury.").  Although conceding that the County Court violated *Jackson*, Respondent contends that this violation was cured by the Appellate Division on direct appeal of the conviction.  According to Respondent, an appellate court in New York "may render its own findings of fact on direct appeal."  (*Id.*).  Respondent assures this Court that this procedure was blessed by *Jackson* because "the sole remedy for a trial court's failure to issue findings on voluntariness is not a new trial, but rather a remand to the trial court for an *after-the-fact* hearing on voluntariness."  (*Id.* at 4-5) (emphasis in original).  This Court should reject Respondent's argument for several reasons.[9]

As an initial matter, Respondent's remedial assertion proves too much.  Petitioner is not contending that the trial court's *Jackson* violation requires a new trial.  Because the County Court here adhered to the same pre-*Huntley* procedure repudiated in *Jackson*, Dearstyne was entitled to the same remedy provided the defendant in *Jackson*—a hearing outside the presence of the trial jury at which the contested factual disputes are resolved and the voluntariness of the alleged confession is fairly determined.  Notice, too, that Respondent does not suggest that *Jackson* remanded the case to the state appellate court to make an *after-the-fact* determination of voluntariness based on transcribed testimony concerning the

---

[9] Respondent has never contended, nor could it, that Petitioner's statement would be deemed voluntary if his account of the interrogation were fully credited.

circumstances of the challenged statement.

More to the point, if due process could be satisfied when a court—though resolving no critical factual disputes, including credibility determinations—holds a hearing that produces a transcript from which the voluntariness issue may be later determined by a reviewing court, then the *Jackson* Court would have merely remanded to a reviewing court to make factual findings in the first instance and render a voluntariness determination based on the trial transcript. It did not. Instead, it expressly rejected such an approach. The *Jackson* Court acknowledged that the voluntariness determination in that case involved "substantial facts in dispute." 378 U.S. at 391–92 ("[I]f the State is to be believed we cannot say that Jackson's confession was involuntary, whereas if Jackson's version of the facts is accepted the confession was involuntary and inadmissible."). Accordingly, the defendant was "entitled to a reliable resolution of these evidentiary conflicts." *Id*. at 392. Importantly, the *Jackson* Court found that this could not be done on direct review of the transcript alone. *Id*. The defendant in *Jackson*, who had already been convicted following a trial at which the voluntariness of the confession was contested, was constitutionally due "a soundly conducted collateral proceeding" at which the voluntariness of the confession would be "fairly determined." *Id*. at 395–96.

That an after-the-fact voluntariness determination by an appellate court in the first instance is insufficient to satisfy due process was reaffirmed by the Supreme

Court in *Swenson v. Stidham*, 409 U.S. 224 (1972). In *Swenson*, the defendant was initially granted a hearing outside the jury's presence concerning the voluntariness of the contested confession. *Id*. at 225–26. Because it was unclear whether the trial judge made factual findings and ruled on the voluntariness of the confession, an appellate court later ordered a second trial court to conduct a hearing in compliance with *Jackson*. *Id*. at 226. The second trial judge did just that—held a hearing, issued findings of fact and conclusions of law, and found the confession voluntary. *Id*. at 226. On direct review, the appellate court found that the second trial judge had complied with *Jackson*, and, in its own view, found that the confession was voluntary. *Id*. at 227. Against the defendant's complaint that the second trial judge felt bound by the prior proceedings, the *Swenson* Court held that the second trial court, in hearing and making factual and legal findings, had complied with *Jackson*. As the appellate court found that the second trial judge's finding of voluntariness was "overwhelmingly supported," the *Swenson* Court also held that "as between the two courts the *Jackson v. Denno* error, if any, was sufficiently remedied." *Id*. at 230. Contrary to Respondent's suggestion here, the *Swenson* Court did not merely rely on the appellate court's evaluation alone.

It requires no imaginative leap to appreciate the reason why permitting a reviewing court to render factual findings in the first instance violates due process. As explained by Lord Coleridge when rejecting a request to have a retrial conducted

by reading the notes of the witnesses' prior testimony:

> The most careful note must often fail to convey the evidence fully in some of its most important elements. . . . It cannot give the look or manner of the witness: his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration; . . . the dead body of the evidence, without its spirit; which is supplied, when given openly and orally, by the ear and eye of those who receive it.

*Queen v. Bertrand*, 4 Moo. P. C. N. S. 460, 481, 16 Eng. Rep. 391, 399 (1867), *quoted in United States v. Raddatz*, 447 U.S. 667, 680 (1980).  This has led the Supreme Court to adopt a general rule that "[t]he one who decides must hear." *Morgan v. United States*, 298 U.S. 468, 481 (1936).  An appellate court making factual findings, including credibility determinations, without hearing live testimony violates this general mandate.  Other courts, including this one, have echoed these concerns.  *See*, *e.g.*, *Palmero v. Warden, Green Haven State Prison*, 545 F.2d 286, 293 (2d Cir. 1976) ("Where findings relate to the design, motive and intent behind human actions, they especially depend upon the credibility assessment of witnesses by those who see and hear them. Thus, an appellate court, equipped only with a 'cold' record, is appropriately reluctant to reject the credibility evaluations of the district court.") (internal citations omitted); *Publicker Indus., Inc. v. Cohen,* 733 F.2d 1059, 1072 (3d Cir. 1984) ("[T]he availability of a trial transcript is no substitute for a public presence at the trial itself. As any experienced appellate judge can attest, the cold record is a very imperfect reproduction of events that transpire in the

courtroom.") (internal quotation marks omitted); *United States v. Ceballos,* 302 F.3d 679, 694 (7th Cir. 2002) ("We do not rule on voluntariness questions in the first instance. The voluntariness of a confession is a question of fact for the district court, not a legal determination for this Court.") (citing *United States v. Huerta,* 239 F.3d 865, 871 (7th Cir. 2001)).

