# 15-2950

## United States Court of Appeals for the Second Circuit

FRANK W. DEARSTYNE,

*Petitioner-Appellant,*

v.

WILLIAM MAZZUCA,
Superintendent, Fishkill Correctional Facility,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Northern District of New York

**BRIEF FOR RESPONDENT-APPELLEE**

ERIC T. SCHNEIDERMAN
 *Attorney General of the*
 *State of New York*
Attorney for Respondent-Appellee
120 Broadway
New York, New York 10271
(212) 416-8229

Dated: August 19, 2016

BARBARA D. UNDERWOOD
 *Solicitor General*
NIKKI KOWALSKI
 *Deputy Solicitor General*
PAUL B. LYONS
 *Assistant Attorney General*
  *of Counsel*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES....................................................................iv

INTRODUCTION.............................................................................i

COUNTERSTATEMENT OF THE ISSUES PRESENTED ...................3

STATEMENT OF THE CASE .................................................4

    A.   Introduction................................................................4

    B.   Suppression Hearing.....................................................4

        1.   The People's case.................................................4

        2.   Petitioner's case ................................................12

        3.   The Court's decision...........................................16

    C.   The Trial................................................................17

        1.   The People's case...............................................17

            a.   T.O.......................................................17

            b.   C.C.......................................................19

            c.   Petitioner's confession ............................20

        2.   Petitioner's case ................................................20

        3.   The verdict and sentence ....................................21

    D.   The Direct Appeal .....................................................22

    E.   Motion to Vacate Judgment.........................................23

    F.   District Court Proceedings...........................................26

# TABLE OF CONTENTS (cont'd)

**Page**

G.   Certificate of Appealability ...................................................27

SUMMARY OF ARGUMENT .................................................28

STANDARD OF REVIEW.....................................................29

ARGUMENT .................................................................30

POINT I  -  THE STATE COURTS REASONABLY HELD
THAT PETITIONER'S CONFESSION WAS
VOLUNTARY ................................................30

A. The State Courts Made the Judicial
Determination of Voluntariness Required by
Jackson v. Denno, 378 U.S. 368 (1964). .....................31

1.  The hearing court made the necessary
determination that petitioner's confession was
voluntary..................................................31

2.  Any *Jackson* error at trial was partially cured
by the Appellate Division's ruling rejecting
petitioner's isolation claim. ...................................37

a.  The isolation claim was determined by the
Appellate Division...............................38

b.  The coercive questioning claim would be
appropriately remanded to state court if it
had not been considered and rejected by the
hearing court. ....................................42

B. Petitioner's Confession Was Voluntary. ......................43

1.  Petitioner's personal characteristics support a
finding of voluntariness.........................................44

ii

# TABLE OF CONTENTS (cont'd)

**Page**

2. Petitioner's confession was not rendered involuntary by his separation from his parents. .... 46

3. The police interview was not improperly coercive. ................................................................. 50

POINT II  -  THE APPELLATE DIVISION REASONABLY APPLIED SUPREME COURT LAW BY DENYING PETITIONER'S INEFFECTIVE COUNSEL CLAIM ..... 55

A. Standard of Review. ...................................... 57

B. Trial Counsel Provided Overall Effective Assistance. ................................................... 57

C. Petitioner's Complaints About Trial Counsel Are Baseless. ...................................................... 61

1. Medical expert. ........................................ 65

a. Medical evidence involving T.O. ......................... 65

b. Medical evidence involving C.C. ........................ 71

2. Psychiatric expert. .................................... 74

D. Petitioner's Second Circuit Authority Is Distinguishable. ........................................... 78

CONCLUSION ..................................... 81

iii

# TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*Berghuis v. Thompkins,*
  560 U.S. 370 (2010)..............................................................53

*Boles v. Stevenson,*
  379 U.S. 43 (1964)...............................................................41

*Burt v. Titlow,*
  134 S. Ct. 10 (2013)............................................................61

*Cardoza v. Rock,*
  731 F.3d 169 (2d Cir. 2013) ...............................................29

*Colorado v. Connelly,*
  479 U.S. 157 (1986).............................................................47

*Colorado v. Spring,*
  479 U.S. 564 (1987).............................................................54

*Cullen v. Pinholster,*
  563 U.S. 170 (2011)....................................... 55, 61, 64, 71

*Dallio v. Spitzer,*
  170 F. Supp. 2d 327 (E.D.N.Y. 2001)................................39

*Epps v. Poole,*
  687 F.3d 46 (2d Cir. 2012) .................................................29

*Eze v. Senkowski,*
  321 F.3d 110 (2d Cir. 2003) ................................. 78, 79, 80

*Fare v. Michael C.,*
  442 U.S. 707 (1979)................................................. passim

*Frazier v. Cupp,*
  394 U.S. 731 (1969).............................................................54

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                      **Page(s)**

*Gersten v. Senkowski,*
   426 F.3d 588 (2d Cir. 2005) .............................................. 69, 78, 79, 80

*Gilbert v. Merchant,*
   488 F.3d 780 (7th Cir. 2007) ...................................................... 46, 47

*Green v. Scully,*
   850 F.2d 894 (2d Cir. 1988) ......................................................... 44, 54

*Hall v. Thomas,*
   611 F.3d 1259 (11th Cir. 2010) ................................................... 46, 47

*Harrington v. Richter,*
   562 U.S. 86 (2011) ...................................................................... passim

*Jackson v. Denno,*
   378 U.S. 368 (1964) .................................................................... passim

*Jones v. Murphy,*
   694 F.3d 225 (2d Cir. 2012) ............................................................ 79

*Key v. Artuz,*
   No. 99-CV-161JG, 2002 WL 31102627
   (E.D.N.Y. Sept. 16, 2002) ................................................................ 39

*Knowles v. Mirzayance,*
   556 U.S. 111 (2009) .......................................................................... 57

*LaVallee v. Delle Rose,*
   410 U.S. 690 (1973) .......................................................................... 39

*Lego v. Twomey,*
   404 U.S. 477 (1972) .......................................................................... 44

*Lindstadt v. Keane,*
   239 F.3d 191 (2d Cir. 2001) .................................................... 78, 79, 80

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                         **Page(s)**

*Marshall v. Lonberger*,
459 U.S. 422 (1983) .................................................................. 39

*Marshall v. Rodgers*,
133 S. Ct. 1446 (2013) ............................................................. 78

*Parke v. Raley*,
506 U.S. 20 (1992) .................................................................... 39

*Parker v. Matthews*,
132 S. Ct. 2148 (2012) ............................................................. 78

*Pavel v. Hollins*,
261 F.3d 210 (2d Cir. 2001) ................................................ 78, 79, 80

*People v. Danylocke*,
150 A.D.2d 480 (2d Dep't 1989) ............................................... 39

*People v. Dearstyne*,
100 N.Y.2d 593 (2003) ............................................................. 25

*People v. Dearstyne*,
230 A.D.2d 953 (3d Dep't 1996) ......................................... passim

*People v. Dearstyne*,
305 A.D.2d 850 (3d Dep't 2003) .......................................... 2, 25

*People v. Dearstyne*,
89 N.Y.2d 921 (1996) ............................................................... 23

*People v. Fleming*,
76 A.D.3d 582 (2d Dep't 2010) ................................................ 39

*People v. Fortin*,
184 Misc. 2d 10 (Nassau Cty. Ct. 2000) ................................. 77

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                          **Page(s)**

*People v. Huntley,*
  15 N.Y.2d 72 (1965) ................................................................. 35

*People v. La Belle,*
  53 Misc. 2d 111 (Rensselaer Cty. Ct. 1967)........................................ 36

*People v. Loomis,*
  172 Misc. 2d 265 (Suffolk Cty. Ct. 1997)........................................... 77

*People v. Nicholson,*
  26 N.Y.3d 813 (2016) ............................................................... 76

*Pinto v. Pierce,*
  389 U.S. 31 (1967)................................................................. 41

*Procunier v. Atchley,*
  400 U.S. 446 (1971)................................................................ 53

*Renico v. Lett,*
  559 U.S. 766 (2010)................................................................ 78

*Ridgeway v. Zon,*
  424 F. App'x 58 (2d Cir. 2011) ................................................. 61, 62

*Rodriguez v. Miller,*
  537 F.3d 102 (2d Cir. 2008) ....................................................... 78

*Rogers v. Quarterman,*
  555 F.3d 483 (5th Cir. 2009)....................................................... 46

*Schneckloth v. Bustamonte,*
  412 U.S. 218 (1973)................................................................ 43

*Sigler v. Parker,*
  396 U.S. 482 (1970)................................................................ 41

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                    **Page(s)**

*Sims v. Georgia,*
　385 U.S. 538 (1967)................................................................ 33, 38, 41

*Smith v. Scribner,*
　384 F. App'x 672 (9th Cir. 2010)........................................... 46

*Strickland v. Washington,*
　466 U.S. 668 (1984)................................................................ 57

*Swenson v. Stidham,*
　409 U.S. 224 (1972)................................................................ 40

*Tankleff v. Senkowski,*
　135 F.3d 235 (2d Cir. 1998) .................................................. 54

*Tungate v. Commonwealth,*
　901 S.W.2d 41 (Ky. Sup. Ct. 1995) ...................................... 77

*United States v. Burrous,*
　147 F.3d 111 (2d Cir. 1998) ............................................. 43, 44

*United States v. Bye,*
　919 F.2d 6 (2d Cir. 1990) ...................................................... 53

*United States v. Feinberg,*
　383 F.2d 60 (2d Cir. 1967) .................................................... 41

*United States v. Tutino,*
　883 F.2d 1125 (2d Cir. 1989) ................................................ 53

*Ventura v. Meachum,*
　957 F.2d 1048 (2d Cir. 1992) ................................................ 39

*Wainwright v. Goode,*
　464 U.S. 78 (1983)................................................................. 38

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                              **Page(s)**

*Wainwright v. Witt,*
    469 U.S. 412 (1985) ................................................................. 39

*Whitaker v. Meachum,*
    123 F.3d 714 (2d Cir. 1997) ................................................. 39

*White v. Woodall,*
    134 S. Ct. 1697 (2014) ................................................... 78, 79

*Williams v. Maggio,*
    727 F.2d 1387 (5th Cir. 1984) ............................................ 40

**Laws**

28 U.S.C. § 2254 ...................................................... 46, 54, 55, 78

Criminal Procedure Law
    § 440.10 ....................................................................... 24
    § 440.30 ....................................................................... 24
    § 470.15 ....................................................................... 38
    § 710.60 ................................................................. 23, 24
    § 710.70 ....................................................................... 33

## INTRODUCTION

This federal habeas corpus petition challenges petitioner's New York State conviction of attempting to rape "T.O.," a three-year-old girl, committing aggravated sexual abuse of "C.C.," a two-year-old girl, and endangering the welfare of both girls, between January and June of 1987.  His conviction, following a jury trial in Rensselaer County Court, was based on, among other things, his detailed written confession that, on at least three occasions in a month, he had sexually abused T.O., whom his mother had been babysitting.  Petitioner admitted that just nine days before his confession he took T.O. into his room, put his finger in her vagina, moved it around a little bit, and then inserted his penis into her vagina, taking it out only because "it wouldn't go in." Petitioner, who was sixteen years old at the time, made this confession during a daytime police interview lasting approximately two and one-half hours.