This is why Respondent has been unable to cite a single Circuit or Supreme Court case in which a court has endorsed the after-the-fact resolution of dispositive factual disputes, including credibility contests, based solely on a cold record. The Supreme Court's approval of the Federal Magistrates Act in *Raddatz* is no exception. 28 U.S.C. § 636(b)(1)(B) permits a magistrate judge to conduct a suppression hearing and submit proposed findings of fact and recommended dispositions. A district court must then "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In doing so, a district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id*. Although the Supreme Court found this procedure complied with due process, the *Raddatz* Court was careful to observe an implicit limitation in a district court's power to reject a magistrate's proposed findings on credibility when those findings are dispositive. As explained by the *Raddatz* majority, a district court's rejection of proposed findings on credibility over dispositive issues "without seeing and hearing

the witness or witnesses whose credibility is in question could well give rise to serious questions which we do not reach." *Raddatz*, 447 U.S. at 681 n.7.

What is more, Respondent's claim fails on its own terms. Even if this Court were to sanction an appellate court's resolution of hotly contested and dispositive factual disputes based solely on the cold record, the Appellate Division here did not actually make any relevant findings of fact in this case, or acknowledge that the trial court failed to do so. Dearstyne's suppression motion focused on three related claims concerning the facts surrounding his alleged confession: (1) he was a juvenile deliberately isolated from his parents; (2) he signed the statement as a result of "fear and fatigue"; and (3) he was coerced with "false promises" of leniency and "trickery" and threatened with non-existent evidence. On direct appeal, the Appellate Division focused exclusively on claim (1) – whether Dearstyne was deliberately isolated from his parents.

The Appellate Division utterly failed to so much as mention the coercive events that occurred within the interrogation room. In addition to ignoring these salient facts, the Appellate Division never addressed whether Dearstyne's statement was involuntary as obtained through fear and intimidation and threats and promises. Nor could it, given that these questions hinged entirely on credibility determinations that remained unresolved by the County Court. Therefore, even if permitted to make factual findings in compliance with *Jackson v. Denno*, a point Petitioner in no way

concedes, the Appellate Division's failure to make any findings concerning the coercive events that occurred during Dearstyne's interrogation and its failure to rule on whether those events rendered his statement involuntary clearly violates due process.

### B. THE STATE COURT'S DETERMINATION THAT PETITIONER'S STATEMENT DID NOT RESULT FROM INTENTIONAL ISOLATION DESIGNED TO OVERBEAR HIS WILL WAS AN UNREASONABLE DETERMINATION OF THE FACTS

On direct appeal, Petitioner's challenge to his statement focused solely on the deceptive steps law enforcement officers took to isolate him from his parents. Petitioner did not raise, and the Appellate Division did not rule on, the coercive measures law enforcement officers exercised in extracting an involuntary statement. While the nature of the questioning within the interrogation room was (and remains) hotly contested, the facts surrounding Dearstyne's isolation are still largely undisputed. Nevertheless, even within the narrow context of these undisputed facts, the Appellate Division found suppression unwarranted solely because Dearstyne's isolation did not result "from official deception or trickery." *Dearstyne*, 230 A.D.2d at 958. This conclusion was based on the Appellate Division's finding (1) "the police had obtained the consent of defendant's mother to speak to him" and (2) "there is no indication that his father made any effort to contact an attorney to represent him." *Id*.

As the Magistrate Judge noted in his Report and Recommendation, "the Appellate Division's conclusion that Petitioner's statement did not result from intentional isolation designed to overbear Petitioner's will was an unreasonable determination of the [undisputed] facts, in light of the evidence presented in the State court proceeding." (A-240). The Magistrate's conclusion was based on the following considerations: (1) "the police intentionally isolated petitioner from his mother by not informing her where they were bringing him"; (2) they brought "him into the barracks by means of an entrance not used by the public"; and (3) they contravened "established police procedure by not signing him in on the sign-in log at the barracks, so there was no record that he was in the building." (A-240). The Magistrate's Report also concluded that "the troopers' deceptive practices in making sure that Petitioner's whereabouts were a secret lends credence to Petitioner's version of the interrogation." (A-239).

The Appellate Division was only able to reach a contrary conclusion by ignoring the following undisputed facts:

(1) When Detective Petrucci and Trooper Donovan went to the Dearstyne residence, Dearstyne was their prime suspect in an alleged sexual abuse case claimed to have occurred at the Dearstyne residence. (CA-280:19-281:3). They intended to take Dearstyne to Loudonville to be interrogated by Investigator Girtler (CA-281:18-22: CA-288:18-21);

(2) Instead of sharing this information with Dearstyne's mother, Detective Petrucci falsely told Petitioner's mother that Dearstyne was not in any trouble and that she had nothing to worry about.

They never told her *where* and *why* they planned to question her son. They also never disclosed to her that a child claimed to have been abused while under her care (CA-281:1-282:4; CA-353:14-354:22);

(3)   Dearstyne was not informed of *where* and *why* the police officers wanted to speak with him until he was outside the presence of his friends and family (CA-283:4-14);

(4)   When arriving at the Loudonville Barracks, the officers brought Dearstyne in through the back door of the station reserved for officers and failed to log his name in the "blotter," both in contravention of police protocol. As a consequence, no one other than Dearstyne, Petrucci, Donovan, and Girtler knew where Petitioner was being interrogated. No other police officer or agency knew of Dearstyne's whereabouts. (CA-271:20-272:2; CA-290:18-291:11; CA-337:5-338:23);

(5)   Detective Petrucci did not speak with Dearstyne's father until after the officers had almost secured a statement (CA-302:17-304:13); and

(6)   During that conversation, Detective Petrucci did not tell Dearstyne's father that Petitioner was being interrogated. Instead, he "advised" him and his wife to come to the station where they could discuss the matter. (CA-303:24-304:5).

Remarkably, when recounting the exchange between Detective Petrucci and Dearstyne's mother in support of a finding that Petitioner's mother gave her consent, the Appellate Division simply stated that Petrucci did not "specify the subject of the investigation." *Dearstyne*, 230 A.D. 2d at 958. While true, this was an unreasonably narrow reed upon which to support a finding of consent, given the officers' failure to inform Petitioner's mother of their true intentions.