For these crimes, petitioner was sentenced to consecutive prison terms of from four to twelve years for the attempted first-degree rape, and from six to eighteen years for first-degree aggravated sexual abuse, to be served concurrently with prison terms of one year for each of the

endangering convictions.  The judgment was affirmed by a unanimous court, *People v. Dearstyne*, 230 A.D.2d 953, 957-58 (3d Dep't 1996), *lv. denied*, 89 N.Y.2d 921 (1996), as was the denial of petitioner's motion to vacate the conviction, *People v. Dearstyne*, 305 A.D.2d 850, 853 (3d Dep't 2003), *lv. denied*, 100 N.Y.2d 593 (2003).

In the petition for federal habeas corpus that is the subject of this appeal, petitioner claimed, inter alia, that his confession should have been suppressed, either because it was involuntary, or because voluntariness was not determined by a judge, as required by *Jackson v. Denno*, 378 U.S. 368 (1964).  He also claimed that his trial counsel was constitutionally deficient for failing to consult with or call at trial a medical or psychological expert.  While a magistrate judge, in a lengthy report and recommendation issued in 2011, recommended granting relief on all three grounds (A-200-417), the United States District Court for the Northern District of New York (Scullin, J.), dismissed the petition on August 20, 2015, and denied a certificate of appealability

2

(SPA-1-6).[1]

This Court granted a certificate of appealability on whether the state court improperly concluded that petitioner's confession was voluntary, and that counsel was not ineffective in not consulting or calling medical experts or a behavioral or psychological expert.

Petitioner is on parole supervision, to which he was released in 2014.

## COUNTERSTATEMENT OF THE ISSUES PRESENTED

1. Whether the state courts reasonably applied Supreme Court law in concluding that petitioner's confession was voluntary, and not the product of his unfair isolation from his parents or coercive interrogation techniques.

2. Whether the state court reasonably applied Supreme Court law in concluding that trial counsel provided effective representation by countering the prosecution's evidence that the victims exhibited indicia of sexual abuse through means other than defense experts.

---

[1] Numbers preceded by "A-," "CA-," and "SPA-" refer to petitioner's appendices. Numbers preceded by "RA-" refer to respondent's supplemental appendix.

3

## STATEMENT OF THE CASE

### A.  Introduction

Petitioner sexually abused C.C., attempted to rape T.O., and endangered the welfare of each of them, between January and June of 1987.  C.C. and T.O. were, at the time of the crimes, two and three years old respectively, and were entrusted to the care of petitioner's mother, their regular babysitter, when petitioner abused them.  He was convicted of these crimes after a jury trial, at which he was acquitted of charges that he had abused a third child.

### B.  Suppression Hearing

Before trial, petitioner moved to suppress his confession to police officers as involuntarily made.  The county court judge conducted an evidentiary hearing on the motion over three days in May, 1991.

#### 1.  The People's case

Three law enforcement officers testified for the People at the hearing: New York State Trooper Patricia Donovan, Rensselaer City Police Detective Francis Petrucci, and New York State Police Investigator Edward Girtler.

Donovan testified that on June 18, 1987, she interviewed T.O.,

who said that "Frank" had rubbed her crotch area while she was being cared for at the Dearstyne house. (CA-91.) From this statement and other information, Donovan, working with Petrucci, identified petitioner as a suspect. (CA-32-33, 65-66, 90-92, 145.)

The next day, at approximately 1:45 p.m., Donovan and Petrucci drove to petitioner's house in separate unmarked cars, where they met Carol Dearstyne, who was petitioner's mother and T.O.'s babysitter. Donovan and Petrucci showed Mrs. Dearstyne their police identification and asked to speak with petitioner regarding an unspecified investigation they were conducting. (CA-17-18, 66-67, 90.) Mrs. Dearstyne asked if petitioner "was in trouble," and Petrucci told her that he was not, and that they just wanted to speak to him. (CA-18-19, 33, 36, 67, 70, 92.) Petrucci testified that "at that particular time [he] just wanted to talk to [petitioner], and he wasn't in any trouble at that time." (CA-18-19, 33-36, 70, 92.) Petrucci asked Mrs. Dearstyne if there was "a problem" with his talking to petitioner, who was at a neighbor's house, and "she said no, not at all"; "Go ahead and talk to my son." (CA-18-19, 36, 70.)

Petrucci and Donovan drove to the neighbor's house, arriving at

5

around 2:00 p.m. (CA-84-86.) There, they told petitioner that his name had come up in an investigation, and asked to speak to him. He said "'Okay, that's no problem.'" (CA-19-21.) Petrucci also told petitioner that his mother had "okayed" his talking to them, and he said "fine." (CA-21-22, 42.) Petitioner asked, "what is this about?" Petrucci stated that he "didn't want to get into it right here because of the circumstances," which included that people were nearby. Petrucci stated that he "would explain everything to" petitioner when they got to "our location." Petrucci told petitioner that "he didn't have to come if he didn't want to." Petitioner responded, "Fine." (CA-22, 37-39, 42, 70-71, 94-95.)

Petitioner got into Petrucci's car, and they drove to the state police barracks at Loudonville (where Donovan was stationed), arriving between 2:00 and 2:25 p.m. (CA-22-23, 25, 40, 72, 95.) In the car, petitioner asked where they were going, and Petrucci told him, but they did not discuss the investigation. (CA-22-23, 25-26, 37, 39-40.)

They entered the barracks from the rear parking lot, an entrance

reserved for troopers only.  (CA-25-26, 42-44, 72.)[2]  At between 2:20 and 2:30 p.m., they took petitioner to the second floor to meet Investigator Girtler, who was in charge of a program to investigate exploitation of children.  (CA-26, 31-32, 46-47, 72-73, 96-97, 101, 128-31, 143, 145.)  Petitioner was questioned in Loudonville "[b]ecause Investigator Girtler was in Loudonville."  (CA-62-63, 92, 114.)  Petrucci told petitioner that Girtler wanted to talk to him, petitioner assented, and Girtler, Donovan, and petitioner entered a conference room, sat down, and talked.  (CA-26-27, 73, 97-99, 101, 131.)[3]  Girtler explained that he was involved in a "sexual offense unit" investigation "regarding the possible sexual abuse of some children that were babysat at" petitioner's residence.  (CA-75, 99-100, 132.)  Petitioner agreed to speak to Girtler about it.  (CA-132.)

Although Donovan had informed Girtler that a two- or three-year-old girl had alleged sexual abuse, Donovan did not give Girtler her

_____

[2] When they arrived at the barracks, Donovan forgot to make a "blotter entry" in the barracks records noting their arrival.  Accordingly, when they left the barracks two hours later, she made a "time corrected" entry that they had arrived at 2:30 p.m.  (CA-112-13.)

[3] Petrucci waited in another room during the interview, which lasted approximately two hours.  (CA-27, 47, 97-98, 159, 165.)

interview notes or discuss with Girtler any "particular acts" that T.O. had described. (CA-129-30, 132, 145-46, 148-49, 159-60.)

A couple of minutes into the interview, Girtler advised petitioner of his *Miranda* rights, which he read from a form, and asked whether he understood. Petitioner said that he understood and signed the form at 2:35 p.m., witnessed by Donovan. (CA-74-75, 99, 133-34, 144, 148.) Petitioner did not invoke his right to counsel or express any desire to contact his family. (CA-75, 99, 133, 156, 218.) Petitioner did not ask in Girtler's presence to make a phone call. (CA-149.) Girtler knew that petitioner was sixteen years old. (CA-145-46.)

Girtler began the interview, as he usually did in cases involving possible sexual abuse, by talking with the interviewee generally about "teenage sex, sexual activities, pressures." (CA-150-51.) About twenty minutes into the interview, Donovan asked if petitioner would be more comfortable if she left. He said yes, so she left. (CA-76-77, 99-101, 134, 155.) At some point, Donovan came back to give petitioner a soda, and immediately left again. (CA-78-79, 101, 138-39, 165.)

Donovan returned to the interview room twenty or thirty minutes later and sat with them for a while. (CA-77, 101.) Petitioner "was

discussing that he was having sexual pressures and that he was having problems dealing with them" and that he did not know how "to act them out." (CA-77, 91.) Petitioner said "that he hadn't had sex with someone his own age; that he had felt pressure to want to have sex, and that [T.O.] was available to him and that he acted out these pressures with [T.O.]." (CA-77-78, 102, 150.)

Girtler spoke with petitioner for 45 minutes to an hour before Girtler began to reduce petitioner's confession to writing. (CA-140-49.) Petitioner's written confession described his sexual feelings, his access to the children that his mother babysat, and his sexual activity with T.O. (CA-135-36.) As petitioner made each point, Girtler wrote it down and confirmed that it was correct before going on to the next point. (CA-137-38, 153-54.)

Around 4:15 or 4:30 p.m., in Donovan's presence, Girtler had petitioner read out loud the *Miranda* rights and the first few paragraphs of the body of the confession to determine that petitioner could read. (CA-79-80, 82, 103.) Petitioner then read the remainder to himself. (CA-80-81, 142.) Petitioner made some handwritten corrections to the confession, which he then initialed. (CA-142, 160-66.)

9

At 4:40 p.m., petitioner signed the confession, Girtler witnessed the signature in two places, and Donovan notarized it. (CA-81-82, 116, 136-37, 142-43.) Petitioner was then arrested for first-degree rape. (CA-56-57, 140-42, 157.)

In his written confession, petitioner admitted that on at least three occasions over the course of a month in 1987, he sexually abused T.O., whom his mother had been babysitting. He admitted that about one month before his confession, he took T.O. to his room, "played" with her vagina, and had her "play with" his erect penis. A few days later, petitioner lay down naked on his bed and placed an undressed T.O. on top of him with his penis next to her vagina. In the last incident, just nine days before his confession, he took T.O. into his room, put his finger in her vagina, moved it around a little bit, and then inserted his penis into her vagina, taking it out only because "it wouldn't go in." (*See* Respondent's Supplemental Appendix ("RA") 2-3.)

Petitioner also confessed that he had access to several young girls that his mother babysat, including a two-year-old with C.C.'s first name, and that when he was in the presence of those girls he would "get the feeling I want to fool around." (RA-2.)

10

At some point, the trooper at the barracks front desk told Petrucci that petitioner's father was on the phone and wanted to speak to one of the investigators. (CA-53-54.) Petrucci took the call, telling Mr. Dearstyne that petitioner was being interviewed for an investigation of a sex crime. (CA-52-53.) Petrucci did not know when petitioner's confession was completed, so he could not say whether Mr. Dearstyne had called before it was completed. (CA-54-55.)

Petitioner's parents arrived at the barracks shortly after Mr. Dearstyne's phone call with Petrucci, who estimated the time of their arrival as approximately 4:45 to 5:00 p.m. Petrucci told Mr. Dearstyne that he would advise the other investigator of their arrival. (CA-27-29.) Mr. Dearstyne did not at any time request that the questioning stop. (CA-29, 61-62.) Donovan testified that by the time Petrucci and Donovan spoke to petitioner's parents in the front lobby of the barracks at around 4:45 or 5:00 p.m., petitioner had already been arrested. (CA-104-05.) Girtler testified that about ten or fifteen minutes after petitioner was placed under arrest, someone said "a parent or two was downstairs in the lobby." (CA-157.)

11

## 2. Petitioner's case

Petitioner and his parents testified in petitioner's defense. Mrs. Dearstyne testified that on June 19, 1987, at around 1:00 to 1:30 p.m., Petrucci and Donovan went to the Dearstyne residence and asked to see petitioner. Petrucci told Mrs. Dearstyne that petitioner's "name came up in a case we are investigating and we just need to ask him a few questions." Petrucci also stated that they were "not taking him anywheres [sic]." (CA-188-89, 196.) She gave permission to speak to petitioner, who was at a neighbor's house. (CA-195-96.) Five to ten minutes later, she called her husband and described the police visit. (CA-183-84, 189.)