What is more, the Appellate Division ignored the fact that the reason Dearstyne's father did not make any effort to contact an attorney to represent him was because Detective Petrucci initially told Mrs. Dearstyne that her son was not in any trouble and she had nothing to worry about. (CA-352:14-353:20). Moreover, Dearstyne's father, who had been attempting to contact Petitioner since 2:20, was unable to do so until 4:45, and even then, was never told by Detective Petrucci that his son was being interrogated by police officers, but was, instead, "advised" to come to the station house where Petrucci and him would "sit down and speak . . . about it." (CA-303:4-304:10). Had Detective Petrucci not acted in this deceptive manner, told Mrs. Dearstyne that her son was the prime suspect and that Petrucci intended to remove and isolate Petitioner to interrogate him, Petitioner's parents would have understood the need to immediately retain counsel to represent their son. The State cannot deliberately keep Petitioner's parents in the dark as to their intentions with respect to a 16-year-old child, then claim that the parents' failure to act quickly enough, renders the officers' deception moot or inconsequential. Furthermore, because Dearstyne's location was deliberately secret, it is far from clear what benefit retaining an attorney could have provided. Thus, the state court's determination that Dearstyne's statement did not result from intentional isolation designed to overbear his will was an unreasonable determination of the facts.

## II.   PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL

In addition to being denied due process and his right against self-incrimination through the improper inclusion of Dearstyne's involuntary statement, the representation provided by Dearstyne's trial counsel, Grimmick, was wholly ineffective, thereby depriving Dearstyne of his Sixth Amendment right to counsel and a fair trial.  The Appellate Division's denial of Dearstyne's ineffective assistance of counsel claim involved an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254.  (A-362; A-367-368; A-374).  The clearly established Federal law applicable to Dearstyne's ineffective assistance claim is the standard set forth in *Strickland v. Washington*.  *See Williams*, 529 U.S. at 390 (holding that the merits of petitioner's *habeas* claim for ineffective assistance of counsel was "squarely governed" by the holding in *Strickland*).

To establish ineffective assistance of counsel, a *habeas* petitioner must show: "(1) that counsel's representation fell below an objective standard of reasonableness measured by the prevailing professional norms; and (2) that there is a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different."  *United States v. Gordon*, 156 F.3d 376, 379 (2d Cir. 1998) (citing *Strickland*, 466 U.S. at 688−90).

The standards for deciding a claim of ineffective assistance of counsel, articulated in *Strickland*, were re-affirmed by the Supreme Court in *Williams v. Taylor*:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable.

529 U.S. at 390 (quoting *Strickland*, 466 U.S. at 687). Representation is ineffective if it "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

Here, Petitioner has met both prongs of this test. Grimmick's failure to consult with or call experts was (1) objectively unreasonable and (2) prejudicial to Petitioner's case. Grimmick did not consult with or present the testimony of a medical expert who could have contradicted the reliability of the testimony and medical evidence presented by the prosecution. Nor did Grimmick consult with or present the testimony of an expert who could have testified about the psychological indicators of sexual abuse, and the fact that the "symptoms" and "behavioral changes" in the alleged victims as reported by their mothers, are the types of conduct often seen in three-year-olds who have *not* been exposed to sexual abuse. Grimmick

explicitly stated in his 2005 affirmation that he did not call or consult with such experts to contest the prosecution because "he did not believe that it would be prudent to do so." (A-198-99 at ¶11). Grimmick's "excuse" for failing to call or consult with experts is insufficient under the law. His failure was objectively unreasonable and prejudicial to Dearstyne under Supreme Court precedent.

Had Grimmick provided effective counsel by consulting with and retaining medical and psychological experts, the defense would have been able to provide expert testimony to undercut the prosecution's theories and to effectively cross-examine the prosecution's witnesses, and the outcome of Dearstyne's case would have been altered.

Moreover, attorney errors must be considered in the aggregate, and ineffective assistance of counsel claims will prevail when the cumulative weight of those errors rises to the level of constitutionally deficient conduct. *See Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001)[10]; *Eze v. Senkowski*, 321 F.3d 110, 135−36 (2d Cir. 2003).

---

[10] Although the *habeas* petition in *Pavel* was filed prior to the effective date of the AEDPA and thus the Court reviewed the petition under standards dictated by pre-AEDPA law, the Court relied on Supreme Court precedent—namely *Strickland*—in holding that petitioner's counsel provided ineffective assistance of counsel. Further, *Pavel* has been repeatedly cited to post-AEDPA. *See, e.g., Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005) (citing *Pavel*, 261 F.3d at 224) ("In sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel."); *Cortijo v. Bennett*, 293 F. App'x 794, 796–97 (2d Cir. 2008) (quoting *Pavel*, 261 F.3d at 224) ("There is no indication in the record that Cortijo's defense counsel 'had the education or experience necessary' to assess relevant psychiatric evidence, or 'to make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the

While it is true that courts are hesitant to second guess matters of "trial strategy," failing to investigate all available options in the sort of credibility contest that is a child sex abuse case is *not* a "trial strategy." *See Gersten v. Senkowski*, 426 F.3d 588, 608 (2d Cir. 2005) (defense counsel's decision to concede the medical evidence without consulting an expert in an accused sex offender's case "was not justified as an objectively reasonable strategic choice").

Grimmick's failure to take any steps to consult with or retain medical or behavioral experts is constitutionally deficient under *Strickland*. *Id.* at 688–90. Grimmick's failure to consult with or call either type of expert on its own, would be sufficient for this Court to hold that the representation fell below the acceptable level. *See, e.g. Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986) ("[A] single, serious error may support a claim for ineffective assistance of counsel."). However, Grimmick's cumulative failures and omissions more clearly rise to the level of ineffective assistance of counsel.

As set forth in more detail below, Gimmick's representation of Dearstyne was constitutionally deficient under *Strickland* in that he failed to call any expert witnesses to the stand, or to even consult with experts regarding the medical evidence and/or the psychological effects of sexual abuse.

---

stand.'").

**A.** **TRIAL COUNSEL ACTED IN AN OBJECTIVELY UNREASONABLE AND PREJUDICIAL MANNER WHEN HE FAILED TO CONSULT WITH OR CALL MEDICAL EXPERT WITNESSES**

**1.** **The Failure to Even Consult With or Interview Potential Medical Experts Has Been Found to be Unreasonable**

Grimmick acted in an objectively unreasonable manner when he failed to even consult with a medical expert. "Because of the importance of physical evidence in 'credibility contest' sex abuse cases, in such cases physical evidence should be a focal point of defense counsel's pre-trial investigation and analysis of the matter." *Pavel*, 261 F.3d at 224. Further, "because of the 'vagaries of abuse indicia,' such pre-trial investigation and analysis will *generally require some consultation with an expert*." *Id.* at 224 (emphasis added). Like in *Pavel*, Grimmick's "decision not to call a medical expert was deficient because it was not based on pre-trial consultation with such an expert." *Id.* at 223.