Petitioner testified that when the officers found him at the neighbor's house, at around 1:15 or 1:30 p.m., they asked if he "mind[ed] going to Loudonville" with them, and petitioner said "sure," because he "had nothing to hide." (CA-197, 210-11, 215-16.) The officers did not tell him, however, that his mother had given permission to talk to them. (CA-211.) Petitioner claimed that during the drive to Loudonville, Petrucci asked him if he "had ever been in trouble before," and petitioner responded, "no." (CA-198.)

12

They arrived in Loudonville fifteen minutes later. Petrucci and Donovan took him to a room and told him he was being charged with raping a girl. (CA-198-99, 202, 211-12, 218-19.) Thirty minutes later, Girtler, a "professional" in sexual crime investigations, joined them. (CA-200-01, 211.) Girtler displayed a large envelope, which he said contained all the evidence needed to put petitioner "away for 25 years." (CA-201.) Petitioner maintained that he "didn't do it," and when he asked if he could make a phone call, Girtler replied, "Shut up. Sit your ass down." (CA-201, 208, 213, 218.) At that point, petitioner was "scared" and "didn't know what [the investigators] were going to do." (CA-201.) "[T]he voices and everything . . . they were mean." (CA-203-05.) Girtler was "getting mad," "slamming his fist on the desk." (CA-201, 209.) Petitioner acknowledged, however, that the investigators did not "threaten" him or "hit [him] or do anything like that." (CA-208.)

Petitioner testified that Girtler grew increasingly angry because petitioner continued to deny his guilt. Girtler and Donovan walked out, leaving petitioner alone with Petrucci. (CA-202.) Petrucci told him, "If you make a confession, you will get five years probation. If you don't make a confession, you can end up getting 25 years." (CA-202.)

13

Petitioner testified that he was "scared" and "crying" at this point. (CA-202.) Petrucci also told him: "When you are in jail, you are going to have big guys who are going to come make you [their] baby. Bring a supply of vasoline [sic], and everything." (CA-202-03.)

When Girtler returned, he asked petitioner to read his rights from a pre-printed form. (CA-204.) Petitioner testified that he had read and signed the form and had understood his rights, including his right to counsel. (CA-204, 213, 218.) At the time of the confession, petitioner was entering his junior year in high school, studying grade-level curriculum. (CA-212-13.)

Petitioner claimed that Girtler dictated the entire written confession. Petitioner was "tired" and "scared" and "wanted to go home," so when Girtler asked whether petitioner committed a certain act, petitioner responded, "Not really, but out of your satisfaction, I will say 'yes' to it." (CA-204-06.) According to petitioner, Girtler completed the entire statement in this manner, employing none of petitioner's own language and no information that came from petitioner. (CA-206, 212, 219.)

Petitioner testified that he signed the confession, even though it

14

was false, because he was tired and wanted to go home and had been told that he would only get five years' probation. (CA-206-09, 213-14.) He ultimately acknowledged, however, that the police never promised that he could go home if he signed the confession. (CA-215.) He also acknowledged that he read the confession and made corrections before signing it. (CA-206-07.) After he signed, Donovan brought him a soda and he was allowed to see his parents. (CA-207.)

Petitioner's father testified that his wife called him at work at around 1:45 p.m. to say that the police had been there five minutes earlier, asking to interview petitioner, who was at a neighbor's home. (CA-168-69, 183-84.) Mr. Dearstyne went to the neighbor's house, but petitioner was not there. Later, he called the Rensselaer police station, which referred him to Loudonville. But when he called Loudonville he was told that there was no record of Petrucci, Donovan, or his son being there. (CA-169-74.) Petrucci returned Mr. Dearstyne's call at about 5:15 p.m. and told him that his son was being charged with a serious crime and that Mr. Dearstyne should get down to the Loudonville police station within the next fifteen minutes. (CA-175-76, 191.) When Mr. and Mrs. Dearstyne arrived at the station, they were not permitted to

15

see petitioner, because he was being processed for his arrest and was being taken to Rensselaer.  The Dearstynes met with petitioner at approximately 7 p.m. that evening.  (CA-176-77, 180-81.)

### 3.   The Court's decision

On July 8, 1991, having received written submissions from the parties, the court denied the suppression motion in a written order, stating:

> During the taking of the testimony at the Suppression Hearing and in the arguments set forth in the memoranda a sharp question of fact has arisen.
>
> There are no clear cut legal issues without resolving the questions of fact.
>
> Accordingly, the motion to suppress is denied.  A question of fact as to voluntariness has been presented for determination by the trial jury.

(CA-7-8.)

## C.  The Trial

### 1.  The People's case

#### a.  T.O.

T.O., who was seven years old at the time of the trial, testified briefly as an unsworn witness, and was unable to identify petitioner. (CA-463-66.)

T.O.'s mother testified that Mrs. Dearstyne babysat three-year-old T.O. between May and June 12, 1987.  During the second week in May, T.O. began to exhibit behavioral changes: she did not want to be alone, especially while she used the bathroom; she would not play hide and seek or be in the dark; she was clingy; she wet her bed; and she scribbled on her dolls' faces.  (CA-469, 471-72, 474-76, 491-92, 502-03.)

On the morning of June 12, 1987, T.O. pleaded with her mother, "I don't want to go [to the Dearstynes'] today.  Please don't make me go in."  That afternoon Stacey O., T.O.'s older sister, saw petitioner when she accompanied her father to pick up T.O. from the Dearstynes'.  Later that evening, Stacey heard T.O. cry out in her sleep.  When T.O.'s mother arrived home at about 6:00 p.m., T.O. had already gone to sleep for the night, which was unusual.  (CA-426, 451-52, 455, 469, 471-72,

17

477-79, 495-96, 502.)

The next day, June 13, at approximately 2:00 p.m., T.O.'s mother discovered blood in T.O.'s underwear and called Dr. Theodore Close. Dr. Close examined T.O. at approximately 5:30 p.m., and observed that T.O.'s hymen was slightly larger than normal. Dr. Close swabbed T.O.'s underwear, confirmed that the stain was blood, and noticed some drainage in T.O.'s vagina which, under a microscope, appeared to contain sperm. He also found some pus cells, indicative of an infection or trauma. Additionally, T.O. had a small abrasion inside her vagina which had recently been bleeding. Although, theoretically, the abrasion could have been caused by any form of penetration, including by T.O.'s own fingers, Dr. Close had never seen such a self-inflicted abrasion in his eleven years as a pediatrician, and believed that the injury had been inflicted by somebody other than T.O. Dr. Close referred T.O. to the Albany Medical Center Emergency Room and the Child Sexual Abuse Center. T.O. continued to wet her bed for a month and her nightmares continued until December, 1987. (CA-482-83, 488-92, 505-06, 622-29, 633, 635, 638-40, 644, 673.)

### b.   C.C.

C.C., who was six years old at the time of trial, also testified as an unsworn witness.  (CA-528.)  She testified that once, while playing in petitioner's backyard, petitioner "put the stick between [C.C.'s] legs" which caused her pain.  C.C. was not wearing underwear at the time, and petitioner told her not to tell her mother what had happened.  (CA-535-36, 538.)

C.C.'s mother testified that Mrs. Dearstyne babysat two-year-old C.C. from January through June of 1987.  (CA-547.) In early April, 1987, C.C.'s mother noticed her daughter's behavior changed: C.C. cried when her mother dropped her off at the Dearstynes'; she had nightmares; she talked like a baby; she started wearing diapers again; and she insisted that someone accompany her in the bathroom.  This behavior continued for two years.  On June 20th, 1997, C.C.'s mother received a telephone call from Rensselaer County Police and, as a result of that conversation, took her daughter to the Albany Medical Center

Emergency Room.  (CA-537, 543, 546, 550-56, 559, 569-70.)[4]

### c.   Petitioner's confession

Detective Petrucci, Trooper Donovan and Investigator Girtler testified about the circumstances of petitioner's confession, largely replicating their hearing testimony.  Petitioner's confession was read to the jury, admitting that he had repeatedly sexually abused T.O., including by penetrating her.  He also confessed that he had access to several other young girls that his mother babysat, including a two-year-old with C.C.'s first name, and that when he was in the presence of those girls he would "get the feeling I want to fool around."  (RA-2.)

### 2.   Petitioner's case

Petitioner's parents and sister testified regarding the circumstances surrounding his confession.  Petitioner denied his guilt and largely repeated his hearing account of his confession.

Over the People's objection, defense counsel introduced reports from the New York State Police stating that T.O.'s underpants and

---

[4] The People also presented testimony regarding the alleged abuse of a third girl, but that testimony is omitted here because the jury acquitted on those counts.

20

samples from her vagina had tested negative for sperm. (CA-721-25, 773-84, 1014-15.)

### 3. The verdict and sentence

The jury convicted petitioner of Attempted Rape in the First Degree and Endangering the Welfare of a Child regarding T.O., and Aggravated Sexual Abuse in the First Degree and Endangering the Welfare of a Child regarding C.C. Petitioner was acquitted of the charges of Rape in the First Degree regarding T.O., and of all counts (Sexual Abuse in the First Degree and Endangering the Welfare of a Child) regarding a third child.

At petitioner's sentencing, the prosecutor stated that four years earlier, when he was fourteen, petitioner had been previously "found guilty [as a juvenile] of precisely the same type of conduct, and gave a statement in that action that mirrors his conduct that he was convicted of here in this courtroom." (CA-938-39.) The pre-sentence report submitted to the court stated that those earlier charges arose from his rubbing his penis on the outside of the vagina of a five-year-old girl he was babysitting. He gave a voluntary written confession and was sentenced to probation. (RA-5-6.) Petrucci investigated that case as

well.

The trial court sentenced petitioner to consecutive terms of from four to twelve years for attempted first-degree rape and from six to eighteen years for first-degree aggravated sexual abuse, to be served concurrently with one-year terms for the two counts of endangering.

## D.  The Direct Appeal

On appeal, petitioner claimed in relevant part that his confession should have been suppressed, solely on the ground that it had been secured "in violation of settled protections for youthful suspects," as the police had deliberately isolated petitioner from his family through deceptive means.  (RA-95-102.)

The Appellate Division rejected the claim and affirmed the conviction.  *People v. Dearstyne*, 230 A.D.2d 953, 957-58 (3d Dep't 1996). The court discussed at length the facts elicited at the suppression hearing, concluding that "these facts do not warrant suppression of [petitioner's] statement for they do not establish that his isolation resulted from official deception or trickery." *Id*. at 958.  First, the court noted that "because [petitioner] was legally an adult, there was no requirement that his family be present during the police questioning."

22

*Id.* Second, the court held that "the police had obtained the consent of [petitioner's] mother to speak to him and there is no indication that his father made any effort to contact an attorney to represent him." *Id.* The Court of Appeals denied leave to appeal. *People v. Dearstyne*, 89 N.Y.2d 921 (1996), *recon. denied*, 89 N.Y.2d 1034 (1997).

### E. Motion to Vacate Judgment

In 1997, petitioner filed in the state trial court a *pro se* CPL § 440.10 motion to vacate his judgment of conviction. He asserted for the first time that the trial court violated CPL § 710.60(6) by failing to render findings of fact and conclusions of law regarding petitioner's motion to suppress his confession. Petitioner further claimed that the trial court violated *Jackson v. Denno*, 378 U.S. 368 (1964), by failing to make a threshold voluntariness finding before submitting the issue to the jury.