In the affidavit submitted by Grimmick, Grimmick describes each of the steps he took to prepare for trial. Notably absent from Grimmick's affidavit is any indication that he consulted with *any* type of expert or physician. (A-197 at ¶ 5) (emphasis added). Certainly, consultation with experts is necessary, at the very least, to better prepare to effectively cross-examine the state's witnesses and better define defense counsel's "theory of the case," yet Grimmick did not even use an expert to assist him in this basic regard. Grimmick did not interview C.C. or T.O.'s treating

physicians in advance of trial to determine if they had any potentially helpful testimony. Additionally, the doctor who had examined C.C. was unavailable to testify at trial, which further prejudiced Dearstyne. (CA-662:1-2).

The failure to consult with a medical expert, even if not planning to present expert testimony at trial, has been held to be objectively unreasonable. Defense counsel has an obligation, wherever possible, to "attack vigorously the reliability of any physical evidence of sexual conduct between the defendant and the complainant." *Eze*, 321 F.3d at 112. This was not done here. As the Court of Appeals for the Second Circuit has stated:

> [W]hen a defendant is accused of sexually abusing a child and the evidence is such that the case will turn on accepting one party's word over the other's, the need for defense counsel to, *at a minimum*, consult with an expert to become educated about the vagaries of abuse indicia is critical. The importance of consultation and pre-trial investigation is heightened where, as here, the physical evidence is less than conclusive and open to interpretation.

*Id.* at 128 (emphasis added) (quotation omitted); *see also Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001) (holding trial counsel was constitutionally ineffective because of his failure to conduct any relevant research, such as contacting an expert "either to testify or (at least) to educate counsel on the vagaries of abuse indicia").

Just as the trial counsel in *Lindstadt*, *Eze*, *Gersten*, and *Pavel* acted unreasonably under *Strickland* when they failed to consult experts who might have been able to point to published studies or refute or undermine the State's physical

evidence of sexual abuse, Grimmick likewise acted unreasonably when he failed to consult with an expert and failed to present evidence of contemporaneous medical studies that would have undermined the physical evidence presented by the prosecution.

Here, where the testimony of T.O. and C.C. was in opposition to Dearstyne's testimony and the physical evidence available in support of T.O. and C.C.'s testimony was open to interpretation, the testimony or opinion of a medical expert was critical to Dearstyne's defense. The medical evidence that was available in support of the allegations was inconclusive at best. In addition, the method used by T.O.'s examining physician (Dr. Close) had been called into question, and "medical studies [which] raised questions about the reliability of hymenal examinations as a basis for determining the occurrence of sexual abuse" were available to Grimmick prior to trial. *Eze*, 321 F.3d at 128–29 (collecting studies published in 1990). Those studies state that various factors can impact the results of hymenal measurements and question the reliability of hymenal measurements. Just as trial counsel in *Eze* and *Pavel*, Grimmick failed to confront Dr. Close, who examined T.O. and who testified that he measured T.O.'s hymen and that it was a little larger than what would be expected for a child that age (CA-635:20-637:5), with these studies or to present his own expert who would have been able to use these studies to discount the evidence offered by the State. *Eze*, 321 F.3d at 128–29; *Pavel*, 261 F.3d at 223–24.

A medical expert would also have been able to use these or similar studies to explain the medical record of C.C. which stated: "Hymen is not attached." (CA-663:6-8).

The medical evidence relating to C.C. is particularly troubling because the physician who examined her was unavailable at the time of the trial, and according to his affidavit, Grimmick admittedly never spoke with this physician to determine the scope of his testimony or the meaning of these notations. (CA-675:14-24). In a discussion between counsel and the court on whether to admit this medical record without the testimony of the treating physician (CA-654:15-671:15), Grimmick agreed with the court that without the treating physician's testimony regarding the significance of C.C.'s medical record, the jury was left to speculate as to what could have caused the injuries. (CA-667:21-668:21). However, despite his concern, Grimmick did not interview a medical expert or try to contact C.C.'s treating physician regarding the significance, or more importantly, the lack of significance, of these findings. Had Grimmick acted with objective reasonableness, he would have interviewed an appropriate expert in advance of trial and offered expert testimony at trial, rather than leave the jury to draw its own conclusions from the medical record of C.C. The testimony of a medical expert would have explained the other possible sources for such injuries and their significance. Instead, Mr.

Grimmick acted in an objectively unreasonable manner, and simply left the jury to draw its own conclusions.[11]

### 2. The Failure to Call or Interview Any Medical Experts Was Not a "Trial Strategy"

The failure to consult with an expert has been held to constitute ineffective assistance of counsel because such failure does not constitute a trial strategy. For example, the Eleventh Circuit has recognized that the failure to present medical evidence in rebuttal was not a strategic decision when counsel had not even bothered to interview possible medical experts. As the court stated in *Holsomback v. White*, 133 F.3d 1382, 1388 (11th Cir. 1998), "[h]ad counsel interviewed the doctors, a subsequent tactical decision might have fallen well within 'the wide range of reasonable professional assistance.'" *Id.* (citing *Strickland*, 466 U.S. at 689). Without the opportunity to hear what evidence could be presented through an

---

[11] Furthermore, in the absence of any expert consultation, there is no evidence that Grimmick had any special expertise in the area of interpreting medical records or in dealing with sexual abuse cases. As in *Pavel*, because "there is no indication in the record that [counsel] had the education or experience necessary to assess relevant physical evidence, and to make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand," it was all the more necessary for Grimmick to, at the very least, consult with some type of medical expert. *Pavel*, 261 F.3d at 224.

interview or consultation with an expert, counsel's decision not to call an expert to

testify at trial cannot constitute an informed trial strategy. *Id*.

In his affidavit, Grimmick states:

> With respect to my decision not to call experts of my own . . . , I simply did not believe that it would be prudent to do so given my extensive cross-examination of the People's witnesses, and the fact that some of these witnesses provided testimony favorable to the defense. To the best of my recollection, I discussed this strategy with petitioner.