Second, petitioner claimed that his confession was involuntary under the totality of the circumstances, based on, among other things, his age and lack of experience, the investigators' coercive interrogation techniques, and petitioner's isolation from his parents due to police deception and trickery.

23

Third, petitioner claimed that his trial counsel was ineffective for numerous reasons including, as relevant here, that he allegedly failed to consult with or call at trial any medical or psychological experts.

The trial court denied the motion in its entirety. First, it held that the CPL § 710.60(6) claim (and implicitly the *Jackson* claim) was procedurally barred under CPL § 440.10(2)(c) because the claim was based on matters in the record and thus should have been raised on direct appeal. (RA-13.) Second, the court also denied the voluntariness claim on procedural grounds, including that: the allegations regarding petitioner's isolation from his parents were addressed and denied on direct appeal, CPL § 440.10(2)(a); and any remaining allegations regarding petitioner's confession should have been raised on direct appeal, CPL § 440.10(2)(c). (RA-16.)

Third, as to petitioner's claim that counsel erred by not consulting with or calling experts, the court denied the claim under CPL § 440.30(4)(b) because petitioner failed to support certain of his contentions with "sworn factual detail." (RA-20.) Further, the court found that the record, including counsel's cross-examination and summation, demonstrated "a clear strategic pattern" on counsel's part

24

"to point out the ambiguities of the People's case in every area, emphasizing to the jury that there were no experts to interpret the evidence, and challeng[ing] them to find sexual abuse 'beyond a reasonable doubt.'" (RA-25-30.)

The Appellate Division granted petitioner leave to appeal. In his counseled and *pro se* briefs petitioner raised his ineffective counsel claim but omitted his *Jackson* claim and his involuntary-confession claim.

Addressing petitioner's ineffective counsel claim, the Appellate Division stated: "even assuming that defendant's claims of ineffective assistance of counsel are not based on facts appearing in the record and could not have been raised in his prior appeal, his claims are either moot, unsupported by sworn allegations of fact or meritless." *Dearstyne*, 305 A.D.2d at 853 (citations omitted). The court stated that it had "considered defendant's remaining arguments" and had found them to be "unpersuasive." *Id*. The Court of Appeals denied leave to appeal. *People v. Dearstyne*, 100 N.Y.2d 593 (2003).

25

## F.   District Court Proceedings

In 2004, petitioner filed his instant *pro se* federal habeas petition, which was supplemented by a counseled reply memorandum and subsequently amended.   Petitioner raised the *Jackson*, involuntary-confession, and ineffective-counsel claims that are before this Court. Respondent expressly conceded that petitioner had exhausted his claims in state court; as explained below, this appears to be incorrect as to several claims but we do not press the point here.

The Magistrate Judge's 2011 Report and Recommendation assumed that all of the relevant claims had been exhausted.   The Report recommended finding that: (1) the trial court violated *Jackson* by failing to render fact findings regarding the voluntariness of the confession, and the Appellate Division could not render fact findings of its own; and (2) the Appellate Division unreasonably determined the facts in concluding that petitioner's confession did not result from intentional isolation designed to overbear his will.   (A-240, 245, 251.) The Report also recommended finding that petitioner's trial counsel was ineffective for failing to consult with or call at trial a medical or psychological expert.   (A-347-75.)   The Report recommended granting

26

the writ on each of these grounds.

On August 20, 2015, the district court, rejecting the magistrate judge's recommendation, summarily dismissed the petition in its entirety and denied a certificate of appealability. (SPA-1-6.)

## G. Certificate of Appealability

This Court granted a certificate of appealability on "whether the state court's rulings were contrary to or an unreasonable application of clearly established federal law, as determined by the United States Supreme Court, (1) in concluding that Petitioner's confession was voluntary, or (2) in concluding that counsel was not ineffective in not consulting or calling medical experts or a behavioral or psychological expert."

## SUMMARY OF ARGUMENT

Petitioner's confession was properly admitted into evidence. Contrary to petitioner's contention, the hearing court determined the voluntariness of petitioner's confession as required by *Jackson v. Denno*. The state courts' determination that petitioner's confession was voluntary, and not the result of unfair isolation from his parents or coercive interrogation methods, was reasonable and is entitled to deference on habeas review.

Alternatively, if this Court were to conclude that the hearing court did not make a judicial determination of voluntariness, any such *Jackson* error was partially cured by the Appellate Division's consideration and rejection of the part of petitioner's voluntariness claim he presented to it, and a remand for a state court finding would be appropriate only as to the balance of the claim.

The state court reasonably held that petitioner received effective assistance of counsel. Petitioner offered no evidence in state court to support his contention that counsel failed to consult with or retain defense experts to counter the prosecution's evidence that the victims exhibited indicia of sexual abuse. Even if his assertion were true,

28

counsel's strategy – to cross-examine the prosecution's lay witnesses and argue that the prosecution's failure to offer experts to explain the significance of this evidence rendered their case insufficient – was reasonable. Any shortcoming in counsel's performance did not affect the outcome because the evidence of petitioner's guilt was overwhelming.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision to deny a petition for a writ of habeas corpus. *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012). Petitioner must prove by a preponderance of the evidence that his constitutional rights were violated. *Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013). For claims that were adjudicated on the merits by a state court, the highly deferential standard of review codified in AEDPA applies. *See Harrington v. Richter*, 562 U.S. 86, 101-02 (2011).

## ARGUMENT

## POINT I

## THE STATE COURTS REASONABLY HELD THAT PETITIONER'S CONFESSION WAS VOLUNTARY

Petitioner's confession was voluntary and was properly admitted into evidence. The state courts reasonably applied governing law in rejecting petitioner's challenges to the voluntariness of his confession, and are entitled to deference on habeas review. Contrary to petitioner's claim, the hearing court complied with the requirement under *Jackson v. Denno*, 378 U.S. 368 (1964), that the voluntariness of his confession be judicially determined.

Petitioner incorrectly reads that court's order as refusing to determine voluntariness and completely referring the voluntariness issue to the jury, but he is mistaken. Instead, as explained below, the hearing court, upon finding the confession voluntary, made the further ruling, required by state law, that petitioner was entitled to argue to the jury that it should disregard his confession because it was involuntary.

If, however, this Court were to conclude otherwise, then it should hold that the Appellate Division's direct appeal decision upholding the

voluntariness of petitioner's confession partially cured the error. That court rejected the allegation that petitioner was unfairly isolated from his parents, the only voluntariness claim petitioner presented to it. *See Dearstyne*, 230 A.D.2d at 958. Thus at most petitioner may be entitled to a state court determination on his claim that the police coerced his confession through improper questioning, and that claim could be remanded to state court for such a determination, as contemplated in *Jackson*, 378 U.S. at 393.

### A. The State Courts Made the Judicial Determination of Voluntariness Required by *Jackson v. Denno*, 378 U.S. 368 (1964).

#### 1. The hearing court made the necessary determination that petitioner's confession was voluntary.

In *Jackson*, the Supreme Court held that determination of the voluntariness of a confession must not be left to the trial jury alone, but must be decided by a court, because otherwise: (a) the voluntariness finding would be unreliable, as the jury might be unduly influenced by evidence of defendant's guilt; (b) the defendant might be deterred from testifying to support his voluntariness challenge by the fear of being

cross-examined as to his guilt; and (c) appellate review might be difficult. *Jackson*, 378 U.S. at 379-91.

The hearing court fully complied with *Jackson*. The court took testimony over three days from six witnesses, including petitioner, on petitioner's motion to suppress his confession as involuntary. Petitioner was represented by counsel, who vigorously cross-examined the prosecution witnesses and presented witnesses of his own. The parties filed "lengthy memoranda." (CA-7.) Petitioner does not dispute that this proceeding was adequate to ensure a "reliable" outcome, as required by *Jackson*. 378 U.S. at 391.

The hearing court further complied with *Jackson's* requirement that it render a "clear-cut" determination on the voluntariness of petitioner's confession. *Id.* The court issued a post-hearing order that began by acknowledging that the testimony presented "a sharp question of fact." (CA-7.) It next observed that petitioner's challenges to the voluntariness of his confession depended on resolution of those factual issues: "There are no clear-cut legal issues without resolving the questions of fact." (CA-7.) "Accordingly," it held, petitioner's "motion to suppress is denied." (CA-8.) The plain import of the order is that the

32

court had resolved the factual and legal issues in favor of the prosecution and concluded that petitioner's confession was voluntary. The absence of more formal fact findings is of no moment, as due process does not require them. *Sims v. Georgia*, 385 U.S. 538, 544 (1967).[5]

Petitioner's argument that the hearing court did not rule on his involuntariness claim but referred resolution of that question to the jury is implausible. The language of the court's post-hearing order does not support this view. Petitioner bases his claim on the court's concluding statement that "a question of fact as to voluntariness has been presented for determination by the trial jury," but he is mistaken. Instead, this language represents the court's ruling on a related but separate issue of state law. Under CPL § 710.70(4), after the court has ruled that a confession is voluntary and admissible, a defendant is nonetheless entitled to have the jury redetermine his voluntariness

---

[5] Respondent argued this view of the hearing court's order in its main opposition to the petition in the District Court (Dkt. No. 23 at 42, 46), but misguidedly took a different position in its objections to the Magistrate Judge's Report and Recommendations. Upon further consideration, for the reasons explained here, respondent concludes that its original reading of the record best reflects the hearing court's intent and is most consistent with the record as a whole.

claim when reasonable minds could differ on the issue. By its concluding statement, the hearing court recorded its conclusion that the parties' dispute about what occurred during petitioner's questioning was sufficient to permit petitioner to submit his claim of involuntariness to the jury.

Further support for this reading of the hearing court's order is found in a charge conference colloquy. Petitioner's counsel urged the court to instruct the jury to ignore petitioner's confession if they determined that it resulted from improper law enforcement efforts to isolate him from his family. The court denied the request, saying: "that's an issue which . . . was brought up by you in the Suppression Hearing, and I felt at the time – as I do now – as a matter of law, that there had been no trickery or coercion." By contrast, the court observed: "It's going to be a question of fact as to whether or not [the jury believes] his youth and inexperience compelled him to sign his statement admitting something which he now says he didn't do." (CA-894.) This exchange supports the view that the hearing court found the claim of trickery or coercion by isolation was unsupported as a matter of law and should not be submitted to the jury, but the claim of

34

involuntariness by reason of youth and inexperience in the face of police questioning, while rejected by the court, could nonetheless be submitted to the jury.

Other considerations beyond the court's language further support this understanding of the court's words. Petitioner urges this Court to conclude that the hearing court declined to determine voluntariness, following precisely the New York procedure that had been invalidated by the Supreme Court in *Jackson* 27 years earlier. (Pet. Br. 27). That conclusion is utterly implausible in historical context. In response to *Jackson*, New York Court of Appeals revised the procedure for determining the voluntariness of a defendant's confession, *People v. Huntley*, 15 N.Y.2d 72 (1965), and the New York legislature later enacted CPL Article 710 to codify the procedure adopted in *Huntley*. This represented a dramatic change in New York practice, widely known to New York criminal practitioners.