(A-198-99 at ¶ 11). Grimmick implies that his cross-examination of Nurse West and

Dr. Close alone was sufficient to discredit the State's medical evidence. However,

cross-examination does not take the place of the knowledge that is possessed by an

expert or an empirical study that calls evidence into question and undercuts its

reliability. *See, e.g.*, *Miller v. Senkowski*, 268 F. Supp. 2d 296, 311 (E.D.N.Y. 2003)

("[C]ross-examination does not cure the error of failing to seek a competing expert

opinion."). Grimmick's affidavit establishes that he did not even consult an expert.

Having failed to even consult an expert, Grimmick's cross-examination was not

"extensive" (as he claims) but much less effective. For example, Grimmick's cross-

examination did not establish that the method of examination used by Dr. Close had

been called into question by the medical community, a factor which under *Frye* or

*Daubert* might have led to his testimony being stricken. Furthermore, questions

asked by counsel during cross-examination are not evidence that may be considered

by the jury. In fact, in this case, the jury was specifically instructed *not* to consider counsel's questions as evidence by the Judge. (CA-232:16-19).

While Grimmick describes his decision as a "strategy," the decision not to consult with a medical expert arose during the pre-trial preparations, and therefore, Grimmick chose not to consult with an expert far in advance of his cross-examination at trial. He could not have known how successful or unsuccessful his cross-examination was going to be, or even what testimony was going to be given, when he allegedly made the decision to not consult with an expert. Therefore, what he claims to be "strategy" is really more akin to a decision by counsel to avoid additional work, as was the case in *Pavel*, and the explanation given by Grimmick only supports the conclusion that he did not make an informed decision not to call an expert. Thus, counsel did not act in an objectively reasonable manner under *Strickland*. An objectively reasonable trial attorney would not decide in advance of a trial that his cross-examination of a physician as to physical evidence in a sex abuse case would be sufficient to discredit the evidence, absent some special knowledge or some type of consultation with other experts as to the validity of such physical evidence.

Respondent argues that counsel's failure to call medical experts was part of a strategy "to point out the ambiguities of the People's case in every area, emphasizing to the jury that there were no experts to interpret the evidence." (Doc. 26, at 14,

*quoting* October 13, 1999 Order). However, in the context of the credibility contest that is a child sex abuse case, it was objectively unreasonable for Grimmick to focus solely on weakening the People's case, rather than calling his own experts to strengthen Dearstyne's affirmative case. Having not even explored the possible testimony of *any* medical expert, Grimmick was unable to reasonably determine that his method of "weakening the People's case" was preferable to presenting the affirmative testimony of expert. As such, his decision not to call a medical expert was not a "strategy." In fact, his closing, which highlights the lack of experts, serves as evidence that Grimmick recognized that the testimony of experts was lacking. (*See*, *e.g.*, CA-910:679:21-25; 912:685:5-11; 912:687:19-24).

Further, the fact that the State failed to introduce any expert testimony of its own, is further evidence of the fact that it had a very weak case, which Grimmick failed to exploit. The prosecution essentially left the jury to speculate as to the significance of the medical records, and Grimmick did not present any testimony which would keep such speculation in check.

Respondent contends that Grimmick effectively represented Dearstyne, in part because of his arguments on summation. (Doc. 26, at 16). However, counsel's opening and closing arguments are not a substitute for *evidence* and certainly are not a substitute for the type of evidence that can be provided by an expert. The court in Dearstyne's case explicitly told the jury during Grimmick's closing statement that

"[t]he Jury will have to recall what the facts are. What either counsel says is not evidence. You are the people who must remember what everybody said." (CA-911:684:19-21). In fact, by noticing that there were weaknesses in the State's expert testimony, and by not providing experts to counter those weaknesses, Grimmick perpetuated his ineffectiveness. Even an effective argument on summation cannot serve as a remedy for the lack of expert testimony.

### 3. Had Grimmick Consulted With or Presented Testimony of a Medical Expert, the Outcome of the Trial Would Have Been Different

By not even consulting a medical expert, Grimmick fatally prejudiced Dearstyne's case. Under the *Strickland* rubric, a petitioner establishes prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. Further, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Here, had a medical expert been consulted, such an expert would have been able to question the methodology used by T.O.'s examining physician based on published studies that were available at the time and to call into question the medical record of C.C. which was admitted to evidence without any testimony from the examining physician and which, without the testimony of the physician, was left to the speculation of the jury. Had a medical expert been called to the stand, that expert

could have discussed the medical record in detail and provided alternative explanations for the findings that did not include sexual abuse.

The affidavit of Dr. Robert Fay, submitted by Petitioner in support of Petitioner's N.Y. CRIM. PROC. LAW § 440.10 motion, demonstrates that an expert witness could have been called at trial and provided a view into what that expert testimony would have encompassed.[12]  (Fay Affidavit, CA-9-10).  In his affidavit, Dr. Fay, who specializes in Pediatric Medicine and who is familiar with medical conditions encountered in children who may have been sexually abused, calls into question Dr. Close's findings with respect to T.O. and the methods in which Dr. Close examined T.O.  In particular, Dr. Fay found the conclusion of Dr. Close that the "yellow material" in T.O.'s vaginal area was semen "questionable on its face."  Dr. Fay stated that in his professional experience, semen is white, and yellowish material in a child's vagina is usually discharge, frequently from an infection. (CA-9-10, at ¶3).

---

[12]  As noted in the Report at fn 31, despite the unsigned copy in the record, the CPL § 440.10 court concluded that the affidavit from Dr. Fay was a valid and proper affidavit, considered this particular ineffective assistance claim on the merits, and there does not appear to be any dispute regarding the fact that Dr. Fay presented a valid and proper affidavit in the state court proceedings, which affidavit is, in sum and substance, the same as the affidavit provided to the District Court.  (A-347)

In addition, Dr. Fay found the methods used by Dr. Close in examining the victims "questionable." (CA-9-10, at ¶4). Dr. Fay opines that it would not have been possible for Dr. Close to see the scratches in T.O.'s vagina that he claimed to have seen without the use of a speculum, which Dr. Close admittedly did not have. (CA-9-10, at ¶4). According to Dr. Fay, it is "extremely difficult for any doctor to see a vaginal abrasion unaccompanied by bleeding, especially without a speculum." *Id*.