Moreover, the change was demonstrably well known to the particular judge who conducted the hearing. Before taking the bench, he had practiced as a defense attorney for many years and had served as the District Attorney for Rensselaer County, a position he occupied

at the time *Jackson* was decided.  As the District Attorney, he litigated at least one reported case which considered the consequences of *Jackson* on the process for determining the voluntariness of the statement of a defendant whose conviction had been reversed and remanded for retrial.  *People v. La Belle*, 53 Misc. 2d 111 (Rensselaer Cty. Ct. 1967). At the time of the instant trial, he had been on the bench for 14 years. Disputed hearings into the voluntariness of a defendant's statement are staple fare for prosecutors and for judges who preside in criminal cases. Under the circumstances, it is inconceivable that the hearing court was unaware of its obligation to rule, and nothing about this case suggests a reason why it would abdicate that responsibility here.  Because the record can be understood to support the conclusion that the court acted in accordance with well-established law, that reading of the record should prevail.

Petitioner's *Jackson* claim should, therefore, be denied.

### 2. Any *Jackson* error at trial was partially cured by the Appellate Division's ruling rejecting petitioner's isolation claim.

Alternatively, if this Court were to find, contrary to the argument set forth above, that the hearing court did not make the necessary *Jackson* findings, then the error was partially cured by the Appellate Division's decision on direct appeal.[6]   Petitioner argued to that court that his confession was involuntary because he was separated from his parents while the police questioned him, and the court rejected that claim, finding that the separation was not the result of official deception or trickery. *Dearstyne*, 230 A.D.2d at 958.  Accordingly the *Jackson* requirement is satisfied for that particular claim.  If a remand to state court for *Jackson* findings is required, it should be limited to petitioner's claim that the confession was involuntary

---

[6] Respondent previously argued that the Appellate Division's decision on direct appeal made all of the necessary legal and factual determinations, fully satisfying *Jackson*.  While there is some support for that view in the record, on the theory that a court could not determine voluntariness without considering all aspects of the claim, a close review of the briefs and decision suggests that the Appellate Division ruled only on whether the police intentionally isolated him from his parents. *Dearstyne*, 230 A.D.2d at 958.

37

because the police engaged in specific coercive techniques at his actual interview.

### a. The isolation claim was determined by the Appellate Division.

Under *Jackson* and its progeny, where a criminal defendant disputes the voluntariness of his confession, the state court must make an independent judicial determination of voluntariness "in accordance with valid state procedures." *Sims*, 385 U.S. at 544 n.2 (quoting *Jackson*, 378 U.S. at 393). That is precisely what petitioner received here on the claim that isolation and trickery rendered his confession involuntary. The Appellate Division made an independent factual determination that the record did "not establish that [petitioner's] isolation resulted from official deception or trickery." *Dearstyne*, 230 A.D.2d at 958.

It is well settled under New York law that the Appellate Division is empowered to render factual findings of its own. *See* CPL § 470.15(1), (3)(b). Moreover, the Supreme Court has held that deference to state court factual findings "applies equally to findings of trial courts and appellate courts." *Wainwright v. Goode*, 464 U.S. 78, 85 (1983) (citing

38

*Sumner v. Mata*, 449 U.S. 539, 545-47 (1981)); *accord Parke v. Raley*, 506 U.S. 20, 35-36 (1992). Such deference also applies to factual findings (including credibility determinations) that were not explicitly stated by the court but could be inferred from its legal conclusion. *See Wainwright v. Witt*, 469 U.S. 412, 430 (1985); *Marshall v. Lonberger*, 459 U.S. 422, 433-34 (1983); *LaVallee v. Delle Rose*, 410 U.S. 690, 694-95 (1973); *Whitaker v. Meachum*, 123 F.3d 714, 715 n.1 (2d Cir. 1997); *Ventura v. Meachum*, 957 F.2d 1048, 1054-55 (2d Cir. 1992). Accordingly, where a hearing court has conducted a full and fair hearing on voluntariness, but did not expressly decide the issue of voluntariness, the Appellate Division may render its own findings of fact on direct appeal.[7]

Petitioner argues that the Appellate Division's voluntariness findings were unreliable and cannot satisfy the *Jackson* requirement of a judicial determination because the Appellate Division did not observe

---

[7] *Cf., e.g., Key v. Artuz*, No. 99-CV-161JG, 2002 WL 31102627, at *7 (E.D.N.Y. Sept. 16, 2002); *Dallio v. Spitzer*, 170 F. Supp. 2d 327, 334-35 & n.4, 339-40 (E.D.N.Y. 2001), *aff'd*, 343 F.3d 553 (2d Cir. 2003); *People v. Fleming*, 76 A.D.3d 582, 583 (2d Dep't 2010); *People v. Danylocke*, 150 A.D.2d 480, 481 (2d Dep't 1989) (all demonstrating the Appellate Division's authority to make legal and factual determinations when the hearing court has not stated the basis for its ruling).

live testimony, and thus could not have properly made credibility determinations.   He notes that, by contrast, the *Jackson* Court remanded for a live evidentiary hearing.  (Pet. Br. 24-25.)  Petitioner's argument misses the mark.

First, *Jackson* merely requires a determination in accordance with valid state procedures, and both New York and federal law permit appellate courts to make fact findings, including credibility determinations.   Petitioner offers no reason why voluntariness determinations should be treated differently.  Neither respondent nor petitioner has found any decision prohibiting such a procedure, and at least one court has approved the procedure.  *See Williams v. Maggio*, 727 F.2d 1387, 1390 (5th Cir. 1984) (deferring to state appellate court's voluntariness findings).

Second, there is no basis to believe that the Supreme Court considered and rejected the possibility that an appellate court's fact findings could satisfy *Jackson.  See Jackson*, 378 U.S. at 394 n.22.  The remand instructions in *Jackson* and its progeny employed broad language that simply directed a determination under valid state procedures.  *See Jackson*, 378 U.S. at 393; *Swenson v. Stidham*, 409

40

U.S. 224, 229-30 (1972); *Sigler v. Parker*, 396 U.S. 482, 484 (1970); *Sims v. Georgia*, 385 U.S. 538, 544 n.2 (1967); *Boles v. Stevenson*, 379 U.S. 43, 45-46 (1964).[8]  There is no reasonable dispute that the Appellate Division here employed valid state procedures.

Third, the Appellate Division's fact findings here were reliable because the facts of petitioner's alleged isolation are "largely undisputed," as petitioner acknowledges. (Pet. Br. 33.)  For example, the testimony of Detective Petrucci and Trooper Donovan is consistent with Mrs. Dearstyne's testimony about the particulars of their initial conversation and Mr. Dearstyne's testimony about his efforts to locate petitioner.  Thus, the only issues before the Appellate Division were whether the police intentionally isolated petitioner and whether, as a matter of law, that isolation rendered petitioner's confession

---

[8] This Court has held that the dispositive factor in determining whether *Jackson* error has occurred is whether the procedure followed produced a reliable judicial determination of the defendant's voluntariness challenge.  In *United States v. Feinberg*, 383 F.2d 60 (2d Cir. 1967), it found no *Jackson* error where the lower court's ruling that the defendant's statement was voluntary was based on the trial record. This Court held that due process did not demand "a slavish adherence" to a rule requiring a pre-trial voluntariness determination.  *Id*. at 70. As the defendant had received an "'independent judicial determination' on the issue of voluntariness," no purpose would be served by a remand. *Id*. at 70-71; *accord Pinto v. Pierce*, 389 U.S. 31, 32 (1967).

involuntary. As explained in Section I(B)(2), below, the Appellate Division had a reasonable basis to find from the agreed facts that any isolation was not intentional, and that any such isolation did not render the confession involuntary under clearly established Supreme Court law.

In short, neither *Jackson* nor its progeny prohibited state appellate courts from making the requisite factual findings as to voluntariness, and the Appellate Division's procedure satisfied *Jackson's* concern that voluntariness receive a reliable independent judicial determination.

> **b. The coercive questioning claim would be appropriately remanded to state court if it had not been considered and rejected by the hearing court.**

While the Appellate Division resolved petitioner's isolation claim, it was not asked to resolve petitioner's hearing claim that he involuntarily confessed in response to coercive police interview techniques. If the hearing court had not rejected this claim, then it would be appropriate to remand it to state court.

As petitioner acknowledges, a *Jackson* error does not "require[] a new trial." (Pet. Br. 27.) Rather, the Supreme Court has repeatedly held, in *Jackson* and its progeny, that the sole remedy for a *Jackson* error is a remand for a judicial determination of voluntariness "in the state courts in accordance with valid state procedures." *Jackson*, 378 U.S. at 393.

### B. Petitioner's Confession Was Voluntary.

As explained above, both the state hearing court and the Appellate Division found that petitioner's confession was voluntary. Both of those findings are consistent with clearly established Supreme Court law.

To begin, in *Fare v. Michael C.*, 442 U.S. 707 (1979), the Supreme Court held that the voluntariness of a juvenile's confession must be analyzed under the same totality-of-the-circumstances test applicable to adult confessions. *Id.* at 724-26; *accord United States v. Burrous*, 147 F.3d 111, 116 (2d Cir. 1998). Under that test, courts look to "both the characteristics of the accused and the details of the interrogation" that resulted in the confession. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Relevant personal characteristics include the defendant's

"age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare*, 442 U.S. at 725; *accord Burrous*, 147 F.3d at 116; *Green v. Scully*, 850 F.2d 894, 900-02 (2d Cir. 1988). The People need merely prove voluntariness by a preponderance of the evidence. *See Lego v. Twomey*, 404 U.S. 477, 486-87 (1972).

### 1. Petitioner's personal characteristics support a finding of voluntariness.

Here, petitioner's personal characteristics – including his age, experience, education, background, and intelligence – strongly favored a finding of voluntariness. Petitioner, like the defendant in *Fare*, whose confession the Court held was voluntary, was sixteen at the time of the interview. He had recently graduated from the tenth grade, studying grade-level curriculum, and was president of his high school's "Key Club." (CA-212-13, 816.) Further, his hearing and trial testimony revealed him to be a shrewd and well-spoken witness, and adept at parrying questions on cross-examination. (CA-211-12, 217-18.)

Petitioner also had extensive experience with the criminal justice

system. Just two years earlier he had confessed in writing to, and was found guilty of, First Degree Sexual Abuse for his assault of a five-year-old girl whom he had been babysitting – essentially the same type of conduct that he was convicted of here. The Appellate Division was aware of petitioner's prior confession, which was discussed in petitioner's pre-sentencing report and at sentencing, and the Appellate Division, in affirming the sentence, referred to "defendant's prior history of pedophilia." *Dearstyne*, 230 A.D.2d at 959.[9] In addition, as explained below, the details of the interview also supported the state courts' conclusion that petitioner's confession was voluntary, and not the product either of his alleged isolation from his parents or of coercive police conduct at the interview.

---

[9] In his Report and Recommendation, the Magistrate Judge erroneously relied on petitioner's purported lack of experience with the criminal justice system as a factor supporting a finding of involuntariness. (A-238-39.)

45

## 2. Petitioner's confession was not rendered involuntary by his separation from his parents.

Both the hearing court and the Appellate Division properly found that petitioner's separation from his parents did not result from official deception or trickery. Those decisions did not unreasonably apply clearly established Supreme Court law and did not unreasonably determine the facts. 28 U.S.C. § 2254(d)(1)-(2).