In addition, Dr. Fay found it hard to believe that Dr. Close would not have seen the hymenal clefts and notches observed by the Albany Medical Center, where T.O. was examined following Dr. Close's examination. *Id*. Dr. Fay also found Dr. Close's methodology deficient in that he failed to take any photographs of T.O.'s alleged injuries. *Id*. Had Grimmick employed expert assistance such as that detailed in Dr. Fay's affidavit, there was a reasonable likelihood of a more favorable outcome at trial.

Judge Bianchini was thus correct in concluding that Dearstyne has shown he was prejudiced under *Strickland* with respect to the allegations involving T.O. and C.C. and the state court was unreasonable in concluding otherwise and denying his ineffective assistance of counsel claim. (A-353-368).

Because the testimony of a medical expert would have raised additional questions about the sufficiency of already inconclusive physical evidence and underwhelming evidence of guilt in this credibility contest, Grimmick's failure to

present or seek out this type of testimony was prejudicial to Dearstyne.  Had a medical expert been consulted, there is a reasonable probability that the outcome of the trial would have been different.

**B.  TRIAL COUNSEL ACTED IN AN OBJECTIVELY UNREASONABLE AND PREJUDICIAL MANNER WHEN HE FAILED TO CONSULT WITH OR CALL PSYCHOLOGICAL EXPERT WITNESSES**

**1.  Grimmick Acted Unreasonably by Not Consulting With an Expert on the Psychological Effects of Sexual Abuse**

Separate and independent from his unreasonable failure to consult medical experts, Grimmick acted in an objectively unreasonable and prejudicial manner when he failed to consult with or call an expert to testify as to the psychological effects of sexual abuse.  At trial, the mothers of T.O. and C.C. were allowed to testify as to certain behavioral changes they allegedly saw in their children at or about the time of the alleged abuse.  (CA-472:20-478:24; CA-550:16-555:20). The behavioral changes observed by these mothers were offered to show that the three girls purportedly demonstrated signs of abuse at or around the time of the allegations. However, the prosecution offered no evidence to suggest that the alleged observed behavior was typical of actual sexual abuse, versus the normal behavior of two and three year olds.  Therefore, the jury was left to speculate as to the significance or insignificance of the testimony of the mothers.

In his closing, when referencing the testimony of the children's mothers, Grimmick actually stated that, "I think it might have been dime store psychology to say these changes occur, and that's indicative of a rape or sexual assault, but we don't have psychologists. We don't have psychiatrists. We don't have anything else to interpret those." (CA-910:679:21-25). Respondent argues this type of observation shows that Grimmick effectively represented his client. (Doc. 26 at 16). Even if this type of statement did constitute "evidence," the court ultimately instructed the jury to disregard Grimmick's statement.

Grimmick admitted, in front of the jury, that there was no psychiatrist to comment on the behavioral changes testified to by the mothers, and even stated that it was his own opinion that this testimony was not relevant to the issue of abuse. However, if Grimmick had acted in an objectively reasonable manner, he would not have stopped at giving his own, personal opinion. He would have consulted with an expert, confirmed that the behavioral changes cited by the mothers are explainable as the sort of conduct typically seen in two and three year old children and are not seen by a professional as an indication of sex abuse. This type of affirmative evidence on the part of a defense expert would have helped to discredit the testimony offered by the prosecution. By merely noting his opinion, without ever researching the extent that the behavioral changes could have been caused by other sources, Grimmick acknowledged that he understood what a good defense would have been,

while at the same time acknowledging that he did nothing to present such evidence. Grimmick simply did not provide effective assistance to his client.

### 2. Had Grimmick Consulted With or Presented the Testimony of an Expert on the Psychological Effects of Sexual Abuse, the Outcome of the Trial Would Have Been Different

Grimmick did not consult with or present the testimony of a psychologist to refute the significance of the behavioral changes noted by the alleged victims' mothers. The affidavit of Dr. Richard A. Gardner, submitted by Petitioner in support of Petitioner's N.Y. CRIM. PROC. LAW § 440.10 motion, demonstrates that an expert witness could have been called at trial to support Dearstyne's case. (Gardner Affidavit, CA-998-1004). Dr. Gardner's states that the behavior and psychological changes noted in T.O. and C.C. do not necessarily indicate sexual abuse. (CA-1001-1003 ¶¶13-14 and ¶¶16-17). Dr. Gardner further stated that "the changes testified to are only indicative of normal activity that a young girl can go through during routine changes in her life (i.e., being aware from family, being sick, mood swings, etc." (A-1002-1003 at ¶¶16-17).

Had such an expert been called at trial, that expert could have testified to the other causes for such behavior, and pointed out that the timing of the alleged behavior did not correspond with the alleged abuse, impacting the jury's view of this evidence. Additionally, such an expert could have explained some of the common ways that sex abuse manifests itself in small children, and that such behavior was

not exhibited by the girls in question. *See, e.g.*, *Gersten*, 426 F.3d at 611 (holding that defense counsel "was unable to mount an effective cross-examination" because he "failed to consult or call an expert on the psychology of child sexual abuse, or to educate himself sufficiently on the scientific issues."). Rather, as an expert could have testified to, the alleged victims' behavior was consistent with most young children their age. Dearstyne was particularly prejudiced with the lack of expert testimony to refute the behavioral changes in C.C., because he was convicted of both charges involving C.C., for which the only proof came from the victim herself, the medical record of a non-appearing medical witness, and the victim's mother's testimony about her behavioral changes. Had expert testimony like that of Dr. Fay been presented at trial, it is likely that the jury would have found that the prosecution had not met its burden of proof, and the outcome of the trial would have been different. Therefore, in neglecting to even consult with an expert on the psychological effects of sexual abuse, Grimmick prejudiced Dearstyne's defense under *Strickland*.

## CONCLUSION

Petitioner-appellant Frank W. Dearstyne respectfully requests that the District Court's Decision and Order be reversed, the state court judgment of conviction be vacated, and that this Court issue a writ of *habeas corpus* as a matter of law.

Dated: May 20, 2016

Respectfully Submitted,

KELLEY DRYE & WARREN LLP

By: /s/ James V. O'Gara
James V. O'Gara (601366)
*Pro Bono Counsel*
101 Park Avenue
New York, NY 10178
(212) 808-7800

OFFICE OF THE FEDERAL PUBLIC
DEFENDER

Lisa A. Peebles
Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, New York 13202

James P. Egan
Office of the Federal Public
Defender Research & Writing
Specialist

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate

Procedure, the foregoing brief is in 14-Point Times Roman proportional font

and contains 13,141 words and thus is in compliance with the type-volume

limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate

Procedure.