As a threshold matter, the Appellate Division correctly held that because petitioner was legally an adult, "there was no requirement [under state law] that his family be present during the police questioning." *Dearstyne*, 230 A.D.2d at 958. Nor is a parent's presence required under federal law. *See, e.g., Fare*, 442 U.S. at 723-27. Rather, federal courts have consistently held that the absence of a juvenile's parents from his police interview is merely one factor among many to be considered in determining whether his confession was coerced. *See, e.g., Hall v. Thomas*, 611 F.3d 1259, 1289 (11th Cir. 2010); *Smith v. Scribner*, 384 F. App'x 672, 673 (9th Cir. 2010); *Rogers v. Quarterman*, 555 F.3d 483, 495 n.9 (5th Cir. 2009); *Gilbert v. Merchant*, 488 F.3d 780, 793 (7th Cir. 2007). There is also no clearly established Supreme Court

46

law that a confession is rendered involuntary simply because a juvenile was prevented from speaking to his parents or vice versa.  *See Hall*, 611 F.3d at 1289 (juvenile was denied request to speak to parents); *Gilbert*, 488 F.3d at 793 (parent was denied request to speak to 14-year-old juvenile); *cf. Fare*, 442 U.S. at 716-24 (finding confession voluntary even though juvenile was not allowed to talk to his probation officer).

In addition, a necessary predicate to a finding of involuntariness is some causal connection between the alleged police "overreaching" and the confession.  *Colorado v. Connelly*, 479 U.S. 157, 164, 170 (1986). Here, even assuming that the police intentionally isolated petitioner from his parents, there is no evidence that this caused him to confess. There is also no evidence that he asked to speak to his parents, which supports the conclusion that he neither wanted nor needed his parents' presence.  Moreover, given petitioner's intelligence and his prior experience with police interview procedures, his will was not likely overborne merely by his parents' absence.  And, it is undisputed that petitioner's parents made no efforts to prevent investigators from questioning petitioner.  Petitioner's mother consented to the officers' interviewing her son when she thought the questioning would occur at

47

her neighbor's home, and petitioner's parents, upon learning that a stationhouse interview was in process, neither requested counsel nor asked that the interview cease. (CA-27-29, 61-62, 176-77, 191-92, 862-64, 875.)

In any event, the record amply supports the state courts' rejection of the various bases from which petitioner argues that the police intentionally sought to isolate him from his parents. While petitioner maintains that Detective Petrucci deliberately misled Mrs. Dearstyne about his proposed interview of petitioner, the record demonstrates that Petrucci simply answered the questions she asked him. Specifically, when Petrucci replied in the negative to her question whether petitioner "was in trouble," his answer was correct, as petitioner was only a suspect at that point. Mrs. Dearstyne did not ask what the interview was about or where it was to take place, and the police were under no obligation to inform her.

Other circumstances of the interview relied upon by petitioner have equally benign explanations. Petitioner was interviewed in Loudonville rather than Rennselaer, where the crimes occurred, because both Trooper Donovan and the child sex abuse expert and

48

primary interrogator, Investigator Girtler, were stationed there. (CA-22, 62-63, 65, 128-29.) Petitioner was brought in through the back entrance to the barracks because it was near the rear parking lot. (CA-25-26, 271, 290-91.) As for Donovan's failure to complete the sign-in "blotter" upon entering, she testified that she forgot to do so, and that such a mistake is so "frequent" and "routine" that the stationhouse has in place a special "time corrected" entry for rectifying such errors. (CA-111-12, 115, 337-38.)

Nor does the record suggest that staff at the Rensselaer stationhouse or the Loudonville barracks attempted to thwart Mr. Dearstyne's efforts to locate petitioner. To the contrary, the record shows that those individuals provided accurate answers based on the information available to them, and made reasonable efforts to assist him. For example, Rensselaer staff suggested that Mr. Dearstyne call Loudonville, where Donovan, Petrucci's partner on this case, was stationed. Staff in Loudonville checked for any record that petitioner and the others were there, and accurately reported that there was none. Apparently, Loudonville made further efforts when Mr. Dearstyne called again, because they located Petrucci and told him that Mr.

49

Dearstyne was on the phone. Petrucci took the call, told Mr. Dearstyne that his son was being interviewed for a sex crime investigation, and petitioner's parents arrived at the barracks shortly afterward.

Under the circumstances, the state courts reasonably rejected petitioner's contention that the three investigators from different commands engaged in a wholesale conspiracy to isolate petitioner from his parents and then conspired to lie about it under oath at the suppression hearing. It is at least "possible" that a "fairminded jurist" could agree with the state courts that petitioner was not improperly isolated from his parents. *Richter*, 562 U.S. at 102-03. Therefore, petitioner's claim should be denied.

### 3. The police interview was not improperly coercive.

The circumstances of petitioner's interview also supported the hearing court's finding that the confession was not coerced, for the following reasons.

First, petitioner testified that he had read, signed, and understood his *Miranda* warnings, including his right to counsel. (CA-204, 213, 218, 861-64.) He also testified that he had read, signed, and understood

50

his written confession, going so far as to add corrections that he initialed. (CA-206-07, 865.) Second, there is no record of petitioner asking to speak to either his parents or an attorney. (CA-75, 99, 133, 156, 863-64.)

Third, the entire daytime interview lasted two to two-and-one-half hours – from 2:00 p.m. at the earliest until petitioner signed his confession at 4:40 p.m. Petitioner acknowledged that he was never "hit" or "threaten[ed]" or "anything like that." (CA-208, 211.) He was asked if he wanted anything to drink or eat and was, at one point, provided with a soda. No more than one hour into the interview, petitioner had already begun to describe the sexual abuse. (CA-76-78, 99, 101, 381.) His confession ran to four handwritten pages. It contained details – such as the dates and details of the three incidents – that went far beyond the barebones oral statement that T.O. had made to the police the previous day (CA-32-33, 91), belying petitioner's contention that the police merely fed the facts to him. To the contrary, petitioner provided certain details – such as the fact that one of the incidents took place during the week of his final exams – that only he could have known.

To be sure, petitioner testified that the police employed

51

coercive tactics. Namely, petitioner claimed, and the police witnesses unanimously denied, that: (1) petitioner asked to make a telephone call and was told to "shut up" and sit down (CA-201); (2) Petrucci told petitioner that, if he did not confess he would be sentenced to twenty-five years in jail where he would be raped, but would receive probation if he did confess (CA-201); (3) Girtler waved a file which he claimed contained evidence in petitioner's face (CA-201); and (4) petitioner cried at one point during the interview (CA-202).

Ample reason exists to discredit petitioner's allegations. To begin, as noted above, all three investigators flatly denied that any of these things occurred, and testified, instead, to a consistent account in which Girtler and petitioner were alone for most of the interview. The police witnesses consistently testified that Petrucci did not even enter the interview room with petitioner, much less engage in a tête-à-tête with him. (CA-27, 47, 97-98, 159, 165.) Furthermore, Girtler explained that his approach encouraged subjects to discuss their general attitudes about sex before bringing the discussion around to the events under investigation. Donovan confirmed that Girtler followed this approach, and that she left the room so that petitioner would be more comfortable

52

discussing his feelings with Girtler. Petitioner's confession is couched in terms of his acting out the pressures he felt to have sex. Girtler's approach was inconsistent with the strong-arm tactics petitioner described. Further, the police testimony was otherwise quite forthright, and did not, for example, conflict materially with the testimony of petitioner's parents.

Moreover, even if most of petitioner's allegations were presumed to be true, they would not require a finding of coercion. *See Procunier v. Atchley*, 400 U.S. 446, 451 (1971). First, even if petitioner did ask to use the telephone, he did not ask to speak to an attorney or to his parents. Requests for counsel, including requests by juveniles, must be unambiguous. *See Fare*, 442 U.S. at 716-24; *accord Berghuis v. Thompkins*, 560 U.S. 370, 380-82 (2010). Second, and similarly, even if petitioner was, in fact, told that he could be sentenced to 25 years' imprisonment, such true statements by the police have not been found to be coercive. *See United States v. Bye*, 919 F.2d 6, 9-10 (2d Cir. 1990); *United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989).

Third, even if Detective Girtler waved an evidence folder in petitioner's face, Girtler could have been holding the notes of Donovan's

interview with T.O., which would have been quite inculpatory. In the alternative, if the alleged envelope had been empty, the Supreme Court has held that such police bluffing at an interrogation can be permissible. *See, e.g., Colorado v. Spring*, 479 U.S. 564, 571-77 (1987); *Frazier v. Cupp*, 394 U.S. 731, 737-39 (1969); *Tankleff v. Senkowski*, 135 F.3d 235, 244-45 (2d Cir. 1998). Finally, even if petitioner cried during the interview, that is hardly conclusive proof that his will was overborne. *See, e.g., Fare*, 442 U.S. at 733 n.2 (sixteen-year-old's confession found voluntary even though tape showed that he cried as he confessed); *Green*, 850 F.2d at 899.

Ultimately, only petitioner's hearing claims that Petrucci told him that he would get five years' probation if he confessed and that he would be raped in prison if he refused to confess, could have resulted in a finding of coercion if credited. (CA-202.) This factual dispute was, of course, for the hearing court to resolve. The hearing court's determination must be presumed correct absent clear and convincing evidence to the contrary, which evidence petitioner has never provided. 28 U.S.C. § 2254(e)(1). The hearing court implicitly concluded that petitioner's testimony was not credible, after weighing the consistent

54

testimony of three investigators in good standing against the self-serving testimony of an admitted pedophile facing a long stretch in prison.

In short, petitioner's confession was voluntary when considered under the totality of the circumstances. Accordingly, the hearing court's determination did not unreasonably apply *Fare* or unreasonably determine the facts. *See* 28 U.S.C. §§ 2254(d)(1)-(2).

## POINT II

### THE APPELLATE DIVISION REASONABLY APPLIED SUPREME COURT LAW BY DENYING PETITIONER'S INEFFECTIVE COUNSEL CLAIM

The Appellate Division reasonably held that petitioner received effective assistance from his trial counsel. Petitioner's claim relies on his assertion that counsel failed to consult with or retain experts. But that assertion relies solely on counsel's affirmation presented in this habeas proceeding, which cannot be considered by this Court. *See Cullen v. Pinholster*, 563 U.S. 170, 180-87 (2011). Moreover, counsel's strategy of challenging the prosecution's evidence that the victims exhibited indicia of sexual abuse through cross-examination and

summation argument was reasonable. The prosecution offered no experts of its own requiring expert rebuttal, and calling defense experts would have given the prosecution an opportunity to elicit further incriminating information. And, the proof of petitioner's guilt was overwhelming, as it included petitioner's detailed confession to multiple instances of abusing one victim and his acknowledgement of his access and attraction to the second. Therefore, the Appellate Division's rejection of petitioner's ineffective assistance claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

Nonetheless, this Court could appropriately hold this claim in abeyance pending state court proceedings if it determines, contrary to Respondent's argument in Point I, that the hearing court did not decide the voluntariness of petitioner's confession and remands the case, or a portion of it, to state court for that determination. That is so, because if the state court were to determine that petitioner's confession was involuntary, petitioner would be entitled to a new trial in which the confession is not admitted, and his challenge to counsel's effectiveness at the first trial would be moot.

## A.   Standard of Review

A habeas petitioner seeking to establish that his trial counsel was ineffective must demonstrate that his attorney's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).

On habeas review of a *Strickland* claim, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'"  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citation omitted).

## B.   Trial    Counsel    Provided Overall Effective Assistance.

Counsel's performance, viewed in the aggregate, was effective.  In the face of strong evidence of petitioner's guilt, counsel vigorously advocated for petitioner while highlighting the weaknesses in the People's case.

At the suppression hearing, counsel extensively cross-examined

the People's witnesses and presented three witnesses on petitioner's behalf. Counsel submitted a substantial memorandum of law in support of the suppression motion. Counsel also filed and argued a complex motion to dismiss on speedy trial grounds.