Dated:      New York, New York
              May 20, 2016


                        /s/ James V. O'Gara

**SPECIAL APPENDIX**

# TABLE OF CONTENTS

**Page**

Order of the Honorable Frederick J. Scullin, Jr.,
Appealed From, dated August 20, 2015 ............... SPA-1

Judgment, Appealed From, dated August 21, 2015 ... SPA-6

28 U.S.C.A. § 2254, effective April 24, 1996............ SPA-7

U.S.C.A. Const. Amendment V - Grand Jury
Indictment for Capital Crimes; Double Jeopardy,
Self-Incrimination; Due Process of Law; Takings
without Just Compensation.................................... SPA-10

U.S.C.A. Const. Amendment VI - Jury Trials for
Crimes and Procedural Rights .............................. SPA-11

SPA-1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**FRANK W. DEARSTYNE,**

                                                **Petitioner,**

                    **v.**                                                  **9:04-CV-741**
                                                                              **(FJS/VEB)**

**WILLIAM MAZZUCA, Superintendent,**
**Fishkill Correctional Facility,**

                                                **Respondent.**
_____

**APPEARANCES**                                **OF COUNSEL**

**KELLEY, DRYE & WARREN LLP**          **JAMES V. O'GARA, ESQ.**
101 Park Avenue
New York, New York 10178
Attorneys for Petitioner

**OFFICE OF THE FEDERAL**                 **LISA A. PEEBLES, FPD**
**PUBLIC DEFENDER**
The Clinton Exchange, 3rd Floor
4 Clinton Street
Syracuse, New York 13202
Attorneys for Petitioner

**OFFICE OF THE NEW YORK**               **PAUL B. LYONS, AAG**
**STATE ATTORNEY GENERAL**            **ALYSON J. GILL, AAG**
120 Broadway
New York, New York 10271
Attorneys for Respondent

**SCULLIN, Senior Judge**

## ORDER

        Petitioner was convicted in a New York State court of attempted rape in the first degree,

aggravated sexual abuse in the first degree, and two counts of endangering the welfare of a child.

Petitioner contended that his conviction was imposed in violation of his constitutional rights and,

therefore, should be vacated.  Petitioner filed his petition for a writ of *habeas corpus* pursuant to 28

U.S.C. § 2254, in which he argued that there were multiple errors that warranted habeas relief.  In an

extensive, and very thorough, Report and Recommendation, Magistrate Judge Bianchini

recommended, among other things, that this Court

> (1) direct the State of New York to vacate immediately Petitioner's convictions of Attempted Rape in the First Degree, in violation of New York Penal Law §§ 110 and 130.35 and of Endangering the Welfare of a Child, in violation of New York Penal Law § 260.20, with respect to the alleged victim identified as "T.O."

> (2) direct the State of New York to vacate immediately Petitioner's convictions of Aggravated Sexual Abuse in the First Degree, in violation of New York Penal Law § 130.70, and of Endangering the Welfare of a Child, in violation of New York Penal Law § 260.20, with respect to "C.C."

> (3) direct the State of New York to release Petitioner within thirty days from the entry of an Order adopting or approving this Report and Recommendation "unless New York State had, by that point, taken concrete and substantial steps expeditiously to retry" Petitioner with respect to the charges in question

> (4) deny the balance of the claims that Petitioner raised in his Amended Petition

> (5) issue a Certificate of Appealability regarding the issue of the Petitioner's prosecutorial misconduct claim and not issue a Certificate of Appealability regarding his other claims

Both Petitioner and Respondent filed objections to Magistrate Judge Bianchini's

recommendations.

After reviewing a magistrate judge's recommendations, the district court may accept, reject

or modify those recommendations.  *See* 28 U.S.C. § 636(b)(1).  The court reviews *de novo* those

portions of the magistrate judge's recommendations to which a party objects.  *See Pizzaro v.*

*Bartlett*, 776 F. Supp. 815, 817 (S.D.N.Y. 1991).  """If, however, the party makes only conclusory or general objections, . . . the Court reviews the Report and Recommendation only for clear error.'""" *Salmini v. Astrue*, No. 3:06-CV-458, 2009 WL 179741, *1 (N.D.N.Y. June 23, 2009) (quoting [*Farid v. Bouey*, 554 F. Supp. 2d 301] at 306 [(N.D.N.Y. 2008)] (quoting *McAllan v. Von Essen*, 517 F. Supp. 2d 672, 679 (S.D.N.Y. 2007))).  Finally, even if the parties file no objections, the court must ensure that the face of the record contains no clear error.  *See Wilds v. United Parcel Serv., Inc.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003) (quotation omitted).

Section 2254 of Title 28 of the United States Code, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs federal *habeas corpus* review of a state-court conviction.  Under the AEDPA, federal courts must give substantial deference to a state-court determination that has adjudicated a federal constitutional claim on the merits.  *See* 28 U.S.C. § 2254(d); *Sellan v. Kuhlman*, 261 F.3d 303, 309-10 (2d Cir. 2001).

Furthermore, the AEDPA requires that, where a state court has adjudicated the merits of a Petitioner's federal claim, a court may not grant *habeas corpus* relief unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2).

A state-court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state

-3-

court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A state-court decision involves "an unreasonable application of" Supreme Court case law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

Under these standards, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  "Objectively unreasonable," however, is different from "clear error." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness" (citations omitted)).  Thus, federal habeas relief is precluded "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86 (2011) (quotation omitted); *see also White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (stating that a "'state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement'" (quotation omitted)).  "This is a 'difficult to meet,' . . ., and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt,' . . . ."  *Cullen v. Pinholster*, 563 U.S. 170, ___, 131 S. Ct. at 1398 (2011) (internal citations omitted).