At trial, counsel adeptly cross-examined each of the People's witnesses. For example, counsel mounted pointed cross-examinations of the three police witnesses regarding petitioner's confession. Counsel also presented his own witnesses regarding the circumstances of the confession, including petitioner himself, his parents, and his sister. Moreover, counsel mastered the victims' medical records and skillfully cross-examined Dr. Theodore Close, T.O.'s treating physician. Counsel undermined Dr. Close's direct testimony by introducing, over the People's staunch objection, reports from the New York State Police stating that T.O.'s underpants and samples from her vagina had tested negative for sperm. (CA-721-25, 773-84, 1014-15.)

Throughout the trial, counsel offered appropriate objections and made various well-argued motions, which included: alleging *Brady* violations (CA-448-50); objecting to the unsworn testimony of T.O. and C.C. as well as the third complainant's sworn testimony (CA-462-63,

529-30, 581-82); and arguing that the admission of the victims' medical records violated petitioner's right to confront witnesses (CA-662-71, 896-99). The court granted counsel's motion to dismiss four counts, holding that petitioner's confession with respect to certain acts involving T.O. had not been sufficiently corroborated. (CA-696-702.)

Counsel persuaded the court to submit lesser included offenses to the rape charge. (703-12, 719-20, 881.) Counsel also pressed the court for a specific instruction that the jury, in evaluating the voluntariness of petitioner's confession, could consider what the defense maintained was police deception to isolate petitioner from his parents (CA-714-15, 887-96), and successfully requested a specific charge regarding the requirement that the testimony of unsworn witnesses be corroborated (CA-715-19, 882-87).

Finally, counsel delivered a well-argued summation, asserting that petitioner's written confession was "nothing more than the result of deception by the authorities in trying to get something from [petitioner]," and that there were "many ways to twist a 16-year-old around, to intimidate a 16-year-old." (CA-906-07.) Counsel also argued that Dr. Close's testimony regarding his examination of T.O. was flatly

contradicted by state police reports which found no sperm in the materials recovered from T.O., and that the remaining medical evidence offered by the People was ambiguous and unsupported by the testimony of a treating physician, much less a medical expert. (CA-905-14.)

As a result of counsel's advocacy, the jury acquitted petitioner of the most serious charge, Rape in the First Degree, with respect to T.O., and both counts with respect to the third complainant. (CA-931.) Petitioner also received less than the maximum sentence allowed. In short, counsel's performance, in the aggregate, was excellent. "[I]t is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Richter*, 562 U.S. at 111.

## C.   Petitioner's Complaints About Trial Counsel Are Baseless.

Petitioner's assertion that trial counsel failed to consult with or retain any experts fails, first, because it is unsupported by the record before the state court in the trial and post-conviction proceedings.  The only evidence petitioner points to for counsel's alleged failure is an affirmation from counsel Grimmick that was executed and submitted in 2005 in this federal habeas action at the direction of the Magistrate Judge.  (A-195-99.)  However, that affirmation, describing  some steps taken by counsel in preparation for trial, is inadmissible in this proceeding because the Supreme Court subsequently held that federal habeas "review is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 180-87 (2011); *accord Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Ridgeway v. Zon*, 424 F. App'x 58, 59-60 (2d Cir. 2011).  Absent the now inadmissible affirmation, petitioner has nothing to support his claim.  "[T]he absence of evidence cannot overcome the 'strong presumption'" that counsel's conduct was reasonable.  *Burt v. Titlow*, 134 S. Ct. at 17 (quoting *Strickland*, 466 U.S. at 689); *accord Richter*, 562 U.S. at 109.

In similar circumstances, this Court affirmed the denial of an

61

ineffective counsel claim in a child sex abuse case where, as here, the "sparse" state-court record "failed to establish conclusively that [petitioner's] counsel had not consulted a medical expert." *Ridgeway*, 424 F. App'x at 59-60. This Court held that, even though "additional information proffered before the District Court appears to lend some credence to [petitioner's] claims" regarding counsel's consultation with an expert, *Pinholster* prohibited the Court from considering that evidence. *Id.* at 60.

In any event, counsel's habeas affirmation does not support petitioner's claim because it did not address whether he had consulted or retained any experts. Petitioner argues to this Court that counsel's failure to mention experts in his affidavit describing his trial preparation shows that he did not consult any (Pet. Br. 38-39), but that is not necessarily so.

Moreover, even if petitioner had established in state court that counsel did not consult with or retain an expert, counsel's decision could still be considered a reasonable strategic choice. Counsel's decision not to call experts was part of a clear strategy to point out the ambiguities of the People's case, emphasize to the jury that there were no experts to

interpret the evidence, and argue that, without that expert explanation, the People's proof failed to establish sexual abuse beyond a reasonable doubt.

That strategy was approved by the Supreme Court in *Harrington v. Richter*. There, counsel was criticized for not consulting with experts in serology and blood pattern evidence after learning that the prosecution intended to offer such experts. *Richter*, 562 U.S. at 92-95. The Court reversed the grant of the writ, finding that the circuit court had disregarded the "doubly" deferential standard to be applied to *Strickland* cases under AEDPA review. *Id*. at 91-92, 105. The Court observed that "[e]ven if it had been apparent that expert blood testimony could support Richter's defense, it would be reasonable to conclude that a competent attorney might elect not to use it" because of the possibility that such evidence could backfire. *Id*. at 108. The Court also noted that, "[t]o support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Id*. at 109. "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an

63

equal and opposite expert from the defense." *Id.* at 111. Rather, "[i]n many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict." *Id.*

Moreover, habeas courts are "required not simply to give [the] attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." *Pinholster*, 563 U.S. at 196 (citation omitted); *accord Richter*, 562 U.S. at 110. "Although courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions." *Richter*, 562 U.S. at 109 (citations omitted). Thus, the state court did not err by deducing counsel's trial strategy and finding it reasonable, even absent a statement from counsel that explained his strategy.

### 1. Medical expert

#### a. Medical evidence involving T.O.

The record establishes that counsel had a reasonable strategy of declining to call an expert medical witness as to T.O., in light of the People's failure to call their own expert, the danger that a defense expert's testimony could backfire, and counsel's effective cross-examination of the People's witnesses. For largely the same reasons, there is no reasonable probability that counsel's decision not to call an expert affected the verdict. Indeed, given petitioner's detailed confession that he abused T.O., the jury likely required very little corroborating evidence to convict.

On cross-examination, counsel vigorously attacked the findings of Dr. Close, T.O.'s treating pediatrician, and successfully elicited: that T.O.'s vaginal drainage could have been caused by an infection (CA-633); that the scrape found on the internal wall of T.O.'s vagina could have been caused by T.O.'s own finger (CA-635, 640); and that the enlargement of T.O.'s hymen was only "borderline" suspicious (CA-635-36). In summation, counsel tied these points together and further noted that "Dr. Close acknowledged that he's not a pathologist, not somebody

who is an expert in diagnosing sexual abuse." (CA-911.) Counsel highlighted the findings of the New York State Police lab that no sperm was present in either T.O.'s underwear or vagina, contradicting Dr. Close's testimony and casting all of his conclusions into doubt. (CA-911-12.) Counsel's performance, including, for example, his questions regarding the measurement of T.O.'s hymen, demonstrated his mastery of the medical evidence and understanding of the indicia of sexual abuse. His forceful cross-examination of Dr. Close likely resulted in petitioner's acquittal on the rape charge. *See Richter*, 562 U.S. at 111.

Petitioner's counsel had plainly intended to cross examine the hospital physician who subsequently examined T.O. But because that witness was unavailable at the time of trial, the court admitted T.O.'s hospital medical records with all medical conclusions redacted (CA-650-51, 694-95.) Under the circumstances, counsel can hardly be faulted for the physician's last-minute unavailability, or the trial court's decision to admit the redacted records without sponsoring testimony.

In any event, petitioner's counsel turned that ruling to his advantage in his summation by repeatedly citing the People's failure to offer expert medical testimony that could explain the records, and

arguing that, as a result, the medical evidence did not establish abuse. (CA-911-12.) Counsel noted that the records "weren't interpreted by a physician, so who knows what they mean. We don't have expert testimony that tells what they mean." (CA-912.) The Supreme Court noted in *Richter*, 562 U.S. at 111, that "the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict."

Indeed, after learning that the hospital physician would not testify, counsel reasonably may have decided not to call an expert witness, simply because a defense expert could have been cross-examined to explain the inculpatory but otherwise confusing hospital records. Counsel may have decided that it would be better to leave the records unexplained than to take the chance of expert testimony that could backfire. Such tactical decisions should not be second-guessed. *See Richter*, 562 U.S. at 108.

In light of counsel's effective cross-examination of Dr. Close, counsel's attacks on the hospital records as unexplained and ambiguous, and counsel's clear mastery of the medical evidence, petitioner has failed to establish that additional expert medical input or

67

testimony was necessary or that it would have altered the outcome of petitioner's trial. *See Richter*, 562 U.S. at 111.

The affidavit from Dr. Robert Fay criticizing the work of Dr. Close and the hospital, submitted by petitioner to the state court, does not alter this conclusion. To begin, Dr. Fay conducted no clinical examinations of his own, and did not indicate that he tested any of the relevant medical evidence collected. (CA-9 ¶ 2.)

Moreover, Dr. Fay's conclusions showed that his testimony would have either damaged petitioner's defense or had no effect at all. First, Dr. Fay contended that Dr. Close erred by concluding that yellow discharge from T.O.'s vagina was semen. (CA-9 ¶ 2.) Of course, petitioner's counsel introduced State police findings to the same effect into evidence, then highlighted this very contradiction in summation, which probably led to petitioner's acquittal on the rape charge. Dr. Fay's testimony on this point would have been redundant and could not have accomplished any more.

Dr. Fay's other criticisms of Dr. Close fare no better. Dr. Fay questioned whether, without the use of a speculum, Dr. Close could have seen the scratches in the vagina that he reported, if the scratches

were not accompanied by bleeding. (CA-9 ¶ 4.) But Dr. Close testified that the abrasion was "just inside the beginning of [T.O.'s] vagina," and was likely the source of the blood in T.O.'s underpants. (CA-633-34, 640.) While it may have been "extremely difficult" for Dr. Close to see the scratches, Dr. Fay was hardly in a position to dispute Dr. Close's observation.

Dr. Fay also asserted that Dr. Close's examination was deficient because he failed to note "hymenal clefts or notches that the Albany Medical Center physicians encountered." (CA-9-10 ¶ 4.) But because "hymenal clefts or notches" are symptoms of sexual abuse – "indications of penetrating trauma," *Gersten v. Senkowski*, 426 F.3d 588, 599 (2d Cir. 2005) – Dr. Fay's observation would have simply highlighted for the jury inculpatory information in the hospital records that might have otherwise escaped the jury's attention.

In short, if Dr. Fay's testimony had been offered at trial, it would have added little to defense counsel's vigorous cross-examination of Dr. Close, it might have highlighted damaging information, and it would

have risked exposing Dr. Fay to the prosecution's cross-examination.[10]

Finally, the proof that petitioner abused T.O. was overwhelming, as it included petitioner's detailed confession, the reports of T.O.'s extremely unusual behavior around the time of the attacks, testimony from Dr. Close, and the Albany Medical Center records. Accordingly, given the "wide latitude" to be applied to state court decisions denying ineffectiveness claims alleging the failure to retain experts, it is not merely "possible" but overwhelmingly likely that a "fairminded jurist" could agree with the Appellate Division's decision denying petitioner's ineffectiveness claim. *Richter*, 562 U.S. at 106.