In this case, Petitioner asserted sixteen grounds in support of his request for *habeas* relief, each of which Magistrate Judge Bianchini discussed in great detail.  The Court has conducted a *de*

*novo* review of each of Magistrate Judge Bianchini's recommendations in light of the parties'

objections and the applicable law and concludes that, although the Court may disagree with some of

the state-court decisions, Petitioner has not demonstrated that any of those decisions were contrary

to clearly established Federal law or objectively unreasonable.  Accordingly, having completed its

review of the entire record in this matter, as well as the applicable law, the Court hereby

     **ORDERS** that Magistrate Judge Bianchini's Report and Recommendation, *see* Dkt. No. 90,

is **ACCEPTED in part and REJECTED in part**; and the Court further

     **ORDERS** that Petitioner's amended petition is **DENIED and DISMISSED in its entirety**;

and the Court further

     **ORDERS** that a Certificate of Appealability will **not** issue with regard to any of the grounds

that Petitioner raised in his amended petition because Petitioner has not "made a substantial showing

of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); and the Court further

     **ORDERS** that the Clerk of the Court shall enter judgment and close this case.

**IT IS SO ORDERED.**

Dated: August 20, 2015
     Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Judge

-5-

SPA-6

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

### JUDGMENT IN A CIVIL CASE

**FRANK W. DEARSTYNE**,
        Petitioner,
    vs.                  **CASE NUMBER: 9:04-CV-741 (FJS/VEB)**

**WILLIAM MAZZUCA,**
        Respondent.

**Decision by Court.**  This action came to trial or hearing before the Court.  The issues
have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that Magistrate Judge Bianchini's Report and
Recommendation, see Dkt. No. 90 , is ACCEPTED in part and REJECTED in part.
ORDERED that Petitioner's amended petition is DENIED and DISMISSED in its
entirety. ORDERED that a Certificate of Appealability will not issue with regard to any of
the grounds that Petitioner raised in his amended petition because Petitioner has not
"made a substantial showing of the denial of a constitutional right." 28 U.S.C. §
2253(c)(2).   All of the above pursuant to the order of the Honorable Judge Frederick J.
Scullin, Jr., dated the 20th day of August, 2015.

DATED: August 21, 2015

Clerk of Court

ENTERED ON DOCKET:
        August 21, 2015         s/ A. Hudson
                               **(BY) DEPUTY CLERK**

SPA-7

§ 2254. State custody; remedies in Federal courts, 28 USCA § 2254

---

> United States Code Annotated
> Title 28. Judiciary and Judicial Procedure (Refs & Annos)
> Part VI. Particular Proceedings
> Chapter 153. Habeas Corpus (Refs & Annos)

28 U.S.C.A. § 2254

§ 2254. State custody; remedies in Federal courts

Effective: April 24, 1996

Currentness

<Notes of Decisions for 28 USCA § 2254 are displayed in three separate documents. Notes of Decisions for subdivisions I to XIV are contained in this document. For Notes of Decisions for subdivisions XIV to end, see documents for 28 USCA § 2254, post.>

**(a)** The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

**(b)(1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--

   **(A)** the applicant has exhausted the remedies available in the courts of the State; or

   **(B)(i)** there is an absence of available State corrective process; or

   **(ii)** circumstances exist that render such process ineffective to protect the rights of the applicant.

**(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

**(3)** A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

**(c)** An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

**(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

---

SPA-8

**(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

**(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

**(e)(1)** In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

**(2)** If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

**(A)** the claim relies on--

**(i)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

**(ii)** a factual predicate that could not have been previously discovered through the exercise of due diligence; and

**(B)** the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

**(f)** If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination. If the applicant, because of indigency or other reason is unable to produce such part of the record, then the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official. If the State cannot provide such pertinent part of the record, then the court shall determine under the existing facts and circumstances what weight shall be given to the State court's factual determination.

**(g)** A copy of the official records of the State court, duly certified by the clerk of such court to be a true and correct copy of a finding, judicial opinion, or other reliable written indicia showing such a factual determination by the State court shall be admissible in the Federal court proceeding.

**(h)** Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel for an applicant who is or becomes financially unable to afford counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority. Appointment of counsel under this section shall be governed by section 3006A of title 18.

SPA-9

§ 2254. State custody; remedies in Federal courts, 28 USCA § 2254

(i) The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 967; Nov. 2, 1966, Pub.L. 89-711, § 2, 80 Stat. 1105; Apr. 24, 1996, Pub.L. 104-132, Title I, § 104, 110 Stat. 1218.)

Notes of Decisions (8959)

28 U.S.C.A. § 2254, 28 USCA § 2254
Current through P.L. 114-119, 114-121, 114-123, 114-124, 114-126, 114-129 to 114-131, 114-133 to 114-135, and 114-137.

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

SPA-10

United States Code Annotated
  Constitution of the United States
    Annotated
      Amendment V. Grand Jury; Double Jeopardy; Self-Incrimination; Due Process; Takings

U.S.C.A. Const. Amend. V full text

Amendment V. Grand Jury Indictment for Capital Crimes; Double Jeopardy;
Self-Incrimination; Due Process of Law; Takings without Just Compensation

Currentness

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

<Historical notes and references are included in the full text document for this amendment.>

<For Notes of Decisions, see separate documents for clauses of this amendment:>

<USCA Const. Amend. V--Grand Jury clause>

<USCA Const. Amend. V--Double Jeopardy clause>

<USCA Const. Amend. V--Self-Incrimination clause>

<USCA Const. Amend. V-- Due Process clause>

<USCA Const. Amend. V--Takings clause>

U.S.C.A. Const. Amend. V full text, USCA CONST Amend. V full text
Current through P.L. 114-143. Also includes P.L. 114-145 and 114-146.

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

SPA-11

United States Code Annotated
    Constitution of the United States
        Annotated
           Amendment VI. Jury Trial for Crimes, and Procedural Rights (Refs & Annos)

U.S.C.A. Const. Amend. VI-Jury trials

Amendment VI. Jury trials for crimes, and procedural rights

Currentness

&lt;Notes of Decisions for this amendment are displayed in three separate documents. Notes of Decisions for subdivisions I through XX are contained in this document. For Notes of Decisions for subdivisions XXI through XXIX, see the second document for Amend. VI. For Notes of Decisions for subdivisions XXX through XXXIII, see the third document for Amend. VI.&gt;

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S.C.A. Const. Amend. VI-Jury trials, USCA CONST Amend. VI-Jury trials
Current through P.L. 114-143. Also includes P.L. 114-145 and 114-146.

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works. 1