---

[10] Petitioner complains that counsel should have cross-examined Dr. Close with studies that allegedly call into question the reliability of hymenal examinations as a basis for determining sexual abuse. (Pet. Br. 43-44.) However, Dr. Fay's affidavit did not mention such studies or this possible line of questioning. (CA-9-10.) Thus, the County Court did not have this information before it when considering petitioner's claim of ineffectiveness.

It also bears noting that, under *Pinholster,* this Court may not consider Dr. Close's declaration (A-192-94), because it was submitted solely in this habeas proceeding.

## b. Medical evidence involving C.C.

To prove the charges involving C.C., the prosecution presented neither expert testimony nor the testimony of a treating physician, as the physician who examined C.C. at Albany Medical Center was abroad at the time of trial. (CA-673-76.) The prosecution offered the doctor's medical records which, according to the trial court, stated the following: "Redness seen at 3:00 to 9:00 o'clock in the peri-hymenal. Hymen is not attached. Old healer seen at 1:00 o'clock position." (CA-663-66, 679-80, 695.) According to the trial court, the records originally included the doctor's "assessment" that the "findings of a hymenal tear are indicative of attempted vaginal penetration and would be consistent with the history of alleged sexual abuse." (CA-665-66.) Upon counsel's objection, on Confrontation Clause grounds, to admission of the records, the trial court ordered the redaction of the doctor's highly damaging assessment. (CA-659-71, 680.)[11]

---

[11] Petitioner's Appendix contains an excerpt from C.C.'s unredacted medical records. (CA-946.) That document was not, however, submitted in any form as part of petitioner's CPL § 440.10 papers. Accordingly, this habeas court is limited to considering the trial court's description of those records (CA-666). *See Pinholster*, 563 U.S. at 180-87.

As in the case of T.O., petitioner's claim rests on his assertion, with no basis in the state court record, that counsel failed to consult with or retain a medical expert as to the charges involving C.C. As noted above, counsel's affidavit is not admissible on habeas under *Pinholster*, and does not in any event show that counsel failed to consult a medical expert, and nothing in the state court record establishes that claim either.

Moreover, the decision not to consult or call an expert to testify was an entirely reasonable strategic decision. Counsel reasonably may well have decided, after learning that C.C.'s doctor would not testify, that it would be too dangerous to call an expert who could then be cross-examined to explain C.C.'s otherwise confusing hospital records. *See Richter*, 562 U.S. at 108. Here again, counsel took advantage of the situation by highlighting the People's failure to offer any testimony explaining C.C.'s medical condition or her medical records. In his summation, counsel argued, among other things, that because the People offered no expert interpretation of C.C.'s medical records the People had thus failed to carry their burden of proof. (CA-912.)

Moreover, petitioner offered the state court no explanation at all

from a reliable authority as to what a medical expert would have added to petitioner's case regarding C.C., either as a consultant or as a testifying witness. The Fay affidavit, discussed above, related solely to T.O. and did not discuss C.C. at all.

The record shows that it was counsel's strategy to cross-examine C.C.'s doctor regarding, among other things, her medical records, just as counsel had effectively cross-examined T.O.'s doctor. Counsel can hardly be faulted for not foreseeing the physician's unavailability. *See Richter*, 562 U.S. at 110. Moreover, petitioner's case clearly benefitted from the redaction of the highly inculpatory conclusions recorded by C.C.'s doctor.

Finally, petitioner erroneously minimizes the strength of the People's case involving C.C., which included: C.C.'s own testimony; the testimony regarding C.C.'s unusual behavior; her physical symptoms based on her medical records; and petitioner's own confession. Petitioner attempts to discount the probative power of petitioner's confession with respect to C.C., but the fact remains that petitioner admitted that: he molested T.O. on several occasions; he had access to several young girls his mother babysat for, including a two-year-old

with C.C.'s first name; and he sexually desired those girls. The jury could have reasonably concluded that petitioner did not expressly confess to abusing C.C. because the police were then unaware that petitioner had abused C.C. and did not ask petitioner about her. In short, petitioner's confession, together with the other evidence involving C.C., amounted to substantial proof of guilt.

Given counsel's capable cross-examination of the People's witnesses regarding C.C., the failure of the People to offer any medical testimony, and the obvious danger of offering a defense expert, there is no reasonable probability that the verdict as to C.C. would have changed had counsel offered the testimony of a medical expert.

Accordingly, the state court's denial of petitioner's claim was not an unreasonable application of *Strickland*.

### 2. Psychiatric expert

Equally without foundation is petitioner's assertion that counsel erred by not consulting with or offering the testimony of a psychiatric expert to rebut the prosecution's argument that evidence of the victims' changed behavior supported the charges that petitioner sexually abused them.

74

First, it appears unlikely that the trial court would have allowed the defense to offer the testimony of a psychiatric expert to explain the victims' behavior, given that the court earlier prohibited the prosecution from offering a psychologist to make "observation[s] any layman can make." (*See* CA-440, 473-74, 717-18.)

Second, petitioner offered no evidence to the state court establishing that counsel failed to consult with or retain a psychiatric expert. Counsel may simply have decided, as a strategic matter, not to call his own psychiatric expert after learning that the People would not be permitted to call their expert. Counsel reasonably may have calculated that expert testimony would, at best, belabor the obvious, and at worst, lead to damaging admissions.

For example, petitioner's proposed expert, Richard A. Gardner, offered only cookie-cutter conclusions that were purely "hypothetical," and not based on "any clinical evaluations." (CA-998 ¶ 5.) Gardner merely concluded that T.O.'s and C.C.'s behavior and psychological changes "do not necessarily indicate sexual abuse." (CA-1001-04 ¶¶ 13, 16, 22.) But that statement acknowledges, to petitioner's detriment, that the observed changes could be consistent with sexual abuse.

75

Counsel also may have reasonably been concerned that on cross-examination, the People would elicit damaging testimony regarding "Child Sexual Abuse Accommodation Syndrome" (CSAAS). *See People v. Nicholson*, 26 N.Y.3d 813, 827-28 (2016).

Third, regardless of whether counsel had consulted or retained an expert, counsel's conduct demonstrated a clear strategy of poking holes in the People's case through cross-examination and then highlighting the absence of expert psychiatric evidence connecting the children's behavioral changes to sexual abuse. For instance, counsel argued on summation that the People's interpretation of the victims' changed behavior was little but "dime story psychology" (CA-910), and that the behavior described by the complainants' mothers could be the perfectly normal acting-out of a three-year-old, that only appeared troubling in hindsight. (CA-912.) Counsel also argued – based on testimony that C.C.'s mother met with the prosecution maybe "[f]ifty times" (CA-571-73) – that the mothers' testimony about behavioral changes "seemed kind of pat, seemed kind of set, and they had been talking to the prosecution over the years a number of times" (CA-910). These were all arguments that any layperson could readily understand without the aid

76

of expert testimony.  (*See* CA-473-74.)

Fourth, had petitioner offered Gardner as a psychiatric expert, the People almost certainly would have attacked him as a hired gun whom later courts criticized for propagating a controversial theory based on "parental alienation syndrome."[12]

Finally, as noted above, the People put on a strong case against petitioner regarding the charges involving both T.O. and C.C.  Given the court's likely rejection of a psychiatric expert, the modest benefit of such testimony, and the possibility that the testimony could backfire, it is not reasonably probable that counsel's decision not to offer such testimony affected the outcome of petitioner's case.

---

[12] *See People v. Fortin*, 184 Misc. 2d 10, 11-14 (Nassau Cty. Ct. 2000), *aff'd*, 289 A.D.2d 590, 591 (2d Dep't 2001); *People v. Loomis*, 172 Misc. 2d 265, 267-68 (Suffolk Cty. Ct. 1997); *Tungate v. Commonwealth*, 901 S.W.2d 41, 42-44 (Ky. Sup. Ct. 1995).

## D. Petitioner's Second Circuit Authority Is Distinguishable.

Petitioner's brief relies overwhelmingly on four decisions of this Court. *See Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005); *Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003); *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001); *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001). That reliance is misplaced.

First, circuit precedent is not "clearly established federal law as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), and thus cannot provide the basis for habeas relief. *Renico v. Lett*, 559 U.S. 766, 779 (2010); *accord White v. Woodall*, 134 S. Ct. 1697, 1702 n.2 (2014); *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450-51 (2013); *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012); *see also Rodriguez v. Miller*, 537 F.3d 102, 109 (2d Cir. 2008). Circuit court decisions cannot even be employed to "illuminate" Supreme Court precedent, *Renico*, 559 U.S. at 779, or "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced," *Marshall v. Rodgers*, 133 S. Ct. at 1450.

All of the Second Circuit decisions cited by petitioner predated the *Renico* Court's announcement in 2010 that "clearly established Federal

law" includes only Supreme Court holdings, and must steer clear of circuit court authority. Accordingly, and quite understandably, the four cited Second Circuit cases relied overwhelmingly on other circuit authority and even law review articles, and thus failed to follow the "clearly established Supreme Court law" standard announced in *Renico*.[13]

The Second Circuit decisions are also distinguishable on the merits. In all four cases, unlike the instant case, petitioner established that defense counsel had failed to consult with any expert medical witness. *Gersten*, 426 F.3d at 607-08; *Eze*, 321 F.3d at 128; *Pavel*, 261 F.3d at 223-24; *Lindstadt*, 239 F.3d at 201-02. In all four cases, the People had offered a medical expert, and in all but *Pavel*, the People had also offered a psychiatric expert. Here, by contrast, the People offered no experts, as Dr. Close was not qualified as an expert. In all four cases, this Court found that the People's experts had offered erroneous testimony that could have been flatly refuted, either on cross-

---

[13] The Supreme Court has held, however, that lower court decisions may still be employed to find that some "fairminded jurist" could agree with the state court's decision, thus *denying* habeas relief. *White*, 134 S. Ct. at 1703 n.3; *accord Jones v. Murphy*, 694 F.3d 225, 242 n.9 (2d Cir. 2012).

examination or through defense experts who could have conclusively established that there had been no abuse. And in all four cases, unlike here, counsel failed to educate himself regarding the relevant medical issues, and thus was unable to conduct an effective cross-examination of the People's witnesses. *See Gersten*, 426 F.3d at 608-10; *Eze*, 321 F.3d at 129; *Pavel*, 261 F.3d at 224-25; *Lindstadt*, 239 F.3d at 201-02. Finally, none of the cases involved a confession by the defendant, much less a detailed confession to repeated incidents of abuse.

## CONCLUSION

For the reasons set forth above, this Court should affirm the order of the district court denying the petition for a writ of habeas corpus.

Dated:     New York, New York
             August 19, 2016

Respectfully submitted,

BARBARA D. UNDERWOOD
  *Solicitor General*
NIKKI KOWALSKI
  *Deputy Solicitor General*
  *for Criminal Matters*
PAUL B. LYONS
  *Assistant Attorney General*
  *of Counsel*

ERIC T. SCHNEIDERMAN
  *Attorney General of the*
  *State of New York*
Attorney for Respondent-Appellee

By:   /s/ Paul B. Lyons
       Paul B. Lyons
       Assistant Attorney General

120 Broadway
New York, NY  10271
(212) 416-8229
Paul.Lyons@ag.ny.gov

81

## CERTIFICATION PURSUANT TO RULE 32(a)(7)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, according to the word count function of the word processing program used to prepare the accompanying brief, this brief contains 14,575 words, excluding the cover, tables of contents and authorities, Rule 32(a)(7)(B) certification, and declaration of service.

2.     This type complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Word Version 2010 in 14 Point Century Schoolbook.

/s/ Paul B. Lyons
PAUL B. LYONS
Counsel for Respondent-Appellee

Dated:  August 19, 2016